Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Marc A. Goldich (*pro hac vice*)
AXLER GOLDICH, LLC
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 207-2920
mgoldich@axgolaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER NELSON, individually and on behalf of all others similarly situated, | No. 5:16-cv-00523-RMW |
| Plaintiff, | AMENDED CLASS ACTION COMPLAINT |
| v. | |
| SEAGATE TECHNOLOGY LLC, | DEMAND FOR JURY TRIAL |
| Defendant. | |

AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   PARTIES ............................................................................................................3

III.  JURISDICTION AND VENUE .........................................................................3

IV.   FACTUAL ALLEGATIONS .............................................................................4

     A.    Background Information ..........................................................................4

          1.    Hard Drives Generally..................................................................4

          2.    The Drives ....................................................................................6

     B.    Seagate Markets and Advertises Its Drives as Highly Reliable, Having Extremely Low Failure Rates, and Suitable for RAID and NAS ...............................................7

     C.    Defendant's Statements and Data are False, Misleading, and Deceptive, and Defendant Failed to Disclose the Drives' Defects and Unsuitability for RAID/NAS13

          1.    The Backblaze Reports .................................................................13

          2.    The Drives Are Not Designed for RAID 5 and Are Not Suitable for Any Level of RAID or NAS.................................................................18

          3.    Defendant Failed to Disclose the Drives' Defects and Their Unsuitability for RAID and NAS.................................................................18

     D.    Seagate's Warranty on the Drives .........................................................20

     E.    The Plaintiff's and the Class' Experience With Failed Seagate Drives ...................21

     F.    Class Members' Experience with the Drives .........................................23

V.    CLASS ACTION ALLEGATIONS....................................................................28

VI.   VIOLATIONS ALLEGED .................................................................................31

FIRST CLAIM FOR RELIEF  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (ON BEHALF OF PLAINTIFF AND THE CLASS) .................................................31

SECOND CLAIM FOR RELIEF  VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (ON BEHALF OF PLAINTIFF AND THE CLASS) .................................................36

THIRD CLAIM FOR RELIEF  VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (ON BEHALF OF PLAINTIFF AND THE CLASS) ............................38

FOURTH CLAIM FOR RELIEF  BREACH OF EXPRESS WARRANTY  (ON BEHALF OF PLAINTIFF AND THE CLASS) .................................................................40

FIFTH CLAIM FOR RELIEF  BREACH OF IMPLIED WARRANTY (ON BEHALF OF PLAINTIFF AND THE CLASS) .................................................................43

SIXTH CLAIM FOR RELIEF  BREACH OF EXPRESS WARRANTY (ON BEHALF OF THE PLAINTIFF AND SOUTH DAKOTA SUBCLASS)............................................................45

SEVENTH CLAIM FOR RELIEF  BREACH OF IMPLIED WARRANTY (ON BEHALF OF PLAINTIFF AND THE SOUTH DAKOTA SUBCLASS)................................................47

EIGHTH CLAIM FOR RELIEF  VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION STATUTE (ON BEHALF OF PLAINTIFF AND THE SOUTH DAKOTA SUBCLASS)................................................49

NINTH CLAIM FOR RELIEF  UNJUST ENRICHMENT (ON BEHALF OF PLAINTIFF AND THE CLASS)..............................................................................................................51

PRAYER FOR RELIEF ............................................................................................................52

JURY DEMAND........................................................................................................................53

Christopher Nelson, by his designated attorneys, individually and on behalf of all others similarly situated, for his Amended Complaint, allege as follows based upon personal knowledge, the investigation of counsel, information and belief, and publicly available information:

## I.      INTRODUCTION

1.      This is a class action arising from Defendant Seagate Technology, LLC's ("Defendant") repeated failure and inability to deliver non-defective hard drives that conform to their express and implied warranties; its breach of consumer protection, unfair competition, and false advertising laws; and its unjust enrichment.

2.      In October 2011, Defendant released the Seagate Barracuda 3TB Internal Hard Disk Drive ("Internal Barracuda").  Defendant subsequently released external versions of the Barracuda, such as the Seagate Backup Plus 3TB External Hard Disk Drive (hereafter "Backup Plus") and the Seagate FreeAgent GoFlex 3TB External Hard Disk Drive (hereafter "GoFlex") (collectively referred to as "Drives").

3.      Defendant claimed, and continues to claim and market, on its website and in its promotional and informational publications that the Drives are reliable, dependable, have extremely low failure rates, and are suitable for Network Attached Storage ("NAS") devices and Redundant Array of Independent Disk ("RAID") configurations.

4.      The Drives are not, however, reliable or dependable and they do not have low failure rates.  Rather, they contain latent, model-wide defects that cause them to fail prematurely at spectacularly – and in many respects unprecedentedly – high rates.

5.      As demonstrated by consumer experience and reports released by Backblaze, a data backup company, the true failure rate of the Drives is substantially higher than advertised and the Drives do not last nearly as long as comparable devices from other manufacturers or even other models manufactured by Defendant.  Indeed, rather than having an advertised annualized failure rate of *less than 1%*, Backblaze reported that the annualized failure rate of the Drives is as high as 47.2%.

6.      Moreover, contrary to Defendant's representations, the Drives are not designed for certain types of home RAID configurations.   In fact, the Drives are not suitable for *any* type of RAID or NAS due to their tendency to suddenly fail.

7.      The Drives, which were shipped by Defendant with a latent defect before being sold to and purchased by Plaintiff and Class Members, failed after unreasonably short intervals including, without limitation, failures that occurred less than a year after purchase. Indeed, many Class Members purchased Drives that failed months, weeks, or even days after purchase.

8.      Because Defendant misrepresented, among other things, the quality, reliability, failure rate, and proper uses of the Drives, it violated state consumer protection and false advertising laws.

9.      Defendant also violated state consumer protection laws by making material omissions and otherwise failing to disclose the Drives' defects and their true qualities, characteristics, and proper uses.  Defendant's factual omissions and concealments regarding the quality, reliability, failure rate, and proper uses of the Drives were material because reasonable persons in the position of the Plaintiff and Class Members would have wanted to know about the true nature of Drives, let alone the existence of a latent defect, prior to making a purchasing decision.

10.      Defendant expressly warranted that it would replace failed Drives with "functionally equivalent" hard drives, but the replacements provided to Plaintiff and Class Members, like the original Drives themselves, were inherently defective and failed at extremely high rates. Thus, the warranties failed of their essential purpose because Defendant never delivered non-defective, conforming Drives.

11.      Defendant also breached the implied warranty of merchantability because all Drives, at the time they left the possession of Defendant, contained an inherent and latent defect that caused them to be substantially below the quality generally accepted in the market; unsuitable for their ordinary purpose, which is data storage; and inadequately packaged and labeled.

12.      This suit is brought on behalf of Plaintiff and all other purchasers of Defendant's Drives for violations of the California Unfair Competition Law, the California False Advertising Law, the California Consumer Legal Remedies Act, the South Dakota Deceptive Trade Practices and Consumer Protection Statute, breach of express and implied warranties, and unjust enrichment.

13.      As a result of these violations and breaches, this action seeks restitution; damages arising from replacement costs, loss of data, and data recovery expenses; other actual, consequential,

and incidental damages; interest; reasonable attorneys' fees and costs; and any other relief the Court deems just and appropriate.

## II.     PARTIES

14.     Plaintiff Nelson is a natural person and a citizen of South Dakota who purchased a Backup Plus in South Dakota.

15.     As set forth herein, Plaintiff and Class Members suffered ascertainable losses, namely the loss of money, financial injury, and damages as a direct and proximate result of the acts and omissions committed by Defendant.

16.     Defendant Seagate Technology, LLC is a hard drive manufacturer and distributor incorporated in Delaware and has its principal place of business in Cupertino, California. Defendant, along with its subsidiaries, affiliates, and parent corporations, is the second largest hard drive manufacturer in the world. Defendant markets, advertises, and sells hard disk drives and other hardware and software products throughout the United States and the world, including in the state of South Dakota.

## III.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because there are more than 100 proposed Class Members, some members of the proposed class and the Defendant are citizens of different states, and the amount in controversy exceeds $5 million.

18.     This Court has personal jurisdiction over Defendant because Defendant has its principal place of business in Cupertino, California and directs all of its operations from there. Alternatively, this Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with California such that the exercise of jurisdiction by this Court is consistent with notions of fair play and substantial justice.  A substantial portion of the wrongdoing alleged in this Amended Complaint took place in California; Defendant conducts business in California and otherwise avails itself of the protections and benefits of California law through the promotion, marketing, and sale of its Drives in the State; and this action arises out of or relates to these contacts.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant has its principal place of business in Cupertino, California and directs all of its operations from there.

20.     Intradistrict Assignment:  Assignment to the San Jose division of this Court is appropriate because Defendant's headquarters and principal place of business is in Cupertino, California. Because this action arises in the county of Santa Clara, pursuant to Northern District of California Local Rule 3-2, assignment to the San Jose division is proper.

## IV.     FACTUAL ALLEGATIONS

### A.     Background Information

#### 1.     Hard Drives Generally

21.     A hard disk drive ("HDD" or "hard drive") is an electromechanical data storage device used for storing and retrieving information for a computer using rotating discs – which are called platters – coated with magnetic material with motors to spin or "drive" the discs.

22.     HDDs use a moving actuator arm – known as a head arm – to read and write data by magnetically changing or reading areas on the platters pursuant to instructions sent from the computer. The head arm is powered by an actuator motor called the servo motor.

23.     In addition to mechanical components, hard drives also have firmware embedded in their memory. Firmware is a type of software that governs how a piece of hardware functions. In plain terms, it is "software for hardware."

24.     Storage capacity of HDDs is typically measured in terms of gigabytes ("GB") and terabytes ("TB"). One GB is 1,000 megabytes, and one TB is 1,000 GB, or one million megabytes.

25.     There are two main types of hard drives: Internal and external. An internal hard drive is installed inside the casing of a computer. An external hard drive is enclosed in its own casing, has an external power supply, and is connected to a computer with Universal Serial Bus ("USB") cables or similar types of connectors.

26.     Some hard drives can also be used in NAS and RAID devices.

27.     NAS is a computer appliance that acts as a data storage server. In other words, it is a centralized repository for data that is often used for storing and sharing files across a computer network. NAS systems are available for home use, and many individuals use them to share and

AMENDED COMPLAINT - 4
010581-11  871898 V1

stream multimedia files to multiple home computers, gaming consoles, tablets, phones, and Smart TVs.

28.     A NAS consists of three main components: 1) an enclosure; 2) hardware such as a motherboard, a CPU, and memory; and 3) at least one hard drive.



*Figure 1:  Network-Attached Storage device.*

29.     Many NAS devices are sold without hard drives, requiring consumers to purchase drives separately.

30.     RAID is a data storage technology that combines multiple hard drives in a single unit for the purposes of data redundancy, performance improvement, or both. Data redundancy refers to the writing of the same data to multiple hard drives, such that if one drive fails the data is still available on the other drive(s).

31.     Like NAS devices, RAID is available for home use and consists of an enclosure, hard drives, and other components. RAID comes in several "levels," and the most common levels for home units are RAID 0, RAID 1, and RAID 5.

32.     RAID 0 is the most basic level of RAID which does not provide any data redundancy but typically increases storage space and data read/write speeds.

33.     RAID 1 is used for data redundancy. Typically RAID 1 setups only have two hard drives, and as data is written to one drive it is automatically written to the other, providing an exact duplicate.

34.     RAID 5 is used for data redundancy, performance improvement, and increased storage space. It utilizes three or more hard drives, and a percentage of each hard drive, together equaling the storage space of one drive, is set aside for redundancy purposes. A RAID 5 configuration can withstand the failure of one hard drive, but if two drives fail within a short span of one another, data is lost.

