# EXHIBIT 1

Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Marc A. Goldich (*pro hac vice*)
AXLER GOLDICH, LLC
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 207-2920
mgoldich@axgolaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| IN RE SEAGATE TECHNOLOGY LLC LITIGATION | No. 5:16-cv-00523-RMW |
|---|---|
| CONSOLIDATED ACTION | SECOND CONSOLIDATED AMENDED |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................ 1

II.    PARTIES ....................................................................................................... 3

III.   JURISDICTION AND VENUE ..................................................................... 4

IV.    FACTUAL ALLEGATIONS ......................................................................... 5

    A.    Background Information ...................................................................... 5

        1.    Hard Drives Generally .............................................................. 5

        2.    The Drives ................................................................................. 7

    B.    Seagate Markets and Advertises Its Drives as ~~Highly Reliable~~, Having Extremely Low Failure Rates, and Suitable for RAID ~~and NAS~~ ............................................................................................... 8

    C.    Defendant's Statements and Data Are False, Misleading, and Deceptive, and Defendant Failed to Disclose the Drives' Defects and Unsuitability for RAID~~/NAS~~ ................................................. 14

        1.    The Backblaze Reports ........................................................... 14

        2.    The Drives Are Not Designed for RAID 5 and Are Not Suitable for Any Level of RAID ~~or NAS~~ ............................. 18

        3.    Defendant Failed to Disclose the Drives' Defects and Their Unsuitability for RAID ~~and NAS~~ ....................................... 19

    ~~D.    Seagate's Warranty on the Drives~~........................................... ~~21~~

    E.    The Plaintiffs' and the Class' Experience With Failed Seagate Drives ................................................................................................ 22

        1.    Plaintiff Nelson ....................................................................... 22

        2.    Plaintiff Hauff ........................................................................ 24

        3.    Plaintiff Schechner .................................................................. 26

        4.    Plaintiff Hagey ....................................................................... 28

        5.    Plaintiff Crawford ................................................................... 29

        ~~6.    Plaintiff Ginsberg~~................................................................. ~~32~~

        7.    Plaintiff Manak ....................................................................... 33

        8.     Plaintiff Enders ................................................................. 34

        9.     Plaintiff Dortch ................................................................ 35

        10.    Plaintiff Smith.................................................................. 37

    F.     Class Members' Experience with the Drives ................................. 38

V.     CLASS ACTION ALLEGATIONS ..................................................... 43

VI.    VIOLATIONS ALLEGED ................................................................ 46

FIRST CLAIM FOR RELIEF VIOLATION OF THE CALIFORNIA UNFAIR
    COMPETITION LAW (ON BEHALF OF PLAINTIFFS AND THE
    CLASS).............................................................................................. 46

SECOND CLAIM FOR RELIEF VIOLATION OF THE CALIFORNIA FALSE
    ADVERTISING LAW (ON BEHALF OF PLAINTIFFS AND THE
    CLASS).............................................................................................. 51

THIRD CLAIM FOR RELIEF VIOLATION OF THE CALIFORNIA
    CONSUMER LEGAL REMEDIES ACT (ON BEHALF OF
    PLAINTIFFS AND THE CLASS) ...................................................... 53

~~FOURTH CLAIM FOR RELIEF BREACH OF EXPRESS WARRANTY (ON
    BEHALF OF PLAINTIFFS AND THE CLASS) .................................... 56~~

~~FIFTH CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY (ON
    BEHALF OF ALL PLAINTIFFS AND THE CLASS) ............................ 58~~

~~SIXTH CLAIM FOR RELIEF BREACH OF EXPRESS WARRANTY (ON
    BEHALF OF THE CALIFORNIA, NEW YORK, ILLINOIS, FLORIDA,
    MASSACHUSETTS, TENNESSEE, SOUTH CAROLINA, TEXAS,
    AND SOUTH DAKOTA SUBCLASSES) .............................................. 61~~

~~SEVENTH CLAIM FOR RELIEF BREACH OF IMPLIED WARRANTY (ON
    BEHALF OF THE CALIFORNIA, NEW YORK, ILLINOIS, FLORIDA,
    MASSACHUSETTS, TENNESSEE, SOUTH CAROLINA, TEXAS,
    AND SOUTH DAKOTA SUBCLASSES)~~ ..................................... 63

EIGHTH CLAIM FOR RELIEF VIOLATION OF THE NEW YORK
    DECEPTIVE ACTS AND PRACTICES STATUTE (ON BEHALF OF
    PLAINTIFF CRAWFORD AND THE NEW YORK SUBCLASS) ......................... 65

~~NINTH CLAIM FOR RELIEF VIOLATION OF FLORIDA'S UNFAIR AND
    DECEPTIVE TRADE PRACTICES ACT (ON BEHALF OF PLAINTIFF
    SCHECHNER AND THE FLORIDA SUBCLASS)~~ ................................... 68

TENTH CLAIM FOR RELIEF DECEPTIVE ACTS OR PRACTICES
    PROHIBITED BY MASSACHUSETTS LAW (ON BEHALF OF
    PLAINTIFF HAUFF AND THE MASSACHUSETTS SUBCLASS) ...................... 70

ELEVENTH CLAIM FOR RELIEF VIOLATION OF ILLINOIS CONSUMER
FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ON
BEHALF OF PLAINTIFF SMITH AND THE ILLINOIS SUBCLASS)...................75

TWELFTH CLAIM FOR RELIEF VIOLATION OF TENNESSEE CONSUMER
PROTECTION ACT (ON BEHALF OF PLAINTIFF HAGEY AND
THE TENNESSEE SUBCLASS)................................................................77

THIRTEENTH CLAIM FOR RELIEF VIOLATIONS OF THE SOUTH
CAROLINA UNFAIR TRADE PRACTICES ACT (ON BEHALF OF
PLAINTIFF DORTCH AND SOUTH CAROLINA SUBCLASS)...........................79

FOURTEENTH CLAIM FOR RELIEF  VIOLATIONS OF THE TEXAS
DECEPTIVE TRADE PRACTICES ACT (ON BEHALF OF PLAINTIFF
MANAK AND TEXAS SUBCLASS) ............................................................82

FIFTEENTH CLAIM FOR RELIEF VIOLATION OF THE SOUTH DAKOTA
DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION
STATUTE (ON BEHALF OF PLAINTIFF NELSON AND THE SOUTH
DAKOTA SUBCLASS) ...........................................................................85

SIXTEENTH CLAIM FOR RELIEF UNJUST ENRICHMENT (ON BEHALF
OF PLAINTIFFS AND THE CLASS) .........................................................87

PRAYER FOR RELIEF ................................................................................88

JURY DEMAND .........................................................................................89

Plaintiffs Christopher Nelson ("Plaintiff Nelson"), Dennis Crawford ("Plaintiff Crawford"), Joshuah Enders ("Plaintiff Enders"), ~~Adam Ginsberg ("Plaintiff Ginsberg"),~~ David Schechner ("Plaintiff Schechner"), Chadwick Hauff ("Plaintiff Hauff"), James Hagey ("Plaintiff Hagey"), Nikolas Manak ("Plaintiff Manak"), John Smith ("Plaintiff Smith") and Dudley Lane Dortch IV ("Plaintiff Dortch") (collectively "Plaintiffs"), by their designated attorneys, individually and on behalf of all others similarly situated, for their Second Consolidated Amended Complaint, allege as follows based upon personal knowledge, the investigation of counsel, information and belief, and publicly available information:

## I. INTRODUCTION

1. This is a class action arising from Defendant Seagate Technology, LLC's ("Defendant") repeated failure and inability to deliver non-defective hard drives ~~that conform to their~~ ~~express and~~ ~~implied warranties~~; its breach of consumer protection, unfair competition, and false advertising laws; and its unjust enrichment.

2. In October 2011, Defendant released the Seagate Barracuda 3TB Internal Hard Disk Drive ("Internal Barracuda").  Defendant subsequently released external versions of the Barracuda, such as the Seagate Backup Plus 3TB External Hard Disk Drive (hereafter "Backup Plus") and the Seagate FreeAgent GoFlex 3TB External Hard Disk Drive (hereafter "GoFlex") (collectively referred to as "Drives").

3. Defendant claimed, and continues to claim and market, on its website and in its promotional and informational publications that the Drives ~~are reliable, dependable,~~ have extremely low failure rates, and are suitable for ~~Network Attached Storage ("NAS") devices and~~ Redundant Array of Independent Disk ("RAID") configurations.

4. The Drives ~~are not, however, reliable or dependable and they~~ do not have low failure rates. Rather, they contain latent, model-wide defects that cause them to fail prematurely at spectacularly – and in many respects unprecedentedly – high rates.

5. As demonstrated by consumer experience and reports released by Backblaze, a data backup company, the true failure rate of the Drives is substantially higher than advertised

and the Drives do not last nearly as long as comparable devices from other manufacturers or even other models manufactured by Defendant.  Indeed, rather than having an advertised annualized failure rate of *less than 1%*, Backblaze reported that the annualized failure rate of the Drives is as high as 47.2%.

6.    Moreover, contrary to Defendant's representations, the Drives are not designed for certain types of home RAID configurations.  In fact, the Drives are not suitable for *any* type of RAID ~~or NAS~~ due to their tendency to suddenly fail.

7.    The Drives, which were shipped by Defendant with a latent defect before being sold to and purchased by Plaintiffs and Class Members, failed after unreasonably short intervals including, without limitation, failures that occurred less than a year after purchase. Indeed, many Plaintiffs and Class Members purchased Drives that failed months after their first use.

8.    Because Defendant misrepresented, among other things, the ~~quality, reliability,~~ failure rate, and proper uses of the Drives, it violated state consumer protection and false advertising laws.

9.    Defendant also violated state consumer protection laws by making material omissions and otherwise failing to disclose the Drives' defects and their true qualities, characteristics, and proper uses. Defendant's factual omissions and concealments regarding the ~~quality, reliability,~~ failure rate, and proper uses of the Drives were material because reasonable persons in the position of the Plaintiffs and Class Members would have wanted to know about the true nature of Drives, let alone the existence of a latent defect, prior to making a purchasing decision.

~~10.    Defendant expressly warranted that it would replace failed Drives with "functionally equivalent" hard drives, but the replacements provided to Plaintiffs and Class Members, like the original Drives themselves, were inherently defective and failed at extremely high rates. Thus, the warranties failed of their essential purpose because Defendant never delivered non-defective, conforming Drives.~~

~~11.    Defendant also breached the implied warranty of merchantability because all Drives, at the time they left the possession of Defendant, contained an inherent and latent defect that caused them to be substantially below the quality generally accepted in the market; unsuitable for their ordinary purpose, which is data storage; and inadequately packaged and labeled.~~

12.    This suit is brought on behalf of Plaintiffs and all other purchasers of Defendant's Drives for violations of the California Unfair Competition Law, the California False Advertising Law, the California Consumer Legal Remedies Act, the New York Deceptive Acts and Practices Statute, ~~the Florida Unfair and Deceptive Trade Practices Act,~~ Massachusetts law, the Illinois Consumer Fraud and Deceptive Business Practices Act, the Tennessee Consumer Protection Act, the South Carolina Unfair Trade Practices Act, ~~the Texas Deceptive Trade Practices Act,~~ breach of ~~express and~~ implied warranties, and unjust enrichment.

13.    As a result of these violations and breaches, this action seeks restitution; damages arising from replacement costs, loss of data, and data recovery expenses; other actual, consequential, and incidental damages; interest; reasonable attorneys' fees and costs; and any other relief the Court deems just and appropriate.

## II.    PARTIES

14.    Plaintiff Nelson is a natural person and a citizen of South Dakota who purchased a Backup Plus in South Dakota.

15.    Plaintiff Smith is a natural person and a citizen of Illinois who purchased multiple Internal Barracudas in Illinois.

16.    Plaintiff Crawford is a natural person and a citizen of New York who purchased multiple Internal Barracudas in New York.

17.    Plaintiff Enders is a natural person and a citizen of California who purchased multiple Internal Barracudas in California.

~~18.    Plaintiff Ginsberg is a natural person and a citizen of California who purchased a GoFlex in California.~~

19.     Plaintiff Schechner is a natural person and was a citizen of Florida when he purchased a Backup Plus in Florida.  He is now a citizen of North Carolina.

20.     Plaintiff Hauff is a natural person and a citizen of Massachusetts who purchased multiple Internal Barracudas in Massachusetts.

21.     Plaintiff Hagey is a natural person and a citizen of Tennessee who purchased an Internal Barracuda in Tennessee.

22.     Plaintiff Manak is a natural person and a citizen of Texas who purchased multiple Internal Barracuda in Texas.

23.     Plaintiff Dortch is a natural person and a citizen of South Carolina who purchased multiple Internal Barracudas in South Carolina.

24.     As set forth herein, Plaintiffs and Class Members suffered ascertainable losses, namely the loss of money, financial injury, and damages as a direct and proximate result of the acts and omissions committed by Defendant.

25.     Defendant Seagate Technology, LLC is a hard drive manufacturer and distributor incorporated in Delaware and has its principal place of business in Cupertino, California. Defendant, along with its subsidiaries, affiliates, and parent corporations, is the second largest hard drive manufacturer in the world. Defendant markets, advertises, and sells hard disk drives and other hardware and software products throughout the United States and the world, including in the states of Illinois, New York, California, North Carolina, Massachusetts, Tennessee, Texas, South Carolina, and South Dakota.

### III.     JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because there are more than 100 proposed Class Members, some members of the proposed class and the Defendant are citizens of different states, and the amount in controversy exceeds $5 million.

27.     This Court has personal jurisdiction over Defendant because Defendant has its principal place of business in Cupertino, California, and directs all of its operations from there.

Alternatively, this Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with California such that the exercise of jurisdiction by this Court is consistent with notions of fair play and substantial justice. A substantial portion of the wrongdoing alleged in this Second Consolidated Amended Complaint took place in California; Defendant conducts business in California and otherwise avails itself of the protections and benefits of California law through the promotion, marketing, and sale of its Drives in the State; and this action arises out of or relates to these contacts.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant has its principal place of business in Cupertino, California, and directs all of its operations from there.

29.     Intradistrict Assignment:  Assignment to the San Jose division of this Court is appropriate because Defendant's headquarters and principal place of business is in Cupertino, California. Because this action arises in the county of Santa Clara, pursuant to Northern District of California Local Rule 3-2, assignment to the San Jose division is proper.

## IV.     FACTUAL ALLEGATIONS

### A.     Background Information

### 1.     Hard Drives Generally.

30.     A hard disk drive ("HDD" or "hard drive") is an electromechanical data storage device used for storing and retrieving information for a computer using rotating discs – which are called platters – coated with magnetic material with motors to spin or "drive" the discs.

31.     HDDs use a moving actuator arm – known as a head arm – to read and write data by magnetically changing or reading areas on the platters pursuant to instructions sent from the computer. The head arm is powered by an actuator motor called the servo motor.

32.     In addition to mechanical components, hard drives also have firmware embedded in their memory. Firmware is a type of software that governs how a piece of hardware functions. In plain terms, it is "software for hardware."

33.     Storage capacity of HDDs is typically measured in terms of gigabytes ("GB") and terabytes ("TB"). One GB is 1,000 megabytes, and one TB is 1,000 GB, or one million megabytes.

34.     There are two main types of hard drives: internal and external. An internal hard drive is installed inside the casing of a computer. An external hard drive is enclosed in its own casing, has an external power supply, and is connected to a computer with Universal Serial Bus ("USB") cables or similar types of connectors.

35.     Some hard drives can also be used in ~~NAS and~~ RAID devices.

36.     ~~NAS is a computer appliance that acts as a data storage server. In other words, it is a centralized repository for data that is often used for storing and sharing files across a computer network. NAS systems are available for home use, and many individuals use them to share and stream multimedia files to multiple home computers, gaming consoles, tablets, phones, and Smart TVs.~~

37.     ~~A NAS consists of three main components: 1) an enclosure; 2) hardware such as a motherboard, a CPU, and memory; and 3) at least one hard drive.~~



Figure 1: Network-Attached Storage device.

38.     Many NAS devices are sold without hard drives, requiring consumers to purchase drives separately.

39.     RAID is a data storage technology that combines multiple hard drives in a single unit for the purposes of data redundancy, performance improvement, or both. Data redundancy refers to the writing of the same data to multiple hard drives, such that if one drive fails the data is still available on the other drive(s).

40.     Like NAS devices, RAID is available for home use and consists of an enclosure, hard drives, and other components. RAID comes in several "levels," and the most common levels for home units are RAID 0, RAID 1, and RAID 5.

41.     RAID 0 is the most basic level of RAID which does not provide any data redundancy but typically increases storage space and data read/write speeds.

42.     RAID 1 is used for data redundancy. Typically, RAID 1 setups only have two hard drives, and as data is written to one drive it is automatically written to the other, providing an exact duplicate.

43.     RAID 5 is used for data redundancy, performance improvement, and increased storage space. It utilizes three or more hard drives, and a percentage of each hard drive, together equaling the storage space of one drive, is set aside for redundancy purposes. A RAID 5 configuration can withstand the failure of one hard drive, but if two drives fail within a short span of one another, data is lost.

44.     NAS systems can use RAID configurations such that the server backs up its own data using data redundancy.

**2.     The Drives.**

45.     The Drives at issue in this action, the Internal Barracuda and all external Drives that use the Internal Barracuda, including without limitation the Backup Plus and GoFlex, have capacities of 3TB.

46.     The Internal Barracuda, model number ST3000DM001, was renamed to "Desktop HDD 3TB" in or around late 2012 or early 2013, but the model number remained the same.  For brevity, both will be referred to as "Internal Barracuda."

47.     The external versions, including without limitation the Backup Plus 3TB and GoFlex 3TB, are Barracuda hard drives enclosed in external casings with external power supplies and USB connectors.

48.     Although the external versions come in multiple models, the model number of their enclosed Barracuda hard drives, ST3000DM001, is the same as the Internal Barracuda. Accordingly, the statements, technical specifications, and reports pertaining to the Internal Barracuda discussed *infra* also apply to the external versions.

**B.     Seagate Markets and Advertises Its Drives as ~~Highly Reliable,~~ Having Extremely Low Failure Rates, and Suitable for RAID ~~and NAS~~**

49.     Defendant released the Internal Barracuda in October 2011, and it subsequently released the external versions. Defendant sold – and continues to sell – the Drives through resellers and/or its own website.

50.     The Internal Barracuda was released to much fanfare.  ~~As reported on several hardware review websites, it was the first hard drive in the world to utilize three platters of 1TB each.  By contrast, its predecessor, the Barracuda XT 3TB HDD, contained five platters with a capacity of 600GB each.~~

~~51.     Defendant marketed the Internal Barracuda as an engineering triumph and a "major milestone for the hard drive industry."  According to the *Barracuda Product Overview*, first published by Defendant in 2011, in order to cram a TB of storage onto each platter:~~

~~Seagate engineers had to pack 340,000 hard drive tracts into the width of a single inch. This means that, when reading and writing data, the read-write head needs to accurately follow a track that is a mere 75 nanometers wide. That's about 500 times smaller than the period at the end of this sentence.~~

~~*See Barracuda Product Overview*, attached hereto as Exhibit A.~~

52.     Defendant further touted the Internal Barracuda as having a "host of refined technologies to further boost performance.  In combination, these improvements squeeze even more performance out of storage already known for pushing the envelope!" Some of these improvements include a "third-generation dual-core processor" that handles data faster; "40nm chip manufacturing technology" that provides more computing power; and "64MB of DDR2 SDRAM" that "enables the fastest cache to date on Barracuda drives."

