# EXHIBIT 32

David Schechner, Vol 1  June 06, 2017

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE SEAGATE TECHNOLOGY LLC
LITIGATION,
_____

                                CASE NO. 5:16-CV-00523-JCS
_____
CONSOLIDATED ACTION,

_____

VIDEOTAPED DEPOSITION OF DAVID SCHECHNER

San Francisco, California

Tuesday, June 6, 2017

Reported by:  Ashley Soevyn, CSR No. 12019

Job No. 2240

Pages 1 - 154

David Schechner, Vol 1                                              June 06, 2017

Page 102

 1  lawsuit?
 2      A   No, they do not.  I'm sorry, they know
 3  I'm involved in a class action lawsuit.  They don't
 4  know specifics about it.
 5      Q   Do they know it involves hard drives?
 6      A   No.
 7      Q   Does Netapp know about this lawsuit?
 8      A   Nope.
 9      Q   What did you mean when you said that hard
10  drives fail all the time?
11      A   I mean that hard drives fail.  It's what
12  they -- I don't know how to rephrase that in any
13  other way.  I mean hard drives fail.  They have a
14  certain amount of time, or if there is a bug in the
15  firmware the hard drive will fail, it gets replaced.
16          In the large storage arrays that I work
17  with with customers, one drive failing is not
18  usually a concern.
19      Q   Do you advise customers with regard to
20  failure rates?
21      A   No.  No.  Because there is a redundancy
22  built into these arrays to prevent any sort of
23  catastrophic effects from a single drive failure.
24      Q   I would like you to turn back to Exhibit
25  4 for a second.

Page 103

 1      A   Exhibit 4.
 2      Q   RFP numbers three and four are request
 3  for production numbers three and four.
 4          Are you currently in possession of any of
 5  the hard drives referred to in the complaint?
 6      A   I am currently in possession of the hard
 7  drive that was sent to me in December 2014.  I don't
 8  know the serial number of that drive and whether
 9  it's referred to in this complaint or not.
10      Q   In response to request number five, have
11  you searched for all documents, including but not
12  limited to advertising, upon which you relied in
13  connection with your purchases of any of the drives
14  referred to in the complaint?
15      A   I have.
16      Q   Was there any advertising that you relied
17  on?
18      A   There was no advertising that I had
19  saved.
20      Q   Do you remember what you relied on in
21  making the decision to purchase the Backup Plus
22  drive?
23      A   Initially?
24      Q   Yes.
25      A   Sure.  I relied on the advertised

Page 104

 1  specifications for the drive, the size, the price,
 2  the annualized failure rate; anything that would
 3  have been shown on Amazon.  I relied on other
 4  customer reviews.
 5      Q   Do you remember looking at any other
 6  websites other than Amazon?
 7      A   I do.  That was listed in here.  I looked
 8  at Tiger Direct and at Newegg, I believe, was the
 9  third one that I had listed.
10      Q   ==Do you remember going to the Seagate==
11  ==website?==
12      A   ==I looked up the data sheet for the==
13  ==Barracuda drives, yes.==
14      Q   ==What do you recall reading on the data==
15  ==sheet?==
16      A   ==The annualized failure rate was listed==
17  ==less than 1 percent power on hours of 2,400.==
18      Q   Did you save anything you saw on the
19  Seagate websites?
20      A   Not at the time, no.  I didn't.  I have a
21  copy of the data sheet now but I had not saved it at
22  the time.
23      Q   Is there any other document that you
24  relied on, or website that you relied on, in making
25  the decision to purchase the Backup Plus hard drive?

Page 105

 1      A   We talked about this earlier.  I also
 2  read reviews on Tom's Hardware.
 3      Q   Sorry.  I didn't know if that was in
 4  connection with this specific drive or just hardware
 5  in general.
 6      A   Yeah.
 7      Q   Do you remember what those reviews said?
 8      A   They were -- I remember they were
 9  generally favorable, but they did have concern about
10  power-on hours of 2,400 being fairly low.
11      Q   And what did you think about the power-on
12  hours being 2,400?
13      A   At the time, I didn't really know much
14  about it or what that statistic meant.
15      Q   Did you understand it was less than full
16  time operation?
17      A   Yes.
18      Q   Did you have your back up drive on full
19  time?
20      A   It was plugged in full time and powered
21  on full time, yes.  But it was not being accessed
22  full time.
23      Q   Did you take that into consideration when
24  you purchased the drive?
25      A   No.  I figured a backup drive would just

