# EXHIBIT 37

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

______________________________
)
IN RE SEAGATE TECHNOLOGY LLC )Case No.:
LITIGATION )3:16-cv-00523-JCS
)
______________________________)

SEAGATE TECHNOLOGY 30(b)(6) DEPOSITION OF
BRUCE MARC SCHWARTZ
Palo Alto, California
Thursday, October 19, 2017
Volume 1

Reported by:
RACHEL FERRIER, CSR No. 6948
Job No. 2731894
PAGES 1 - 140

Page 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

______________________________
)
IN RE SEAGATE TECHNOLOGY LLC )Case No.:
LITIGATION )3:16-cv-00523-JCS
)
______________________________)

SEAGATE TECHNOLOGY 30(b)(6) DEPOSITION OF BRUCE MARC SCHWARTZ, VOLUME 1, taken on behalf of the Plaintiffs, at Sheppard Mullin Richter & Hampton LLP, 379 Lytton Avenue, Palo Alto, California, beginning at 8:54 a.m. and ending at 1:54 p.m. on Thursday, October 19, 2017, before RACHEL FERRIER, Certified Shorthand Reporter No. 6948.

ELITE LITIGATION SOLUTIONS, LLC
One Penn Center
1617 J.F.K. Boulevard, Suite 340
Philadelphia, Pennsylvania 19103
www.elitelsllc.com ~ 215.563.3703

Page 3

APPEARANCES:

For Plaintiffs:
AXLER GOLDICH, LLC
BY: NOAH AXLER
Attorney at Law
1520 Locust Street, Suite 301
Philadelphia, PA 19102
267.534.7400
naxler@axgolaw.com

For Defendant SEAGATE TECHNOLOGY LLC:
SHEPPARD MULLIN RICHTER & HAMPTON LLP
BY: MUKUND SHARMA
Attorney at Law
379 Lytton Avenue
Palo Alto, CA 94301
650.815.2645
msharma@sheppardmullin.com

Page 4

INDEX

| WITNESS | EXAMINATION |
|---|---|
| BRUCE MARC SCHWARTZ VOLUME 1 | |
| BY MR. AXLER | 5, 100 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition of Defendant Seagate Technology LLC 30(b)(6) Designee Bruce Schwartz | 12 |
| Exhibit 2 | Seagate Global Limited Warranty Overview Policy (Bates FED_SEAG0004964 - 4975) | 52 |
| Exhibit 3 | Exhibit F to the Second Consolidated Amended Complaint | 63 |
| Exhibit 4 | Seagate Limited Warranty (Bates FED_SEAG0020659) | 94 |
| Exhibit 5 | Spreadsheet (Bates FED_SEAG34920) | 106 |
| Exhibit 6 | Spreadsheet (Bates FED_SEAG16461) | 109 |
| Exhibit 7 | Spreadsheet (Bates FED_SEAG59026) | 113 |

Palo Alto, California; Thursday, October 19, 2017
8:54 a.m.

BRUCE MARC SCHWARTZ,
having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. AXLER:
Q Good morning, Mr. Schwartz. I'm Noah Axler. I'm co-counsel for Plaintiffs in this case.
Can you please state your full name for the record.
A Bruce Marc Schwartz. Marc with a "c."
Q Mr. Schwartz, have you ever been deposed before?
A No.
Q Okay. Let me tell you a little bit about the ground rules of the deposition.
I'm going to ask questions. You are going to answer them. The Court Reporter, Rachel, will take down your answers. Your answers have to be verbal. In other words, no head shake, no nodding of the head. She can't record that. Okay?
A All right.
Q Also helps if you let me finish my question before you answer. It will make a clearer record, and,

in turn, I'll wait for you to finish your answer before I start with another question. Okay?
A Okay.
Q You understand that you are under oath?
A Yes.
Q And that you must give truthful testimony today?
A Yes.
Q Are you under the influence of any medication or other substance that would prevent you from understanding my answers [sic] today?
A No.
Q Same question but with respect to giving accurate answers?
A Am I under the influence of something that --
Q Let me rephrase it.
A Yes.
Q Are you under the influence of any medication or substance that would prevent you from answering accurately today?
A No.
Q Those questions aren't personal. We ask them at every deposition just to ensure that the witness isn't under some prescribed medication which might interfere with their ability to understand. Okay?
A Okay.