35.     NAS systems can use RAID configurations such that the server backs up its own data using data redundancy.

**2.      The Drives**

36.     The Drives at issue in this action, the Internal Barracuda and all external Drives that use the Internal Barracuda, including without limitation the Backup Plus and GoFlex, have capacities of 3TB.

37.     The Internal Barracuda, model number ST3000DM001, was renamed to "Desktop HDD 3TB" in or around late 2012 or early 2013, but the model number remained the same. For brevity, both will be referred to as "Internal Barracuda."

38.     The external versions, including without limitation the Backup Plus 3TB and GoFlex 3TB, are Barracuda hard drives enclosed in external casings with external power supplies and USB connectors.

39.     Although the external versions come in multiple models, the model number of their enclosed Barracuda hard drives, ST3000DM001, is the same as the Internal Barracuda.  Accordingly, the statements, technical specifications, and reports pertaining to the Internal Barracuda discussed *infra* also apply to the external versions.

**B.    Seagate Markets and Advertises Its Drives as Highly Reliable, Having Extremely Low Failure Rates, and Suitable for RAID and NAS**

40.    Defendant released the Internal Barracuda in October 2011, and it subsequently released the external versions.  Defendant sold – and continues to sell – the Drives through resellers and/or its own website.

41.    The Internal Barracuda was released to much fanfare.  As reported on several hardware review websites, it was the first hard drive in the world to utilize three platters of 1TB each.  By contrast, its predecessor, the Barracuda XT 3TB HDD, contained five platters with a capacity of 600GB each.

42.    Defendant marketed the Internal Barracuda as an engineering triumph and a "major milestone for the hard drive industry."  According to the *Barracuda Product Overview*, first published by Defendant in 2011, in order to cram a TB of storage onto each platter:

> Seagate engineers had to pack 340,000 hard drive tracts into the width of a single inch. This means that, when reading and writing data, the read-write head needs to accurately follow a track that is a mere 75 nanometres wide. That's about 500 times smaller than the period at the end of this sentence.

*See Barracuda Product Overview*, attached hereto as Exhibit A.

43.    Defendant further touted the Internal Barracuda as having a "host of refined technologies to further boost performance.  In combination, these improvements squeeze even more performance out of storage already known for pushing the envelope!" Some of these improvements include a "third-generation dual-core processor" that handles data faster; "40nm chip manufacturing technology" that provides more computing power; and "64MB of DDR2 SDRAM" that "enables the fastest cache to date on Barracuda drives."

44.    Defendant promoted the Internal Barracuda as not only fast and technologically refined, but also highly reliable.  For example, in the *Barracuda Product Overview*, Defendant asserted that the Drives provide "[r]eliable performance, even in tough environments, thanks to Seagate AcuTrac™ servo technology," and that Seagate AcuTrac technology "reliably and accurately [follows the Drive's] nano-tracks even in challenging operating environments, like an all-in-one PC with the music turned up."

45.     Likewise, Defendant claimed in the *Barracuda Data Sheet*, first published in 2011, that its "AcuTrac™ servo technology delivers dependable performance, even with hard drive track widths of only 75 nanometers."  *See Barracuda Data Sheet*, attached hereto as Exhibit B.

46.     The following statements, among others, appeared on the webpage for the Internal Barracuda on Defendant's website in 2012 (hereafter "2012 Barracuda webpage"):

a.      "Seagate AcuTrac technology enables reliable read/write performance even in high touch operating environments."

b.      "Seagate AcuTrac™ technology enables new storage densities with accurate reading and writing to nano-sized tracks that are only 75 nanometers wide! That's about 500 times smaller than the period at the end of this sentence."

c.      "Proven quality and performance."

d.      "Barracuda has become the world's most popular family of hard drives with consistent quality and performance-enhancing innovations and features…."

e.      "The Barracuda® hard drive gives you one hard drive platform for every desktop storage application. One drive with trusted performance, reliability, simplicity, and capacity."

f.      "Count on Barracuda drives to deliver the storage innovations that drive your costs down and your performance up."

g.      The Barracuda is "produced using the most sophisticated manufacturing process in the industry, with a focus on environmental stewardship."

47.     The *Barracuda Data Sheet* and the *Barracuda Product* Overview contain many of the same, or substantially similar, statements as above.

48.     Identical, or virtually identical, statements appeared on the webpage for the Internal Barracuda in 2013 (hereafter "2013 Barracuda webpage").  Indeed, the only difference between the statements on the 2012 and 2013 webpages is the substitution of the name "Barracuda" for "Desktop HDD" and other non-material changes.

49.     Statements that are virtually identical or substantially similar to the foregoing have continued to appear on Defendant's website.  For instance, the current Barracuda webpage contains the following statements and affirmations:

a.    The Drive is the "one drive for every desktop system need, supported by 30 years of trusted performance, reliability and simplicity."

b.    "Rest easy knowing your drive delivers dependable performance with Seagate® AcuTrac™ servo technology."

c.    "Count on Seagate to deliver the storage innovations that bring down your costs and crank up your storage."

d.    "Desktop HDDs are produced using the most sophisticated manufacturing process in the industry, with a focus on environmental stewardship."[1]

50.    In addition to promoting the Internal Barracuda as consistent, reliable, accurate, and dependable, Defendant marketed, and continues to market, the Drive as being "designed for," "perfect" for, and "best-fit" for RAID and NAS.

51.    For example, in a 2011 press release, Defendant touted the Drive as being "designed for desktop, tower or all-in-one personal computers; workstations, home and small business servers; network-attached storage devices; direct-attached storage expansion; and home and small-business RAID solutions."

52.    By way of further example, the 2012 Barracuda webpage similarly asserted that the Drive is "Perfect when you need to," *inter alia*, "Build desktop or all-in-one PCs;" "Equip home servers;" "Implement a desktop RAID;" or "Build network attached storage devices (NAS)."

53.    The 2013 Barracuda webpage proclaimed that the Drive is "Perfect when you need to . . . Build a desktop or home server up to 4TB," and the 2014 webpage contended that the Drive is "Perfect when you need to . . . equip home servers."

54.    Likewise, the *Barracuda Data Sheet*, first published in 2011, lists "Home servers," "Desktop RAID," and "Network-attached storage devices (NAS)" as being "Best-Fit Applications" for the Drive. The *Desktop HDD Kit Data Sheet*, (hereafter "*Kit Data Sheet*")[2] first released in 2013,

---

[1] *Desktop HDD*, Seagate, http://www.seagate.com/internal-hard-drives/desktop-hard-drives/desktop-hdd/ (last accessed Jan. 21, 2016).

[2] Note that a hard drive kit is simply a hard drive packaged with cables and other accessories.

claims that the Drive is "perfect for" these applications.  *See* Exhibit C.  Since then, each iteration of the *Kit Data Sheet* has made this same claim.

55.     Notably, none of the above webpages or data sheets state that the Drive is not suitable for RAID 5.  Rather, the above representations would cause a reasonable person to believe that the Drive is suitable and designed for all RAID and NAS configurations, including RAID 5.

56.     The foregoing statements are not mere puffery or hyperbole.  A reasonable consumer would consider these statements material because they pertain to the reliability and longevity of the Internal Barracuda, which are extremely important qualities of hard drives, and to the Drive's suitability for use in a RAID or NAS.

57.     Moreover, a reasonable person would take the statements to mean that the Internal Barracuda: 1) is stable, reliable, and has a long life expectancy; 2) contains cutting-edge technology that enables the Drive to perform reliably and with precision even in high-vibration or otherwise challenging operating environments; 3) is yet another high-quality, reliable hard drive in the Barracuda line; 4) will last as long as comparable hard drives on the market, if not longer; 5) is suitable for storing and preserving important and irreplaceable personal data; 6) is suitable and designed for all RAID and NAS configurations, including RAID 5; and 7) does not suffer from a latent, model-wide defect that causes it to fail at an extremely high rate.

58.     Defendant marketed both the external and internal versions of the Barracuda as highly reliable and dependable.  The following statements, among others, appeared on the order page for the Backup Plus on Defendant's website in 2012 (hereafter "2012 Backup Plus webpage"):

a.     "Your digital life safe and sound"

b.     "Backup Plus from Seagate is the simple, one-click way to protect and share your entire digital life—without getting in the way of the rest of your life."

c.     "Up to 4TB capacity for a lifetime of memories"

d.     "Backup Plus is the family of external drives from Seagate that lets you do more with photos and movies, protect everything in your digital life, and manage it all from a single, intuitive dashboard."

e.     "Space for everything you've got. No more having to pick and choose what you protect."

f.     "Protect…Photos, videos, and more. Automatically."

g.     "Life is full of amazing moments you want to remember forever. The Backup Plus desktop drive lets you set up easy automatic backups of all your stuff, so you know that even if 'life happens' to your computer, your memories are always protected."

h.     "Think of how many photos you've shared on Facebook or Flickr. With Backup Plus, you can easily download them right to your Backup Plus drive, so even more of your life is safe and sound."

59.     The 2012 Backup Plus webpage contained a link to the *Backup Plus Data Sheet*, which also contained statements about the suitability of the Drive to protect one's "entire digital life." *See* Exhibit D.

60.     Statements that are identical or virtually identical to the foregoing appeared on the Backup Plus webpage in 2013, and similar statements appeared there in 2014 and 2015.  The version of the webpage that is current as of this filing contains the statements listed in paragraph 58(b),(c),(g), and (h).

61.     The foregoing statements are not mere puffery or hyperbole.  A reasonable person would consider them material because they pertain to the reliability and longevity of the Backup Plus, which are extremely important qualities of hard drives.

62.     Moreover, a reasonable consumer would interpret these statements – including the assertions that the Backup Plus will protect one's "entire digital life," "lifetime of memories," and "amazing moments" – to mean that the Backup Plus: 1) is stable, reliable, and has a long life expectancy; 2) will last as long as comparable drives on the market, if not longer; 3) is suitable for storing, protecting, and backing up important and irreplaceable personal data; and 4) does not suffer from a model-wide defect that causes it to fail at an extremely high rate.

63.     In addition to the foregoing statements, Defendant published reliability and data integrity specifications for the Drives.  Specifically, Defendant claimed that the annualized failure rate ("AFR") of the Drives is less than 1% and that the maximum non-recoverable read errors per bits read is 1 per 10E14.[3]

---

[3] *Barracuda Data Sheet*.

AMENDED COMPLAINT - 11
010581-11  871898 V1

64.     This information appeared in the *Barracuda Data Sheet* and the *Storage Solutions Guide*, among other places.

65.     The maximum non-recoverable read errors per bits read (hereafter "read error rate") pertains to the probability of a drive failing to read and return the requested data after exhausting all means to recover it (practically speaking, this means the data is lost), and the probability of such a failure is measured in relation to some number of bits transferred or read.

66.     10E14 means 10 to the power of 14.  Thus, the Drives' claimed read error rate of 1 per 10E14 means that one non-recoverable read error will occur for every 100 trillion bits read.

67.     A hard drive's annualized failure rate is the probability that it will fail in a given year due to problems in its manufacture or design or some other supplier cause.  AFR does not include failures that occurred because of misuse, user-inflicted damage, unauthorized modifications, and the like.[4]

68.     A hard drive's AFR is calculated by the manufacturer using tests and/or mathematical formulas.  AFRs can also be calculated by consumers and businesses, such as data backup companies, based on the number of failures their drives incur, provided they have a large sample size.

69.     A hard drive's AFR, if properly calculated, is typically accurate for about three years, and after that the true AFR begins to increase.  Accordingly, the Drives' advertised AFR of less than 1% means that the Drive has less than a 1% chance of failing in any given year, at least within the first three years of use.