53.     Defendant promoted the Internal Barracuda as not only fast and technologically refined, but also highly reliable.  For example, in the *Barracuda Product Overview*, Defendant asserted that the Drives provide "[r]eliable performance, even in tough environments, thanks to Seagate AcuTrac™ servo technology," and that Seagate AcuTrac technology "reliably and accurately [follows the Drive's] nano-tracks even in challenging operating environments, like an all-in-one PC with the music turned up."

54.     Likewise, Defendant claimed in the *Barracuda Data Sheet*, first published in 2011, that its "AcuTrac™ servo technology delivers dependable performance, even with hard drive track widths of only 75 nanometers."  *See Barracuda Data Sheet*, attached hereto as Exhibit B.

55.     The following statements, among others, appeared on the webpage for the Internal Barracuda on Defendant's website in 2012 (hereafter "2012 Barracuda webpage"):

a.     "Seagate AcuTrac technology enables reliable read/write performance even in high touch operating environments."

b.     "Seagate AcuTrac™ technology enables new storage densities with accurate reading and writing to nano-sized tracks that are only 75 nanometers wide! That's about 500 times smaller than the period at the end of this sentence."

c.     "Proven quality and performance."

d.     "Barracuda has become the world's most popular family of hard drives with consistent quality and performance-enhancing innovations and features…."

e.      "The Barracuda® hard drive gives you one hard drive platform for every desktop storage application. One drive with trusted performance, reliability, simplicity, and capacity."

f.      "Count on Barracuda drives to deliver the storage innovations that drive your costs down and your performance up."

g.      The Barracuda is "produced using the most sophisticated manufacturing process in the industry, with a focus on environmental stewardship."

56.     The *Barracuda Data Sheet* and the *Barracuda Product* Overview contain many of the same, or substantially similar, statements as above.

57.     Identical, or virtually identical, statements appeared on the webpage for the Internal Barracuda in 2013 (hereafter "2013 Barracuda webpage").  Indeed, the only difference between the statements on the 2012 and 2013 webpages is the substitution of the name "Barracuda" for "Desktop HDD" and other non-material changes.

58.     Statements that are virtually identical or substantially similar to the foregoing have continued to appear on Defendant's website.  For instance, the current Barracuda webpage contains the following statements and affirmations:

a.      The Drive is the "one drive for every desktop system need, supported by 30 years of trusted performance, reliability and simplicity."

b.      "Rest easy knowing your drive delivers dependable performance with Seagate® AcuTrac™ servo technology."

c.      "Count on Seagate to deliver the storage innovations that bring down your costs and crank up your storage."

d.      "Desktop HDDs are produced using the most sophisticated manufacturing process in the industry, with a focus on environmental stewardship."[1]

---

[1] *Desktop HDD*, Seagate, http://www.seagate.com/internal-hard-drives/desktop-hard-drives/desktop-hdd/ (last accessed Jan. 21, 2016).

59.     In addition ~~to promoting the Internal Barracuda as consistent, reliable, accurate, and dependable~~, Defendant marketed, and continues to market, the Drive as being "designed for," "perfect" for, and "best-fit" for RAID ~~and NAS~~.

60.     For example, in a 2011 press release, Defendant touted the Drive as being "designed for ~~desktop, tower or all-in-one personal computers; workstations, home and small business servers; network-attached storage devices; direct-attached storage expansion; and~~ home and small-business RAID solutions."

61.     By way of further example, the 2012 Barracuda webpage similarly asserted that the Drive is "Perfect when you need to," *inter alia* ~~"Build desktop or all-in-one PCs;" "Equip home servers;"~~ "Implement a desktop RAID~~;~~[.]" ~~or "Build network attached storage devices (NAS)."~~

~~62.     The 2013 Barracuda webpage proclaimed that the Drive is "Perfect when you need to . . . Build a desktop or home server up to 4TB," and the 2014 webpage contended that the Drive is "Perfect when you need to . . . equip home servers."~~

63.     Likewise, the *Barracuda Data Sheet*, first published in 2011, lists ~~"Home servers," "Desktop RAID," and "Network-attached storage devices (NAS)"~~ as being "Best-Fit Applications" for the Drive. The *Desktop HDD Kit Data Sheet*, (hereafter "*Kit Data Sheet*")[2] first released in 2013, claims that the Drive is "perfect for" these applications.  *See* Exhibit C. Since then, each iteration of the *Kit Data Sheet* has made this same claim.

64.     Notably, none of the above webpages or data sheets state that the Drive is not suitable for RAID 5. Rather, the above representations would cause a reasonable person to believe that the Drive is suitable and designed for all RAID ~~and NAS~~ configurations, including RAID 5.

65.     The foregoing statements are not mere puffery or hyperbole.  A reasonable consumer would consider these statements material because they pertain to the reliability and

---

[2] Note that a hard drive kit is simply a hard drive packaged with cables and other accessories.

longevity of the Internal Barracuda, which are extremely important qualities of hard drives, and to the Drive's suitability for use in a RAID or NAS.

66.    Moreover, a reasonable person would take the statements to mean that the Internal Barracuda: 1) is stable, reliable, and has a long life expectancy; 2) contains cutting-edge technology that enables the Drive to perform reliably and with precision even in high-vibration or otherwise challenging operating environments; 3) is yet another high-quality, reliable hard drive in the Barracuda line; 4) will last as long as comparable hard drives on the market, if not longer; 5) is suitable for storing and preserving important and irreplaceable personal data; 6) is suitable and designed for all RAID and NAS configurations, including RAID 5; and 7) does not suffer from a latent, model-wide defect that causes it to fail at an extremely high rate.

67.    Defendant marketed both the external and internal versions of the Barracuda as highly reliable and dependable. The following statements, among others, appeared on the order page for the Backup Plus on Defendant's website in 2012 (hereafter "2012 Backup Plus webpage"):

a.    "Your digital life safe and sound"

b.    "Backup Plus from Seagate is the simple, one-click way to protect and share your entire digital life—without getting in the way of the rest of your life."

c.    "Up to 4TB capacity for a lifetime of memories"

d.    "Backup Plus is the family of external drives from Seagate that lets you do more with photos and movies, protect everything in your digital life, and manage it all from a single, intuitive dashboard."

e.    "Space for everything you've got. No more having to pick and choose what you protect."

f.    "Protect…Photos, videos, and more. Automatically."

g.    "Life is full of amazing moments you want to remember forever. The Backup Plus desktop drive lets you set up easy automatic backups of all your stuff, so you know that even if 'life happens' to your computer, your memories are always protected."

h.    "Think of how many photos you've shared on Facebook or Flickr. With Backup Plus, you can easily download them right to your Backup Plus drive, so even more of your life is safe and sound."

68.    The 2012 Backup Plus webpage contained a link to the *Backup Plus Data Sheet*, which also contained statements about the suitability of the Drive to protect one's "entire digital life." *See* Exhibit D.

69.    Statements that are identical or virtually identical to the foregoing appeared on the Backup Plus webpage in 2013, and similar statements appeared there in 2014 and 2015.  The version of the webpage that is current as of this filing contains the statements listed in paragraph 67(b),(c),(g), and (h).

70.    The foregoing statements are not mere puffery or hyperbole.  A reasonable person would consider them material because they pertain to the reliability and longevity of the Backup Plus, which are extremely important qualities of hard drives.

71.    Moreover, a reasonable consumer would interpret these statements—including the assertions that the Backup Plus will protect one's "entire digital life," "lifetime of memories," and "amazing moments"—to mean that the Backup Plus: 1) is stable, reliable, and has a long life expectancy; 2) will last as long as comparable drives on the market, if not longer; 3) is suitable for storing, protecting, and backing up important and irreplaceable personal data; and 4) does not suffer from a model-wide defect that causes it to fail at an extremely high rate.

72.    In addition to the foregoing statements, Defendant published reliability and data integrity specifications for the Drives.  Specifically, Defendant claimed that the annualized failure rate ("AFR") of the Drives is less than 1% and that the maximum non-recoverable read errors per bits read is 1 per 10E14.

73.    This information appeared in the *Barracuda Data Sheet* and the *Storage Solutions Guide*, among other places.  See Exhibit B.

74.    The maximum non-recoverable read errors per bits read (hereafter "read error rate") pertains to the probability of a drive failing to read and return the requested data after

~~exhausting all means to recover it (practically speaking, this means the data is lost), and the~~ ~~probability of such a failure is measured in relation to some number of bits transferred or read.~~

~~75.    10E14 means 10 to the power of 14. Thus, the Drives' claimed read error rate of 1~~ ~~per 10E14 means that one non-recoverable read error will occur for every 100 trillion bits read.~~

76.    A hard drive's annualized failure rate is the probability that it will fail in a given year due to problems in its manufacture or design or some other supplier cause. AFR does not include failures that occurred because of misuse, user-inflicted damage, unauthorized modifications, and the like.[3]

77.    A hard drive's AFR is calculated by the manufacturer using tests and/or mathematical formulas.  AFRs can also be calculated by consumers and businesses, such as data backup companies, based on the number of failures their drives incur, provided they have a large sample size.

78.    A hard drive's AFR, if properly calculated, is typically accurate for about three years, and after that the true AFR begins to increase. Accordingly, the Drives' advertised AFR of less than 1% means that the Drive has less than a 1% chance of failing in any given year, at least within the first three years of use.

79.    A reasonable consumer would consider these statistics material because they measure the reliability and longevity of the Drives, which are extremely important qualities of hard drives.

80.    Likewise, upon reading that the AFR is less than 1% ~~and the read error rate is one~~ ~~per 100 trillion bits read~~, a reasonable consumer, regardless of whether they knew the specific technical definitions, would interpret these statistics to mean that the Drive: 1) is reliable and has

---

[3] The technical definitions of AFR ~~and read error rate are~~ [is] provided for background purposes and are not intended to suggest or allege that only consumers with this background knowledge would find Defendant's statistics to be material or misleading. A reasonable consumer would, simply by looking at the names of these statistics, surmise that "annualized failure rate" is the probability of hard drive failure in annual terms ~~and that~~ ~~"maximum non-recoverable read errors per bits read" is a measure of how often serious read~~ ~~errors occur~~. Moreover, the AFR ~~and read error rate~~ are listed in the *Barracuda Data Sheet* under the heading "Reliability/Data Integrity," which is a clear indication of their meaning.

a long expected life; 2) is highly unlikely to fail in any given year, at least until the Drive wears out after a substantial amount of use; 3) ~~incurs read errors very infrequently; 4)~~ is suitable for storing important and irreplaceable personal data, given its reliability and longevity; and 5) does not suffer from a model-wide defect that causes it to fail at an extremely high rate.

81.    As explained *infra*, the foregoing statements and data are false, misleading, and have a tendency to deceive.  Indeed, Plaintiffs found them material, were deceived by them, acted in reliance on them, and suffered harm as a result.

**C.    Defendant's Statements and Data Are False, Misleading, and Deceptive, and Defendant Failed to Disclose the Drives' Defects and Unsuitability for RAID~~/NAS~~**

**1.    The Backblaze Reports.**

82.    Backblaze, Inc. ("Backblaze") is an online data backup company that has published multiple reports demonstrating that the Drives contain a model-wide defect that causes them to fail prematurely at extremely high rates.  The Backblaze reports further demonstrate that the Drives do not last nearly as long as comparable hard drives and have an AFR that is much higher than that advertised by Defendant.

83.    Backblaze backs up its customers' data using "storage pods" consisting of numerous consumer-grade hard drives.  It has been in business since 2007.

84.    Over the years, Backblaze has used tens of thousands – if not hundreds of thousands – of drives from various manufacturers in its storage pods, including the Drives at issue in this lawsuit. Currently, there are approximately 50,000 drives deployed in Backblaze's pods.[4]

85.    In 2013 and 2015, Backblaze reported that the vast majority of hard drives last at least four years.  Indeed, approximately 80% of the drives it uses function for at least four years.[5]

---

[4] *See What Can 49,056 Hard Drives Tell Us? Hard Drive Reliability Stats for Q3 2015*, Backblaze (Oct. 14, 2015), https://www.backblaze.com/blog/hard-drive-reliability-q3-2015 (hereafter "Q3 2015 Report").

[5] *CSI: Backblaze – Dissecting 3TB Drive Failure*, Backblaze (April 15, 2015), https://www.backblaze.com/blog/3tb-hard-drive-failure (hereafter "2015 Report"); *How long do disk drives last?*, Backblaze (Nov. 12, 2013), https://www.backblaze.com/blog/how-long-do-disk-drives- last/ (hereafter "2013 Report").

86.     The Drives at issue in this action, however, fell far short of this benchmark.

87.     Hard drives should follow a "bathtub-shaped failure rate curve." Reliability engineers use this model to describe expected failure rates for products, and it takes into account factory defects resulting in early failures, random failures, and wear-out failures that occur after substantial use.[6]

88.     The early failure rate is highest when a product is new and decreases substantially with time, whereas the wear-out failure rate increases significantly over time and the random failure rate remains constant.  This creates an overall failure rate that looks like a semi-flattened "U", and all of these rates together create a bathtub shape when plotted on a graph.



*Figure 2*: *Bathtub curve*

_____

[6] 2013 Report.

89.     In 2013, Backblaze reported that its experience matches the bathtub-curve model. It calculated the AFR for its drives based on their observed failures and found that it hovers around 5% for the first year-and-a-half, drops to about 1.4% for the next year-and-a-half, and then increases to 11.8 % for the following year.[7]

90.     Backblaze later discovered that Barracuda Drives do not conform to the bathtub curve. The failure rate for the Barracuda Drives was far different.

91.     Beginning in January 2012, Backblaze deployed 4,829 Barracuda Drives – both the internal and external versions – in its storage pods.  To use the external Drives, Backblaze removed the Drives from their external casings.

92.     In 2015, Backblaze reported that, instead of following the expected bathtub curve, the AFR for the Drives followed a steep upward curve.  In 2012, the AFR was 2.7%, and instead of declining it increased to 5.4% in 2013, and then skyrocketed to 47.2% in 2014.[8]

93.     Backblaze subsequently released statistics for 2015, revealing that the Drives had an AFR of 30.94% for the first through third quarters of 2015 and an overall failure rate of 28.46% dating back to 2013.[9]

94.     The Drives' AFRs were substantially higher than any of the other six models of 3TB hard drives used by Backblaze during this period.  The next highest failure rate belonged to the Western Digital Red, which had a 2015 AFR of only 8.79% and an overall failure rate of 7.65%.

95.     Indeed, the Drives had a higher failure rate than all but one of the twenty-six other models of any size deployed by Backblaze, which ranged from 1-8TB. *See Backblaze Hard Drive Failure Rates* (hereto attached as Exhibit E).

96.     The raw failure rate of the Drives was just as dismal.  A hard drive's raw failure rate is calculated by dividing the number of hard drives that failed in a particular period by the

---

[7] *Id.*
[8] 2015 Report.
[9] Q3 2015 Report.

number that were in use during that same period.  Out of the 4,829 Drives Backblaze deployed between 2012 and 2014, 1,423 failed in operation by early 2015, which yields a raw failure rate of 29.5%.[10] Moreover, out of the 4,190 Drives that were deployed in 2012, 1,342 failed by early 2015, which is a 32% failure rate.[11]

97.     This means that only 68% of the Drives were functional after *three* years, which was well below Backblaze's overall drive survival rate of 80% after *four years.*

98.     In addition to the Drives that failed during operation, a large number of Drives failed Backblaze's reliability testing and were removed from service.

99.     Due to the high number of Seagate Drive failures, Backblaze became suspicious that there was a latent problem with the Drives.  Thus, if a storage pod with the Drives incurred a failure, Backblaze began to pull all of the Drives in that pod and subject them to two tests to assess their health. The first test involved reformatting the Drives and the second test checked for bad data sectors.  A Drive had to pass both tests to be returned to service.

100.    A data sector is 512 bytes.  A sector is "bad" if it cannot be read and/or written to. If a hard drive amasses too many bad sectors, it will suffer serious performance degradation and may fail completely.

101.    Backblaze removed 2,597 Drives for testing between 2012 and early 2015, and a shocking 75% – 1,948 Drives – failed one of the two tests.

102.    Out of the 4,190 Drives that Backblaze deployed in 2012, about 1,342 failed during operation (32%), 1,948 failed after removal (46%), approximately 649 were removed but did not fail any test (15%), and 251 (6%) remained in operation as of March 31, 2015.  In total, **78% of the Drives that Backblaze deployed in 2012 failed** either in place or after removal.[12]

103.    The raw failure rate of the Drives dwarfed those of the other brands and models that Backblaze used.  For instance, in 2012, Backblaze deployed 2,511 HGST 3TB drives, and

---

[10] 2015 Report.
[11] *Id.*
[12] *Id.*

by early 2015, only 103 (4.1%) had failed. Likewise, only 2 of 45 (4.5%) of Backblaze's Western Digital 3TB drives failed. Indeed, even the Barracuda's predecessor, the Seagate XT 3TB drive, model ST33000651AS, fared substantially better: out of the 181 deployed in 2012, only 15 drives (8.3%) failed by 2015.[13]

104.    The survival rate after three years for these hard drives was therefore 95.9%, 95.5%, and 91.7%, respectively. Furthermore, Backblaze did not permanently remove any of the HGST or Western Digital drives that did not fail during operation, and only eleven Seagate XT drives were retired after being pulled for testing.[14] This stands in stark contrast to the mere 6% of the Seagate Barracuda Drives that were still in operation after three years.

105.    In attempting to determine the reason for the Drives' high failure rates, Backblaze ruled out confounding factors related to its storage environment and the removal of external Drives from their casings (referred to as "shucking"). All of the hard drives it used, regardless of manufacturer, were installed in the same storage pod environment, and the fact that there were such substantial differences in failures between the Seagate Drives and the other drives ruled out the possibility that the storage environment was the cause of the issue.

106.    Shucking also did not affect the failure rate. Backblaze found that the failure rates did not differ materially between Internal Barracudas and shucked external Drives.

107.    Backblaze, therefore, concluded that the cause of the staggering failure rate was the Drives themselves.[15]

108.    Indeed, Backblaze's data – particularly the Drives' steep upward failure curve and their extremely high AFR and raw failure rates – indicates that the Drives contain an inherent, model-wide defect that causes a large portion of them to incur catastrophic failures early in their useful lives.

---

[13] *Id.*
[14] *Id.*
[15] *See* 2015 Report.

109.    Moreover, as demonstrated by the Backblaze reports, Defendant's representation that the Drives have an AFR of less than 1% is false, misleading, and likely to deceive a reasonable person. ~~Moreover, the Drives are far less reliable and do not last nearly as long as comparable hard drives on the market.~~

**2.    The Drives Are Not Designed for RAID 5 and Are Not Suitable for Any Level of RAID ~~or NAS~~.**

110.    Notwithstanding that they are marketed for use in RAID ~~and NAS~~ systems, the Drives were purportedly not designed for RAID 5 and, due to the latent defect, are otherwise not suitable for any RAID ~~or NAS~~ use.

111.    In an email to Plaintiff Smith, Defendant admitted that the Internal Barracuda is not actually designed for RAID 5, which is a common configuration in home RAID ~~and NAS~~ systems. Specifically, a Seagate customer support representative wrote, "The consumer level drives you have are not meant for any type of raid configuration beyond a Desktop RAID 0 or 1. If you do use 'desktop class drives' in a RAID 5 configuration, you can expect to deal with RAID failures."