David Schechner, Vol 1                                          June 06, 2017

Page 106

1  sit there and be accessed when the backup program
2  ran.
3      Q   At the time that you purchased the
4  external hard drive, the Backup Plus, did you know
5  the model number of the internal drive?
6      A   Not at the time.
7      Q   Where did you find the data about AFR and
8  power-on hours?
9      A   On Seagate's website.
10     Q   Seagate's website for the Backup Plus?
11     A   Seagate's website for Barracuda drives,
12  yeah.
13     Q   Did you know it was a Barracuda drive
14  that was inside the Backup Plus?
15     A   I did.
16     Q   And where did you get that information?
17     A   I couldn't even tell you.  Somewhere
18  online.  It might have been Tom's Hardware.  I don't
19  recall.
20     Q   I think we partially covered this before.
21  Have you searched for all of your communications
22  with Seagate?
23     A   Yeah.  Yes.
24     Q   Is it possible that you did not search
25  your sent mail folder on your Gmail account?

Page 107

1          MR. SIEGEL:  Objection.  Asked and
2  answered.
3          THE WITNESS:  Yeah.  We went over that
4  before.
5  BY MS. RODEWALD:
6      Q   Okay.  I'd like to ask that you do that
7  search and provide us with any documents.
8      A   Okay.
9          MR. SIEGEL:  I'd object and state that
10  you can request that from us and we can communicate
11  with our client about that.
12  BY MS. RODEWALD:
13     Q   Did you have any communications with
14  BackBlaze?
15     A   No.
16     Q   Do you know what BackBlaze is?
17     A   I know what they are now.  I did not know
18  back when this all happened.
19     Q   When did you learn about BackBlaze?
20     A   When I read the first complaint that was
21  filed, or the lawsuit or whatever.
22     Q   Did you know prior to reading the
23  complaint?
24     A   No.
25     Q   Have you searched for any communications

Page 108

1  with BackBlaze?
2      A   I have had no communication with
3  BackBlaze.
4      Q   Do you have any documents relating to the
5  purposes for which you used your drives?
6      A   No.
7      Q   All right.  So going back to Exhibits 1
8  and 2, the complaint and the consolidated amended
9  complaint.
10         MR. SIEGEL:  Exhibit 3.
11         THE WITNESS:  Consolidated.
12         MS. RODEWALD:  Yeah.  There were three
13  tomes.
14         MR. SIEGEL:  Sure.
15  BY MS. RODEWALD:
16     Q   Are you familiar with the differences
17  between these three complaints?
18     A   Not off the top of my head, no.  I
19  believe there were some objections filed from
20  Seagate, and that those were taken into the amended
21  complaint.
22     Q   I think you said that you reviewed the
23  original complaint.
24     A   I did.
25     Q   When was that?

Page 109

1      A   I couldn't tell you exactly.  But after
2  it was filed, I was sent a copy of it.
3      Q   Did you review it before it was filed?
4      A   No.
5      Q   Were you familiar with what it said
6  before it was filed?
7      A   I had -- I mean I assumed what it would
8  contain, based on my conversations with my
9  attorneys.  I didn't know specifically what it was
10  going to say.
11     Q   Did you review the Exhibit 2, the
12  consolidated amended complaint?
13     A   I skimmed it.  I wouldn't say I read
14  every word.
15     Q   When was that?
16     A   Again, not long after it was filed I was
17  sent a copy.
18     Q   Were you aware that the consolidated
19  amended complaint adds claims for the violation of
20  the Florida Expressed and Implied Warranty Loss?
21     A   I was not aware of that.
22     Q   Were you aware that the consolidated
23  amended complaint has a claim for violations of the
24  Florida Unfair and Deceptive Trade Practices Act?
25     A   I was aware of that.