Q Do you understand that you are here today as a corporate witness for Seagate Technology LLC?
A Yes.
Q And from now on, in today's deposition, I will refer to Seagate Technology as "Seagate." Okay?
A Okay.
Q Do you currently work for Seagate?
A Yes.
Q What position do you have?
A I'm a warranty analyst. My actual title is a program -- boy, I haven't used it in a while. Staff program -- do you have that written down? I never use my actual title. I'm a program -- you know, I honestly don't know my official title.
Q Okay. You just testify to the extent that you know, and these are questions about your personal knowledge and what you remember as you sit here today. Okay?
A Yes.
Q Okay. How long have you been in that position?
A In my current position at Seagate?
Q Yes.
A 15, 18 years, somewhere in that range.
Q And all those years in your current position as warranty analyst?

A Yes.
Q How long have you been at Seagate in total?
A 25 years.
Q And what other positions did you hold at Seagate before warranty analyst?
A Customer quality engineer, failure analysis lab manager, and then warranty.
Q Okay. Let's focus on your current position.
Where do you work?
A Cupertino. Seagate.
Q And that's Cupertino, California?
A Yes.
Q And is Cupertino Seagate's U.S. headquarters?
A Yes, it is.
Q And what are your job responsibilities in your current position?
A My primary responsibility is to ensure the adequacy of the warranty reserve by providing warranty rates to finance.
Q What do you mean by "warranty reserve"?
A We have a fiduciary responsibility to make sure that Seagate has enough reserves, which we refer to as the "adequacy," to cover any potential failures in the future of any product that is -- has already been sold and is under warranty.

bunch of paperwork just generally talking about the warranty process.
MR. SHARMA: And you don't need to go into detail about the contents of our communications.
THE WITNESS: Okay.
MR. SHARMA: Yeah.
THE WITNESS: So, yeah, there really wasn't -- from my part anyway, not much preparation.
BY MR. AXLER:
Q About how many hours would you say you spent preparing?
A About -- I think it was about four hours.
Q And was that how long you met with Mukund --
A Yes.
Q -- or in total? Okay.
Other than your meeting with your counsel, did you do anything else to prepare?
A I provided data that was asked for early on months ago.
Q I take it that wasn't specifically in preparation for this deposition, though?
A That I don't know. I was asked -- yeah, I really don't know.
MR. SHARMA: You said you don't know. It was an independent request.

BY MR. AXLER:
Q Other than documents your counsel showed you at your meeting with him, did you review any other documents?
A No.
Q I want to ask you a little bit about the structure of Seagate as it relates to warranty claims by customers. Okay?
A Okay.
Q Are you the senior person overseeing the reporting of warranty claims within Seagate?
A I need you to specify exactly what you mean by that.
Q Sure, and maybe it will help if I ask the question a little more broadly.
Who are the primary people at Seagate who are responsible for overseeing the warranty program?
MR. SHARMA: Objection; vague and ambiguous.
THE WITNESS: And to what Mukund just said, "warranty" is a very broad term. I, personally, am involved with warranty rates and the warranty rate process as it relates to the adequacy. There are other people that handle other parts of marketing, customer fulfillment, things like that, contracts, which I am not part of.

BY MR. AXLER:
Q Does your particular unit, if there is one at Seagate, have a name?
A Not really. We are in corporate -- I'm in corporate quality, and my responsibility is warranty rates.
Q Is the corporate quality department based in Cupertino?
A Yes.
Q Is there a head of the corporate quality department?
A My direct manager is Carrie Martin.
Q How do you spell Carrie?
A C-a double r-i-e.
Q And who reports to you?
A I have a dotted-line report by a warranty analyst in Singapore. His name is Yuri Pangco, P-a-n-c-o, yeah. I might have the spelling of his last name wrong.
Q He's the only person who reports directly to you?
A Yes, and he only reports to me in the capacity as warranty analyst. He has his own manager in Singapore, so for warranty rates, he reports to me. For everything else he does, he reports to a different manager.
Q And what does he do for you?
A He does a subset of the rates.