70.     A reasonable consumer would consider these statistics material because they measure the reliability and longevity of the Drives, which are extremely important qualities of hard drives.

---

[4] The technical definitions of AFR and read error rate are provided for background purposes and are not intended to suggest or allege that only consumers with this background knowledge would find Defendant's statistics to be material or misleading. A reasonable consumer would, simply by looking at the names of these statistics, surmise that "annualized failure rate" is the probability of hard drive failure in annual terms and that "maximum non-recoverable read errors per bits read" is a measure of how often serious read errors occur. Moreover, the AFR and read error rate are listed in the *Barracuda Data Sheet* under the heading "Reliability/Data Integrity," which is a clear indication of their meaning.

71.     Likewise, upon reading that the AFR is less than 1% and the read error rate is one per 100 trillion bits read, a reasonable consumer, regardless of whether they knew the specific technical definitions, would interpret these statistics to mean that the Drive: 1) is reliable and has a long life expectancy; 2) is highly unlikely to fail in any given year, at least until the Drive wears out after a substantial amount of use; 3) incurs read errors very infrequently; 4) is suitable for storing important and irreplaceable personal data, given its reliability and longevity; and 5) does not suffer from a model-wide defect that causes it to fail at an extremely high rate.

72.     As explained *infra*, Defendant's statements and their implications are false, misleading, and have a tendency to deceive.  Moreover, Plaintiff and Class Members were deceived by them, acted in reliance on them, and suffered harm as a result.

## C.     Defendant's Statements and Data are False, Misleading, and Deceptive, and Defendant Failed to Disclose the Drives' Defects and Unsuitability for RAID/NAS

### 1.     The Backblaze Reports

73.     Backblaze, Inc. ("Backblaze") is an online data backup company that has published multiple reports demonstrating that the Drives contain a model-wide defect that causes them to fail prematurely at extremely high rates.  The Backblaze reports further demonstrate that the Drives do not last nearly as long as comparable hard drives and have an AFR that is much higher than that advertised by Defendant.

74.     Backblaze backs up its customers' data using "storage pods" consisting of numerous consumer-grade hard drives.  It has been in business since 2007.

75.     Over the years, Backblaze has used tens of thousands – if not hundreds of thousands – of drives from various manufacturers in its storage pods, including the Drives at issue in this lawsuit.  Currently, there are approximately 50,000 drives deployed in Backblaze's pods.[5]

76.     In 2013 and 2015, Backblaze reported that the vast majority of hard drives last at least four years.  Indeed, approximately 80% of the drives it uses function for at least four years.[6]

---

[5] *See What Can 49,056 Hard Drives Tell Us? Hard Drive Reliability Stats for Q3 2015*, Backblaze (Oct. 14, 2015), https://www.backblaze.com/blog/hard-drive-reliability-q3-2015 (hereafter "Q3 2015 Report").

1    77.    The Drives at issue in this action, however, fell far short of this benchmark.

2    78.    Hard drives should follow a "bathtub-shaped failure rate curve."  Reliability engineers

use this model to describe expected failure rates for products, and it takes into account factory

defects resulting in early failures, random failures, and wear-out failures that occur after substantial

use.[7]

79.    The early failure rate is highest when a product is new and decreases substantially

with time, whereas the wear-out failure rate increases significantly over time and the random failure

rate remains constant.  This creates an overall failure rate that looks like a semi-flattened "U", and all

of these rates together create a bathtub shape when plotted on a graph.



*Figure 2*: *Bathtub curve*

---

[6] *CSI: Backblaze – Dissecting 3TB Drive Failure*, Backblaze (April 15, 2015),
https://www.backblaze.com/blog/3tb-hard-drive-failure (hereafter "2015 Report"); *How long do disk drives last?*, Backblaze (Nov. 12, 2013), https://www.backblaze.com/blog/how-long-do-disk-drives-last/ (hereafter "2013 Report").

[7] 2013 Report.

80.     In 2013, Backblaze reported that its experience matches the bathtub-curve model. It calculated the AFR for its drives based on their observed failures and found that it hovers around 5% for the first year-and-a-half, drops to about 1.4% for the next year-and-a-half, and then increases to 11.8 % for the following year.[8]

81.     Backblaze later discovered that Barracuda Drives do not conform to the bathtub curve. The failure rate for the Barracuda Drives was far different.

82.     Beginning in January 2012, Backblaze deployed 4,829 Barracuda Drives – both the internal and external versions – in its storage pods.  To use the external Drives, Backblaze removed the Drives from their external casings.

83.     In 2015, Backblaze reported that, instead of following the expected bathtub curve, the AFR for the Drives followed a steep upward curve.  In 2012, the AFR was 2.7%, and instead of declining it increased to 5.4% in 2013, and then skyrocketed to 47.2% in 2014.[9]

84.     Backblaze subsequently released statistics for 2015, revealing that the Drives had an AFR of 30.94% for the first through third quarters of 2015 and an overall failure rate of 28.46% dating back to 2013.[10]

85.     The Drives' AFRs were substantially higher than any of the other six models of 3TB hard drives used by Backblaze during this period.  The next highest failure rate belonged to the Western Digital Red, which had a 2015 AFR of only 8.79% and an overall failure rate of 7.65%.

86.     Indeed, the Drives had a higher failure rate than all but one of the twenty-six other models of any size deployed by Backblaze, which ranged from 1-8TB.  *See Backblaze Hard Drive Failure Rates* (hereto attached as Exhibit E).

87.     The raw failure rate of the Drives was just as dismal.  A hard drive's raw failure rate is calculated by dividing the number of hard drives that failed in a particular period by the number that were in use during that same period.  Out of the 4,829 Drives Backblaze deployed between 2012

---

[8] *Id.*

[9] 2015 Report.

[10] Q3 2015 Report.

and 2014, 1,423 failed in operation by early 2015, which yields a raw failure rate of 29.5%.[11]
Moreover, out of the 4,190 Drives that were deployed in 2012, 1,342 failed by early 2015, which is a
32% failure rate.[12]

88.    This means that only 68% of the Drives were functional after *three* years, which was
well below Backblaze's overall drive survival rate of 80% after *four years*.

89.    In addition to the Drives that failed during operation, a large number of Drives failed
Backblaze's reliability testing and were removed from service.

90.    Due to the high number of Seagate Drive failures, Backblaze became suspicious that
there was a latent problem with the Drives.  Thus, if a storage pod with the Drives incurred a failure,
Backblaze began to pull all of the Drives in that pod and subject them to two tests to assess their
health.  The first test involved reformatting the Drives and the second test checked for bad data
sectors.  A Drive had to pass both tests to be returned to service.

91.    A data sector is 512 bytes.  A sector is "bad" if it cannot be read and/or written to.  If
a hard drive amasses too many bad sectors, it will suffer serious performance degradation and may
fail completely.

92.    Backblaze removed 2,597 Drives for testing between 2012 and early 2015, and a
shocking 75% – 1,948 Drives – failed one of the two tests.

93.    Out of the 4,190 Drives that Backblaze deployed in 2012, about 1,342 failed during
operation (32%), 1,948 failed after removal (46%), approximately 649 were removed but did not fail
any test (15%), and 251 (6%) remained in operation as of March 31, 2015.  In total **78% of the
Drives that Backblaze deployed in 2012 failed** either in place or after removal.[13]

94.    The raw failure rate of the Drives dwarfed those of the other brands and models that
Backblaze used.  For instance, in 2012, Backblaze deployed 2,511 HGST 3TB drives, and by early
2015, only 103 (4.1%) had failed. Likewise, only 2 of 45 (4.5%) of Backblaze's Western Digital
3TB drives failed.  Indeed, even the Barracuda's predecessor, the Seagate XT 3TB drive, model

---

[11] 2015 Report.

[12] *Id.*

[13] *Id.*

ST33000651AS, fared substantially better: out of the 181 deployed in 2012, only 15 drives (8.3%) failed by 2015.[14]

95.    The survival rate after three years for these hard drives was therefore 95.9%, 95.5%, and 91.7%, respectively.  Furthermore, Backblaze did not permanently remove any of the HGST or Western Digital drives that did not fail during operation, and only eleven Seagate XT drives were retired after being pulled for testing.[15]  This stands in stark contrast to the mere 6% of the Seagate Barracuda Drives that were still in operation after three years.

96.    In attempting to determine the reason for the Drives' high failure rates, Backblaze ruled out confounding factors related to its storage environment and the removal of external Drives from their casings (referred to as "shucking").  All of the hard drives it used, despite manufacturer, were installed in the same storage pod environment, and the fact that there were such substantial differences in failures between the Seagate Drives and the other drives ruled out the possibility that the storage environment was the cause of the issue.

97.    Shucking also did not affect the failure rate.  Backblaze found that the failure rates did not differ materially between Internal Barracudas and shucked external Drives.

98.    Backblaze, therefore, concluded that the cause of the staggering failure rate was the Drives themselves.[16]

99.    Indeed, Backblaze's data – particularly the Drives' steep upward failure curve and their extremely high AFR and raw failure rates – indicates that the Drives contain an inherent, model-wide defect that causes a large portion of them to incur catastrophic failures early in their useful lives.

100.    Moreover, as demonstrated by the Backblaze reports, Defendant's representation that the Drives have an AFR of less than 1% is false, misleading, and likely to deceive a reasonable person.  Moreover, the Drives are far less reliable and do not last nearly as long as comparable hard drives on the market.

---

[14] *Id.*

[15] *Id.*

[16] *See* 2015 Report.

AMENDED COMPLAINT - 17
010581-11  871898 V1

**2.      The Drives Are Not Designed for RAID 5 and Are Not Suitable for Any Level of RAID or NAS**

101.     Notwithstanding that they are marketed for use in RAID and NAS systems, the Drives were purportedly not designed for RAID 5 and, due to the latent defect, are otherwise not suitable for any RAID or NAS use.

102.     In an email to a customer, Defendant admitted that the Internal Barracuda is not actually designed for RAID 5, which is a common configuration in home RAID and NAS systems. Specifically, a Seagate customer support representative wrote, "The consumer level drives you have are not meant for any type of raid configuration beyond a Desktop RAID 0 or 1. If you do use 'desktop class drives' in a RAID 5 configuration, you can expect to deal with RAID failures."

103.     Nevertheless, as discussed *supra*, Defendant advertised, and continues to advertise, the Internal Barracuda as "designed for," "perfect" for, and "best-fit" for NAS and Desktop RAID. These statements appeared on the Barracuda webpage, in the *Barracuda Data Sheet,* in the *HDD Kit Data Sheet*, and in a 2011 press release without any qualification that the Drive is only appropriate for RAID 0 or 1.

104.     Notwithstanding, the Internal Barracuda is not suitable for **any** RAID or **any** NAS because it contains inherent and latent defects, as explained *supra*.

105.     Moreover, a major advantage of RAID 1 and 5 is that they protect data through redundancy. If multiple defective hard drives are used in the RAID, however, this feature is undermined because RAID 1 and 5 can only withstand one drive failure. If two or more drives fail within a short time of one another, massive or complete data loss will occur. Due to their extremely high failure rate, Internal Barracudas are not suitable for a system that backs up its own data through redundancy, as using them would amount to defective Drives backing up data on defective Drives.

106.     The Drives are also not suitable for RAID 0 and single-drive NAS systems because the failure of one hard drive will cause massive or total data loss.

**3.      Defendant Failed to Disclose the Drives' Defects and Their Unsuitability for RAID and NAS**

107.     Defendant knew that its Drives were defective and not suitable for RAID and NAS, yet it failed to disclose this to Plaintiff and Class Members.