112.    Nevertheless, as discussed *supra*, Defendant advertised, and continues to advertise, the Internal Barracuda as "designed for," "perfect" for and "best-fit" for ~~NAS and~~ Desktop RAID. These statements appeared on the Barracuda webpage, in the *Barracuda Data Sheet,* in the *HDD Kit Data Sheet*, and in a 2011 press release without any qualification that the Drive is only appropriate for RAID 0 or 1.

113.    Notwithstanding, the Internal Barracuda is not suitable for **any** RAID ~~or any NAS~~ because it contains inherent and latent defects, as explained *supra*.

114.    Moreover, a major advantage of RAID 1 and 5 is that they protect data through redundancy. If multiple defective hard drives are used in the RAID, however, this feature is undermined because RAID 1 and 5 can only withstand one drive failure. If two or more drives fail within a short time of one another, massive or complete data loss will occur. Due to their extremely high failure rate, Internal Barracudas are not suitable for a system that backs up its

own data through redundancy, as using them would amount to defective Drives backing up data on defective Drives.

115.    The Drives are also not suitable for RAID 0 ~~and single-drive NAS~~ systems because the failure of one hard drive will cause massive or total data loss.

**3.    Defendant Failed to Disclose the Drives' Defects and Their Unsuitability for RAID ~~and NAS~~.**

116.    Defendant knew that its Drives were defective and not suitable for RAID ~~and NAS~~, yet it failed to disclose this to Plaintiffs and Class Members.

117.    As evidenced by the email sent by Seagate customer support to Mr. Smith, Defendant knew that the Drives were not designed for RAID 5 and would cause failures if used in such a configuration. Nevertheless, Defendant did not disclose this fact or qualify the statements made on the Barracuda web page, in the *Barracuda Data Sheet,* or in the *HDD Kit Data Sheet* that the Drives are "perfect" and "best-fit" for desktop RAID ~~and NAS~~.

118.    Defendant also knew, or should have known, that its Drives possessed an inherent, latent, model-wide defect and that its reliability data ~~and promotional statement about the Drives~~ were false and misleading. As discussed *infra*, there are thousands of negative reviews and complaints about Drive failures on websites such as newegg.com and amazon.com. Defendant was aware, or should have been aware, of the contents of these reviews and complaints because it responded to many of them, apologizing for the problems the customers were having with their Drives and inviting them to call Seagate customer services or tech support.

119.    Moreover, Defendant had firsthand knowledge of the Drives' defects. As stated on Defendant's website, Defendant has a "take-back program for hard drives under warranty" where "100 percent of these drives [returned by consumers for replacement] are refurbished or, if not repairable, are recycled."[16]  Defendant's express warranty only covers defects in materials or

---

[16] *Global Citizenship*, Seagate, http://www.seagate.com/global-citizenship/product-stewardship/ (last accessed May 2, 2016).

workmanship and does not cover, *inter alia,* problems caused by accident, abuse, neglect, electrostatic discharge, degaussing, heat or humidity beyond product specifications, improper installation, or misuse. *See Seagate Limited Warranty*, attached hereto as Exhibit F. Accordingly, Defendant not only repairs or attempts to repair 100% of warranty returns, but 100% of those Drives are defective. Upon information and belief, for Defendant to repair a defective Drive, it investigates the problem or complaint to ascertain the defect or, at a minimum, the signs and symptoms of the defect. As a result, Defendant had firsthand knowledge of the defects and problems inherent in the Drives.

120.    Given the large number of consumer complaints and Defendant's exposure to its own defective Drives, Defendant knew, or should have known, that the defects were inherent, latent, and model-wide.

121.    Despite this knowledge, Defendant did not disclose the defects to the Plaintiffs, Class Members, or general public, or otherwise inform them of the Drive's problems. Instead, as set forth in this Second Consolidated Amended Complaint, Defendant promoted the Drives, expressly and impliedly, as ~~highly reliable and stable,~~ having an extremely low failure rate~~, and suitable for storing irreplaceable personal data, among other things~~.

~~D.    Seagate's Warranty on the Drives~~

~~122.    In addition to misrepresenting the reliability of the Drives and their suitable uses, as well as omitting critical facts about the Drives, Defendant failed to satisfy its warranty obligations.~~

~~123.    The Drives purchased by Plaintiffs and Class Members are or were covered by an express limited warranty. The warranty, by its explicit terms, is governed by California law. See Exhibit F.~~

~~124.    Upon information and belief, the Internal Barracuda's warranty was three years for a brief time following its release. It was then reduced to one year on December 31, 2011, and has been varying lengths since. The warranties for the external versions, including without limitation the Backup Plus and GoFlex, also vary.~~

~~125.    Other than varying in duration, the warranty is uniform and is therefore subject to uniform standards, principles, and applications for purchasers throughout the United States.~~

~~126.    The warranty covers defects in "material or workmanship" and provides for the replacement of defective Drives. Defendant will not, however, recover data off a customer's Drive unless the customer pays an "engagement fee" and a "recovery fee" which can "easily be over $2,000."17~~

~~127.    Customers are responsible for paying the cost to ship their Drives to Defendant for replacement.~~

~~128.    The warranty on replacements is the remainder of the original warranty period or 90 days, whichever is greater.~~

~~129.    Because the Drives contain latent, model-wide defects, the replacement Drives suffer from the same defects as those that are newly purchased, causing them to fail prematurely at extremely high rates.~~

~~130.    Replacement Drives are refurbished units, which includes failed Drives that were returned to Defendant by previous owners for replacement.~~

~~131.    Defendant knew, or should have known, that the Drives are irreparably defective and highly likely to fail.~~

~~132.    In light of the foregoing, Defendant did not—and cannot—deliver Drives to Plaintiffs and Class Members that conform to their express and implied warranties. Defendant is therefore liable for breach of express warranty.~~

~~133.    Sending failed Drives as warranty replacements knowing they are highly likely to fail again is also unfair and unconscionable.~~

~~134.    Moreover, Defendant breached the implied warranty of merchantability because all Drives contained a latent defect that rendered them unsuitable for their ordinary purposes,~~

---

~~17 See id.; Frequently Asked Questions, Seagate, http://www.seagate.com/services-software/seagate-recovery-services/resources (last accessed Jan 22, 2016).~~

SMRH:482333630.4                                        -27-

were inadequately packaged and labeled, and fell below the quality generally accepted in the hard drive market.

### E. The Plaintiffs' and the Class' Experience With Failed Seagate Drives

### 1. Plaintiff Nelson.

135.     Plaintiff Nelson ordered a new Backup Plus online from Best Buy on November 22, 2012, and received it at his home shortly thereafter.  He registered the Drive with Seagate in December 2012.

136.     Best Buy is an authorized Seagate retailer, and Mr. Nelson purchased and used the Backup Plus for personal, non-business purposes.

137.     Prior to purchase, Mr. Nelson knew that the Backup Plus he purchased was covered by a two-year manufacturer warranty. He knew this because: 1) the order page for the Backup Plus on the Best Buy website stated that it came with a two-year warranty; 2) the Backup Plus' box, a picture of which appeared on the order page, stated the same; and 3) the *Backup Plus Data Sheet* stated the same.

138.     Mr. Nelson relied on these statements and would not have purchased a Backup Plus if there had not been an express warranty.

139.     On November 22, 2012, shortly before purchase, Mr. Nelson visited the Backup Plus page on Seagate.com, which is owned and maintained by Defendant. On this webpage, Mr. Nelson read all of the statements on the 2012 Backup Plus webpage that are listed above.

140.     Mr. Nelson found these statements to be material because they pertained to the reliability and longevity of the Backup Plus, which are extremely important characteristics of hard drives. He relied on the statements in deciding to purchase a Backup Plus because they caused him to reasonably believe that the Backup Plus, 1) was one of the most stable and reliable 3TB external hard drives on the market; 2) had long life expectancy and would last just as long as comparable hard drives on the market, if not longer; 3) would last at least four years, as most hard drives do; 4) was suitable for storing, protecting, and backing up his important and

irreplaceable personal data; and 5) did not have a model-wide defect that would likely cause it to fail within an unreasonably short period of time.

141.    Indeed, Mr. Nelson has owned multiple models of Seagate hard drives, other than the 3TB Internal Barracuda or Backup Plus, that lasted five years or longer without incurring any type of failure. He currently has a 1TB Seagate internal hard drive in his computer that has nearly five years of power-on time.

142.    Power-on time is the total amount of time a hard drive has been powered on throughout its life.

143.    The statements published by Defendant were misrepresentations for the reasons set forth in this Second Consolidated Amended Complaint. These reasons include, without limitation, that the Drive: 1) was not stable or reliable; 2) did not last as long as comparable hard drives on the market; 3) had a model-wide defect that cause it to fail prematurely at extraordinarily high rates; 4) and was not suitable for storing, protecting, or backing up personal data. Moreover, in conjunction with these misrepresentations, Defendant knowingly failed to disclose the Drive's defects and unreliability.

144.    Mr. Nelson's Drive failed in December 2014, approximately two years after purchase. Specifically, a large number of data sectors suddenly failed with little to no warning, causing the Drive to suffer a catastrophic failure which rendered it useless.

145.    As a result of the failure, Mr. Nelson lost data, including without limitation irreplaceable photos and documents. He also expended a considerable amount of time attempting to recover his data.

146.    In or about December 2014, Mr. Nelson requested and received a replacement Backup Plus from Defendant pursuant to the Drive's warranty. The replacement Drive was a refurbished unit. The warranty on the replacement Drive was 90 days.

147.    Within this 90-day warranty period, the Drive began to malfunction by intermittently overheating when copying files. Less than a year later, on or around October 20, 2015, the Drive suffered a complete failure after the warranty expired.

148.    Had Mr. Nelson known that the Backup Plus had an inherent, model-wide defect that drastically reduced its lifespan vis-à-vis comparable hard drives, caused it to fail prematurely at extremely high rates, and made it unsuitable for storing and protecting data, he would not have purchased one.

**2.    Plaintiff Hauff.**

149.    Plaintiff Hauff ordered two new Internal Barracudas from amazon.com on or around August 19, 2012. He received them on August 29, 2012.

150.    Amazon is an authorized Seagate retailer, and Mr. Hauff purchased and used the Drives for personal, non-commercial purposes. Specifically, he used them in his personal NAS system.

151.    Prior to purchase, Mr. Hauff knew that the Barracuda he purchased was covered by a two-year manufacturer warranty because the length of the warranty was stated on the Barracuda order page on Amazon. Additionally, Mr. Hauff went to an electronics store – Micro Center, in Cambridge, Massachusetts – a few days prior to purchasing the Drive on Amazon, and he found the warranty length on the Barracuda's box.

152.    Mr. Hauff relied on these representations and would not have purchased an Internal Barracuda if there was no express warranty.

153.    Days prior to purchase, Mr. Hauff read the *Barracuda Data Sheet* and the 2012 Barracuda webpage, including the AFR data and the statements that the Drive is "perfect for" and "best-fit" for RAID ~~and NAS~~ systems.

154.    Mr. Hauff found the AFR data to be material because it pertained to the Internal Barracuda's reliability and longevity, which are extremely important characteristics of hard drives. He relied on this data in deciding to purchase the Internal Barracuda because it caused him to reasonably believe that the Internal Barracuda: 1) was stable, reliable, and had a long life expectancy; 2) was highly unlikely to fail in any given year, at least until the Drive wore out after substantial use; 3) would last just as long as comparable hard drives on the market, if not longer; 4) was suitable for storing his important and irreplaceable personal data, given the

Drive's reliability and expected longevity; and 5) did not have a model-wide defect that would likely cause it to fail within an unreasonably short period of time.

155.     Indeed, Mr. Hauff has owned multiple models of Seagate hard drives, other than the 3TB Internal Barracuda or Backup Plus, which lasted at least five years. For instance, he has two 2TB Barracuda XT internal hard drives that are approximately five years old and have over 28,000 power-on hours. These hard drives have no bad sectors, have not failed, and have worked well in his RAID and NAS systems.

156.     Mr. Hauff found the statements that the Internal Barracuda is ideal for RAID and NAS systems to be material and he relied on them, as he purchased the Drive for use in a NAS system.

157.     The data and statements published by Defendant were misrepresentations for the reasons set forth in this Second Consolidated Amended Complaint. These reasons include, without limitation, that the Internal Barracuda: 1) was not stable or reliable; 2) did not last as long as comparable hard drives on the market; 3) had an AFR that was substantially higher than comparable hard drives; 4) had a model-wide defect that cause it to fail prematurely at extraordinarily high rates; 5) was not suitable for storing personal data; and 6) was not suitable for use in a NAS system. Moreover, in conjunction with these misrepresentations, Defendant knowingly failed to disclose the Drive's defects and unreliability.

158.     One of Mr. Hauff's Drives failed within warranty on July 7, 2014, less than two years after purchase. Specifically, the Drive failed to boot, rendering it useless. Mr. Hauff then ran a diagnostic test on the Drive, which revealed the boot failure was caused by bad sectors.

159.     Mr. Hauff received a warranty replacement from Seagate on or around July 23, 2014. Approximately three months later, in October 2014, this replacement Drive started experiencing problems; it developed bad sectors and started dropping from Mr. Hauff's NAS as an "invalid drive." It developed additional bad sectors in December 2014 and failed completely on or around January 8, 2015.

160.    The second Drive that Mr. Hauff purchased started to malfunction in or around January 2015, when it developed over 1,500 bad sectors. It failed completely in February 2015 when it was out of warranty.

161.    Had Mr. Hauff known that the Internal Barracuda had a latent, model-wide defect that drastically reduced its lifespan, caused it to fail prematurely at extremely high rates, ~~and made it unsuitable for use in a NAS system,~~ he would not have purchased one.

**3.    Plaintiff Schechner.**

162.    Plaintiff Schechner purchased a new Backup Plus from amazon.com on November 28, 2012, and he received it at his home a couple of days later.

163.    Amazon is an authorized Seagate retailer, and Mr. Schechner purchased and used the Backup Plus for personal, non-commercial purposes; he used it about once a week for data backup.

164.    Prior to purchase, Mr. Schechner knew that the Backup Plus he purchased was covered by a three-year manufacturer warranty because the length of the warranty was stated on the Backup Plus order page on Amazon.

165.    Mr. Schechner relied on this representation and would not have purchased a Backup Plus if there had not been an express warranty.

166.    One or two days prior to purchase, Mr. Schechner researched the Backup Plus on amazon.com, tigerdirect.com, and newegg.com. ~~One or more of these websites included the statements about the Backup Plus made by Defendant that are listed in paragraph 67, supra. These statements appeared under the heading "From the Manufacturer" or were otherwise quoted on the foregoing websites.~~

167.    ~~Mr. Schechner read Defendant's statements, found them material, and relied on them. He found these statements to be material because they pertained to the reliability and longevity of the Backup Plus, which are extremely important characteristics of hard drives. He relied on these statements in deciding to purchase a Backup Plus because they caused him to reasonably believe that the Backup Plus: 1) was stable, reliable, and had a long expected life; 2)~~

~~would last just as long as comparable hard drives on the market, if not longer; 3) was suitable for storing, protecting, and backing up his important and irreplaceable personal data; and 4) did not have a model-wide defect that would likely cause it to fail within an unreasonably short period of time.~~

168.    ~~Defendant's statements were misrepresentations, and Defendant knowingly failed to disclose the Drive's defects and unreliability, for the reasons set forth in this Second Consolidated Amended Complaint.~~

169.    On or around April 13, 2014 – approximately one year and four months after purchase – the Mr. Schechner's Drive crashed and failed to boot back up ever again. When Mr. Schechner connected the Drive to his computer, the power light would turn on but the Drive did not "spin up." Rather, it would click once or twice and then do nothing, and the computer could not find or recognize the Drive.

170.    As a result of the failure, Mr. Schechner lost all of his files on the Drive, which included, *inter alia*, personal documents and pictures. Mr. Schechner paid a data recovery company, DataPro Data Recovery Lab, Inc., to assess whether any data could be recovered from the Drive. DataPro concluded that nothing could be recovered.

171.    Mr. Schechner received a warranty replacement from Defendant, which was a refurbished unit. On or around November 10, 2014, less than seven months after receipt of the replacement Drive, the replacement failed in the same manner as the original.

172.    Mr. Schechner returned the replacement, which was still under warranty, to Defendant, and Defendant sent him another refurbished unit. Mr. Schechner has not used it, as his experience with the Backup Plus has demonstrated that the Drive is not capable of performing the function for which it was designed~~: storing and protecting his important personal data, serving as a reliable backup, and keeping his data "safe and sound" in case "life happens" to his computer~~.

173.    Had Mr. Schechner known that the Backup Plus had a latent, model-wide defect that drastically reduced its lifespan, caused it to fail prematurely at extremely high rates, and made it unsuitable for storing and protecting data, he would not have purchased one.

**4.    Plaintiff Hagey.**

174.    Plaintiff Hagey purchased a new Internal Barracuda in-person at a Best Buy location in Nashville on or around April 6, 2014.

175.    Best Buy is an authorized Seagate retailer, and Mr. Hagey purchased and used the Drive for personal, non-commercial purposes.

176.    Prior to purchase, Mr. Hagey knew that the Internal Barracuda he purchased was covered by a three-year manufacturer warranty. Mr. Hagey reviewed the Drive's page on the Best Buy website, which included the warranty duration. Moreover, when he went to the Best Buy store to purchase the Drive, he read the warranty information printed on the box, which stated the warranty was three years in duration.

177.    Mr. Hagey relied on these representations and would not have purchased an Internal Barracuda if it had less than a three-year warranty or no warranty at all.

178.    Prior to purchase, Mr. Hagey read the *Barracuda Data Sheet*, including the AFR data.

179.    Mr. Hagey considered the AFR data to be material because it pertained to the Internal Barracuda's reliability and longevity, which are extremely important characteristics of hard drives. He relied on this data in deciding to purchase the Internal Barracuda because it caused him to reasonably believe that the Internal Barracuda: 1) was stable, reliable, and had a long life  expectancy; 2) was highly unlikely to fail in any given year, at least until the Drive wore out after substantial use; 3) would last just as long as comparable hard drives on the market, if not longer; 4) would last for at least four years, as most hard drives do; 5) was suitable for storing his important and irreplaceable personal data, given the Drive's reliability and expected longevity; and 6) did not have a model-wide defect that would likely cause it to fail within an unreasonably short period of time.

180.    Indeed, Mr. Hagey owns multiple hard drives that have not exhibited any type of failure and are fully functional after at least five years.

181.    Defendant's statements were misrepresentations, and Defendant knowingly failed to disclose the Drive's defects and unreliability, for the reasons set forth in this Second Consolidated Amended Complaint.

182.    Due to an inherent, model-wide defect, the Drive purchased by Mr. Hagey crashed and catastrophically failed on or around May 25, 2015, approximately one year after purchase and while it was still under warranty.

183.    Mr. Hagey subsequently received a replacement from Defendant, which was a refurbished unit. It failed four to five months after he received it and while it was still under warranty. Specifically, it incurred intermittent drive seek failures and subsequently crashed and failed completely.

184.    The warranty on Mr. Hagey's Drive expires April 6, 2017, but he has not sent it back for replacement because he does not want to pay to have the failed replacement Drive shipped back to Defendant only to receive another refurbished Drive that is also highly likely to fail and cause the loss of his data for a third time.

185.    Had Mr. Hagey known that the Internal Barracuda had a latent, model-wide defect that drastically reduced its lifespan, caused it to fail prematurely at extremely high rates, and made it unsuitable to store and protect his data, he would not have purchased one.