David Schechner, Vol 1                                                      June 06, 2017

Page 142
1   Q   Do you recall ever seeing this?
2   A   I don't think so.
3   Q   Do you think you might have seen
4   something on Facebook?
5   A   Probably.  It's hard to say.  It could
6   have been Facebook.  It could have been somebody
7   from work e-mailed me a link to it.  I don't recall.
8       MS. RODEWALD:  I'd like to mark this as
9   Exhibit 26.
10      (Exhibit 26 marked for identification.)
11  BY MS. RODEWALD:
12  Q   Does this post look familiar?
13  A   No.  I've never seen this before.
14  Q   What have you done so far to participate
15  in this litigation?
16  A   I have corresponded with my attorneys,
17  whatever documentation they requested, spoken with
18  them.
19      Seagate had questions that they sent
20  back, and I provided them that information.
21  Q   Do you know any of the other named
22  plaintiffs?
23  A   I do not.
24  Q   Have you spoken with any of them?
25  A   I have not.

Page 143
1   Q   Do you know any people who you think
2   would be in the class of plaintiffs that you're
3   representing?
4   A   I do not.
5   Q   What assistance do you plan to provide in
6   pursuing this litigation?
7   A   What do you mean by assistance?
8   Q   How do you anticipate helping class
9   counsel with this litigation?
10  A   Besides the information I've already
11  supplied and -- I don't know what other assistance I
12  can provide.
13  Q   Do you understand that if you lose this
14  case, you could be responsible for reimbursing
15  Seagate's cost?
16  A   No, I was not aware of that.
17  Q   Have you been involved in any other class
18  action litigation?
19  A   Not as a class representative.
20  Q   As member of the class, have you been?
21  A   Yes.
22  Q   Do you remember how many times that was?
23  A   Once or twice.
24  Q   Do you remember what the -- what were the
25  issues in those cases?

Page 144
1   A   One, I think, was for print -- for
2   overcharging customers.  And that was, you know, if
3   you had issues, sign up here.  And then you hear
4   nothing for a year.  You get a check in the mail for
5   six dollars.  That was about the extent of it.
6   Q   And do you remember any others?
7   A   There might have been one other.  I don't
8   recall what it was for.
9   Q   I just want to make sure if there are
10  other issues in the complaint.
11      Oh, sorry.  Going back to Exhibit 3.
12  A   Okay.
13  Q   Paragraph 171.
14      It says:  Mr. Schechner received a
15  warranty replacement from defendant, which was a
16  refurbished unit.
17      How do you know it was a refurbished
18  unit?
19  A   It had a sticker on the outside that said
20  refurb.
21  Q   Was this in relation to the one you
22  received in April 2014?
23  A   That's correct.
24  Q   And the drive you received in November
25  December 2014, was that also refurbished?

Page 145
1   A   I don't know.  I would have to go and
2   look at it.
3       Actually, it does say, in 172, it was
4   another refurbished unit.
5   Q   Do you remember, as you sit here right
6   now, whether it was or it wasn't?
7   A   If I stated that in the complaint, then
8   yes, it was.
9   Q   I think you've mentioned the word "AFR"
10  before in this deposition.
11  A   Annualized failure rate.  Sure.
12  Q   Do you know what AFR is, other than
13  translating it into annualized failure rate?
14  A   From what I understand, the AFR is the
15  expected rate of failures of hard drives.  If
16  there's a hundred hard drives that are shipped out
17  in a year, one of them should fail, for example, if
18  it's 1 percent.
19  Q   **And did you read any statements by**
20  **Seagate about AFR prior to purchasing the Backup**
21  **Plus drive in 2012?**
22  A   **Yes.**
23  Q   **And where did you read that?**
24  A   **On the Barracuda products they issued.**
25  Q   I think we're on 27.

David Schechner, Vol 1                                          June 06, 2017

```
                                                        Page 154
 1            I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby
 3   certify:
 4            That the foregoing proceedings were taken
 5   before me at the time and place herein set forth;
 6   that any witnesses in the foregoing proceedings,
 7   prior to testifying, were duly sworn; that a record
 8   of the proceedings was made by me using machine
 9   shorthand, which was thereafter transcribed under my
10   direction; further, that the foregoing is a true
11   record of the testimony given.
12            I further certify I am neither financially
13   interested in the action nor a relative or employee
14   of any attorney or party to this action.
15            IN WITNESS WHEREOF, I have this date
16   subscribed my name.
17
18   Dated: _____
19
20
21   _____
            Ashley Soevyn
22   ASHLEY SOEVYN
     CSR No. 12019
23
24
25
```