Q What is that subset?
A Currently, it's personal compute, consumer electronics, and retail.
Q Does Mr. Pangco work on the ST3000 warranty rates?
A He would now.
Q What do you mean by "now"?
A Okay. The way we look at warranty rates, we don't look at them at the level that you are referring to. So the ST3000 was a DM001 that we are referring to. That refers to a -- a specific model. If we are talking retail, we roll up to the marketing name level. If we are talking desktop, we roll up to the product internal name, and there's -- there's a bunch of things. For bare drives, we use product internal name, marketing name, sub-market, application, warranty period, and whether it's OEM or disti. And so each of those combinations defines a unique what we call "product combo," and that's how we analyze warranty by product compos. So we don't look at it at the ST level.
Q Okay. And back to your point about Mr. Pangco working on the ST3000 or some subset thereof now, what did you mean by that exactly?
A Yuri came on board -- he was providing some rates for a while, but we have a new system that I implemented

Q And how about GRS?
A Global return system, I believe.
Q And are RMAs, GRS, and DAF databases of some sort?
A No. An RMA, which is one of the ones you mentioned -- I guess an RMA is a formal request from a customer saying, "We want to return these drives to Seagate. Do we have authorization to do that?" So there's a process that is -- I'm not familiar with the details of the process, but a customer can't just send things back. They have to get authorization first.
Q To the extent you know, what can you tell me about the process after an RMA is received by Seagate?
A I don't know the details of that. If the RMA is accepted and we say, "Yes, you can return it," meaning it's in warranty, then there is arrangements to send the drive back. In some cases, there are arrangements where they don't have to send the drive back. There are different things that can be done. And then once the drives are received by Seagate, that's when they enter the different GRS -- actually, I'm not sure when GRS is fulfilled. My systems don't see it until I've received the returns. So I see actual received returns and actual shipments.
Q What determines whether a warranty return request

goes into the RMAs or GRS systems?
A There is no RMA system. I think that was just RMA we were talking about before.
Q Okay. So an RMA, if it's accepted and processed by Seagate, goes into the GRS system at some point?
A I assume. I don't know that for a fact. I know that data is entered. I don't know specifically how it is entered. But GRS will track all of our returns.
Q And how does information make its way from GRS to DAF?
A There are automatic feeds. I don't know if they do it on a daily basis or a weekly basis. My DAF agg. is updated weekly. DAF might be updated daily. I don't know that for sure. And I think GRS is live.
Q Is there a particular unit at Seagate -- or units at Seagate that are responsible for processing RMAs?
A Yes.
Q What are those units?
A The groups that process those? That is the fulfillment. That is our CSO organization, which changes acronyms quite often. Might be called SSC right now.
Q You refer to that --
A Customer service organization.
Q Where is that organization based?

A I believe a lot of it is done in Oklahoma. We have some of the executives in Cupertino.
Q Who are those executives?
A Well, the one I know for sure that I can point to is Alan Clark.
Q As long as we are on the subject, you had testified earlier that you direct report to Carrie Martin; correct?
Where is Ms. Martin located?
A Cupertino.
Q And does the fulfillment or CSO organization you just told me about also manage the GRS and DAF systems?
A Don't know.
MR. SHARMA: Objection; calls for speculation.
BY MR. AXLER:
Q So you don't know if there's a particular unit at Seagate that manages the GRS and DAF systems?
MR. SHARMA: Same objections.
THE WITNESS: Correct.
BY MR. AXLER:
Q With respect to the RMA system, you mentioned that some of the CSO organization was in Oklahoma and there were executives in Cupertino as well; correct?
Do you know where that data -- the RMA data, I should say, is stored?

A No.
Q Do you know if Seagate maintained customer service numbers for customers to call with respect to ST3000 drives?
MR. SHARMA: Objection; outside the scope.
THE WITNESS: I wouldn't know that.
MR. SHARMA: Calls for speculation.
MR. AXLER: Mr. Schwartz, I'm going to mark Exhibit 2 at this point. Let me get it ready for you. It's the document which is Bates-numbered Fed_Seagate -- or FED_SEAG0004964 and runs through 4975. We will mark that as B. Schwartz 2.
(Exhibit 2 was marked for identification by the Court Reporter.)
BY MR. AXLER:
Q Feel free to take a moment to look it over, Mr. Schwartz. I'll be asking you about particular points in the document, but it's several pages, so take a moment to familiarize yourself with it.
A There's a lot. I may have to refer back to, depending on your question.
Q Certainly. Why don't we get started, and if you need a moment to review, you will let me know. Okay?
A Okay.
Q Do you recognize this document?

like, maybe a Barracuda Green was only part of the date ranges, so I don't know if everything listed here was in every date range, but the way this is set up, if they did sell it in a particular time period, then the warranty would apply.