108.    As evidenced by the email sent by Seagate customer support to the customer, Defendant knew that the Drives were not designed for RAID 5 and would cause failures if used in such a configuration.  Nevertheless, Defendant did not disclose this fact or qualify the statements made on the Barracuda web page, in the *Barracuda Data Sheet,* or in the *HDD Kit Data Sheet* that the Drives are "perfect" and "best-fit" for desktop RAID and NAS.

109.    Defendant also knew, or should have known, that its Drives possessed an inherent, latent, model-wide defect and that its reliability data and promotional statements about the Drives were false and misleading. As discussed *infra*, there are thousands of negative reviews and complaints about Drive failures on websites such as newegg.com and amazon.com.  Defendant was aware, or should have been aware, of the contents of these reviews and complaints because it responded to many of them, apologizing for the problems the customers were having with their Drives and inviting them to call Seagate customer services or tech support.

110.    Moreover, Defendant had firsthand knowledge of the Drives' defects.  As stated on Defendant's website, Defendant has a "take-back program for hard drives under warranty" where "100 percent of these drives [returned by consumers for replacement] are refurbished or, if not repairable, are recycled."[17]  Defendant's express warranty only covers defects in materials or workmanship and does not cover, *inter alia,* problems caused by accident, abuse, neglect, electrostatic discharge, degaussing, heat or humidity beyond product specifications, improper installation, or misuse.  *See Seagate Limited Warranty*, attached hereto as Exhibit F. Accordingly, Defendant not only repairs or attempts to repair 100% of warranty returns, but 100% of those Drives are defective. Upon information and belief, for Defendant to repair a defective Drive, it investigates the problem or complaint to ascertain the defect or, at a minimum, the signs and symptoms of the defect.  As a result, Defendant had firsthand knowledge of the defects and problems inherent in the Drives.

---

[17] *Global Citizenship*, Seagate, http://www.seagate.com/global-citizenship/product-stewardship/ (last accessed May 2, 2016).

AMENDED COMPLAINT - 19
010581-11  871898 V1

111.    Given the large number of consumer complaints and Defendant's exposure to its own defective Drives, Defendant knew, or should have known, that the defects were inherent, latent, and model-wide.

112.    Despite this knowledge, Defendant did not disclose the defects to the Plaintiff, Class Members, or general public or otherwise inform them of the Drive's problems.  Instead, as set forth in this Amended Complaint, Defendant promoted the Drives, expressly and impliedly, as highly reliable and stable, having an extremely low failure rate, and suitable for storing irreplaceable personal data, among other things.

**D.    Seagate's Warranty on the Drives**

113.    In addition to misrepresenting the reliability of the Drives and their suitable uses, as well as omitting critical facts about the Drives, Defendant failed to satisfy its warranty obligations.

114.    The Drives purchased by Plaintiff and Class Members are or were covered by an express limited warranty.  The warranty, by its explicit terms, is governed by California law. *See* Exhibit F.

115.    Upon information and belief, the Internal Barracuda's warranty was three years for a brief time following its release. It was then reduced to one year on December 31, 2011, and has been varying lengths since. The warranties for the external versions, including without limitation the Backup Plus and GoFlex, also vary.

116.    Other than varying in duration, the warranty is uniform and is therefore subject to uniform standards, principles, and applications for purchasers throughout the United States.

117.    The warranty covers defects in "material or workmanship" and provides for the replacement of defective Drives. Defendant will not, however, recover data off a customer's Drive unless the customer pays an "engagement fee" and a "recovery fee" which can "easily be over $2,000."[18]

118.    Customers are responsible for paying the cost to ship their Drives to Defendant for replacement.

---

[18] *See id.*; *Frequently Asked Questions*, Seagate, http://www.seagate.com/services-software/seagate-recovery-services/resources (last accessed Jan 22, 2016).

AMENDED COMPLAINT - 20
010581-11  871898 V1

119.    The warranty on replacements is the remainder of the original warranty period or 90 days, whichever is greater.

120.    Because the Drives contain latent, model-wide defects, the replacement Drives suffer from the same defects as those that are newly purchased, causing them to fail prematurely at extremely high rates.

121.    Replacement Drives are refurbished units, which includes failed Drives that were returned to Defendant by previous owners for replacement.

122.    Defendant knew, or should have known, that the Drives are irreparably defective and highly likely to fail.

123.    In light of the foregoing, Defendant did not – and cannot – deliver Drives to Plaintiff and Class Members that conform to their express and implied warranties. Defendant is therefore liable for breach of express warranty.

124.    Sending failed Drives as warranty replacements knowing they are highly likely to fail again is also unfair and unconscionable.

125.    Moreover, Defendant breached the implied warranty of merchantability because all Drives contained a latent defect that rendered them unsuitable for their ordinary purposes, were inadequately packaged and labeled, and fell below the quality generally accepted in the hard drive market.

**E.    The Plaintiff's and the Class' Experience With Failed Seagate Drives**

126.    Plaintiff Nelson ordered a Backup Plus online from Best Buy on November 22, 2012 and received it at his home shortly thereafter.  He registered the Drive with Seagate in December 2012.

127.    Best Buy is an authorized Seagate retailer, and Mr. Nelson purchased and used the Backup Plus for personal, non-business purposes.

128.    Prior to purchase, Mr. Nelson knew that the Backup Plus he purchased was covered by a two-year manufacturer warranty. He knew this because: 1) the order page for the Backup Plus on the Best Buy website stated that it came with a two year warranty; 2) the Backup Plus' box, a

AMENDED COMPLAINT - 21
010581-11  871898 V1

picture of which appeared on the order page, stated the same; and 3) the *Backup Plus Data Sheet* stated the same.

129.    Mr. Nelson relied on these statements and would not have purchased a Backup Plus if there had not been an express warranty.

130.    On November 22, 2012, shortly before purchase, Mr. Nelson visited the Backup Plus page on Seagate.com, which is owned and maintained by Defendant.  On this webpage, Mr. Nelson read all of the statements on the 2012 Backup Plus webpage that are listed above.

131.    Mr. Nelson found these statements to be material because they pertained to the reliability and longevity of the Backup Plus, which are extremely important characteristics of hard drives. He relied on the statements in deciding to purchase a Backup Plus because they caused him to reasonably believe that the Backup Plus, 1) was one of the most stable and reliable 3TB external hard drives on the market; 2) had long life expectancy and would last just as long as comparable hard drives on the market, if not longer; 3) would last at least four years, as most hard drives do; 4) was suitable for storing, protecting, and backing up his important and irreplaceable personal data; and 5) did not have a model-wide defect that would likely cause it to fail within an unreasonably short period of time.

132.    Indeed, Mr. Nelson has owned multiple models of Seagate hard drives, other than the 3TB Internal Barracuda or Backup Plus, that lasted five years or longer without incurring any type of failure. He currently has a 1TB Seagate internal hard drive in his computer that has nearly five years of power-on time.

133.    Power-on time is the total amount of time a hard drive has been powered on throughout its life.

134.    The statements published by Defendant were misrepresentations for the reasons set forth in this Amended Complaint. These reasons include, without limitation, that the Drive: 1) was not stable or reliable; 2) did not last as long as comparable hard drives on the market; 3) had a model-wide defect that cause it to fail prematurely at extraordinarily high rates; 4) and was not suitable for storing, protecting, or backing up personal data. Moreover, in conjunction with these misrepresentations, Defendant knowingly failed to disclose the Drive's defects and unreliability.

AMENDED COMPLAINT - 22
010581-11  871898 V1

135.    Mr. Nelson's Drive failed in December 2014, approximately two years after purchase. Specifically, a large number of data sectors suddenly failed with little to no forewarning, causing the Drive to suffer a catastrophic failure which rendered it useless.

136.    As a result of the failure, Mr. Nelson lost data, including without limitation irreplaceable photos and documents. He also expended a considerable amount of time attempting to recover his data.

137.    In or about December 2014, Mr. Nelson requested and received a replacement Backup Plus from Defendant pursuant to the Drive's warranty. The replacement Drive was a refurbished unit. The warranty on the replacement Drive was 90 days.

138.    Within this 90-day warranty period, the Drive began to malfunction by intermittently overheating when copying files. Less than a year later, on or around October 20, 2015, the Drive suffered a complete failure after the warranty expired.

139.    Had Mr. Nelson known that the Backup Plus had an inherent, model-wide defect that drastically reduced its lifespan vis-à-vis comparable hard drives, caused it to fail prematurely at extremely high rates, and made it unsuitable for storing and protecting data, he would not have purchased one.

**F.      Class Members' Experience with the Drives**

140.    Members of the Class have had experiences similar to Plaintiff's.

141.    On the website newegg.com, there are over 700 reviews where consumers gave the Internal Barracuda a rating of one or two out of five.[19]

142.    Defendant is aware of the large number of negative reviews on Newegg. Indeed, it is aware of the specific consumer complaints as Defendant has responded to many reviews apologizing for the problems with the Internal Barracuda and stating that Defendant would like to speak with the consumer by phone.

143.    Set forth below is a sample of some consumer reviews posted to newegg.com:

---

[19] *See* Reviews of *Seagate Desktop HDD ST3000DM001 3TB 64MB Cache SATA 6.0Gb/s 3.5" Internal Hard Drive Bare Drive*, Newegg, http://www.newegg.com/Product/Product.aspx?Item= N82E16822148844 (last accessed Jan. 20, 2016).

AMENDED COMPLAINT - 23
010581-11  871898 V1

a.  Vincent Y. [December 12, 2012]

Dead in a week

Pros: Great storage (while it works)

Pretty fast

Rather quiet

Cons: Used for a week, started 'chirping' and 'clicking'. (Moderate use, not heavy use). Within the day it started making sounds, the hard-drive simply failed and died. It would not be recognized.

I bought two, this happened to both . . . .

b.  Dustin S. [Dec. 18, 2012]

Replacement is also bad.

Pros: None.

Cons: [Returned] first one replacement also bad after 3days use. Not happy I had to pay shipping.

c.  Brock M. [June 14, 2013 2:41 pm]

DOA Two Times.

*Pros:* I purchase two of these. One is working fine with no problem.

*Cons:* I purchased two of these hard drives. [One] worked and the other one didn't. I returned the one that was dead and received another dead one. Quite frustrating.

d.  Donald D. [July 20, 2013 10:25 am]

Bought 3 died in 3 months.

Pros: Cheap, Lots of space, fast shipping

Cons: I got three of these and all three died in the first three months all about a week apart!

e.  Jake W. [May 2, 2014]

High Failure Rate

Pros: When the drives aren't failing they run how I would expect.

Cons: These drives seem to have a very high failure rate. 2 drives died after less than a week of use. After 3-4 months 2 more failed and I had to go through Seagate's terrible warranty system. Just this week a 5th drive failed and had to be sent back to Seagate. In total I have spent over $60 shipping the drives back to Seagate to get them replaced. I

AMENDED COMPLAINT - 24
010581-11  871898 V1

1   can no longer in good faith recommend Seagate drives to anyone I
2   know.

    f.    Mark N. [August 18, 2014 8:31 pm]

3   No More for me.

4   Pros: Price

5   Cons:  This is a replacement for my original purchase that gave me
6   problems from the get go. This one started having delays and corrupt
    data shortly after use. I'm just getting tired of sending drives back to
7   Seagate just to get another refurbished drive in exchange that will also
    fail shortly after receiving it.
8
    Other Thoughts: Enough is enough, no more getting sucked in because
9   the price may be a few dollars cheaper than a more reliable brand.

10      g.    Anonymous [December 26, 2015 1:35 pm]

11  *Pros:* Fastest storage drive I've ever owned.