**5.    Plaintiff Crawford.**

186.    Plaintiff Crawford ordered three new Internal Barracudas from TigerDirect on or around April 25, 2012, and received them in early May 2012. He purchased another Internal Barracuda from eBay on or around July 22, 2013.

187.    TigerDirect is an authorized Seagate retailer, and Mr. Crawford purchased and used the Drives for non-commercial purposes.  Specifically, he used them in his home RAID 5 system.

188.    Prior to purchase, Mr. Crawford knew that the Internal Barracudas he purchased were covered by a two-year manufacturer warranty, as he saw the length of the warranty on the 2012 Barracuda webpage and/or in the materials published by Defendant hyperlinked to that webpage.

189.    Mr. Crawford relied on these representations and would not have purchased an Internal Barracuda if there had not been an express warranty.

190.    In the month preceding his April 25, 2012 purchase, Mr. Crawford researched the Internal Barracuda on the Seagate website. He also viewed the websites of Defendant's competitors to do a side-by-side comparison of the Internal Barracuda and other Drives.

191.    ~~Mr. Crawford read the statements on the 2012 Barracuda webpage that are listed in paragraph 55, *supra*, including the statements that Seagate AcuTrac technology enables reliable read and write performance even in difficult operating environments and that Seagate can be counted on to "deliver the storage innovations that bring down your costs and crank up your storage."~~

192.    Mr. Crawford read the AFR ~~and read error rate~~ data in the *Barracuda Data Sheet*, as well as Defendant's statements in the *Data Sheet* and on the 2012 Barracuda webpage that the Drive is "perfect" and "best-fit" for desktop RAID[.] ~~and NAS and that it "gives you one hard drive platform for every desktop storage application."~~

193.    Mr. Crawford considered the foregoing statements and data to be material because they pertained to the Internal Barracuda's reliability and longevity, which are extremely important characteristics of hard drives, and its suitability for RAID ~~and NAS~~ use. He relied on these statements and data in deciding to purchase the Internal Barracuda because they caused him to reasonably believe that the Internal Barracuda: 1) was stable, reliable, and had a long life expectancy; 2) was highly unlikely to fail in any given year, at least until the Drive wore out after substantial use; 3) would last as long as comparable hard drives on the market, if not longer; 4) contained cutting-edge technology that enabled the Drive to perform reliably and with precision even in high-vibration or otherwise challenging operating environments; 5) was yet

another high-quality, reliable hard drive in the Barracuda line; 6) was suitable for storing his important and irreplaceable personal data; 7) was suitable and designed for all RAID ~~and NAS~~ configurations, including RAID 5; and 8) did not suffer from a model-wide defect that would cause it to fail at an extremely high rate.

194.    Defendant's statements were misrepresentations, and Defendant knowingly failed to disclose the Drive's defects and unreliability, for the reasons set forth in this Second Consolidated Amended Complaint. Due to the Drive's inherent, model-wide defect and its unsuitability for RAID 5, all of the Drives Mr. Crawford purchased failed, as did most of the warranty replacements.

195.    When Mr. Crawford received the three Drives he ordered from TigerDirect, one was dead on arrival and was replaced.

196.    On or around January 6, 2014, approximately one year and eight months after purchase, one Drive suffered a complete and catastrophic failure and the other two began to return read errors.

197.    Defendant sent Mr. Crawford a warranty replacement for the failed Drive in January 2014, but it refused to replace the other two until the errors became worse in March 2014 ("hereafter March 2014 replacements").  All three warranty replacements were refurbished Drives.

198.    The Drive that Mr. Crawford purchased on July 22, 2013, failed on or around September 8, 2014, approximately one year and one month after purchase.  Defendant subsequently issued a warranty replacement (hereafter "September 2014 replacement").

199.    The September 2014 replacement and one of the March 2014 replacements failed on March 29, 2015. In fact, they failed within hours of one another, causing massive data loss; Mr. Crawford lost 8TB of data, including 20 years of photos, important tax documents, and drawings done by a deceased family member.

200.    Due to the importance of the data that was lost, Mr. Crawford paid DriveSavers, a data recovery company, approximately $7,500 to recover it.

201.    The September 2014 replacement was still under warranty when it failed. When data recovery was complete and Mr. Crawford was able to send the Drive to Defendant for replacement, Defendant refused to provide a warranty replacement even though the Drive failed within warranty.

202.    In all, seven out of the nine original and replacement Drives failed. If Mr. Crawford had known that the Internal Barracuda had an inherent, model-wide defect that drastically reduced its lifespan, caused it to fail prematurely at extremely high rates, and made it unsuitable for storing and protecting data, he would not have purchased one. Likewise, he would not have purchased a Drive if he had known that it was not suitable or designed for RAID 5.

**6.    ~~Plaintiff Ginsberg.~~**

~~203.    Plaintiff Ginsberg purchased a new GoFlex from a Costco in California in or around August 2013.~~

~~204.    Costco is an authorized Seagate retailer, and Mr. Ginsberg purchased and used the Drive for personal, non-commercial purposes.~~

~~205.    Prior to purchase, Mr. Ginsberg knew that the Drive he purchased was covered by a two-year manufacturer warranty; he read the Drive's box when he was at Costco, which included this information.~~

~~206.    Mr. Ginsberg relied on the representations on the box and would not have purchased a GoFlex if it did not have an express warranty.~~

~~207.    Mr. Ginsberg's Drive failed on or around February 9, 2014, approximately six months after purchase, while it was still under warranty. Specifically, the Drive would "hang up" when attempting to copy files and would return the error message "Cannot write to disk." Mr. Ginsberg reformatted the Drive, but this did not fix the problem.~~

~~208.    Mr. Ginsberg received a warranty replacement from Defendant, which was a refurbished unit, and it failed on or around April 25, 2015. It failed in the same manner as the original Drive.~~

209.    Pursuant to the representation on the box that the warranty was two years, the replacement Drive was still under warranty when it failed, as it failed approximately one year and nine months after the original drive was purchased. Defendant, however, refused to honor the warranty; Defendant told Mr. Ginsberg that, by default, the warranty starts running on the date of manufacture, but it would update the warranty end date if he provided proof of purchase. Mr. Ginsberg did so, but Defendant inexplicably maintained that the warranty was only for seven months and refused to provide a replacement.

210.    Had Mr. Ginsberg known that the GoFlex had a latent, model-wide defect that drastically reduced its lifespan, caused it to fail prematurely at extremely high rates, and made it unsuitable to store, protect, and back up his data, he would not have purchased one.

**7.     Plaintiff Manak.**

211.    Plaintiff Manak purchased two new Internal Barracudas from newegg.com on or around May 16, 2013.

212.    Newegg is an authorized Seagate retailer, and Mr. Manak purchased and used the Drives for personal, non-commercial purposes.

213.    Prior to purchase, Mr. Manak knew that the Internal Barracudas he purchased were covered by a two-year manufacturer warranty because this information was reported on Newegg.

214.    Mr. Manak relied on these statements and would not have purchased an Internal Barracuda if it had not been covered by an express warranty.

215.    Prior to purchase, between March and May 2013, Mr. Manak visited the 2013 Barracuda webpage and read statements that were identical, or identical in all material respects, to those listed in paragraph 55, *supra*.

216.    Mr. Manak also read the Drive's *Data Sheet and/or Product Overview*. Specifically, he reviewed the read error rate data and the statements pertaining to the reliability and accuracy of AcuTrac technology.

217.    Mr. Manak found all of the foregoing statements and data to be material because they pertained to the reliability and longevity of the Internal Barracuda, which are extremely important characteristics of hard drives.

218.    He relied on the foregoing statements in deciding to purchase the Internal Barracuda because they caused him to reasonably believe that the Internal Barracuda: 1) was stable, reliable, and had a long expected life; 2) was highly unlikely to fail in any given year, at least until the Drive wore out after substantial use; 3) would incur read errors very infrequently; 4) would last as long as comparable hard drives on the market, if not longer; 5) contained cutting-edge technology that enabled the Drive to perform reliably and with precision even in high-vibration or otherwise challenging operating environments; 6) was yet another high-quality, reliable hard drive in the Barracuda line; 7) was suitable for storing his important and irreplaceable personal data; and 8) did not suffer from a model-wide defect that would cause it to fail at an extremely high rate.

219.    Defendant's statements were misrepresentations, and Defendant knowingly failed to disclose the Drive's defects and unreliability, for the reasons set forth in this Second Consolidated Amended Complaint.

220.    Due to an inherent, model-wide defect, one of Mr. Manak's Drives failed on or around March 15, 2014, which was less than a year after purchase and within the warranty period. He subsequently received a refurbished replacement from Defendant.

221.    The replacement Drive crashed and suffered a complete and catastrophic failure on June 1, 2015, which was approximately two weeks after the warranty expired.

222.    Had Mr. Manak known that the Internal Barracuda had an inherent, model-wide defect that drastically reduced its lifespan vis-à-vis comparable hard drives, caused it to fail prematurely at extremely high rates, and made it unsuitable for storing and protecting data, he would not have purchased one.

8.    **Plaintiff Enders.**

223.    Plaintiff Enders purchased sixteen new Internal Barracudas between September 2012 and May 2014. He purchased two on September 27, 2012; twelve on February 17, 2013; one on March 16, 2014; and one on May 2, 2014. All of the Drives were purchased from amazon.com.

224.    Amazon is an authorized Seagate retailer, and Mr. Enders purchased and used the Drives for personal, non-commercial purposes. Specifically, he used them in his home NAS, which utilized a RAID configuration.

225.    Prior to purchase, Mr. Enders knew that the Internal Barracudas he purchased were covered by a two-year manufacturer warranty, as he saw the length of the warranty on the Defendant's website and/or in the materials published by Defendant hyperlinked to its website.

226.    Mr. Enders relied on these representations and would not have purchased an Internal Barracuda if there had not been an express warranty.

227.    In August 2012, prior to his first purchase, Mr. Enders reviewed the information on the 2012 Barracuda webpage and in the *Barracuda Data Sheet*. He read Defendant's statements contained therein, particularly those pertaining to the benefits of AcuTrac technology and the assertions that the Drive is "best-fit" and "perfect" for desktop RAID and NAS. He also read the AFR and read error rate data in the *Data Sheet*.

228.    He also reviewed the Drive's webpage and the *Data Sheet* hyperlinked therein prior to his subsequent purchases.

229.    Mr. Enders considered the foregoing statements and data to be material because they pertained to the Internal Barracuda's reliability and longevity, which are extremely important characteristics of hard drives, and its suitability for RAID and NAS use. He relied on these statements and data in deciding to purchase the Internal Barracuda.

230.    Defendant's statements were misrepresentations, and Defendant knowingly failed to disclose the Drive's defects and unreliability, for the reasons set forth in this Second Consolidated Amended Complaint. Due to the Drive's inherent, model-wide defect and its unsuitability for RAID, at least five of Enders' drives suffered catastrophic failures during their

respective warranty periods. At least one of the original Drives failed by reporting uncorrectable read errors.

231.    Had Mr. Enders known that the Internal Barracuda had an inherent, model-wide defect that drastically reduced its lifespan, caused it to fail prematurely at extremely high rates, and made it unsuitable for storing and protecting data, he would not have purchased one. Likewise, he would not have purchased a Drive if he had known that it was not suitable for RAID.

**9.    Plaintiff Dortch.**

232.    In the spring of 2013, Plaintiff Dortch purchased eight new Internal Barracudas. Some of the Drives were purchased from tigerdirect.com and some were purchased from online retailer Evertech.

233.    TigerDirect is an authorized Seagate reseller, and Mr. Dortch used the Drives for non- commercial purposes.  Specifically, he used them in his home NAS primarily to store movies, pictures, and other media for personal and family use.

234.    Prior to purchase, Mr. Dortch knew that the Drives were covered by a warranty because of his prior experience with purchasing hard drives from Defendant. The warranty on the Drives was one year.

235.    Mr. Dortch would not have purchased any Internal Barracudas if there had not been an express warranty.

236.    Prior to his first purchase, Mr. Dortch reviewed the *Barracuda Data Sheet.* Specifically, he read the statements on the *Data Sheet* regarding the suitability of the Drive for RAID and NAS. Mr. Dortch considered these statements to be material and relied on them because he was purchasing the Drives for use in his NAS, which was configured in a RAID 5.

237.    Defendant's statements were misrepresentations because the Drives were not fit for NAS, were not designed for RAID 5, and were not suitable for any RAID configuration. Moreover, Defendant knowingly failed to disclose these facts to Mr. Dortch, the Plaintiffs, and Class Members.

238.    Due to the Drive's latent, model-wide defects ~~and its unfitness for NAS~~, four of Mr. Dortch's eight Drives suffered catastrophic failures by early 2014 – approximately one year after purchase.

239.    The first failure occurred within the first 90 days after purchase. Mr. Dortch returned it for a warranty replacement (Replacement 1), and around the same time another original Drive failed (Original Drive 2). Original Drive 2 was also under warranty and replaced with a refurbished Drive.

240.    Replacement 1 was a refurbished unit, and it failed approximately six months after receipt. Shortly thereafter, another original Drive (Original Drive 3) catastrophically failed. Mr. Dortch called Defendant to ask if they would replace Replacement 1 and Original Drive 3, but Defendant refused because these Drives were just outside of warranty.

241.    Due to the failure of four Drives, Plaintiff Dortch lost a massive amount of personal data, including large archives of family photos dating back to 2002. Plaintiff ultimately paid thousands of dollars for a company in South Carolina to recover his data.

242.    Had Mr. Dortch known that the Internal Barracuda was not suitable for his NAS system, which was configured in RAID, and that it had an inherent, model-wide defect that drastically reduced its lifespan, caused it to fail prematurely at extremely high rates, and made it unsuitable for storing and protecting data, he would not have purchased one.

**10.    Plaintiff Smith.**

243.    In approximately November 2012, Plaintiff Smith purchased four or five new Internal Barracudas, and then subsequently purchased two or three new Internal Barracudas, totaling eight Drives.

244.    Mr. Smith purchased his Drives only from authorized retailers, including Newegg and TigerDirect. Mr. Smith used his Drives for personal, non-commercial purposes.

245.    Prior to purchase, Mr. Smith knew that the warranty period on the Drives that he purchased was two years because he saw the length of the warranties on the websites he purchased the Drives from.

246.    Mr. Smith relied on these representations and would not have purchased any Drives if there had not been an express warranty.

247.    Prior to his first purchase, Mr. Smith reviewed the *Barracuda Data Sheet* and the press release issued by Defendant in 2011. Specifically, he read the statements that the Internal Barracuda was "designed for" ~~NAS and~~ "home and small-business RAID solutions," and that desktop RAID"~~ and NAS are~~ [is one] ~~two~~ of the "Best-Fit Applications" for the Drive. Mr. Smith considered these statements to be material and relied on them, as he intended to use the Drives for his personal RAID 5 system.

248.    Defendant's statements were misrepresentations because the Drives were not designed for RAID 5 and were not fit for any type of RAID configuration ~~or NAS~~, and Defendant knowingly failed to disclose the Drive's unfitness for such uses prior to Plaintiff's purchase.

249.    Due to the Drive's latent, model-wide defects and its unfitness for RAID, at least four of Mr. Smith's original eight Drives failed within the warranty period.

250.    Mr. Smith returned two Drives directly to Defendant for warranty replacement, and one of the replacements failed while it was still under warranty.

251.    Had Mr. Smith known that the Internal Barracuda was not suitable for RAID 5, and had an inherent, model-wide defect that drastically reduced its lifespan, caused it to fail prematurely at extremely high rates, and made it unsuitable for storing and protecting data, he would not have purchased any Drives.

252.    In addition to returning two Drives to Defendant, Mr. Smith also returned at least one of the original Drives that failed to Newegg, and at least two of the original Drives that failed to TigerDirect. These Drives failed within thirty days of first use.

**F.    Class Members' Experience with the Drives**

253.    Members of the Class have had experiences similar to Plaintiffs'.

254.    On the website newegg.com, there are over 700 reviews where consumers gave the Internal Barracuda a rating of one or two out of five.[18]

255.    Defendant is aware of the large number of negative reviews on Newegg. Indeed, it is aware of the specific consumer complaints as Defendant has responded to many reviews apologizing for the problems with the Internal Barracuda and stating that Defendant would like to speak with the consumer by phone.

256.    Set forth below is a sample of some consumer reviews posted to Newegg.com:

a.    Vincent Y. [December 12, 2012] Dead in a week

Pros: Great storage (while it works) Pretty fast

Rather quiet

Cons: Used for a week, started 'chirping' and 'clicking'. (Moderate use, not heavy use). Within the day it started making sounds, the hard- drive simply failed and died. It would not be recognized.

I bought two, this happened to both . . . .

b.    Dustin S. [Dec. 18, 2012]

Replacement is also bad.

Pros: None.

Cons: [Returned] first one replacement also bad after 3days use. Not happy I had to pay shipping.

c.    Brock M. [June 14, 2013 2:41 pm]

DOA Two Times.

*Pros:* I purchase two of these. One is working fine with no problem.

*Cons:* I purchased two of these hard drives. [One] worked and the other one didn't. I returned the one that was dead and received another dead one. Quite frustrating.

---

[18] *See* Reviews of *Seagate Desktop HDD ST3000DM001 3TB 64MB Cache SATA 6.0Gb/s 3.5" Internal Hard Drive Bare Drive*, Newegg, http://www.newegg.com/Product/Product.aspx?Item= N82E16822148844 (last accessed Jan. 20, 2016).

d.       Donald D. [July 20, 2013 10:25 am]

Bought 3 died in 3 months.

Pros: Cheap, Lots of space, fast shipping

Cons: I got three of these and all three died in the first three months all about a week

apart!

e.       Jake W. [May 2, 2014]

High Failure Rate

Pros: When the drives aren't failing they run how I would expect.

Cons: These drives seem to have a very high failure rate. 2 drives died after less than a

week of use. After 3-4 months 2 more failed and I had to go through Seagate's terrible warranty

system. Just this week a 5th drive failed and had to be sent back to Seagate. In total I have spent

over $60 shipping the drives back to Seagate to get them replaced. I can no longer in good faith

recommend Seagate drives to anyone I know.

f.       Mark N. [August 18, 2014 8:31 pm]

No More for me.

Pros: Price

Cons:  This is a replacement for my original purchase that gave me problems from the get

go. This one started having delays and corrupt data shortly after use. I'm just getting tired of

sending drives back to Seagate just to get another refurbished drive in exchange that will also fail

shortly after receiving it.

Other Thoughts: Enough is enough, no more getting sucked in because the price may be a

few dollars cheaper than a more reliable brand.

g.       Anonymous [December 26, 2015 1:35 pm]

*Pros:* Fastest storage drive I've ever owned.

*Cons:* Died faster than any drive I've ever owned. Data that I would have rather forfeit

bodily functionality than lose has been lost . . . .

h.       Peter B. [September 8, 2015 7:16 am]

Don't let the price tempt you!

Pros: Works as advertised for a short period of time

Cons: Yikes! Not reliable at all. I have 2 of these drives and the first one died after 3 months. Replacement drive just died again after barely being used (seriously, it sat in the box – when installed, it lasted a month) and now it's out of warranty . . . .

    i.     Alex C. [January 14, 2016 3:23 pm]

Not sure about Seagate Quality anymore.

Pros: Good size

Decent price

Cons: Bad reliability. 3 out 7 failed within 2 years

I bought 7 same drives about 22 months ago for a RAID 5 NAS setup. One as spare. About 4 months ago, one drive failed. Another one failed after 2 more months. Before RMA [Return Material Authorization] came back, another one failed just 3 weeks ago. This last failed one is just of warranty for a few days . . . .

    j.     Howard [Jan. 10, 2016 5:24 am]

The Drives have a bad failure rate

Pros: None

Cons**:** I have had several of these drives fail in my RAID array. I replaced them and now one I just purchased was dead after a month . . .