Q And so what I'm trying to get at is, if a product was sold through different date ranges listed on Appendix 1, it appears that the warranty duration changed for that product, and that's what I meant by "product life"?

A Yes.

Q In your experience at Seagate, is it common, over a product's life, when it's being sold into the market, for its warranty duration to change?

MR. SHARMA: Same objections.

THE WITNESS: It has changed, yes, you know, over time. You know, you are looking at the history of changes right now, you know, so we are looking at a range of -- because we spoke to now. You asked me if it applies to now. We are looking from '7 to '17, so that's a ten-year period, so over a ten-year period you are looking at one, two, three, four -- five changes.

BY MR. AXLER:

Q And you said that the decision as to change warranty duration is not one you make; correct?



A Correct.

Q And I believe you said it's a decision that's in the hands of finance and product line management?

A Right, and contracts typically.

Q For the ST3000 drive -- drives, excuse me, where is the contracts unit based?

A I don't know.

Q How about the finance unit?

A That's Cupertino.

Q And do you know where the product line management unit for the ST3000 is based?

A I think that is also Cupertino. The head of PLM is in Cupertino for that -- for that particular drive, I don't know. There may be some -- you know, it may be broken up by category at different sites, but the top of the management for that would be here, or Cupertino.

Q And who is that?

A I don't know who's heading up them now. We have had some changes over the last couple months, last couple quarters.

Q But, in any event, that person is in Cupertino?

A Yes, sir.

Q Who's the last person you remember filling that role?

A John Grici.



Q How do you spell Mr. Grici --

A G-r-i-c-i.

Q Mr. Schwartz, I'll just remind you: Let me finish my question first. It will -- it looks very muddy after the fact. You are generally being pretty good about it, but I think you are coming on top of some of my questions before I'm finished. I just want to make sure we have a clear record.

A Okay.

MR. AXLER: Thank you.

I'm going to mark the third exhibit now, and let me give it to the Court Reporter and then Rachel will give it to you. Okay? And we will mark this B Schwartz 3.

(Exhibit 3 was marked for identification by the Court Reporter.)

BY MR. AXLER:

Q I can tell you, Mr. Schwartz, I'm not going into great detail on all of the language here, but feel free to look it over. It's not a long document.

A Okay.

Q Do you recognize this document?

A No.

Q Well, I'll represent to you that this document was attached to Exhibit F -- I'm sorry, as Exhibit F to



the Second Consolidated Amended Complaint in this case, and it's a warranty that was obtained by Plaintiffs and attached to Plaintiffs' Complaint --

A Okay.

Q -- okay?

Let me just direct your attention to page -- it's actually the third page of the document, but it's page 1 at the bottom.

You see that?

A Yeah.

Q There's a heading "How Long Does the Coverage Last?"

Do you see that?

A Yes.

Q And it says, under that: The warranty period for your product is the length of time indicated as part of your product packaging."

Do you see that language?

A Yes.

Q Does that language give you any guidance as to what this document might be?

A Well, yes.

Q Okay. And what is that?

A It's a -- it looks like just a general discussion of the warranty, without being very specific.

it allows us to slice and dice data in all -- in databases across the -- across Seagate.

Q And does eCube also -- let me rephrase that.

Does eCube also have FRIT data besides no trouble found rates?

A Don't know.

MR. SHARMA: Objection.

BY MR. AXLER:

Q Do you know how FRIT data can be accessed generally?

A Through that application eCube.

Q Other than what you have told me already, does FRIT data have any role in your calculations of warranty reserve adequacy?

A No.

MR. AXLER: I think that's all I have for you, Mr. Schwartz. Thank you very much.

THE WITNESS: You are welcome.

MR. SHARMA: Just take a five-minute break. Let me just go through this and see if there's redirect. It's very unlikely at this point.

MR. AXLER: Sure.

(Recess taken from 1:51 to 1:54 p.m.)

MR. SHARMA: No redirect.

MR. AXLER: I think we are done. Thank you,

Mr. Schwartz.

THE WITNESS: Thank you.

(TIME NOTED: 1:54 P.M.)

I, BRUCE MARC SCHWARTZ, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of ________________, 2017, at ________________________, _______________.

(City) (State)

_________________________________

BRUCE MARC SCHWARTZ

VOLUME 1

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

<%signature%>

RACHEL FERRIER

CSR No. 6948

Dated: October 23, 2017