12  *Cons:* Died faster than any drive I've ever owned. Data that I would
    have rather forfeit bodily functionality than lose has been lost . . . .
13

14      h.    Peter B. [September 8, 2015 7:16 am]

15  Don't let the price tempt you!

16  Pros: Works as advertised for a short period of time

17  Cons: Yikes! Not reliable at all. I have 2 of these drives and the first
    one died after 3 months. Replacement drive just died again after barely
18  being used (seriously, it sat in the box – when installed, it lasted a
    month) and now it's out of warranty . . . .

19      i.    Alex C. [January 14, 2016 3:23 pm]

20  Not sure about Seagate Quality anymore.

21  Pros: Good size

22  Decent price

23  Cons: Bad reliability. 3 out 7 failed within 2 years
    I bought 7 same drives about 22 months ago for a RAID 5 NAS setup.
24  One as spare. About 4 months ago, one drive failed. Another one failed
    after 2 more months. Before RMA [Return Material Authorization]
25  came back, another one failed just 3 weeks ago. This last failed one is
    just of warranty for a few days . . . .
26

27      j.    Howard [Jan. 10, 2016 5:24 am]

28  The Drives have a bad failure rate

Pros: None

Cons**:** I have had several of these drives fail in my RAID array. I replaced them and now one I just purchased was dead after a month . . .

144.    Hundreds – if not thousands – of reviews and complaints about Internal Barracuda failures are also posted on websites such as amazon.com.[20]

145.    Similarly, the Backup Plus has received hundreds of negative reviews on amazon.com. Indeed, there are approximately 450 reviews where consumers rated the Backup Plus a one-out-of-five.[21]

146.    Defendant is aware of the large number of negative reviews on amazon.com, as well as the specific complaints consumers have, because it replied to numerous reviews.

147.    Set forth below is a sample of some consumer reviews of the Backup Plus posted to amazon.com:

a.    M. Olson [Sept. 5, 2012]

Failed in a week.

I have had this ONE week. On a Mac so I reformatted the drive and it seemed to work fine. Did about 1.5TB of backup the first two days it appeared to work fine. Tried to mount today... Nothing. Disk repair failed. Have to erase and reformat. I don't trust it. Big disappointment.

b.    A Programmer [August 6, 2013]

Failed after a month

As a Pre-engineering student, and as a programmer, I needed a reliable backup drive. This drive failed after a month. Yesterday, I needed to repartition my computer to run only Linux and Windows. I had all of my documents backed up, including games, My school stuff, my college essays, my programs that I made, my operating system .iso's, my programming pdf's, and a draft of the book that I was writing on how to program Java 7. Sure enough, when I plugged in my hard drive (I was running Windows 7) and started to transfer files, it failed and made a weird whirring sound . . .

---

[20] *See, e.g., Customer Reviews*, http://www.amazon.com/Seagate-Desktop-3-5-Inch-Internal-ST3000DM001/dp/B005T3GRLY/ref=cm_cr_pr_product_top?ie=UTF8.

[21] *See Customer Reviews*, http://www.amazon.com/Seagate-Backup-Desktop-External-STCA3000101/product-reviews/B00829THQE/ref=cm_cr_dp_qt_hist_one?ie=UTF8&filterBy=addOneStar&showViewpoints=0 (last accessed Jan. 21, 2015).

AMENDED COMPLAINT - 26
010581-11 871898 V1

I am exceptionally irritated by the drives lack of reliability and [Seagate's] refusal to recover my lost data without paying a great sum of money that I cannot afford as a student.

c.    DS [June 10, 2014]

There's a reason this drive has [hundreds of] 1 star reviews. This is the worst hard drive I've ever had the displeasure of owning. The first drive developed bad sectors in less than one year. So many that data recovery was actually kind of a PITA…

I was able to get an RMA from Seagate for the drive. The new drive arrived from Seagate and it still had the previous customer's asset management stickers on it, including their phone number and address... right next to the big sticker that said: RECERTIFIED.

Three weeks later the replacement drive failed as well. I'm not going to even bother with an RMA even though it's under warranty still, I'm sure the next drive will just fail as well.

d.    Amazon Customer [Feb. 6, 2015]

The purpose of an external hard drive is for it to provide a restore option when and if my computer hard drive fails. In order to be useful for this purpose, the external hard drive must be available and reliable. This is my second hardware failure for this product. Both times the hard drive failed to power up. The Seagate failed within its warranty period, so Seagate replaced it, but would not do any data recovery unless I paid $300 for them to attempt. No guarantees. No thanks . . . Fast forward a year, and the replacement Seagate drive failed.

e.    E [January 11, 2016]

The disk performed OK while it worked, but started dying after less than two years of rather light use.

Over the years I've used quite a few backup drives, and this one seems the least reliable of them all . . . .

148.    Like the Internal Barracuda and Backup Plus, there are hundreds of negative reviews of the GoFlex on websites such as amazon.com.[22]

149.    Defendant is aware of the large number of negative reviews on amazon.com, as well as the specific complaints consumers have, because it replied to numerous reviews.

150.    Set forth below is a sample of some customer reviews of the GoFlex posted to amazon.com:

---

[22] *See Customer Reviews*, Amazon, *http://www.amazon.com/product-reviews/B005IA844G/ref=acr_dpx_hist_1?ie=UTF8&filterByStar=one_star&showViewpoints=0* (last accessed February 4, 2016).

a.    Kindle Customer [Dec. 13. 2011]

3 of 4 Drives = DOA

Seagate has a major quality problem. I ordered two of these from Amazon, one worked right out of the box, the other didn't. (First DOA - dead on arrival.) Replaced the failing drive with another from Amazon. DOA. While talking w. Seagate, they asked that I replace it with one directly from them (Seagate). Another DOA. So that's 3 DOA out of four. In each case, the drive failed while running Seagate's own diagnostic read/write tests. One wonders if they test anything before shipment, and if so, how?

b.    Stephen [March 24, 2012]

I had this hard drive for a month, stopped working and I lost a great deal of data and files that I had already moved to this storage. I would not recommend this hard drive.

c.    Michael C. [Nov. 21, 2015]

Failed and failed again.

Failed twice. First one failed in the first month I had it. Replaced under warranty and it failed after a couple of years and not covered again.

d.    Amazon Customer [Jan. 3, 2016]

Just to let you know[,] EVERY SINGLE one of these I have bought has failed. Some within warranty. I have many decade old WD [Western Digital] drives still working…[but] [t]hese Seagate drive[s] are durable as toilet paper, and every bit of your data will be lost when they start growling or screeching or just silently refuse to ever power up again.

## V.    CLASS ACTION ALLEGATIONS

151.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure on behalf of a Class defined as:

All individuals in the United States who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

152.    Alternatively, Plaintiff brings this action as a class action on behalf of the following

Subclass:

All individuals in South Dakota who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

153.    Excluded from the Classes are: (a) Defendant, including any entity in which Defendant has a controlling interest, and its representatives, officers, directors, employees, assigns and successors; (b) any person or entity who has settled or released these same claims against Defendant as evidenced by a written release; and (c) the Judge to whom this case is assigned.

154.    Plaintiff is a member of the Classes that he seeks to represent. Members of the proposed Classes are fully ascertainable and can be identified using Defendant's records of online retail sales (including records of retail sales by its authorized resellers and dealers), product registrations, and other information kept by Defendant in the usual course of business and/or in the control of Defendant. Class Members can be notified of the class action through publication on user websites and direct e-mailings to address lists maintained in the usual course of business by Defendant. Alternatively, Class Members can identify themselves.

155.    <u>Numerosity/Impracticability of Joinder</u>: The members of the Classes are so numerous that joinder of all members would be impracticable. The proposed Classes include, at a minimum, thousands of members. The precise number of Class Members can be ascertained by reviewing documents and records in Defendant's possession, custody, and control, or otherwise obtained through reasonable means.

156.    <u>Commonality and Predominance</u>: There are common questions of law or fact which predominate over any questions affecting only individual members of the Classes. These common legal or factual questions, include, but are not limited to the following:

      a.    Whether the Drives contain a latent, model-wide defect that causes them to fail prematurely;

      b.    Whether Defendant engaged in a pattern of fraudulent, deceptive and misleading conduct;

      c.    Whether Defendant made material misrepresentations of fact or omitted stating material facts to Plaintiff and the Classes regarding the defective nature and high failure rate of the Drives;

      d.    Whether Defendant's acts and omissions violated consumer protection, unfair competition, and/or false advertising statutes;

      e.    Whether the Drives are of the same quality as those generally acceptable in the market;

    f.       Whether the Drives are fit for the ordinary purposes for which hard drives are used;

    g.       Whether the Drives are adequately contained, packaged, and labeled;

    h.       Whether Defendant breached its express and implied warranties;

    i.       Whether Defendant represented that its Drives are of a particular standard, quality, or grade when they are of another;

    j.       Whether Defendant represented that its Drives have characteristics, uses, or benefits that they do not;

    k.       Whether, as a result of Defendant's misconduct, Plaintiff and the Classes are entitled to relief, and, if so, the nature of such relief;

    l.       Whether, by the misconduct set forth herein, Defendant violated the common law of unjust enrichment; whether the Plaintiff and members of the Classes have sustained ascertainable loss and damages as a result of Defendant's acts and omissions, and the proper measure thereof.

157.    <u>Typicality</u>:  The representative Plaintiff's claims are typical of the claims of the members of the Classes he seeks to represent. Plaintiff and members of the Classes have been injured by the same wrongful practices in which Defendant has engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

158.    <u>Adequacy</u>:  Plaintiff is a representative who will fully and adequately assert and protect the interests of the Classes, and has retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Plaintiff nor his attorneys have any interests which are contrary to or conflicting with the Classes.

159.    <u>Superiority</u>:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Classes are likely in the millions of dollars, the individual damages incurred by each Class member resulting from Defendant's wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual Class Members prosecuting their own separate claims

is remote, and, even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Classes do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Defendant has acted or refused to act on grounds generally applicable to the Classes and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Classes as a whole is appropriate.

160.    In the alternative, Plaintiff seeks certification pursuant to Rule 23(c)(4) on the issues of: (a) whether Defendant breached its warranty contracts with Plaintiff and the Class; and (b) whether Defendant engaged in deceptive, confusing or misleading practices in connection with the sale and warranting of the Drives.

# VI.    VIOLATIONS ALLEGED

## FIRST CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

161.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

162.    California Business and Professions Code § 17200, *et seq*., the Unfair Competition Law ("UCL"), prohibits any "unlawful, unfair, or fraudulent business act or practices."

163.    Plaintiff, the members of the Class, and Defendant are "persons" within the meaning of the UCL.

164.    The UCL applies to the claims of all Plaintiff and Class Members, regardless of the state in which they reside or purchased their Drive(s), because the unlawful conduct giving rise to this claim occurred in and emanated from California. Upon information, belief, and investigation of counsel:

a.    Defendant is headquartered in California and directs all of its operations from there.

b. The Drives were designed, in whole or in part, by Defendant in California.

c. From its headquarters and/or its other locations in California, Defendant markets and advertises its products and directs its marketing and advertisements to consumers across the country.

d. From its headquarters and/or its other locations in California, Defendant orchestrates, coordinates, and carries out national sales and marketing strategies, consumer sales operations, and product planning.

e. From its headquarters and/or its other locations in California, Defendant devises, orchestrates, coordinates, and carries out public relations campaigns in which it "interfaces with public relations agenc[ies] and acts as the corporate spokesperson to the media, analysts and the general public at large."[23]

f. From its headquarters and/or its other locations in California, Defendant "identif[ies], assemble[s], transform[s] and combine[s]" consumer data and creates "actionable and available reports for the entire Seagate consumer business" that "drive decision making for all of [Defendant's] consumer products."[24]

g. The advertisements, materials, and statements at issue in this litigation were conceived, created, and published by Defendant in California and distributed, electronically and otherwise, from California to Plaintiff and Class Members. This is evidenced by the foregoing as well as the fact that the *Barracuda Data Sheet*, *HDD Kit Data Sheet*, *Barracuda Product Overview*, and *Storage Solutions Guide* are copyrighted by Seagate Technology LLC and contain the address of its California headquarters. Moreover, Defendant employs a Senior Director of Marketing and Senior Director of Global Marketing at its headquarters.

h. Defendant also develops and maintains its website and devises, implements, and directs online marketing strategies from California. This is evidenced by the foregoing as well as the fact that Defendant employs web development managers and the Director of Online Marketing at its headquarters.[25]

---

[23] *Sr. PR Manager: Seagate Technology LLC – Cupertino CA 95014*, Monster (April 13, 2016), http://job-openings.monster.com/monster/8d29b43b-ebf5-4d32-ad06-aef9e9f1fb57?mescoid=1100009001001&jobPosition=16.