    257.    Hundreds – if not thousands – of reviews and complaints about Internal Barracuda failures are also posted on websites such as amazon.com.[19]

    258.    Similarly, the Backup Plus has received hundreds of negative reviews on amazon.com. Indeed, there are approximately 450 reviews where consumers rated the Backup Plus a one-out-of-five.[20]

---

[19] *See, e.g.*, *Customer Reviews*, http://www.amazon.com/Seagate-Desktop-3-5-Inch-Internal-ST3000DM001/dp/B005T3GRLY/ref=cm_cr_pr_product_top?ie=UTF8.

[20] *See Customer Reviews*, http://www.amazon.com/Seagate-Backup-Desktop-External-STCA3000101/product-reviews/B00829THQE/ref=cm_cr_dp_qt_hist_one?ie=UTF8&filterBy=addOneStar&showViewpoints=0 (last accessed Jan. 21, 2015).

259.    Defendant is aware of the large number of negative reviews on amazon.com, as well as the specific complaints consumers have, because it replied to numerous reviews.

260.    Set forth below is a sample of some consumer reviews of the Backup Plus posted to Amazon.com:

a.      M. Olson [Sept. 5, 2012]

Failed in a week.

I have had this ONE week. On a Mac so I reformatted the drive and it seemed to work fine. Did about 1.5TB of backup the first two days it appeared to work fine. Tried to mount today... Nothing. Disk repair failed. Have to erase and reformat. I don't trust it. Big disappointment.

b.      A Programmer [August 6, 2013]

Failed after a month

As a Pre-engineering student, and as a programmer, I needed a reliable backup drive. This drive failed after a month. Yesterday, I needed to repartition my computer to run only Linux and Windows. I had all of my documents backed up, including games, My school stuff, my college essays, my programs that I made, my operating system .iso's, my programming pdf's, and a draft of the book that I was writing on how to program Java 7. Sure enough, when I plugged in my hard drive (I was running Windows 7) and started to transfer files, it failed and made a weird whirring sound . . .

I am exceptionally irritated by the drives lack of reliability and [Seagate's] refusal to recover my lost data without paying a great sum of money that I cannot afford as a student.

c.      DS [June 10, 2014]

There's a reason this drive has [hundreds of] 1 star reviews. This is the worst hard drive I've ever had the displeasure of owning. The first drive developed bad sectors in less than one year. So many that data recovery was actually kind of a PITA…

I was able to get an RMA from Seagate for the drive. The new drive arrived from Seagate and it still had the previous customer's asset management stickers on it, including their phone number and address... right next to the big sticker that said: RECERTIFIED.

Three weeks later the replacement drive failed as well. I'm not going to even bother with an RMA even though it's under warranty still, I'm sure the next drive will just fail as well.

> d.      Amazon Customer [Feb. 6, 2015]

The purpose of an external hard drive is for it to provide a restore option when and if my computer hard drive fails. In order to be useful for this purpose, the external hard drive must be available and reliable. This is my second hardware failure for this product. Both times the hard drive failed to power up. The Seagate failed within its warranty period, so Seagate replaced it, but would not do any data recovery unless I paid $300 for them to attempt. No guarantees. No thanks . . . Fast forward a year, and the replacement Seagate drive failed.

> e.      E [January 11, 2016]

The disk performed OK while it worked, but started dying after less than two years of rather light use.

Over the years I've used quite a few backup drives, and this one seems the least reliable of them all . . . .

261.    Like the Internal Barracuda and Backup Plus, there are hundreds of negative reviews of the GoFlex on websites such as Amazon.com.[21]

262.    Defendant is aware of the large number of negative reviews on amazon.com, as well as the specific complaints consumers have, because it replied to numerous reviews.

263.    Set forth below is a sample of some customer reviews of the GoFlex posted to amazon.com:

> a.      Kindle Customer [Dec. 13. 2011]

---

[21] *See Customer Reviews*, Amazon, *http://www.amazon.com/product-reviews/B005IA844G/ref=acr_dpx_hist_1?ie=UTF8&filterByStar=one_star&showViewpoints=0* (last accessed February 4, 2016).

3 of 4 Drives = DOA

Seagate has a major quality problem. I ordered two of these from Amazon, one worked right out of the box, the other didn't. (First DOA - dead on arrival.) Replaced the failing drive with another from Amazon. DOA. While talking w. Seagate, they asked that I replace it with one directly from them (Seagate). Another DOA. So that's 3 DOA out of four. In each case, the drive failed while running Seagate's own diagnostic read/write tests. One wonders if they test anything before shipment, and if so, how?

      b.      Stephen [March 24, 2012]

I had this hard drive for a month, stopped working and I lost a great deal of data and files that I had already moved to this storage. I would not recommend this hard drive.

      c.      Michael C. [Nov. 21, 2015]

Failed and failed again.

Failed twice. First one failed in the first month I had it. Replaced under warranty and it failed after a couple of years and not covered again.

      d.      Amazon Customer [Jan. 3, 2016]

Just to let you know[,] EVERY SINGLE one of these I have bought has failed. Some within warranty. I have many decade old WD [Western Digital] drives still working…[but] [t]hese Seagate drive[s] are durable as toilet paper, and every bit of your data will be lost when they start growling or screeching or just silently refuse to ever power up again.

## V.      CLASS ACTION ALLEGATIONS

264.   Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class defined as:

All individuals in the United States who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

265.   Alternatively, Plaintiffs bring this action as a class action on behalf of the following Subclasses:

All individuals in California who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

All individuals in South Carolina who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

All individuals in New York who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

All individuals in Florida who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

All individuals in Illinois who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

All individuals in Massachusetts who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

All individuals in Tennessee who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

All individuals in Texas who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

All individuals in South Dakota who purchased, not for resale, at least one Seagate model ST3000DM001 hard drive, or at least one external drive that contained a drive with the aforesaid model number.

266.    Excluded from the Classes are: (a) Defendant, including any entity in which Defendant has a controlling interest, and its representatives, officers, directors, employees, assigns and successors; (b) any person or entity who has settled or released these same claims against Defendant as evidenced by a written release; and (c) the Judge to whom this case is assigned.

267.    Plaintiffs are members of the Classes that they seek to represent. Members of the proposed Classes are fully ascertainable and can be identified using Defendant's records of online retail sales (including records of retail sales by its authorized resellers and dealers), product registrations, and other information kept by Defendant in the usual course of business and/or in the control of Defendant. Class Members can be notified of the class action through publication on user websites and direct e-mailings to address lists maintained in the usual course of business by Defendant. Alternatively, Class Members can identify themselves.

268.    <u>Numerosity/Impracticability of Joinder</u>: The members of the Classes are so numerous that joinder of all members would be impracticable.  The proposed Classes include, at a minimum, thousands of members.  The precise number of Class Members can be ascertained by reviewing documents and records in Defendant's possession, custody, and control, or otherwise obtained through reasonable means.

269.    <u>Commonality and Predominance</u>: There are common questions of law or fact which predominate over any questions affecting only individual members of the Classes. These common legal or factual questions, include, but are not limited to the following:

a.    Whether the Drives contain a latent, model-wide defect that causes them to fail prematurely;

b.    Whether Defendant engaged in a pattern of fraudulent, deceptive and misleading conduct;

c.    Whether Defendant made material misrepresentations of fact or omitted stating material facts to Plaintiffs and the Classes regarding the defective nature and high failure rate of the Drives;

d.      Whether Defendant's acts and omissions violated consumer protection, unfair competition, and/or false advertising statutes;

e.      ~~Whether the Drives are of the same quality as those generally acceptable in the market;~~

f.      ~~Whether the Drives are fit for the ordinary purposes for which hard drives are used;~~

g.      ~~Whether the Drives are adequately contained, packaged, and labeled;~~

h.      ~~Whether Defendant breached its~~ express and implied warranties;

i.      Whether Defendant represented that its Drives are of a particular standard, quality, or grade when they are of another;

j.      Whether Defendant represented that its Drives have characteristics, uses, or benefits that they do not;

k.      Whether, as a result of Defendant's misconduct, Plaintiffs and the Classes are entitled to relief, and, if so, the nature of such relief;

l.      Whether, by the misconduct set forth herein, Defendant violated the common law of unjust enrichment; whether the Plaintiffs and members of the Classes have sustained ascertainable loss and damages as a result of Defendant's acts and omissions, and the proper measure thereof.

270.    Typicality: The representative Plaintiffs' claims are typical of the claims of the members of the Classes they seek to represent.  Plaintiffs and members of the Classes have been injured by the same wrongful practices in which Defendant has engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

271.    Adequacy: Plaintiffs are representatives that will fully and adequately assert and protect the interests of the Classes, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests which are contrary to or conflicting with the Classes.

272.     Superiority:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Classes are likely in the millions of dollars, the individual damages incurred by each Class member resulting from Defendant's wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual Class Members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Classes do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Defendant has acted or refused to act on grounds generally applicable to the Classes and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Classes as a whole is appropriate.

273.     In the alternative, Plaintiffs seek certification pursuant to Rule 23(c)(4) on the issues of: (a) whether Defendant breached its warranty contracts with Plaintiffs and the Class; and (b) whether Defendant engaged in deceptive, confusing or misleading practices in connection with the sale and warranting of the Drives.

## VI.     VIOLATIONS ALLEGED

### FIRST CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

### (ON BEHALF OF THE CALIFORNIA SUBCLASS PLAINTIFFS AND THE CLASS)

274.     Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

275.    California Business and Professions Code § 17200, *et seq*., the Unfair Competition Law ("UCL"), prohibits any "unlawful, unfair, or fraudulent business act or practices."

276.    Plaintiffs, the members of the Class, and Defendant are "persons" within the meaning of the UCL.

277.    The UCL applies to the claims of all Plaintiffs and Class Members, regardless of the state in which they reside or purchased their Drive(s), because the unlawful conduct giving rise to this claim occurred in and emanated from California. Upon information, belief, and investigation of counsel:

a.    Defendant is headquartered in California and directs all of its operations from there.

b.    The Drives were designed, in whole or in part, by Defendant in California.

c.    From its headquarters and/or its other locations in California, Defendant markets and advertises its products and directs its marketing and advertisements to consumers across the country.

d.    From its headquarters and/or its other locations in California, Defendant orchestrates, coordinates, and carries out national sales and marketing strategies, consumer sales operations, and product planning.

e.    From its headquarters and/or its other locations in California, Defendant devises, orchestrates, coordinates, and carries out public relations campaigns in which it "interfaces with public relations agenc[ies] and acts as the corporate spokesperson to the media, analysts and the general public at large.[22]"

f.    From its headquarters and/or its other locations in California, Defendant "identif[ies], assemble[s], transform[s] and combine[s]" consumer data and creates "actionable

---

[22] 22 *Sr. PR Manager: Seagate Technology LLC – Cupertino CA 95014*, Monster (April 13, 2016), http://job-openings.monster.com/monster/8d29b43b-ebf5-4d32-ad06-aef9e9f1fb57?mescoid=1100009001001&jobPosition=16.

and available reports for the entire Seagate consumer business" that "drive decision making for all of [Defendant's] consumer products."[23]

g.     The advertisements, materials, and statements at issue in this litigation were conceived, created, and published by Defendant in California and distributed, electronically and otherwise, from California to Plaintiffs and Class Members. This is evidenced by the foregoing as well as the fact that the *Barracuda Data Sheet*, *HDD Kit Data Sheet*, *Barracuda Product Overview*, and *Storage Solutions Guide* are copyrighted by Seagate Technology LLC and contain the address of its California headquarters. Moreover, Defendant employs a Senior Director of Marketing and Senior Director of Global Marketing at its headquarters.

h.     Defendant also develops and maintains its website and devises, implements, and directs online marketing strategies from California. This is evidenced by the foregoing as well as the fact that Defendant employs web development managers and the Director of Online Marketing at its headquarters.[24]

i.     The Drives' misleading reliability data was calculated by, or was calculated from information and data obtained by, Defendant's employees in California. This is evidenced by the fact that Defendant employs materials science and analytical engineering professionals in California who, among other things, are "responsible for hard drive disc materials & thin film analysis, in terms of structure and contamination identification, quality evaluation, purification, and failure analysis."[25]

278.     Defendant violated the UCL for one or more of the following reasons:

a.     It engaged in unlawful conduct.

b.     It made material misrepresentations and omissions.

---

[23] 23 *Sr. Engineer, Data Analytics – Business Intelligence & Data Analytics Group: Seagate Technology LLC – Cupertino CA 95014* (April 15, 2016), http://job-openings.monster.com/monster/35b5855b-b68e-4554-9a37-0f0076240cb4?mescoid=1500127001001&jobPosition=5#

[24] *See Front-End Web Developer / Manager-161657*, Seagate, https://seagate.taleo.net/careersection/2/jobdetail.ftl?job=161657 (last accessed May 2, 2016).

[25] 25 *Staff Engineer, Materials Science/Analytical Engineering: Seagate Technology LLC - Fremont, CA 94537*, Monster (April 7, 2016), http://job-openings.monster.com/monster/3725a2c7-f7f2-4f5a-9711-72e00bb241ea?mescoid=1700183001001&jobPosition=4.

c.      It engaged in immoral, unethical, unscrupulous, and oppressive conduct, or conduct that is otherwise against established public policy.

279.    More specifically, Defendant violated the UCL's "unlawful" prong by violating California's Consumer Legal Remedies Act, False Advertising Law, and ~~express~~ ~~and implied~~ ~~warranty statutes,~~ as set forth below.

280.    Defendant violated the UCL's "fraudulent" prong because it made material misrepresentations and omissions regarding the Drives, as set forth in this Second Consolidated Amended Complaint. Plaintiffs viewed Defendant's statements and representations prior to purchase, considered them to be material, relied on them, and were deceived by them.

281.    The affirmative misrepresentations made by Defendant include, without limitation, that the Drives ~~are highly reliable, have an extremely low failure rate,~~ are ideal for RAID ~~and NAS, and are suitable for protecting important and irreplaceable personal data. For example, Defendant claimed that the Barracuda provides: "[r]eliable performance, even in tough environments, thanks to Seagate AcuTrac™ servo technology;" that it delivers "dependable performance, even with hard drive track widths of only 75 nanometers;"~~ that it is "perfect" and "best-fit" for desktop RAID ~~and NAS;~~ ~~that it "gives you one hard drive platform for every desktop storage application. One drive with trusted performance, reliability, simplicity, and capacity;" and~~ that it has an AFR of less than one percent ~~and a read error rate of 1 in 100 trillion. Moreover, Defendant advertised the Backup Plus as ideal for safeguarding and protecting one's "entire digital life," "lifetime of memories," and life's "amazing moments" against "'life happen[ing]' to your computer."~~

282.    These statements, and the other statements alleged in this Second Consolidated Amended Complaint, are false, misleading, and members of the public would likely be deceived by them, as they are unqualified and specific affirmations of the Drives' reliability and quality and are not mere "puffery" or hyperbole.

283.    In addition, under California law, a duty to disclose arises in four circumstances: 1) when the defendant is in a fiduciary relationship with the plaintiff; 2) when the defendant had

exclusive knowledge of material facts not known to the plaintiff; 3) when the defendant actively conceals a material fact from the plaintiff; and 4) when the defendant makes partial representations but also suppresses some material facts.

284.    Defendant had a duty to disclose the Drives' defects and their unsuitability for RAID ~~and NAS~~ to the Plaintiffs and the Class for the following three independent reasons: 1) Defendant had exclusive knowledge of these facts at the time of sale; 2) Defendant actively concealed these facts from Plaintiffs and Class Members; and 3) Defendant made partial representations to Plaintiffs and Class Members regarding the reliability, longevity, and suitable uses of the Drives.

285.    Defendant had a duty to disclose, and failed to disclose, *inter alia*, 1) that the Drives are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for ~~any~~ form[s] of RAID ~~or NAS~~; 5) that their published ~~read error rates and~~ AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

286.    Defendant failed to disclose the foregoing despite knowing that the Drives are plagued by latent, model-wide defects. Defendant's knowledge stemmed from reading negative consumer reviews detailing Drive failures and testing and repairing its own defective Drives.

287.    Defendant's omissions and misrepresentations were material because they pertain to the Drives' reliability and longevity, and a reasonable consumer would attach importance to the existence or non-existence of a defect that strongly and adversely affects these qualities.

288.    It is common knowledge that a hard drive's reliability and longevity are important to consumers, as consumers store valuable and often irreplaceable files, pictures, documents, and other data on them. Defendant, which is one of the largest hard drive manufacturers in the world, therefore knew, or had reason to know, that consumers were likely to regard the foregoing as important in deciding whether to purchase its Drives. Moreover, the consumer reviews and complaints discussed *supra* put Defendant on notice of the above.

289.    Plaintiffs would not have purchased any Drives if they had known about their model- wide defects, unreliability, and/or unsuitability for RAID and NAS. Since Defendant's misrepresentations and omissions were material, it may be presumed that members of the Class would not have purchased a Drive if they had known about their defects.

290.    If Defendant had disclosed the Drives' defects, the defects would have become known to Plaintiffs and the Class Members because, upon information and belief, they would have been disseminated on the Internet, by retail employees, and through other sources.

291.    Defendant violated the UCL's unfair prong because Defendant's acts and practices set forth in this Second Consolidated Amended Complaint offend established public policy or are otherwise immoral, unethical, unscrupulous, and oppressive.

292.    These acts and practices include, without limitation, Defendant marketing and selling the Drives knowing they contain serious model-wide defects; failing to adequately disclose and remedy the defects; marketing and selling the Drives as "perfect" and "best-fit" for RAID knowing they are not designed for RAID 5 or suitable for any type[s] of RAID or NAS; misrepresenting the quality and reliability of the Drives; replacing failed Drives with "refurbished" Drives that had already failed and were highly likely to fail again; failing to provide refunds or a different model of hard drive to warranty claimants even though Defendant never delivered conforming, non-defective Drives; and providing defective replacement Drives and charging customers exorbitant sums of money to recover their data.

293.    The harm these acts and practices cause to consumers greatly outweighs any benefits associated with those acts and practices.

294.    Defendant's conduct has also impaired competition within the hard drive market and has prevented Plaintiffs and Class Members from making fully informed decisions about whether to purchase Drives and/or the price to be paid to purchase them.

295.    Plaintiffs have standing to pursue all of the foregoing Unfair Competition Law claims on behalf of the Class because they have suffered an injury in fact, including the loss of money or property, as a result of and in reliance on Defendant's unfair, unlawful, and deceptive

practices. As set forth above, Plaintiffs were exposed to and read Defendant's misrepresentations prior to purchase, considered them material, relied on them, and were deceived by them. Moreover, had Defendant disclosed the Drives' defects and true suitable uses, Plaintiffs would not have purchased any. In addition, Plaintiffs expended money as a result of the Drives' defects to the extent that they had to pay to ship their Drives to Defendant for replacement.

296.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

297.    Accordingly, Plaintiffs and the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the Class any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for attorney's fees and costs.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW

## (ON BEHALF OF THE CALIFORNIA SUBCLASS PLAINTIFFS AND THE CLASS)

298.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

299.    California Business and Professions Code § 17500, *et seq.*, the False Advertising Law ("FAL"), proscribes the dissemination of a statement that is "untrue, misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

300.    The FAL prohibits statements that are "disseminated before the public in [California]" as well as those that are "disseminated from [California] before the public in any state."