[24] *Sr. Engineer, Data Analytics – Business Intelligence & Data Analytics Group: Seagate Technology LLC – Cupertino CA 95014* (April 15, 2016), http://job-openings.monster.com/monster/35b5855b-b68e-4554-9a37-0f0076240cb4?mescoid=1500127001001&jobPosition=5#

[25] *See Front-End Web Developer / Manager-161657*, Seagate, https://seagate.taleo.net/careersection/2/jobdetail.ftl?job=161657 (last accessed May 2, 2016).

i.   The Drives' misleading reliability data was calculated by, or was calculated from information and data obtained by, Defendant's employees in California. This is evidenced by the fact that Defendant employs materials science and analytical engineering professionals in California who, among other things, are "responsible for hard drive disc materials & thin film analysis, in terms of structure and contamination identification, quality evaluation, purification, and failure analysis."[26]

165.   Defendant violated the UCL for one or more of the following reasons:

a.   It engaged in unlawful conduct.

b.   It made material misrepresentations and omissions.

c.   It engaged in immoral, unethical, unscrupulous, and oppressive conduct, or conduct that is otherwise against established public policy.

166.   More specifically, Defendant violated the UCL's "unlawful" prong by violating California's Consumer Legal Remedies Act, False Advertising Law, and express and implied warranty statutes, as set forth below.

167.   Defendant violated the UCL's "fraudulent" prong because it made material misrepresentations and omissions regarding the Drives, as set forth in this Complaint.  Plaintiff viewed Defendant's statements and representations prior to purchase, considered them to be material, relied on them, and were deceived by them.

168.   The affirmative misrepresentations made by Defendant include, without limitation, that the Drives are highly reliable, have an extremely low failure rate, are ideal for RAID and NAS, and are suitable for protecting important and irreplaceable personal data. For example, Defendant claimed that the Barracuda provides: "[r]eliable performance, even in tough environments, thanks to Seagate AcuTrac™ servo technology;" that it delivers "dependable performance, even with hard drive track widths of only 75 nanometers;" that it is "perfect" and "best-fit" for desktop RAID and NAS; that it "gives you one hard drive platform for every desktop storage application. One drive with trusted performance, reliability, simplicity, and capacity;" and that it has an AFR of less than

---

[26] *Staff Engineer, Materials Science/Analytical Engineering: Seagate Technology LLC - Fremont, CA 94537*, Monster (April 7, 2016), http://job-openings.monster.com/monster/3725a2c7-f7f2-4f5a-9711-72e00bb241ea?mescoid=1700183001001&jobPosition=4.

one percent and a read error rate of 1 in 100 trillion. Moreover, Defendant advertised the Backup Plus as ideal for safeguarding and protecting one's "entire digital life," "lifetime of memories," and life's "amazing moments" against "'life happen[ing]' to your computer."

169.    These statements, and the other statements alleged in this Amended Complaint, are false, misleading, and members of the public would likely be deceived by them, as they are unqualified and specific affirmations of the Drives' reliability and quality and are not mere "puffery" or hyperbole.

170.    In addition, under California law, a duty to disclose arises in four circumstances: 1) when the defendant is in a fiduciary relationship with the plaintiff; 2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; 3) when the defendant actively conceals a material fact from the plaintiff; and 4) when the defendant makes partial representations but also suppresses some material facts.

171.    Defendant had a duty to disclose the Drives' defects and their unsuitability for RAID and NAS to the Plaintiff and the Class for the following three independent reasons: 1) Defendant had exclusive knowledge of these facts at the time of sale; 2) Defendant actively concealed these facts from Plaintiff and Class Members; and 3) Defendant made partial representations to Plaintiff and Class Members regarding the reliability, longevity, and suitable uses of the Drives.

172.    Defendant had a duty to disclose, and failed to disclose, *inter alia*, that the Drives 1) are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for any form of RAID or NAS; 5) that their published read error rates and AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

173.    Defendant failed to disclose the foregoing despite knowing that the Drives are plagued by latent, model-wide defects. Defendant's knowledge stemmed from reading negative consumer reviews detailing Drive failures and testing and repairing its own defective Drives.

174.   Defendant's omissions and misrepresentations were material because they pertain to the Drives' reliability and longevity, and a reasonable consumer would attach importance to the existence or non-existence of a defect that strongly and adversely affects these qualities.

175.   It is common knowledge that a hard drive's reliability and longevity are important to consumers, as consumers store valuable and often irreplaceable files, pictures, documents, and other data on them. Defendant, which is one of the largest hard drive manufacturers in the world, therefore knew, or had reason to know, that consumers were likely to regard the foregoing as important in deciding whether to purchase its Drives. Moreover, the consumer reviews and complaints discussed *supra* put Defendant on notice of the above.

176.   Plaintiff would not have purchased any Drives if he had known about their model-wide defects, unreliability, and/or unsuitability for RAID and NAS.  Since Defendant's misrepresentations and omissions were material, it may be presumed that members of the Class would not have purchased a Drive if they had known about their defects.

177.   If Defendant had disclosed the Drives' defects, the defects would have become known to Plaintiff and the Class Members because, upon information and belief, they would have been disseminated on the Internet, by retail employees, and through other sources.

178.   Defendant violated the UCL's unfair prong because Defendant's acts and practices set forth in this Complaint offend established public policy or are otherwise immoral, unethical, unscrupulous, and oppressive.

179.   These acts and practices include, without limitation, Defendant marketing and selling the Drives knowing they contain serious model-wide defects; failing to adequately disclose and remedy the defects; marketing and selling the Drives as "perfect" and "best-fit" for RAID knowing they are not designed for RAID 5 or suitable for any type of RAID or NAS; misrepresenting the quality and reliability of the Drives; replacing failed Drives with "refurbished" Drives that had already failed and were highly likely to fail again; failing to provide refunds or a different model of hard drive to warranty claimants even though Defendant never delivered conforming, non-defective Drives; and providing defective replacement Drives and charging customers exorbitant sums of money to recover their data.

180.    The harm these acts and practices cause to consumers greatly outweighs any benefits associated with those acts and practices.

181.    Defendant's conduct has also impaired competition within the hard drive market and has prevented Plaintiff and Class Members from making fully informed decisions about whether to purchase Drives and/or the price to be paid to purchase them.

182.    Plaintiff has standing to pursue all of the foregoing Unfair Competition Law claims on behalf of the Class because they have suffered an injury in fact, including the loss of money or property, as a result of and in reliance on Defendant's unfair, unlawful, and deceptive practices. As set forth above, Plaintiff was exposed to and read Defendant's misrepresentations prior to purchase, considered them material, relied on them, and were deceived by them.  Moreover, had Defendant disclosed the Drives' defects and true suitable uses, Plaintiff would not have purchased any.  In addition, Plaintiff expended money as a result of the Drives' defects to the extent that he had to pay to ship his Drive to Defendant for replacement.

183.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

184.    Accordingly, Plaintiff and the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the Class any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for attorney's fees and costs.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

185.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

186.    California Business and Professions Code § 17500, *et seq.*, the False Advertising Law ("FAL"), proscribes the dissemination of a statement that is "untrue, misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

187.    The FAL prohibits statements that are "disseminated before the public in [California]" as well as those that are "disseminated from [California] before the public in any state."

188.    As alleged in paragraph 164, *supra*, the misrepresentations at issue in this litigation were disseminated from California to Plaintiff and to Class Members across the country.

189.    Plaintiff and the members of the Class are "persons" within the meaning of the FAL.

190.    Defendant is a "corporation" within the meaning of the FAL.

191.    Defendant engaged in advertising and marketing to the public and offered the Drives for sale.

192.    Defendant engaged in the advertising and marketing alleged herein with the intent to induce the sale of its Drives to consumers.

193.    Defendant's advertising and marketing representations regarding its Drives were false, misleading, deceptive, and material as set forth in detail above. Defendant also concealed material information from consumers that the Drives contain a latent defect that causes them to fail at extraordinarily high rates and that the Drives are not designed for RAID 5 or suitable for any RAID or NAS configuration.

194.    Defendant's misrepresentations and omissions deceive or have the tendency to deceive the general public.

195.    Since Defendant's misrepresentations and omissions are objectively material to a reasonable consumer, reliance on them may be presumed as a matter of law.

196.    At the time the misrepresentations were made, Defendant knew, or should have known, that they were untrue or misleading. Defendant had knowledge of thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation, and it had firsthand knowledge of the Drives' defects because it examined and tested all Drives sent in by consumers for replacement.

197.    Plaintiff has standing to pursue a FAL claim on behalf of the Class because he has suffered an injury in fact, including the loss of money or property, as a result of and in reliance on Defendant's false advertising.  Plaintiff was exposed to and read Defendant's misrepresentations prior to purchase, considered them material, relied on them, and were deceived by them. Moreover,

had Defendant disclosed the Drives' defects and true suitable uses, Plaintiff would not have purchased any. In addition, Plaintiff expended money as a result of the Drives' defects to the extent that he had to pay to ship his Drive to Defendant for replacement.

198.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

199.    Accordingly, Plaintiff and the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its false advertising practices and to restore to Plaintiff and the Class any money Defendant acquired by false advertising, including restitution and/or restitutionary disgorgement, and for attorney's fees and costs.

## THIRD CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (ON BEHALF OF PLAINTIFF AND THE CLASS)

200.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

201.    California Civil Code § 1750, *et seq.*, the Consumer Legal Remedies Act, prohibits several enumerated unfair methods of competition and unfair or deceptive acts or practices including, without limitation:

    a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have. Cal. Civ. Code § 1770(a)(5).

    b.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. Cal. Civ. Code § 1770(a)(7).

    c.    Advertising goods or services with intent not to sell them as advertised. Cal. Civ. Code § 1770(a)(9).

    d.    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not. Cal. Civ. Code § 1770(a)(16).

202.    The CLRA applies to the claims of Plaintiff and Class Members, regardless of the state in which they reside or purchased their Drive(s), because the unlawful conduct giving rise to this claim occurred in and emanated from California, as set forth in ¶ 164, *supra*.

203.    Defendant is a "person" as defined in the CLRA.

204.    Plaintiff and Class Members acquired and purchased Drives for personal, family, or household purposes and are therefore "consumers" as defined in the CLRA.

205.    The Drives are "goods" as defined by the CLRA.

206.    The purchases by Plaintiff and Class Members of the goods sold by Defendant constitute "transactions" as defined by the CLRA.