301.    As alleged in paragraph 277, *supra*, the misrepresentations at issue in this litigation were disseminated from California to Plaintiffs in their respective states and to Class Members across the country.

302.    Plaintiffs and the members of the Class are "persons" within the meaning of the FAL.

303.    Defendant is a "corporation" within the meaning of the FAL.

304.    Defendant engaged in advertising and marketing to the public and offered the Drives for sale.

305.    Defendant engaged in the advertising and marketing alleged herein with the intent to induce the sale of its Drives to consumers.

306.    Defendant's advertising and marketing representations regarding its Drives were false, misleading, deceptive, and material as set forth in detail above. Defendant also concealed material information from consumers that the Drives contain a latent defect that causes them to fail at extraordinarily high rates and that the Drives are not designed for RAID 5 or suitable for any RAID or NAS configuration.

307.    Defendant's misrepresentations and omissions deceive or have the tendency to deceive the general public.

308.    Since Defendant's misrepresentations and omissions are objectively material to a reasonable consumer, reliance on them may be presumed as a matter of law.

309.    At the time the misrepresentations were made, Defendant knew, or should have known, that they were untrue or misleading. Defendant had knowledge of thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation, and it had firsthand knowledge of the Drives' defects because it examined and tested all Drives sent in by consumers for replacement.

310.    Plaintiffs have standing to pursue a FAL claim on behalf of the Class because they have suffered an injury in fact, including the loss of money or property, as a result of and in reliance on Defendant's false advertising. Plaintiffs were exposed to and read Defendant's misrepresentations prior to purchase, considered them material, relied on them, and were deceived by them. Moreover, had Defendant disclosed the Drives' defects and true suitable uses, Plaintiffs would not have purchased any. In addition, Plaintiffs expended money as a result of the

Drives' defects to the extent that they had to pay to ship their Drives to Defendant for replacement.

311.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

312.    Accordingly, Plaintiff and the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its false advertising practices and to restore to Plaintiff and the Class any money Defendant acquired by false advertising, including restitution and/or restitutionary disgorgement, and for attorney's fees and costs.

## THIRD CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT

### (ON BEHALF OF THE CALIFORNIA SUBCLASS PLAINTIFFS AND THE CLASS)

313.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

314.    California Civil Code § 1750, *et seq.*, the Consumer Legal Remedies Act, prohibits several enumerated unfair methods of competition and unfair or deceptive acts or practices including, without limitation:

a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have. Cal. Civ. Code § 1770(a)(5).

b.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. Cal. Civ. Code § 1770(a)(7).

c.    Advertising goods or services with intent not to sell them as advertised. Cal. Civ. Code § 1770(a)(9).

d.    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not. Cal. Civ. Code § 1770(a)(16).

315.    The CLRA applies to the claims of all Plaintiffs and Class Members, regardless of the state in which they reside or purchased their Drive(s), because the unlawful conduct giving rise to this claim occurred in and emanated from California, as set forth above.

316.    Defendant is a "person" as defined in the CLRA.

317.    Plaintiffs and Class Members acquired and purchased Drives for personal, family, or household purposes and are therefore "consumers" as defined in the CLRA.

318.    The Drives are "goods" as defined by the CLRA.

319.    The purchases by Plaintiffs and Class Members of the goods sold by Defendant constitute "transactions" as defined by the CLRA.

320.    In connection with its sale of goods to Plaintiffs and the Class, Defendant violated the CLRA, including without limitation §§ 1770(a)(5), (7), (9), and (16), by:

    a.    Misrepresenting to Plaintiffs and the Class that the Drives are reliable consumer hard drives with extremely low failure rates, when in fact they have latent, model-wide defects that cause them to fail at extraordinarily high rates and have a far shorter lifespan than comparable hard drives on the market.

    b.    Misrepresenting to Plaintiff and the Class that the Internal Barracuda was designed for and ideal for Desktop RAID and NAS when it was not designed for RAID 5 and is not suitable for any RAID or NAS configuration.

321.    In addition, under California law, a duty to disclose arises in four circumstances: 1) when the defendant is in a fiduciary relationship with the plaintiff; 2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; 3) when the defendant actively conceals a material fact from the plaintiff; and 4) when the defendant makes partial representations but also suppresses some material facts.

322.    Defendant had a duty to disclose the Drives' defects and their unsuitability for RAID and NAS to the Plaintiffs and the Class for the following three independent reasons: 1) Defendant had exclusive knowledge of these facts at the time of sale; 2) Defendant actively concealed these facts from Plaintiffs and Class Members; and 3) Defendant made partial

representations to Plaintiffs and Class Members regarding the reliability, longevity, and suitable uses of the Drives.

323. Defendant had a duty to disclose, and failed to disclose, *inter alia*, 1) that the Drives are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for any[s] of RAID or NAS; 5) that their published read error rates and AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

324. Defendant failed to disclose the foregoing despite knowing that the Drives are plagued by latent, model-wide defects. Defendant's knowledge stemmed from reading negative consumer reviews detailing Drive failures and testing and repairing its own defective Drives.

325. In sum, Defendant violated the CLRA by supplying defective Drives and misrepresenting their suitable and intended uses and by further concealing material facts regarding the same.

326. Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer for the reasons discussed in detail in this Second Consolidated Amended Complaint, and they did in fact mislead Plaintiffs.

327. Defendant's omissions and misrepresentations were material for the reasons discussed *supra*.

328. Plaintiffs and the Class relied to their detriment on Defendant's misrepresentations and omissions in purchasing Drives, and were injured.

329. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

330. Accordingly, Plaintiffs and the Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its acts and practices that

are in violation of the CLRA and to award Plaintiffs and the Class actual damages, punitive damages, attorney's fees, and any other relief this Court deems just and appropriate.

331.    Pursuant to Cal. Civ. Code § 1782(a), on May 5, 2016, counsel for Plaintiffs and the Subclass served Defendant by United States certified mail with notice of its violations of the CLRA. The notice was received and signed for by Defendant on May 9.  *See* Exhibit G.

332.    Defendant failed to remedy the wrongs complained of in the Notice within 30 days. Accordingly, Plaintiffs and the Class are now entitled to the above-requested relief.

**FOURTH CLAIM FOR RELIEF**

**BREACH OF EXPRESS WARRANTY**

**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

333.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

334.    The Drives' warranty contains a choice of law clause which provides that the "laws of the State of California, USA, govern this limited warranty."

335.    Defendant is and was at all relevant times a merchant as defined by Cal. Com. Code § 2104.

336.    As an express warrantor and manufacturer and merchant, Defendant had certain obligations under California Commercial Code § 2313, *et seq*., and California Civil Code § 1791.2, *et seq*., to conform the Drives to their express warranties.

337.    When Plaintiffs and Class Members purchased the Drives, Defendant expressly warranted that they were free from defects in materials and workmanship.

338.    Defendant breached its express warranties – and continues to breach them – because it did not, and cannot, deliver conforming, non-defective Drives to Plaintiffs and Class Members despite sending replacement Drives to them.

339.    Defendant did not, and cannot, deliver conforming, non-defective Drives because the Drives suffer from latent, model-wide defects which are present at the time of sale or Drive replacement.

340.    These defects cause the Drives' warranties to fail of their essential purpose. Defendant warranted that if a Drive has a defect in materials or workmanship, Defendant will replace it with a "functionally equivalent replacement product." *See* Exhibit F: *Seagate Limited Warranty*.  The reasonable and natural interpretation of this phrase is "functional equivalent of the product as warranted" (i.e. free from defects in materials and workmanship). Defendant did not satisfy this obligation because all of its Drive have latent defects and it failed to replace the Drives owned by Plaintiffs and Class Members with functionally equivalent hard drives of a different model.

341.    Simply put, Defendant replaced defective Drives with defective Drives.  Indeed, Defendant provided as replacements failed drives that it "refurbished" despite knowing that they were irreparably defective and highly likely to fail again.

342.    Plaintiffs purchased their Drives new and in their original packaging, used them in a manner consistent with their intended use, and have performed each and every duty required under the terms of the warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

343.    Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

344.    Additionally, upon information and belief, Defendant has received — or otherwise has knowledge of — thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation and is aware of the Backblaze reports.

345.    Privity of contract is not required in this action. Privity is not an element under California Civil Code § 1791.2, *et seq.* Moreover, under California law, privity is not required under California Commercial Code § 2313, *et seq.*, when plaintiffs rely on a manufacturer's written representations on product labels or advertising materials in deciding to purchase a defective product. Defendant printed the warranty length on the Drives' boxes as well as on its website and/or in its marketing and informational materials. Moreover, upon information and

belief, Defendant represented to authorized retailers and resellers that the Drives were covered by a manufacturer warranty, causing the retailers and resellers to communicate this information to their customers.

346.   As discussed *supra*, Plaintiffs relied on these representations in deciding to purchase the Drives.

347.   Moreover, Defendant's warranty states "Only consumers purchasing this product from an authorized Seagate retailer or reseller may obtain coverage under this Limited Warranty." *See* Exhibit F.

348.   In its capacity as a supplier and/or warrantor, and by the deceptive, unfair, unconscionable, and fraudulent conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defects present in the Drives as of the time of sale, which Defendant knew about prior to offering the Drives for sale, which Defendant concealed and did not disclose, and did not remedy prior to sale or afterward, is unconscionable, and any such effort to disclaim or otherwise limit liability for the defects at issue is null and void.

349.   Any attempt by Defendant to limit or exclude any form of damages or other remedies, including without limitation consequential and incidental damages, is unconscionable and therefore null and void due to Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

350.   Plaintiffs and the Class Members have suffered damages caused by Defendant's breach of the express warranties and seek to recover damages including, without limitation, restitution; consequential and incidental damages such as data loss and data recovery costs; attorney's fees and costs; and any other relief the Court deems just and appropriate.

**FIFTH CLAIM FOR RELIEF**

**BREACH OF IMPLIED WARRANTY**

**(ON BEHALF OF ALL PLAINTIFFS AND THE CLASS)**

351.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

352.     A warranty that the Drives are in merchantable quality and condition is implied by law pursuant to Cal. Com. Code § 2314 and Cal. Civ. Code § 1792.

353.     Defendant is, and was at all relevant times, a merchant with respect to the Drives under Cal. Com. Code § 2014.

354.     The Drives were purchased and used primarily for personal, family, or household purposes, and are therefore consumer goods.

355.     Plaintiffs purchased the Drives new and in their original packaging and used them in a manner consistent with their intended use.

356.     Defendant did not disclaim the implied warranty of merchantability, nor could it; pursuant to Cal. Civ. Code § 1793, a manufacturer, distributor, or retailer may not limit, modify, or disclaim this implied warranty if it extends an express warranty on the product.

357.     Defendant impliedly warranted that the Drives were of good and merchantable condition and quality—fit for their ordinary intended use, namely, providing reliable data storage as an internal hard drive, an external drive, or in a NAS or RAID configuration.

358.     The Drives contained latent, model-wide defects that causes the Drives to fail at an unacceptably high rate far in excess of industry standards for this type of hard drive. Moreover, the Drives were not fit for RAID 5 or any type of RAID or NAS. These latent defects were present in the Drives when they left the exclusive control of Defendant and therefore existed during the duration of the warranty period.

359.     The Drives were not of the same quality as those generally acceptable in the trade; were not fit for the ordinary purposes of consumer data storage for which the goods are used; were not adequately contained, packaged, and labeled; and did not conform to the promises and facts stated on the container and label.

360.     Because all Drives were, and continue to be, latently defective, they were all non-merchantable. Accordingly, Defendant did not satisfy its implied warranty obligations by sending replacement Drives to Plaintiffs and the Class.

361.    Plaintiffs performed each and every duty required by the implied warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

362.    Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

363.    Additionally, upon information and belief, Defendant has received — or otherwise has knowledge of — thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation and is aware of the Backblaze reports.

364.    Privity is not required in this action. Privity is not an element under Cal. Civ. Code § 1792. Moreover, under California law, no privity is required under Cal. Com. Code § 2314 when plaintiffs rely on a manufacturer's written representations on product labels or advertising materials in deciding to purchase a defective product. As alleged *supra*, Plaintiffs relied on Defendant's representations on the Drives' boxes, on Defendant's websites, and in other materials.

365.    Privity is also not required when the plaintiffs are the intended beneficiaries of implied warranties between a retailer and a manufacturer. Plaintiffs and Class Members are intended third-party beneficiaries of contracts between Defendant and its authorized retailers and resellers; specifically, they are the intended beneficiaries of Defendant's implied warranties. The retailers and resellers were not intended to be the ultimate consumers of the Drives and have no rights under the warranty agreements provided with the Drives, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

366.    Defendant, therefore, breached the implied warranty of merchantability, which by law is provided in every consumer agreement for the sale of goods unless disclaimed, including for the sale of the Drives.

367.    As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged by receiving an inferior product from that which they were promised. Plaintiffs and the Class, therefore, seek to recover damages

including, without limitation, restitution; consequential and incidental damages such as data loss and data recovery costs; attorney's fees and costs; and any other relief the Court deems just and appropriate.

<strong>SIXTH CLAIM FOR RELIEF</strong>

<strong>BREACH OF EXPRESS WARRANTY</strong>

<strong>(ON BEHALF OF THE CALIFORNIA, NEW YORK, ILLINOIS, FLORIDA, MASSACHUSETTS, TENNESSEE, SOUTH CAROLINA, TEXAS, AND SOUTH DAKOTA SUBCLASSES)</strong>

368.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

369.    As an express warrantor and manufacturer and merchant, Defendant had certain obligations under to conform the Drives to their express warranties as provided by the law of each aforementioned state, namely, Cal. Com. Code § 2313; Cal. Civil Code § 1791.2; N.Y. U.C.C. Law § 2-313 and § 2-A-2; 810 Ill. Comp. Stat. 5/2-313; Fla. Stat. § 672.313; Mass. Gen. Laws Ch. § 2313; Tenn. Code § 47-2-313; S.C. Code § 36-2-313; Tex. Bus. & Com. Code § 2.313; and S.D. Codified Laws § 57A-2-313.

370.    When Plaintiffs and Class Members purchased the Drives, Defendant expressly warranted that they were free from defects in materials and workmanship.  These express warranties formed the basis of the bargain that was reached when Plaintiffs and other Class Members purchased their Drives.

371.    Defendant breached its express warranties—and continues to breach them—because it did not, and cannot, deliver conforming, non-defective Drives to Plaintiffs and Class Members despite sending replacement Drives to them.

372.    Defendant did not, and cannot, deliver conforming, non-defective Drives because the Drives suffer from latent, model-wide defects which are present at the time of sale or Drive replacement.

373.    These defects cause the Drives' warranties to fail of their essential purpose. Defendant warranted that if a Drive has a defect in materials or workmanship, Defendant will

replace it with a "functionally equivalent replacement product." *See* Exhibit F: *Seagate Limited Warranty*. The reasonable and natural interpretation of this phrase is "functional equivalent of the product as warranted" (i.e. free from defects in materials and workmanship). Defendant did not satisfy this obligation because all of its Drive, have latent defects and it failed to replace the Drives owned by Plaintiffs and Class Members with functionally equivalent hard drives of a different model.

374.    Simply put, Defendant replaced defective Drives with defective Drives. Indeed, Defendant provided as replacements failed drives that it "refurbished" despite knowing that they were irreparably defective and highly likely to fail again.

375.    Plaintiffs purchased their Drives new and in their original packaging, used their Drives in a manner consistent with their intended use, and have performed each and every duty required under the terms of the warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

376.    Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy. Affording Defendant further opportunity to cure its breach of written warranties would be unnecessary and futile.

377.    Additionally, upon information and belief, Defendant has received—or otherwise has knowledge of—thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation and is aware of the Backblaze reports.

378.    Privity of contract is not required in this action, as the express warranty, by its clear and unambiguous terms, extends to "consumers purchasing this product from an authorized Seagate retailer or reseller." *See* Exhibit F.

379.    Moreover, Plaintiffs otherwise relied on Defendant representation that the Drives were covered by a manufacturer warranty. Defendant printed the warranty length on the Drives' boxes as well as on its website and/or in its marketing and informational materials. Upon

information and belief, Defendant also represented to authorized retailers and resellers that the Drives were covered by a manufacturer warranty, causing the retailers and resellers to communicate this information to their customers.

380.    As discussed *supra*, Plaintiffs relied on these representations in deciding to purchase the Drives.

381.    In any event, privity is not an element of breach of express warranty under Massachusetts law and the California Civil Code.

382.    In its capacity as a supplier and/or warrantor, and by the deceptive, unfair, unconscionable, and fraudulent conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defects present in the Drives as of the time of sale, which Defendant knew about prior to offering the Drives for sale, which Defendant concealed and did not disclose, and did not remedy prior to sale or afterward, is unconscionable, and any such effort to disclaim or otherwise limit liability for the defects at issue is null and void.

383.    Any attempt by Defendant to limit or exclude any form of damages or other remedies, including without limitation consequential and incidental damages, is unconscionable and therefore null and void due to Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

384.    Plaintiffs and the Class Members have suffered damages caused by Defendant's breach of the express warranties and seek to recover damages including, without limitation, restitution; consequential and incidental damages such as data loss and data recovery costs; attorney's fees and costs; and any other relief the Court deems just and appropriate.

**SEVENTH CLAIM FOR RELIEF**

**BREACH OF IMPLIED WARRANTY**

**(ON BEHALF OF THE CALIFORNIA, NEW YORK, ILLINOIS, FLORIDA, MASSACHUSETTS, TENNESSEE, SOUTH CAROLINA, TEXAS, AND SOUTH DAKOTA SUBCLASSES)**

385. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

386. A warranty that the Drives are in merchantable quality and condition is implied under the law of each aforementioned state, namely, Cal. Com. Code § 2314; Cal. Civil Code § 1792; N.Y. U.C.C. § 2-314; 810 Ill. Comp. Stat. 5/2-314 and 5/2A-212; Fla. Stat. § 672.314; Massachusetts ALM Gen. Laws Ch. 106, § 2-314; Tenn. Code § 47-2-314; S.C. Code § 36-2-314; Tex. Bus. & Com. Code § 2.314; and S.D. Codified Laws § 57A-2-314.

387. Defendant is, and was at all relevant times, a merchant with respect to the Drives.

388. The Drives were purchased and used primarily for personal, family, or household purposes and are therefore consumer goods.

389. Plaintiffs purchased the Drives new and in their original packaging and used them in a manner consistent with their intended use.

390. Defendant did not disclaim the implied warranty of merchantability.

391. Defendant impliedly warranted that the Drives were of good and merchantable condition and quality—fit for their ordinary intended use, namely providing reliable data storage as an internal hard drive, an external drive, or in a NAS or RAID configuration.

392. The Drives contained latent, model-wide defects that causes the Drives to fail at an unacceptably high rate far in excess of industry standards for this type of hard drive. Moreover, the Drives were not fit for RAID 5 or any type of RAID or NAS. These latent defects were present in the Drives when they left the exclusive control of Defendant and therefore existed during the duration of the warranty period.

393. The Drives were not of the same quality as those generally acceptable in the trade; were not fit for the ordinary purposes of consumer data storage for which the goods are used; were not adequately contained, packaged, and labeled; and did not conform to the promises and facts stated on the container and label.

394. Because all Drives were, and continue to be, latently defective, they were all non-merchantable. Accordingly, Defendant did not satisfy its implied warranty obligations by sending replacement Drives to Plaintiffs and the Class.