207.    In connection with its sale of goods to Plaintiff and the Class, Defendant violated the CLRA, including without limitation §§ 1770(a)(5),(7),(9), and (16), by:

      a.    Misrepresenting to Plaintiff and the Class that the Drives are reliable consumer hard drives with extremely low failure rates, when in fact they have latent, model-wide defects that cause them to fail at extraordinarily high rates and have a far shorter lifespan than comparable hard drives on the market.

      b.    Misrepresenting to Plaintiff and the Class that the Internal Barracuda was designed for and ideal for Desktop RAID and NAS when it was not designed for RAID 5 and is not suitable for any RAID or NAS configuration.

208.    In addition, under California law, a duty to disclose arises in four circumstances: 1) when the defendant is in a fiduciary relationship with the plaintiff; 2) when the defendant had exclusive knowledge of material facts not know to the plaintiff; 3) when the defendant actively conceals a material fact from the plaintiff; and 4) when the defendant makes partial representations but also suppresses some material facts.

209.    Defendant had a duty to disclose the Drives' defects and their unsuitability for RAID and NAS to the Plaintiff and the Class for the following three independent reasons: 1) Defendant had exclusive knowledge of these facts at the time of sale; 2) Defendant actively concealed these facts from Plaintiff and Class Members; and 3) Defendant made partial representations to Plaintiff and Class Members regarding the reliability, longevity, and suitable uses of the Drives.

210.    Defendant had a duty to disclose, and failed to disclose, *inter alia*, that the Drives 1) are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for any

form of RAID or NAS; 5) that their published read error rates and AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

211.    Defendant failed to disclose the foregoing despite knowing that the Drives are plagued by latent, model-wide defects. Defendant's knowledge stemmed from reading negative consumer reviews detailing Drive failures and testing and repairing its own defective Drives.

212.    In sum, Defendant violated the CLRA by supplying defective Drives and misrepresenting their suitable and intended uses and by further concealing material facts regarding the same.

213.    Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer for the reasons discussed in detail in this Amended Complaint, and they did in fact mislead Plaintiff.

214.    Defendant's omissions and misrepresentations were material for the reasons discussed *supra.*

215.    Plaintiff and the Class relied to their detriment on Defendant's misrepresentations and omissions in purchasing Drives, and were injured.

216.    Plaintiff, on behalf of himself and the Class, demands judgment against Defendant under the CLRA for injunctive relief.

217.    Plaintiff, on behalf of himself and the Class, further intend to seek damages.  Pursuant to Cal. Civ. Code § 1782(a), Plaintiff will serve Defendant with notice of its alleged violations of the CLRA by certified mail, return receipt requested. If, within thirty days after the date of such notification, Defendant fails to provide appropriate relief for its violations of the CLRA, Plaintiff will seek the Court's leave to amend this Amended Complaint.

### FOURTH CLAIM FOR RELIEF

### BREACH OF EXPRESS WARRANTY
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

218.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

219.    The Drives' warranty contains a choice of law clause which provides that the "laws of the State of California, USA, govern this limited warranty."

220.     As an express warrantor and manufacturer and merchant, Defendant had certain obligations under California Commercial Code § 2313, *et seq.*, and California Civil Code § 1791.2, *et seq.* to conform the Drives to their express warranties.

221.     When Plaintiff and Class Members purchased the Drives, Defendant expressly warranted that they were free from defects in materials and workmanship.

222.     Defendant breached its express warranties – and continues to breach them – because it did not, and cannot, deliver conforming, non-defective Drives to Plaintiff and Class Members despite sending replacement Drives to them.

223.     Defendant did not, and cannot, deliver conforming, non-defective Drives because the Drives suffer from latent, model-wide defects which are present at the time of sale or Drive replacement.

224.     These defects cause the Drives' warranties to fail of their essential purpose. Defendant warranted that if a Drive has a defect in materials or workmanship, Defendant will replace it with a "functionally equivalent replacement product."  *See* Exhibit F: *Seagate Limited Warranty*. The reasonable and natural interpretation of this phrase is "functional equivalent of the product as warranted" (i.e. free from defects in materials and workmanship).  Defendant did not satisfy this obligation because all of its Drives have latent defects and it failed to replace the Drives owned by Plaintiff and Class Members with functionally equivalent hard drives of a different model.

225.     Simply put, Defendant replaced defective Drives with defective Drives.  Indeed, Defendant provided as replacements failed drives that it "refurbished" despite knowing that they were irreparably defective and highly likely to fail again.

226.     Plaintiff used his Drives in a manner consistent with their intended use and have performed each and every duty required under the terms of the warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

227.     Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

228.    Additionally, upon information and belief, Defendant has received – or otherwise has knowledge of – thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation and is aware of the Backblaze reports.

229.    Privity of contract is not required in this action.  Privity is not an element under California Civil Code § 1791.2, *et seq.,* Moreover, under California law, privity is not required under California Commercial Code § 2313, *et seq.,* when plaintiffs rely on a manufacturer's written representations on product labels or advertising materials in deciding to purchase a defective product. Defendant printed the warranty length on the Drives' boxes as well as on its website and/or in its marketing and informational materials.  Moreover, upon information and belief, Defendant represented to authorized retailers and resellers that the Drives were covered by a manufacturer warranty, causing the retailers and resellers to communicate this information to their customers.

230.    As discussed *supra*, Plaintiff relied on these representations in deciding to purchase the Drives.

231.    Moreover, Defendant's warranty states "Only consumers purchasing this product from an authorized Seagate retailer or reseller may obtain coverage under this Limited Warranty." *See* Exhibit F.

232.    In its capacity as a supplier and/or warrantor, and by the deceptive, unfair, unconscionable, and fraudulent conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defects present in the Drives as of the time of sale, which Defendant knew about prior to offering the Drives for sale, which Defendant concealed and did not disclose, and did not remedy prior to sale or afterward, is unconscionable, and any such effort to disclaim or otherwise limit liability for the defects at issue is null and void.

233.    Any attempt by Defendant to limit or exclude any form of damages or other remedies, including without limitation consequential and incidental damages, is unconscionable and therefore null and void due to Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

234.    Plaintiff and the Class Members have suffered damages caused by Defendant's breach of the express warranties and seek to recover damages including, without limitation, restitution;

consequential and incidental damages such as data loss and data recovery costs; attorney's fees and costs; and any other relief the Court deems just and appropriate.

## FIFTH CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

235.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

236.    A warranty that the Drives are in merchantable quality and condition is implied by law pursuant to Cal. Com. Code § 2314 and Cal. Civ. Code § 1792.

237.    Defendant is, and was at all relevant times, a merchant with respect to the Drives.

238.    The Drives were purchased and used primarily for personal, family, or household purposes, and are therefore consumer goods.

239.    Plaintiff purchased the Drives new and in their original packaging and used them in a manner consistent with their intended use.

240.    Defendant did not disclaim the implied warranty of merchantability, nor could it; pursuant to Cal. Civ. Code § 1793, a manufacturer, distributor, or retailer may not limit, modify, or disclaim this implied warranty if it extends an express warranty on the product.

241.    Defendant impliedly warranted that the Drives were of good and merchantable condition and quality – fit for their ordinary intended use, namely, providing reliable data storage as an internal hard drive, an external drive, or in a NAS or RAID configuration.

242.    The Drives contained latent, model-wide defects that causes the Drives to fail at an unacceptably high rate far in excess of industry standards for this type of hard drive. Moreover, the Drives were not fit for RAID 5 or any type of RAID or NAS. These latent defects were present in the Drives when they left the exclusive control of Defendant and therefore existed during the duration of the warranty period.

243.    The Drives were not of the same quality as those generally acceptable in the trade; were not fit for the ordinary purposes of consumer data storage for which the goods are used; were not adequately contained, packaged, and labeled; and did not conform to the promises and facts stated on the container and label.

244.    Because all Drives were, and continue to be, latently defective, they were all non-merchantable.  Accordingly, Defendant did not satisfy its implied warranty obligations by sending replacement Drives to Plaintiff and the Class.

245.    Plaintiff performed each and every duty required by the implied warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

246.    Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

247.    Additionally, upon information and belief, Defendant has received – or otherwise has knowledge of – thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation and is aware of the Backblaze reports.

248.    Privity is not required in this action.  Privity is not an element under Cal. Civ. Code § 1792.  Moreover, under California law, no privity is required under California Com. Code § 2314 when plaintiffs rely on a manufacturer's written representations on product labels or advertising materials in deciding to purchase a defective product.  As alleged *supra*, Plaintiff relied on Defendant's representations on the Drives' boxes, on Defendant's websites, and in other materials.

249.    Privity is also not required when the plaintiffs are the intended beneficiaries of implied warranties between a retailer and a manufacturer.  Plaintiff and Class Members are intended third-party beneficiaries of contracts between Defendant and its authorized retailers and resellers; specifically, they are the intended beneficiaries of Defendant's implied warranties.  The retailers and resellers were not intended to be the ultimate consumers of the Drives and have no rights under the warranty agreements provided with the Drives, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

250.    Defendant, therefore, breached the implied warranty of merchantability, which by law is provided in every consumer agreement for the sale of goods unless disclaimed, including for the sale of the Drives.

251.    As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiff and the Class have been damaged by receiving an inferior product from

that which they were promised.  Plaintiff and the Class, therefore, seek to recover damages including, without limitation, restitution; consequential and incidental damages such as data loss and data recovery costs; attorney's fees and costs; and any other relief the Court deems just and appropriate.

**SIXTH CLAIM FOR RELIEF**

**BREACH OF EXPRESS WARRANTY**
**(ON BEHALF OF THE PLAINTIFF AND SOUTH DAKOTA SUBCLASS)**

252.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

253.    As an express warrantor and manufacturer and merchant, Defendant had certain obligations under to conform the Drives to their express warranties as provided by the law of each aforementioned state, namely Cal. Com. Code § 2313; Cal. Civil Code § 1791.2; and S.D. Codified Laws § 57A-2-313.

254.    When Plaintiff and Subclass Members purchased the Drives, Defendant expressly warranted that they were free from defects in materials and workmanship.  These express warranties formed the basis of the bargain that was reached when Plaintiff and other Class Members purchased their Drives.

255.    Defendant breached its express warranties – and continues to breach them – because it did not, and cannot, deliver conforming, non-defective Drives to Plaintiff and Subclass Members despite sending replacement Drives to them.

256.    Defendant did not, and cannot, deliver conforming, non-defective Drives because the Drives suffer from latent, model-wide defects which are present at the time of sale or Drive replacement.

257.    These defects cause the Drives' warranties to fail of their essential purpose. Defendant warranted that if a Drive has a defect in materials or workmanship, Defendant will replace it with a "functionally equivalent replacement product." *See* Exhibit F: *Seagate Limited Warranty.* The reasonable and natural interpretation of this phrase is "functional equivalent of the product as warranted" (i.e. free from defects in materials and workmanship). Defendant did not satisfy this

1    obligation because all of its Drives have latent defects and it failed to replace the Drives owned by

2    Plaintiff and Subclass Members with functionally equivalent hard drives of a different model.

3        258.    Simply put, Defendant replaced defective Drives with defective Drives. Indeed,

4    Defendant provided as replacements failed drives that it "refurbished" despite knowing that they

5    were irreparably defective and highly likely to fail again.

6        259.    Plaintiff used their Drives in a manner consistent with their intended use and have

7    performed each and every duty required under the terms of the warranty, except as may have been

8    excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's

9    deceptive, unfair, unconscionable, and fraudulent conduct.

10       260.    Defendant has received timely notice regarding the problems at issue in this litigation

11   and, notwithstanding such notice, has failed and refused to offer an effective remedy.  Affording

12   Defendant further opportunity to cure its breach of written warranties would be unnecessary and

13   futile.

14       261.    Additionally, upon information and belief, Defendant has received – or otherwise has

15   knowledge of – thousands of complaints and reviews from customers pertaining to the defects at

16   issue in this litigation and is aware of the Backblaze reports.