395.    Plaintiffs performed each and every duty required by the implied warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's deceptive, unfair, unconscionable, and fraudulent conduct.

396.    Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

397.    Additionally, upon information and belief, Defendant has received—or otherwise has knowledge of—thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation and is aware of the Backblaze reports.

398.    Privity of contract is not required in this action, because Plaintiffs relied on Defendant's representation that the Drives were covered by a manufacturer warranty.  Defendant printed the warranty length on the Drives' boxes as well as on its website and/or in its marketing and informational materials.  Moreover, upon information and belief, Defendant represented to authorized retailers and resellers that the Drives were covered by a manufacturer warranty, causing the retailers and resellers to communicate this information to their customers.

399.    Privity is also not required because the Plaintiffs and Class Members are intended third-party beneficiaries of contracts between Defendant and its authorized retailers and resellers; specifically, they are the intended beneficiaries of Defendant's implied warranties. The retailers and resellers were not intended to be the ultimate consumers of the Drives and have no rights under the warranty agreements provided with the Drives, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

400.    In any event, privity is not required for implied warranty claims in Massachusetts and the Cal. Civ. Code.

401.    As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged by receiving an inferior product from that which they were promised. Plaintiffs and the Class, therefore, seek to recover damages including, without limitation, restitution, consequential and incidental damages such as data loss

and data recovery costs, attorney's fees and costs, and any other relief the Court deems just and appropriate.

### EIGHTH CLAIM FOR RELIEF

### VIOLATION OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES STATUTE

### (ON BEHALF OF PLAINTIFF CRAWFORD AND THE NEW YORK SUBCLASS)

402.    Plaintiff Crawford incorporates the allegations set forth above as if fully set forth herein.

403.    New York General Business Law § 349, the Deceptive Acts and Practices Statute ("DAPS"), prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

404.    Defendant is a "firm, corporation or association" within the meaning of DAPS.

405.    As a manufacturer of hard drives to the consuming public and whose conduct affects similarly situated consumers and has a broad impact on consumers at large, Defendant is engaged in consumer-oriented conduct within the intended ambit of DAPS.

406.    Plaintiff and Subclass Members are "persons" within the meaning of DAPS.

407.    Defendant violated DAPS because it deceived consumers about the quality and reliability of the Drives through material misrepresentations and omissions, as set forth in this Second Consolidated Amended Complaint.

408.    The affirmative misrepresentations made by Defendant include, without limitation, that the Drives are highly reliable, have an extremely low failure rate, are ideal for RAID and NAS, and are suitable for protecting important and irreplaceable personal data. For example, Defendant claimed that the Barracuda provides: "[r]eliable performance, even in tough environments, thanks to Seagate AcuTrac™ servo technology;" that it delivers "dependable performance, even with hard drive track widths of only 75 nanometers;" that it is "perfect" and "best-fit" for desktop RAID and NAS; that it "gives you one hard drive platform for every desktop storage application. One drive with trusted performance, reliability, simplicity, and

capacity;" and that it has an AFR of less than one percent and a read error rate of 1 in 100 trillion. Moreover, Defendant advertised the Backup Plus as ideal for safeguarding and protecting one's "entire digital life," "lifetime of memories," and life's "amazing moments" against "'life happen[ing]' to your computer."

409.    Defendant also failed to disclose the Drives' defective nature and their true suitable uses. For example, it failed to disclose that the Drives: 1) are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for any form of RAID or NAS; 5) that their published read error rates and AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

410.    Defendant failed to disclose the foregoing despite knowing that the Drives are plagued by latent, model-wide defects. Defendant's knowledge stemmed from reading negative consumer reviews detailing Drive failures and testing and repairing its own defective Drives.

411.    Defendant's misrepresentations and omissions would have deceived an objectively reasonable person into believing, *inter alia*, that the Drives were reliable and dependable, had extremely low failure rates and long useful lives, would last just as long as comparable hard drives on the market, if not longer, and were suitable for all RAID and NAS configurations, including RAID 5.

412.    Defendant's misrepresentations and omissions were directed at consumers across the country, including in New York.

413.    Plaintiff and Subclass Members would not have purchased Drives if they had known about their model-wide defects and unsuitability for RAID and NAS.

414.    If Defendant had disclosed the Drives' defects, the defects would have become known to Plaintiff and the Subclass Members because, upon information and belief, they would have been disseminated on the Internet, by retail employees, and through other sources.

415.    Plaintiff and the Subclass each suffered an ascertainable loss of money and property as a result of Defendant's material misrepresentations and omissions and other deceptive acts and practices described in this Second Consolidated Amended Complaint. As set forth *supra*, Plaintiff was exposed to and read Defendant's misrepresentations about the Internal Barracuda prior to purchase, considered them material, relied on them, and was deceived by them.  Moreover, had Defendant disclosed the Drive's defects and true suitable uses, Plaintiff would not have purchased one. In addition, Plaintiff expended money as a result of the Internal Barracuda's defects by paying to ship his Drives to Defendant for replacement.

416.    Had Defendant disclosed the Drives' defects and true suitable uses, Plaintiff and Subclass Members would not have purchased Drives, or, at a minimum, would not have paid as much.

417.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and Subclass Members have been injured. Accordingly, Plaintiff and the Subclass request that this Court enjoin Defendant from continuing its deceptive acts and practices, and award Plaintiff and the Subclass actual damages and attorney's fees and costs.

NINTH CLAIM FOR RELIEF

VIOLATION OF FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

(ON BEHALF OF PLAINTIFF SCHECHNER AND THE FLORIDA SUBCLASS)

418.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

419.    Plaintiff and Florida Subclass Members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

420.    Defendant engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

421.    FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …"

FLA. STAT. § 501.204(1).  Defendant participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

422.    Defendant participated in misleading, false, or deceptive acts that violated the FUDTPA.  By willfully failing to disclose and actively concealing the true quality, reliability, failure rate, and proper uses of the Drives, Defendant engaged in deceptive business practices prohibited by the FUDTPA.

423.    In the course of its business, Defendant willfully failed to disclose and actively misrepresented the quality of the Drives as described above, including that the Drives are highly reliable, have an extremely low failure rate, are ideal for RAID and NAS, and are suitable for protecting important and irreplaceable personal data.  Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Drives.

424.    Defendant intentionally and knowingly misrepresented material facts regarding the Drives with the intent to mislead Plaintiff and the Florida Subclass.  These statements, and the other statements alleged in this Second Consolidated Amended Complaint, are false, misleading, and members of the public would likely be—and were—deceived by them, as they are unqualified and specific affirmations of the Drives' reliability and quality and are not mere "puffery" or hyperbole.

425.    Due to Defendant's omissions and conduct, Plaintiff and Subclass Members were unaware of the material facts concerning the Drives.  The facts that were suppressed and concealed by Defendant were material.  By failing to disclose and actively concealing the defects in the Drives, Defendant engaged in deceptive business practices in violation of the FUDTPA.

426.    Defendant knew that its Drives were defective and not suitable for RAID and NAS, yet it failed to disclose this to Plaintiff and Subclass Members.

427.    Defendant's omissions and misrepresentations were unfair or deceptive acts or practices that were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true quality, reliability, failure rate, and proper uses of the Drives.

428.    Defendant knew or should have known that its conduct violated the FUDTPA.

429.    Defendant owed Plaintiff a duty to disclose the true nature of the Drives' defects and their unsuitability for RAID and NAS to the Plaintiff and Subclass Members for the following three independent reasons: 1) Defendant had exclusive knowledge of these facts at the time of sale; 2) Defendant actively concealed these facts from Plaintiff and Subclass Members; and 3) Defendant made partial representations to Plaintiff and Subclass Members regarding the reliability, longevity, and suitable uses of the Drives.

430.    Defendant had a duty to disclose, and failed to disclose, inter alia, 1) that the Drives are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for any form[s] of RAID or NAS; 5) that their published read error rates and AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

431.    Plaintiff and the Florida Subclass suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information regarding the quality, reliability, failure rate, and proper uses of the Drives. Plaintiff and Subclass Members who purchased the Drives either would have paid less or would not have purchased them at all but for Defendant's violations of the FUDTPA.

432.    Defendant had an ongoing duty to all Defendant's customers to refrain from unfair and deceptive practices under the FUDTPA. All owners of the Drives suffered ascertainable loss as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

433.    Defendant's violations present a continuing risk to Plaintiff and Florida Subclass Members as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

434.    As a direct and proximate result of Defendant's violations of the FUDTPA, Plaintiff and the Florida Subclass have suffered injury-in-fact and/or actual damage.

435.    Plaintiff and the Florida Subclass are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

436.    Plaintiff also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## TENTH CLAIM FOR RELIEF

## DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW (ON BEHALF OF PLAINTIFF HAUFF AND THE MASSACHUSETTS SUBCLASS)

437.    Plaintiff Hauff incorporates the allegations set forth above as if fully set forth herein.

438.    Plaintiff Hauff, the Massachusetts Subclass members, and Defendant are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

439.    Defendant engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

440.    The Massachusetts Consumer Protection Law ("Massachusetts CPL"), Mass. Gen. Laws ch. 93A, § 1, et seq., prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 2(a).  As described herein, Defendant engaged in unfair and deceptive acts and business practices prohibited by the Massachusetts CPL.

441.    Defendant violated the Massachusetts CPL in the following ways:

a.      Defendant engaged in deceptive acts or practices in the conduct of its trade or commerce; and

b.      Defendant engaged in unfair methods of competition and/or unfair acts or practices in the conduct of its trade or commerce.

442.    Defendant violated the "deceptive" prong of the Massachusetts CPL because, in the course of its business, it made material misrepresentations regarding the Drives and omitted and concealed material facts about them, as set forth in this Second Consolidated Amended Complaint.

443.    Defendant's misrepresentations and omissions were made in the conduct of Defendant's trade or commerce with the intent to mislead Plaintiff and Subclass members, and to induce them to purchase Defendant's Drives.

444.    Indeed, as set forth *supra*, Plaintiff viewed Defendant's statements and representations prior to purchase, considered them to be material, relied on them, and was deceived by them.

445.    The affirmative misrepresentations made by Defendant include, without limitation, that the Drives are highly reliable, have an extremely low failure rate, are ideal for RAID and NAS, and are suitable for protecting important and irreplaceable personal data.  For example, Defendant claimed that the Barracuda provides: "[r]eliable performance, even in tough environments, thanks to Seagate AcuTrac™ servo technology;" that it delivers "dependable performance, even with hard drive track widths of only 75 nanometers;" that it is "perfect" and "best-fit" for desktop RAID and NAS; that it "gives you one hard drive platform for every desktop storage application [and is a] drive with trusted performance, reliability, simplicity, and capacity;" and that it has an AFR of less than one percent and a read error rate of 1 in 100 trillion.  Moreover, Defendant advertised the Backup Plus as ideal for safeguarding and protecting one's "entire digital life," "lifetime of memories," and life's "amazing moments" against "'life happen[ing]' to your computer."

446.     These statements, and the other statements alleged in this Second Consolidated Amended Complaint, are materially false, misleading, and possess a tendency to deceive, as they are unqualified and specific affirmations of the Drives' reliability and quality and are not mere "puffery" or hyperbole.  Accordingly, these statements could reasonably be found to have influenced Plaintiff and Class Members to purchase Drives or pay more for Drives than they would have had they known the truth.

447.     In addition, the Massachusetts CPL imposes a duty to disclose material facts, and the failure to disclose to a buyer or prospective buyer any material fact is a violation of the Massachusetts CPL.  *See* 940 Mass. Code Regs. 3.16(2).

448.     Defendant had a duty to disclose, and failed to disclose, inter alia, 1) that the Drives are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for ~~any~~ form[s] of RAID ~~or NAS~~; 5) that their published ~~read error rates and~~ AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

449.     Defendant had a duty to disclose the foregoing facts to the Plaintiff and Subclass because such facts were material and known to Defendant.

450.     Upon information and belief, Defendant's knowledge of the foregoing facts stemmed from, without limitation, the following activities and sources: 1) pre-market development and testing; 2) testing, diagnosing, and refurbishing failed Drives sent in by consumers; 3) the sheer number of Drives returned for warranty replacement which, upon information and belief, was extremely large; 4) reading and responding to negative consumer reviews detailing Drive failures; and 5) the Backblaze reports, upon information and belief, Defendant knew about.

451.     The foregoing facts were material because they pertain to the Drives' reliability, longevity, and suitable uses, which are objectively important qualities of hard drives. Accordingly, if Defendant had disclosed these facts, such a disclosure would have influenced the

Plaintiff and Subclass members not to purchase the Drives.  Indeed, had Defendant knew the Drives suffered from latent, model-wide defects and were not suitable for RAID ~~or NAS~~, he would not have purchased any.

452.   If Defendant had disclosed these facts, they would have become known to Plaintiff and Subclass members because, upon information and belief, they would have been disseminated on the Internet, by retail employees, and through other sources.

453.   Defendant violated the "unfair" prong of the Massachusetts CPL because Defendant's acts and practices set forth in this Second Consolidated Amended Complaint offend established concepts of unfairness; are immoral, unethical, oppressive, or unscrupulous; and have caused substantial injury to consumers in the aggregate.

454.   These unfair acts and practices include, without limitation, Defendant marketing and selling the Drives knowing they contain serious model-wide defects; failing to adequately disclose and remedy the defects; marketing and selling the Drives as "perfect" and "best-fit" for RAID knowing they are not designed for RAID 5 or suitable for any type of RAID ~~or NAS; misrepresenting the quality and reliability of the Drives; replacing failed Drives with "refurbished" Drives that had already failed and were highly likely to fail again; failing to provide refunds or a different model of hard drive to warranty claimants even though Defendant never delivered conforming, non-defective Drives; and providing defective replacement Drives~~ and charging customers exorbitant sums of money to recover their data.

455.   Defendant engaged in these unfair acts and practices in the conduct of its trade or commerce, and Plaintiff and the Subclass were injured by them for the reasons discussed herein.

456.   The harm these acts and practices cause to consumers greatly outweighs any benefits associated with those acts and practices.

457.   Defendant's conduct has also impaired competition within the hard drive market and has prevented Plaintiffs and Class Members from making fully informed decisions about whether to purchase Drives and/or the price to be paid to purchase them.

458.    Defendant engaged in the deceptive and unfair acts and practices detailed in this Second Consolidated Amended Complaint with the intent to mislead Plaintiff and Subclass Members, and to induce them to purchase Defendant's Drives.  It is common knowledge that a hard drive's reliability, longevity, and suitable uses are important to consumers, as consumers store valuable and often irreplaceable files, pictures, documents, and other data on them. Defendant, which is one of the largest hard drive manufacturers in the world, therefore knew that consumers were likely to regard its misrepresentations as important in deciding whether to purchase its Drives. Defendant also concealed and failed to disclose material facts about the Drives because it knew that consumers would not purchase the Drives if they knew that the Drives suffered from latent, model- wide defects and were not suitable for their advertised uses.

459.    Accordingly, Defendant knowingly and willfully violated the Massachusetts CPL, and thus, Plaintiffs are entitled to double or treble damages in addition to the relief requested below.

460.    Plaintiff has standing to pursue a Massachusetts CPL claim on behalf of the Massachusetts Subclass because he has suffered an injury in fact, including the loss of money or property, as a result of and in reliance on Defendant's unfair methods of competition and/or unfair or deceptive acts or practices. As set forth in this Second Consolidated Amended Complaint, Plaintiff was exposed to and read Defendant's misrepresentations prior to purchase, considered them material, relied on them, and was deceived by them.  Moreover, had Defendant disclosed the Drives' defects and true qualities and suitable uses, Plaintiff would not have purchased one.  In addition, Plaintiff expended money as a result of the Drives' defects to the extent that he had to pay to ship his Drives to Defendant for replacement.

461.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

462.    Accordingly, Plaintiff and the Subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or

deceptive practices, and to award actual damages, double or treble damages, attorney's fees and costs, and any other relief the Court deems just and appropriate.

463.    Pursuant to Mass. Gen. Laws ch. 93A § 9(3), on May 5, 2016, counsel for Plaintiff and the Subclass served Defendant by United States certified mail with notice of its violations of the Massachusetts CPL.  The notice was received and signed for by Defendant on May 9.  *See* Exhibit G.

464.    Defendant failed to remedy the wrongs complained of in the Notice within 30 days.  Accordingly, Plaintiff and the Subclass are now entitled to the above-requested relief.

## ELEVENTH CLAIM FOR RELIEF

## VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ON BEHALF OF PLAINTIFF SMITH AND THE ILLINOIS SUBCLASS)

465.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

466.    Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

467.    Plaintiff and the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

468.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

469.    Defendant participated in misleading, false, or deceptive acts that violated the Illinois CFA. By willfully failing to disclose and actively concealing the true quality, reliability, failure rate, and proper uses of the Drives, Defendant engaged in deceptive business practices prohibited by the Illinois CFA.

470.    In the course of its business, Defendant willfully failed to disclose and actively misrepresented the quality of the Drives as described above, including that the Drives are highly reliable, have an extremely low failure rate, are ideal for RAID and NAS, and are suitable for protecting important and irreplaceable personal data.  Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Drives.

471.    Defendant knew that its Drives were defective and not suitable for RAID and NAS, yet it failed to disclose this to Plaintiff and Subclass Members.

472.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true quality, reliability, failure rate, and proper uses of the Drives.

473.    Defendant intentionally and knowingly omitted and misrepresented material facts regarding the Drives with an intent to mislead Plaintiff and the Illinois Subclass.

474.    Defendant knew or should have known that its conduct violated the Illinois CFA.

475.    Defendant owed Plaintiff a duty to disclose the true nature of the Drives' defects and their unsuitability for RAID and NAS to the Plaintiff and Subclass Members for the following three independent reasons: 1) Defendant had exclusive knowledge of these facts at the time of sale; 2) Defendant actively concealed these facts from Plaintiff and Subclass Members; and 3) Defendant made partial representations to Plaintiff and Illinois Subclass Members regarding the reliability, longevity, and suitable uses of the Drives.

476.    Defendant had a duty to disclose, and failed to disclose, *inter alia*, 1) that the Drives are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for any form[s] of RAID or NAS; 5) that their published read error rates and AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

477.    Plaintiff and the Illinois Subclass suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information regarding the ~~quality, reliability,~~ failure rate, and proper uses of the Drives.  Plaintiff and Subclass Members who purchased the Drives either would have paid less or would not have purchased them at all but for Defendant's violations of the Illinois CFA.

478.    Defendant had an ongoing duty to all Defendant's customers to refrain from unfair and deceptive practices under the Illinois CFA.  All owners of the Drives suffered ascertainable loss as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

479.    Defendant's violations present a continuing risk to Plaintiff as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

480.    As a direct and proximate result of Defendant's violations of the Illinois CFA, Plaintiff and the Illinois Subclass have suffered injury-in-fact and/or actual damage.

481.    Pursuant to 815 ILCS 505/10a(a), Plaintiff and the Illinois Subclass seek monetary relief against Defendant in the amount of actual damages, as well as punitive damages because Defendant acted with fraud and/or malice and/or was grossly negligent.

482.    Plaintiff also seeks an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

### TWELFTH CLAIM FOR RELIEF

### VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT

### (ON BEHALF OF PLAINTIFF HAGEY AND THE TENNESSEE SUBCLASS)

483.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

484.    Plaintiff and the Tennessee Subclass are "natural persons" and "consumers" within the meaning of TENN. CODE ANN. § 47-18-103(2).