17       262.    Privity of contract is not required in this action, as the express warranty, by its clear

18   and unambiguous terms, extends to "consumers purchasing this product from an authorized Seagate

19   retailer or reseller." *See* Exhibit F.

20       263.    Moreover, Plaintiff otherwise relied on Defendant's representation that the Drives

21   were covered by a manufacturer warranty. Defendant printed the warranty length on the Drives'

22   boxes as well as on its website and/or in its marketing and informational materials. Upon information

23   and belief, Defendant also represented to authorized retailers and resellers that the Drives were

24   covered by a manufacturer warranty, causing the retailers and resellers to communicate this

25   information to their customers.

26       264.    As discussed *supra*, Plaintiff relied on these representations in deciding to purchase

27   the Drives.

28

265.    In any event, privity is not an element of breach of express warranty under the California Civil Code.

266.    In its capacity as a supplier and/or warrantor, and by the deceptive, unfair, unconscionable, and fraudulent conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defects present in the Drives as of the time of sale, which Defendant knew about prior to offering the Drives for sale, which Defendant concealed and did not disclose, and did not remedy prior to sale or afterward, is unconscionable, and any such effort to disclaim or otherwise limit liability for the defects at issue is null and void.

267.    Any attempt by Defendant to limit or exclude any form of damages or other remedies, including without limitation consequential and incidental damages, is unconscionable and therefore null and void due to Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

268.    Plaintiff and the Subclass Members have suffered damages caused by Defendant's breach of the express warranties and seek to recover damages including, without limitation, restitution; consequential and incidental damages such as data loss and data recovery costs; attorney's fees and costs; and any other relief the Court deems just and appropriate.

**SEVENTH CLAIM FOR RELIEF**

**BREACH OF IMPLIED WARRANTY**
**(ON BEHALF OF PLAINTIFF AND THE SOUTH DAKOTA SUBCLASS)**

269.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

270.    A warranty that the Drives are in merchantable quality and condition is implied under the law of each aforementioned state, namely Cal. Com. Code § 2314; Cal. Civil Code § 1792; and S.D. Codified Laws § 57A-2-314

271.    Defendant is, and was at all relevant times, a merchant with respect to the Drives.

272.    The Drives were purchased and used primarily for personal, family, or household purposes and are therefore consumer goods.

273.    Plaintiff purchased the Drives new and in their original packaging and used them in a manner consistent with their intended use.

274.    Defendant did not disclaim the implied warranty of merchantability.

275.    Defendant impliedly warranted that the Drives were of good and merchantable condition and quality – fit for their ordinary intended use, namely providing reliable data storage as an internal hard drive, an external drive, or in a NAS or RAID configuration.

276.    The Drives contained latent, model-wide defects that cause the Drives to fail at an unacceptably high rate far in excess of industry standards for this type of hard drive. Moreover, the Drives were not fit for RAID 5 or any type of RAID or NAS. These latent defects were present in the Drives when they left the exclusive control of Defendant and therefore existed during the duration of the warranty period.

277.    The Drives were not of the same quality as those generally acceptable in the trade; were not fit for the ordinary purposes of consumer data storage for which the goods are used; were not adequately contained, packaged, and labeled; and did not conform to the promises and facts stated on the container and label.

278.    Because all Drives were, and continue to be, latently defective, they were all non-merchantable. Accordingly, Defendant did not satisfy its implied warranty obligations by sending replacement Drives to Plaintiff and the Subclass.

279.    Plaintiff performed each and every duty required by the implied warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

280.    Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

281.    Additionally, upon information and belief, Defendant has received – or otherwise has knowledge of – thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation and is aware of the Backblaze reports.

282.    Privity of contract is not required in this action, because Plaintiff relied on Defendant's representation that the Drives were covered by a manufacturer warranty. Defendant printed the warranty length on the Drives' boxes as well as on its website and/or in its marketing and informational materials. Moreover, upon information and belief, Defendant represented to

1    authorized retailers and resellers that the Drives were covered by a manufacturer warranty, causing

2    the retailers and resellers to communicate this information to their customers.

3          283.    Privity is also not required because the Plaintiff and Subclass Members are intended

4    third-party beneficiaries of contracts between Defendant and its authorized retailers and resellers;

5    specifically, they are the intended beneficiaries of Defendant's implied warranties. The retailers and

6    resellers were not intended to be the ultimate consumers of the Drives and have no rights under the

7    warranty agreements provided with the Drives, and the warranty agreements were designed for and

8    intended to benefit the ultimate consumers only.

9          284.    In any event, privity is not required for implied warranty claims in South Dakota.

10          285.    As a direct and proximate cause of Defendant's breach of the implied warranty of

11    merchantability, Plaintiff and the Subclass have been damaged by receiving an inferior product from

12    that which they were promised.  Plaintiff and the Subclass, therefore, seek to recover damages

13    including, without limitation, restitution; consequential and incidental damages such as data loss and

14    data recovery costs; attorney's fees and costs; and any other relief the Court deems just and

15    appropriate.

16                              **EIGHTH CLAIM FOR RELIEF**

17    **VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND
      CONSUMER PROTECTION STATUTE**

18    **(ON BEHALF OF PLAINTIFF AND THE SOUTH DAKOTA SUBCLASS)**

19          286.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

20          287.    The South Dakota Deceptive Trade Practices and Consumer Protection Statute

21    ("DTP-ACPS"), S.D.C.L. § 37-24-1, *et seq*., prohibits deceptive acts or practices including, *inter*

22    *alia*, knowingly and intentionally acting, using, or employing any deceptive act or practice, fraud,

23    false pretense, false promises, or misrepresentation or concealing, suppressing, or omitting any

24    material fact in connection with the sale or advertisement of any merchandise.

25          288.    Plaintiff, Subclass Members, and Defendant are "persons" as defined by the DTP-

26    CPS.

27

28

289.    Defendant violated the DTP-CPS because it knowingly and intentionally made material misrepresentations and omissions regarding the Drives in connection with the sale and/or advertisement of the Drives, as set forth in this Complaint.

290.    Defendant affirmatively misrepresented, and continues to misrepresent, *inter alia*, that the Drives are highly reliable, have an extremely low failure rate, are ideal for RAID and NAS, and are suitable for protecting important and irreplaceable personal data.

291.    These claims are false and/or misleading for the reasons set forth in this Complaint.

292.    Defendant also failed to disclose material facts about the Drives including, without limitation, that the Drives are not reliable or dependable, that they are plagued by a latent, model-wide defect that renders them highly susceptible to premature catastrophic failures, that their published read error rates and AFRs are wholly inaccurate, that they do not last nearly as long as comparable Drives on the market, and that they are not designed for RAID 5 or fit for any type of RAID or NAS.

293.    Defendant made these misrepresentations and omissions knowingly and intentionally. Upon information and belief, Defendant received, or otherwise had knowledge of, thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation and was aware of the Backblaze reports.  Additionally, it had firsthand knowledge of the Drives' defects because it examined and tested all Drives sent in by consumers for replacement. Despite this knowledge, Defendant intentionally misrepresented, and continues misrepresent, the qualities and characteristics of the Drives, and it chose to conceal rather than disclose the true defective nature of the Drives and their true suitable uses for its own pecuniary gain.

294.    If Defendant had disclosed the Drives' defects, they would have become known to Plaintiff and Subclass Members because, upon information and belief, they would have been disseminated on the Internet, by retail employees, and through other sources.

295.    Neither Plaintiff nor members of the Subclass would have purchased a Drive if they had known about the latent, model-wide defects and its unfitness for RAID and NAS. Thus, Defendant's omission of this critical information, along with Defendant's affirmative misrepresentations, proximately caused economic injury to Plaintiff and the Subclass.

296.     Plaintiff Nelson has standing to pursue a DTP-CPS claim on behalf of the South Dakota Subclass because, as detailed in this Amended Complaint, he was exposed to and read Defendant's representations about the Backup Plus prior to purchase, found the representations to be material, relied on them, and was deceived by them. Accordingly, Plaintiff has lost money and property as a result of Defendant's misrepresentations and omissions.

297.     As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiff and the South Dakota Subclass Members have been injured and seek to recover actual damages including, without limitation, restitution; damages stemming from data loss and data recovery costs; and any other relief the Court deems just and appropriate.

### NINTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

298.     In the alternative to Counts IV, V, VI, and VII, Plaintiff, on behalf of himself and the Class, alleges as follows:

299.     Through the deceptive, unfair, and unconscionable conduct and statements described in this Amended Complaint, Defendant sold defective Drives to Plaintiff and Class Members and thereafter failed and refused to provide them with the non-defective Drives they paid for.

300.     Such conduct includes, without limitation, marketing and selling the Drives knowing they contain serious model-wide defects; failing to adequately disclose and remedy the defects; misrepresenting the quality and reliability of the Drives; misrepresenting the uses the Drives are intended and/or suitable for; replacing failed Drives with "refurbished" Drives that had already failed and are highly likely to fail again; failing to provide refunds or a different model of hard drive; and providing customers with defective replacement Drives and charging them exorbitant sums of money to recover their data.

301.     Upon information and belief, Defendant engaged in the foregoing conduct in order to enrich itself at the expense of Plaintiff and Class Members.

302.     As the proceeds from the sale of Defendant's Drives were obtained/induced by improper means, Defendant is not legally or equitably entitled to retain these proceeds.

303.    Defendant breached the public trust through its misrepresentations, omissions, and other deceptive, unfair, and unconscionable conduct connected to the sale and replacement of its Drives, all of which was to the detriment of Plaintiff and Class Members.

304.    By its actions in taking and withholding Drive sales proceeds, Plaintiff and Class Members conferred, and continue to confer, a benefit upon the Defendant, and the Defendant is aware of such benefit.

305.    By Defendant taking and withholding Plaintiff's and the Class' monies, Defendant was and is financially unjustly enriched, causing an economic detriment to the Plaintiff and the Class.

306.    Defendant's retention of this benefit violates the fundamental principles of justice, equity, and good conscience.

307.    As it would be unjust and inequitable for Defendant to retain its ill-gotten gains, Defendant is required to pay restitution to Plaintiff and the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and Class Members pray for relief as set forth below:

A.    Restitution and/or actual, incidental and consequential damages, and such other relief as provided by the statutes cited herein.

B.    Pre-judgment and post-judgment interest.

C.    Equitable relief in the form of restitution and/or disgorgement of all of Defendant's ill-gotten gains.

D.    Attorney's fees and costs.

E.    An injunction against Defendant, its affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing its unfair, unlawful, and deceptive practices and false advertising.

F.    Injunctive relief under the California CLRA as appropriate.

G.    All other relief to which Plaintiff and Class Members may be entitled at law or in equity.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all issues so triable.


DATED: May 4, 2016                    HAGENS BERMAN SOBOL SHAPIRO LLP


By:   */s/ Steve Berman*
     Steve W. Berman (*pro hac vice*)
     1918 Eighth Avenue, Suite 3300
     Seattle, Washington 98101
     Telephone: (206) 623-7292
     Facsimile: (206) 623-0594
     steve@hbsslaw.com

     Jeff. D. Friedman
     715 Hearst Avenue, Suite 202
     Berkeley, California 94710
     Telephone: (510) 725-3000
     Facsimile: (510) 725-3001
     jefff@hbsslaw.com

     Marc A. Goldich (*pro hac vice*)
     AXLER GOLDICH, LLC
     One Liberty Place
     1650 Market Street, Suite 3600
     Philadelphia, PA 19103
     Telephone: (267) 207-2920
     mgoldich@axgolaw.com

     *Attorneys for Plaintiff*