485.    Defendant is a "person" within the meaning of TENN. CODE ANN. § 47-18-103(2).

486.    Defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of TENN. CODE ANN. § 47-18-103(19).

487.    The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to:  "[r]epresenting that goods or services have … characteristics, [or] … benefits … that they do not have…;" "[r]epresenting that goods or services are of a particular standard, quality or grade… if they are of another;" and "[a]dvertising goods or services with intent not to sell them as advertised." TENN. CODE ANN. § 47-18-104. Defendant violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that the Drives have quality, reliability, higher failure rates, and uses that they did not have; representing that the Drives were of a particular standard, quality, or grade when they are of another; and advertising the Drives with intent not to sell them as advertised.

488.    In the course of its business, Defendant willfully failed to disclose and actively misrepresented the quality of the Drives as described above, including that the Drives ~~are highly reliable,~~ have an extremely low failure rate, are ideal for RAID ~~and NAS, and are suitable for protecting important and irreplaceable personal data~~.  Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Drives.

489.    Defendant knew that its Drives were defective and not suitable for RAID ~~and NAS~~, yet it failed to disclose this to Plaintiff and Subclass Members.

490.    By failing to disclose and actively concealing the defects in the Drives, Defendant engaged in deceptive business practices in violation of the Tennessee CPA.

491.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true ~~quality, reliability,~~ failure rate, and proper uses of the Drives.

492.    Defendant intentionally and knowingly misrepresented material facts regarding the Drives with an intent to mislead Plaintiff and the Tennessee Subclass.

493.    Defendant knew or should have known that its conduct violated the Tennessee CPA.

494.    Defendant owed Plaintiff a duty to disclose the true nature of the Drives' defects and their unsuitability for RAID ~~and NAS~~ to the Plaintiff and Subclass Members for the following three independent reasons: 1) Defendant had exclusive knowledge of these facts at the time of sale; 2) Defendant actively concealed these facts from Plaintiff and Subclass Members; and 3) Defendant made partial representations to Plaintiff and Tennessee Subclass Members regarding the reliability, longevity, and suitable uses of the Drives.

495.    Defendant had a duty to disclose, and failed to disclose, *inter alia*, 1) that the Drives are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for ~~any~~ form[s] of RAID ~~or NAS~~; 5) that their published ~~read error rates and~~ AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

496.    Plaintiff and the Tennessee Subclass suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information regarding the quality, reliability, failure rate, and proper uses of the Drives.

497.    Defendant's fraudulent statements and its concealment of the true characteristics of the Drives were material to Plaintiff and the Tennessee Subclass. Reliable hard drives with multiple uses, made by a reputable manufacturer, is worth more than an otherwise comparable hard drive made by a disreputable and dishonest manufacturer.

498.    Plaintiff and the Tennessee Subclass suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information. Class Members who purchased the Drives either would have paid less or would not have purchased them at all but for Defendant's violations of the Tennessee CPA.

499.    Defendant's violations present a continuing risk to Plaintiff and Tennessee Subclass Members as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

500.    As a direct and proximate result of Defendant's violations of the Tennessee CPA, Plaintiff and the Tennessee Class have suffered injury-in-fact and/or actual damage.

501.    Pursuant to TENN. CODE § 47-18-109(a), Plaintiff and the Tennessee Subclass seek monetary relief against Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendant's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

### THIRTEENTH CLAIM FOR RELIEF

### VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT

### (ON BEHALF OF PLAINTIFF DORTCH AND SOUTH CAROLINA SUBCLASS)

502.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

503.    Defendant is a "person" under S.C. CODE ANN. § 39-5-10.

504.    The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. CODE ANN. § 39-5-20(a). Defendant engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by fraudulently representing that the Drives have quality, reliability, higher failure rates, and uses that they did not have; representing that the Drives were of a particular standard, quality, or grade when they are of another; and advertising the Drives with intent not to sell them as advertised.

505.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

506.    In the course of its business, Defendant willfully failed to disclose and actively misrepresented the quality of the Drives as described above, including that the Drives ~~are highly reliable,~~ have an extremely low failure rate, are ideal for RAID ~~and NAS, and are suitable for~~

~~protecting important and irreplaceable personal data~~.  Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Drives.

507.    Defendant knew that its Drives were defective and not suitable for RAID ~~and NAS~~, yet it failed to disclose this to Plaintiff and Subclass Members.

508.    By failing to disclose and actively concealing the defects in the Drives, Defendant engaged in deceptive business practices in violation of the South Carolina UTPA.

509.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true ~~quality, reliability,~~ failure rate, and proper uses of the Drives.

510.    Defendant intentionally and knowingly misrepresented material facts regarding the Drives with an intent to mislead Plaintiff and the South Carolina Subclass.

511.    Defendant knew or should have known that its conduct violated the South Carolina UTPA.

512.    Defendant owed Plaintiff a duty to disclose the true nature of the Drives' defects and their unsuitability for RAID ~~and NAS~~ to the Plaintiff and Subclass Members for the following three independent reasons: 1) Defendant had exclusive knowledge of these facts at the time of sale; 2) Defendant actively concealed these facts from Plaintiff and Subclass Members; and 3) Defendant made partial representations to Plaintiff and South Carolina Subclass Members regarding the reliability, longevity, and suitable uses of the Drives.

513.    Defendant had a duty to disclose, and failed to disclose, *inter alia*, 1) that the Drives are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing, protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for ~~any~~ form[s] of RAID ~~or NAS~~; 5) that their published ~~read error rates and~~ AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

514.    Plaintiff and the South Carolina Subclass suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information regarding the ~~quality, reliability,~~ failure rate, and proper uses of the Drives.

515.    Defendant's fraudulent statements and its concealment of the true characteristics of the Drives were material to Plaintiff and the South Carolina Subclass. Reliable hard drives with multiple uses, made by a reputable manufacturer, is worth more than an otherwise comparable hard drive made by a disreputable and dishonest manufacturer.

516.    Plaintiff and the South Carolina Subclass suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information. Class Members who purchased the Drives either would have paid less or would not have purchased them at all but for Defendant's violations of the South Carolina UTPA.

517.    Defendant's unlawful acts and practices complained of herein affect the public interest.

518.    As a direct and proximate result of Defendant's violations of the South Carolina UTPA, Plaintiff and the South Carolina Subclass have suffered injury-in-fact and/or actual damage.

519.    Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiff seeks monetary relief against Defendant to recover for their economic losses. Because Defendant's actions were willful and knowing, Plaintiffs' damages should be trebled. *Id.*

520.    Plaintiff further alleges that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant acted with willful and conscious disregard of the rights of others, subjecting Plaintiff and the Subclass to cruel and unjust hardship as a result. Defendant intentionally and willfully misrepresented the quality, reliability, failure rates, and available uses of the Drives, deceived Plaintiff and concealed material facts that only Defendant knew. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

521.    Plaintiff further seeks an order enjoining Defendant's unfair or deceptive acts or practices.

**FOURTEENTH CLAIM FOR RELIEF**

**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**

**(ON BEHALF OF PLAINTIFF MANAK AND TEXAS SUBCLASS)**

522.    Plaintiff Manak incorporates the allegations set forth above as if fully set forth herein.

523.    The Texas Deceptive Trade Practices Act ("Texas DTPA"), Tex. Bus. & Com. Code § 17.41, *et seq.*, provides a private right of action to a consumer where the consumer suffers economic damage as a result of false, misleading, and deceptive acts or practices in the conduct of any trade or commerce or "breach of an express or implied warranty."

524.    Plaintiff and Subclass Members are "consumers" as defined in the Texas DTPA.

525.    Defendant is a "person" as defined in the Texas DTPA.

526.    The Drives sold by Defendant and purchased by Plaintiff and Subclass Members are "goods" as defined in the Texas DTPA.

527.    Under the Texas DTPA, false, misleading, and deceptive acts or practices include, without limitation:

a.     Representing that goods have characteristics, uses, or benefits which they do not have;

b.     Representing that goods are of a particular standard, quality, or grade if they are of another;

c.     Advertising goods or services with intent not to sell them as advertised; and

d.     Failing to disclose information concerning goods which was known at the time of the transaction if such failure to disclose was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

528.    Defendant violated the Texas DTPA by engaging in false, misleading, and deceptive acts or practices, including representing that the Drives have quality, reliability, failure

rates, and uses that they did not have; representing that the Drives were of a particular standard, quality, or grade when they are of another; and advertising the Drives with intent not to sell them as advertised.

529.    Defendant has also breached its express warranties and the implied warranty of merchantability with respect to the Plaintiff and Texas Subclass Members as set forth herein.

530.    The affirmative misrepresentations made by Defendant include, without limitation, that the Drives are highly reliable, have an extremely low failure rate, are ideal for RAID and NAS, and are suitable for protecting important and irreplaceable personal data.  For example, Defendant claimed that the Barracuda provides: "[r]eliable performance, even in tough environments, thanks to Seagate AcuTrac™ servo technology;" that it delivers "dependable performance, even with hard drive track widths of only 75 nanometers;" that it is "perfect" and "best-fit" for desktop RAID and NAS; that it "gives you one hard drive platform for every desktop storage application.  One drive with trusted performance, reliability, simplicity, and capacity;" and that it has an AFR of less than one percent and a read error rate of 1 in 100 trillion.  Moreover, Defendant advertised the Backup Plus as ideal for safeguarding and protecting one's "entire digital life," "lifetime of memories," and life's "amazing moments" against "'life happen[ing]' to your computer."

531.    These statements, and the other statements alleged in this Second Consolidated Amended Complaint, are false, misleading, and deceptive.

532.    As set forth in Section E, supra, Plaintiff viewed misrepresentations made by Defendant prior to purchase, considered them to be material, and relied on them to his detriment.

533.    Defendant also violated the Texas DTPA by knowingly failing to disclose material information about the Drives with the intent to induce Plaintiffs and Subclass members to purchase them.

534.    Defendant had a duty to disclose, and failed to disclose, inter alia, 1) that the Drives are not reliable or dependable; 2) that they are plagued by a latent, model-wide defect that renders them highly prone to early catastrophic failures; 3) that they are not suitable for storing,

protecting, or backing up important personal data; 4) that they are not designed for RAID 5 or suitable for any form[s] of RAID or NAS; 5) that their published read error rates and AFRs are wholly inaccurate; and 6) that they do not last as long as comparable hard drives on the market.

535.    Upon information and belief, Defendant knew the above information at the time of each transaction.  Defendant's knowledge stemmed from, without limitation, the following activities and sources: 1) pre-market development and testing; 2) testing, diagnosing, and refurbishing failed Drives sent in by consumers; 3) the sheer number of Drives returned for warranty replacement which, upon information and belief, was extremely large; 4) reading and responding to negative consumer reviews detailing Drive failures; and 5) the Backblaze reports which, upon information and belief, Defendant knew about.

536.    Defendant, through its affirmative misrepresentations and failure to disclose the foregoing information, intended to induce Plaintiff and Subclass Members into a transaction into which Plaintiff and Subclass Members would not have entered had the information been disclosed. It is common knowledge that a hard drive's reliability, longevity, and suitable uses are important to consumers, as consumers store valuable and often irreplaceable files, pictures, documents, and other data on them. Defendant, which is one of the largest hard drive manufacturers in the world, therefore knew that consumers were likely to regard its misrepresentations as important in deciding whether to purchase its Drives.  Defendant also concealed and failed to disclose material facts about the Drives because it knew that consumers would not purchase the Drives if they knew that the Drives suffered from serious latent, model-wide defects and were not suitable for their advertised uses.

537.    If Defendant had disclosed that the Drives suffer from a serious latent model-wide defect, are not suitable for RAID or NAS, and the other information listed supra, this information would have become known to Plaintiff and Subclass Members because, upon information and belief, it would have been disseminated on the Internet, by retail employees, and through other sources.

538.    Had Defendant disclosed this information, Plaintiff and Subclass Members would not have purchased any Drives.

539.    Plaintiff has standing to pursue a Texas DTPA claim on behalf of the Texas Subclass because he has suffered an injury in fact, including the loss of money or property, as a result of and in reliance on Defendant's false, misleading, and deceptive acts or practices.  As set forth in this Second Consolidated Amended Complaint, Plaintiff was exposed to and read Defendant's misrepresentations prior to purchase, considered them material, and relied on them to his detriment. Moreover, had Defendant disclosed the Drives' defects and true qualities and suitable uses, Plaintiff would not have purchased one.  In addition, Plaintiff expended money as a result of the Drives' defects to the extent that he had to pay to ship his Drives to Defendant for replacement.

540.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated throughout the country.

541.    Accordingly, Plaintiff and the Subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its false, misleading, and deceptive acts or practices, and to award actual damages, treble damages, attorney's fees and costs, and any other relief the Court deems just and appropriate.

542.    Pursuant to Tex. Bus. & Com. Code § 17.505(a), on May 5, 2016, counsel for Plaintiff and the Subclass served Defendant by United States certified mail with notice of its violations of the Texas DTPA.  The notice was received and signed for by Defendant on May 9. See Exhibit G.

543.    Pursuant to Tex. Bus. & Com. Code § 17.501(a), on May 5, 2016, counsel for Plaintiff and the Subclass mailed, via United States certified mail, a copy of the Notice to the Office of the Texas Attorney General, Consumer Protection Division ("Office of the Attorney General"). The Notice was received by the Office of the Attorney General on May 9, 2016.  See Exhibit G.

544.    Defendant failed to remedy the wrongs complained of in the Notice within 60 days. Accordingly, Plaintiff and the Subclass are now entitled to the above-requested relief.

FIFTEENTH CLAIM FOR RELIEF

VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION STATUTE

(ON BEHALF OF PLAINTIFF NELSON AND THE SOUTH DAKOTA SUBCLASS)

545.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

546.    The South Dakota Deceptive Trade Practices and Consumer Protection Statute ("DTP-CPS"), S.D.C.L. § 37-24-1, et seq., prohibits deceptive acts or practices including, inter alia, knowingly and intentionally acting, using, or employing any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or concealing, suppressing, or omitting any material fact in connection with the sale or advertisement of any merchandise.

547.    Plaintiff, Subclass Members, and Defendant are "persons" as defined by the DTP-CPS.

548.    Defendant violated the DTP-CPS because it knowingly and intentionally made material misrepresentations and omissions regarding the Drives in connection with the sale and/or advertisement of the Drives, as set forth in this Second Consolidated Amended Complaint.

549.    Defendant affirmatively misrepresented, and continues to misrepresent, inter alia, that the Drives are highly reliable, have an extremely low failure rate, are ideal for RAID and NAS, and are suitable for protecting important and irreplaceable personal data.

550.    These claims are false and/or misleading for the reasons set forth in this Second Consolidated Amended Complaint.

551.    Defendant also failed to disclose material facts about the Drives including, without limitation, that the Drives are not reliable or dependable, that they are plagued by a latent, model-wide defect that renders them highly susceptible to premature catastrophic failures, that their published read error rates and AFRs are wholly inaccurate, that they do not

last nearly as long as comparable Drives on the market, and that they are not designed for RAID 5 or fit for any type[s] of RAID or NAS.

552. Defendant made these misrepresentations and omissions knowingly and intentionally. Upon information and belief, Defendant received, or otherwise had knowledge of, thousands of complaints and reviews from customers pertaining to the defects at issue in this litigation and was aware of the Backblaze reports. Additionally, it had firsthand knowledge of the Drives' defects because it examined and tested all Drives sent in by consumers for replacement. Despite this knowledge, Defendant intentionally misrepresented, and continues misrepresent, the qualities and characteristics of the Drives, and it chose to conceal rather than disclose the true defective nature of the Drives and their true suitable uses for its own pecuniary gain.

553. If Defendant had disclosed the Drives' defects, they would have become known to Plaintiff and Subclass Members because, upon information and belief, they would have been disseminated on the Internet, by retail employees, and through other sources.

554. Neither Plaintiff nor members of the Subclass would have purchased a Drive if they had known about the latent, model-wide defects and its unfitness for RAID and NAS. Thus, Defendant's omission of this critical information, along with Defendant's affirmative misrepresentations, proximately caused economic injury to Plaintiff and the Subclass.

555. Plaintiff Nelson has standing to pursue a DTP CPS claim on behalf of the South Dakota Subclass because, as detailed in this Second Consolidated Amended Complaint, he was exposed to and read Defendant's representations about the Backup Plus prior to purchase, found the representations to be material, relied on them, and was deceived by them. Accordingly, Plaintiff has lost money and property as a result of Defendant's misrepresentations and omissions.

556. As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiff and the South Dakota Subclass Members have been injured and seek to recover actual

~~damages including, without limitation, restitution; damages stemming from data loss and data recovery costs; and any other relief the Court deems just and appropriate.~~

## SIXTEENTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

## (ON BEHALF OF THE CALIFORNIA SUBCLASS ~~PLAINTIFFS AND THE CLASS~~)

557.    In the alternative to Counts IV, V, VI, and VII, Plaintiffs, on behalf of themselves and the Class, allege as follows:

558.    Through the deceptive, unfair, and unconscionable conduct and statements described in this Second Consolidated Amended Complaint, Defendant sold defective Drives to Plaintiffs and Class Members and thereafter failed and refused to provide them with the non-defective Drives they paid for.

559.    Such conduct includes, without limitation, marketing and selling the Drives knowing they contain serious model-wide defects; failing to adequately disclose and remedy the defects; misrepresenting the quality and reliability of the Drives; misrepresenting the uses the Drives are intended and/or suitable for; replacing failed Drives with "refurbished" Drives that had already failed and are highly likely to fail again; failing to provide refunds or a different model of hard drive; and providing customers with defective replacement Drives and charging them exorbitant sums of money to recover their data.

560.    Upon information and belief, Defendant engaged in the foregoing conduct in order to enrich itself at the expense of Plaintiffs and Class Members.

561.    As the proceeds from the sale of Defendant's Drives were obtained/induced by improper means, Defendant is not legally or equitably entitled to retain these proceeds.

562.    Defendant breached the public trust through its misrepresentations, omissions, and other deceptive, unfair, and unconscionable conduct connected to the sale and replacement of its Drives, all of which was to the detriment of Plaintiffs and Class Members.

563.    By its actions in taking and withholding Drive sales proceeds, Plaintiffs and Class Members conferred, and continue to confer, a benefit upon the Defendant, and the Defendant is aware of such benefit.

564.    By Defendant taking and withholding Plaintiffs' and the Class' monies, Defendant was and is financially unjustly enriched, causing an economic detriment to the Plaintiffs and the Class.

565.    Defendant's retention of this benefit violates the fundamental principles of justice, equity, and good conscience.

566.    As it would be unjust and inequitable for Defendant to retain its ill-gotten gains, Defendant is required to pay restitution to Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members pray for relief as set forth below:

A.    Restitution and/or actual, incidental and consequential damages, and such other relief as provided by the statutes cited herein.

B.    Punitive, treble, and/or double damages as provided by the statutes cited herein.

C.    Pre-judgment and post-judgment interest.

D.    Equitable relief in the form of restitution and/or disgorgement of all of Defendant's ill-gotten gains.

E.    Attorney's fees and costs.

F.    An injunction against Defendant, its affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing its unfair, unlawful, and deceptive practices and false advertising.

G.    All other relief to which Plaintiffs and Class Members may be entitled at law or in equity.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury for all issues so triable.

DATED:  July 11, 2016                    HAGENS BERMAN SOBOL SHAPIRO LLP


By: _____/s/ Steve Berman_____
    Steve W. Berman (*pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Jeff. D. Friedman
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

Marc A. Goldich (*pro hac vice*)
AXLER GOLDICH, LLC
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 207-2920
mgoldich@axgolaw.com

*Attorneys for Plaintiffs*