1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2     Including Professional Corporations
   NEIL A.F. POPOVIĆ, Cal. Bar No. 132403
3  ANNA S. McLEAN, Cal. Bar No. 142233
   TENAYA RODEWALD, Cal. Bar No. 248563
4  LIÊN H. PAYNE, Cal. Bar No. 291569
   JOY O. SIU, Cal. Bar. No. 307610
5  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4109
6  Telephone:    415.434.9100
   Facsimile:    415.434.3947
7  Email:        npopovic@sheppardmullin.com
                 amclean@sheppardmullin.com
8                trodewald@sheppardmullin.com
                 lpayne@sheppardmullin.com
9                jsiu@sheppardmullin.com

10  Attorneys for Defendant SEAGATE TECHNOLOGY, LLC

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

15

16  IN RE SEAGATE TECHNOLOGY, LLC          Case No. 3:16-cv-00523 JCS
    LITIGATION
17                                          **DECLARATION OF LIÊN PAYNE IN
                                            SUPPORT OF SEAGATE'S OPPOSITION
    ───────────────────────────────        TO PLAINTIFFS' MOTION FOR CLASS
18  CONSOLIDATED ACTION                     CERTIFICATION**

19                                          Judge: Hon. Joseph C. Spero
                                            Date: March 30, 2018
20                                          Time: 9:30 a.m.
                                            Dept.: Courtroom G
21
                                            Filed Concurrently with DEFENDANT
22                                          SEAGATE TECHNOLOGY LLC'S
                                            OPPOSITION TO MOTION FOR CLASS
23                                          CERTIFICATION

24

25

26

27

28

I, Liên Payne, declare as follows:

1.    I am an attorney duly admitted to practice before this Court. I am an associate with the law firm of Sheppard, Mullin, Richter & Hampton LLP, counsel of record for Defendant Seagate Technology LLC ("Seagate"). I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would competently testify to their truth.

2.    In their Motion for Class Certification, Plaintiffs claim that Seagate "ubiquitously" advertised Annualized Failure Rates ("AFRs") for the products containing the ST3000DM001 hard drive (the "Drive") and advertised a combined AFR of "0.34%, <1%" at one point. Motion, 6:22–7:16. Plaintiffs specifically state the following:

  i.    "These drives were first released around April 2011… [t]he product manual, always available on Seagate's website, stated that these drives had an AFR of 0.34%." Motion 6:22–7:1; *see also* Hospodor Decl., ¶¶ 48 – 49.

  ii.    "By November 2011, Seagate released a data sheet for the drives (downloadable on its website) which also listed the AFR as <1%." Motion, 7:2–3; *see also* Hospodor Decl., ¶ ¶ 51–52.

  iii.    "From April 2012 to at least January 2013, Seagate modified its website to reflect an AFR of "0.34%, <1%." Motion, 7:1– 2; *see also* Hospodor Decl. ¶¶ 53–54.

3.    In his declaration, Hospodor also states: "[After January 2013] [t]he AFR specification was thereafter removed from the website for a brief period, only to return in September 2013 as '0.34%.' The AFR specification remained on the website until at least January 2014." Hospodor Decl., ¶ 54.

4.    To investigate Plaintiffs' and Hospodor's assertions regarding Seagate's publication of AFRs for products containing the ST3000DM001, I oversaw a review of Seagate's historical webpages (referred to as "product detail webpages") for the following products: Barracuda, Desktop HDD Internal Kit, GoFlex Desk for Mac, FreeAgent Desktop, FreeAgent Home, Expansion Desk, and Expansion Desk Plus. The Barracuda and Desktop HDD Internal Kit are internal products ("Internal Products"). The GoFlex Desk for Mac, FreeAgent Desktop,

1  FreeAgent Home, Expansion Desk, and Expansion Desk Plus are external products ("External

2  Products").

3          5.      The review of product detail webpages was targeted to the three specific

4  time frames during which Plaintiffs and Hospodor claimed Seagate published AFRs for products

5  containing the Drives: April – November 2011, April 2012 – January 2013, and September 2013 –

6  January 2014.  *See* Paragraphs 2-3, above.

7          6.      To perform this research, I used the Wayback Machine, which is a service

8  provided by the Internet Archive.  I used the Wayback Machine because Seagate does not keep

9  archives of its webpages.  The Wayback Machine allows visitors to search archived webpages

10  using URLs (i.e. a website address).  If archived records for a particular URL are available, the

11  Wayback Machine will show visitors the dates on which the page was archived and allow the

12  visitor to view the archived pages.

13          7.      I enlisted the assistance of a paralegal and a contract attorney to:  (1) review

14  each available archived URL of Seagate's website during the time frames set forth above, and (2)

15  record whether an AFR was available on the data sheet (if available), product manual (if

16  available), and specifications tab (if available), related to each product.  I quality-controlled their

17  work and found no errors.

18          8.      The review of Seagate's archived webpages included a review of the

19  archived webpages Hospodor cites in his declaration at footnotes 22, 23, 26, and 27, upon which

20  Plaintiffs rely for their assertions in quoted in paragraph 2, above.  As shown below, Seagate did

21  not ubiquitously or even consistently publish the AFRs for Internal Products in the materials

22  available on its website during the time frames cited by Plaintiffs.  Moreover, Plaintiffs proffered

23  no evidence showing that Seagate ever published AFRs for External Products.  Finally, Plaintiffs

24  misinterpret the AFR of "0.34%, <1%" published on Seagate's webpage as specific to the Internal

25  Products; this AFR in fact covered a wide range of products also included on the same webpage

26  during the referenced time frame.  The downloadable data sheets specific to the Internal Products

27  show that those the data sheets contained a <1% AFR representation at that time.

28

SMRH:485123534.3

**Earliest AFR Representations Available on Seagate's Website for the Internal Products**

9.    The results of our Wayback Machine research are as follows:  No representations regarding the 3TB Internal Products were available on Seagate's website before October 23, 2011 at the earliest.

10.    At some point between October 23 and October 31, 2011, Seagate published specifications regarding the Internal Products on its marketing pages for the products (also referred to as "product detail pages").  As of October 31, 2011, the specifications tab and downloadable data sheets available through the product detail pages for the Internal Products contained a <1% AFR.  This means that class members who purchased the Internal Products prior to October 31, 2011 would not have had access to an AFR specification through the webpages Plaintiffs cite.

11.    Product manuals for the Internal Products did not become available on Seagate's marketing webpages until June 26, 2012 at the earliest.

**Combined AFR Representations For Internal Products Between April 2012 and January 2013**

12.    According to the archived webpages available on the Wayback Machine, data sheets for the Internal Products available on Seagate's website from April 28, 2012 through January 17, 2013 only included an AFR representation of <1% for 2400 POH.[1]  None included an AFR representation of 0.34%.  This confirms that the "0.34%, 1%" combined AFR representation cited by Plaintiffs was not specific to the Internal Products.  No product manuals included an AFR representation.

13.    As examples, Exhibits 26 and 27 are true and correct copies of data sheets obtained through the Wayback Machine that were available for download from Seagate's webpage for the Barracuda on April 28, 2012 and January 17, 2013, respectively.

---

[1] POH means "Power On Hours."  Power on Hours is a specification of the amount of time a hard drive is estimated to be in use per year.  2400 POH would be approximately 40 hours/week.

-3-

Case No. 3:16-cv-00523 JCS
PAYNE DECLARATION
ISO CLASS CERTIFICATION OPPOSITION

**AFR Representations on Seagate's Website for External Products**

14.    According to the archived webpages available on the Wayback Machine, Seagate did not publish any AFRs for the External Products for the three time frames referred to by Plaintiffs and Hospodor and set forth in Paragraph 5, above.

**Documents**

15.    Attached hereto are true and correct copies of the following exhibits:

Exhibit 1:  Document Bates–numbered FED_SEAG0026679, produced in the above–captioned matter by Seagate.

Exhibit 2:  Document Bates–numbered FED_SEAG0026839, produced in the above–captioned matter by Seagate.

Exhibit 3:  Document Bates–numbered FED_SEAG0026867, produced in the above–captioned matter by Seagate.

Exhibit 4:  Document Bates–numbered FED_SEAG0026751, produced in the above–captioned matter by Seagate.

Exhibit 5:  Document Bates–numbered FED_SEAG0057277, produced in the above–captioned matter by Seagate.

Exhibit 6:  Document Bates–numbered FED_SEAG0056259, produced in the above–captioned matter by Seagate.

Exhibit 7:  Document Bates–numbered FED_SEAG0008927, reproduced as FED_SEAG0054950, produced in the above–captioned matter by Seagate.

Exhibit 8:  Document Bates–numbered FED_SEAG0055094, produced in the above–captioned matter by Seagate.

Exhibit 9:  Document Bates–numbered FED_SEAG0009670, produced in the above–captioned matter by Seagate.

Exhibit 10:  Document Bates–numbered FED_SEAG0071085, produced in the above–captioned matter by Seagate.

SMRH:485123534.3

1         Exhibit 11:  Excerpts from the Deposition of Andrew Hospodor, taken in the

2    above–captioned matter on December 15, 2017 by Seagate.

3         Exhibit 12: Excerpts from the Deposition of Pat Dewey, taken in the above–

4    captioned matter on September 7, 2017 by Seagate.

5         Exhibit 13: Excerpts from the Deposition of Glen Almgren, taken in the above-

6    captioned matter on July 26, 2017 by Seagate.

7         Exhibit 14: Excerpt from the Deposition of Andrew Khurshudov Deposition, taken

8    in the above-captioned matter on September 8, 2017 by Seagate.

9         Exhibit 15:  Document Bates–numbered FED_SEAG0002320, produced in the

10   above–captioned matter by Seagate.

11        Exhibit 16:  Document Bates–numbered FED_SEAG0009095, produced in the

12   above–captioned matter by Seagate.

13        Exhibit 17: Declaration of Dave Rollings In Support of Defendant Seagate's

14   Opposition to Plaintiffs' Motion for Class Certification, *Pozar v. Seagate Technology LLC*, No.

15   CGC-15-547787.

16        Exhibit 18: Declaration of  Seknam "Allen" Ng In Support of Defendant Seagate's

17   Opposition to Plaintiffs' Motion for Class Certification, *Pozar v. Seagate Technology LLC*, No.

18   CGC-15-547787.

19        Exhibit 19:  Document Bates–numbered FED_SEAG0026135, produced in the

20   above–captioned matter by Seagate.

21        Exhibit 20:  Document Bates–numbered FED_SEAG0026244, produced in the

22   above–captioned matter by Seagate.

23        Exhibit 21:  Document Bates–numbered FED_SEAG0009883, produced in the

24   above–captioned matter by Seagate.

25        Exhibit 22: Excerpts from the Deposition of Nikolas Manak, taken in the above–

26   captioned matter on June 20, 2017.

27        Exhibit 23: Excerpts from the Deposition of Stefan Boedeker, taken in the above-

28   captioned matter on December 12, 2017.

SMRH:485123534.3

Exhibit 24:  Excerpts from the Deposition of Dennis Crawford, taken in the above-captioned matter on June 15, 2017.

Exhibit 25:  50-State Survey of Consumer Protection Statutes prepared by Sheppard Mullin.

Exhibit 26:  April 28, 2012 data sheet downloaded from the Wayback Machine at https://web.archive.org/web/20120428124406/http://www.seagate.com:80/internal-hard-drives/desktop-hard-drives/.

Exhibit 27: January 17, 2013 data sheet downloaded from the Wayback Machine at https://web.archive.org/web/20130117005718/http://www.seagate.com/internal-hard-drives/desktop-hard-drives/.

Exhibit 28: Excerpts from the Deposition of David Shechner, taken in the above-captioned matter on June 6, 2017.

Exhibit 29: Excerpts from the Deposition of Christopher Nelson, taken in the above–captioned matter on June 2, 2017.

Exhibit 30: Excerpts from the Deposition of James Hagey, taken in the above–captioned matter on July 24, 2017.

Exhibit 31: Order Granting in Part Plaintiffs' Motion for Class Certification, *Pozar v. Seagate Technology LLC*, No. CGC-15-547787 (S.F. Super. Ct. Nov. 1, 2017)).

Executed on this 5th day of January, 2018, at San Francisco, California.

Lien Payne

# EXHIBIT 1
## [FILED UNDER SEAL]

# EXHIBIT 2
## [FILED UNDER SEAL]

# EXHIBIT 3
[FILED UNDER SEAL]

# EXHIBIT 4
[FILED UNDER SEAL]

# EXHIBIT 5
## [FILED UNDER SEAL]

# EXHIBIT 6
## [FILED UNDER SEAL]

# EXHIBIT 7
[FILED UNDER SEAL]

# EXHIBIT 8
## [FILED UNDER SEAL]

# EXHIBIT 9
[FILED UNDER SEAL]

# EXHIBIT 10
[FILED UNDER SEAL]

# EXHIBIT 11

1

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5   IN RE SEAGATE TECHNOLOGY, LLC
    LITIGATION,
6   _____ No. 3:16-cv-00523 JCS

7   CONSOLIDATED ACTION

8   _____

9

10      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11

12      Videotape Deposition of Andrew Hospodor,

13   Ph.D., taken at Four Embarcadero Center, 17th

14   Floor, San Francisco, California, on Friday,

15   December 15, 2017 at 9:48 a.m.

16

17

18

19

20

21

22   REPORTED BY:

23   Mary Hogan CSR No. 05386

24

25

49

1           MS. SCARLETT:  Objection to form.

2      Q    (By Ms. Rodewald) Do you know the

3  serial number of the drive?

4           MS. SCARLETT:  Objection, form.

5           THE WITNESS:  Not off the top my head.

6  I haven't memorized it.

7      Q    (By Ms. Rodewald) In this action, in

8  your report, your declaration, you do not opine

9  that the ST3000DM001 drives had any specific

10  defect, do you?

11          MS. SCARLETT:  Objection to form.

12          THE WITNESS:  In my report I provide

13  exemplary information of a number of different

14  defects.

15     Q    (By Ms. Rodewald) Did you identify any

16  specific defect that you opine is common to the

17  ST3000DM001 drives at issue in this litigation?

18          MS. SCARLETT:  Objection to form.

19          THE WITNESS:  So my role in this was

20  not to identify a common defect.

21          There certainly are things that appear

22  over and over again as issues in the production of

23  the Seagate ST drives.

24          My role here was to identify whether

25  or not the annualized failure rates, or AFR, was

50

1    actually within Seagate's claim of being less than

2    1 percent or less than .3 percent as they

3    advertised in their marketing materials.

4         Q    (By Ms. Rodewald) What percentage of ST

5    drives sold to consumers failed?

6              MS. SCARLETT:  Objection to form.

7              THE WITNESS:  I don't know.

8         Q    (By Ms. Rodewald) But it is your

9    opinion that they had a higher failure rate than 1

10   percent?

11        A    The data that I've reviewed indicates

12   that from the beginning of the production process

13   Seagate knew that this drive had an annualized

14   failure rate of more than .34 and more than

15   1 percent.

16        Q    Is it your opinion that the ST drives

17   in consumers' hands failed at a higher rate than 1

18   percent?

19             MS. SCARLETT:  Objection to form.

20             THE WITNESS:  So I don't -- I can't

21   opine on what is in consumers' hands.  I have not

22   seen the data for consumers' hands.

23        Q    (By Ms. Rodewald) Is it your opinion

24   that the ST drives for the entire period from 2011

25   to 2016 had the same failure rate?

51

1              MS. SCARLETT:  Objection to form.

2              THE WITNESS:  It is my opinion that

3    they did not.

4         Q    (By Ms. Rodewald) And what were the

5    differences?  Did the failure rate vary over time?

6              MS. SCARLETT:  Objection to form.

7              THE WITNESS:  During the time and the

8    data that I examined, the failure rate was

9    constantly increasing and it was above 1 percent.

10        Q    (By Ms. Rodewald) What do you mean by

11   "constantly increasing"?

12        A    Let's go into my expert report and

13   I'll show you.  Please, let's do it.

14        Q    Hold on.  I think this is a very

15   simple question.

16        A    I wanted to answer you accurately.

17        Q    When you say "constantly increasing,"

18   do you mean that hard drives manufactured in 2014

19   had a higher failure rate than hard drives

20   manufactured in 2011?

21        A    I'm going to answer you out of my

22   expert report.

23

24

25

52



54

1   report and flush them out, but I'm not sure off

2   the top my head if the eight months is referring

3   to the start of mass production for the -- for the

4   SBS drives or the bare drives, so I -- I would

5   have to go back and review my report to see that.

6         Q     Okay.

7         A     And I'm trying to answer you --

8         Q     No.

9         A     -- as factually as I can.

10        Q     I understand.  And we can look at some

11   documents later, you know, later in the

12   deposition.

13              I'm trying to get some general

14   overview now and trying to understand some

15   concepts, and then we'll go back and tie down some

16   of these things.

17              Okay.  Do you know what percentage of

18   the named plaintiffs' drives failed?

19              MS. SCARLETT:  Objection to form.

20              THE WITNESS:  I'm sorry.  The named

21   plaintiffs being the parties who brought the suit?

22        Q     (By Ms. Rodewald) Correct.

23        A     I do not, but I can assume that they

24   wouldn't bring suit unless their drives had

25   failed.

55

1      Q      But you don't know what percentage?

2              MS. SCARLETT:  Objection, form.

3              THE WITNESS:  I don't know how many

4      drives they had, when they failed, or how many

5      failed.

6      Q      (By Ms. Rodewald) Okay.  Do you want to

7      go for a little further before we take a break?

8      A      No.  We can keep going.

9      Q      Is it your understanding that in the

10     hard drive industry hard drives are produced for

11     different intended uses?

12     A      So I'm -- I'm not really sure I

13     understand what you're asking.

14     Q      Well, let me ask you this:  Do hard

15     drive manufacturers such as Western Digital or

16     Seagate or -- I forget Hitachi's current name.

17     It's HG --

18     A      -- ST.

19     Q      HGST.  Is it your understanding that

20     they manufacture some hard drives to be used

21     inside desktop computers, they manufacture other

22     hard drives to be used in what are called

23     enterprise or mission critical applications, and

24     other hard drives to be used inside DVRs and

25     TiVos, or to be used inside laptops?

88



89



90



91



92



93



94



95



96



105

1    phase referred to as pilot exit.

2        Q    Okay.

3        A    And accordingly, Seagate test drives

4    pre-release, as well as post-release, so it's

5    right there where the drive is released that

6    Seagate will be collecting and analyzing field

7    data to spot trend and determine whether a drive

8    is meeting its anticipated rate of field returns.

9        Q    So after this release it's your

10   understanding that the drive is continued -- hard

11   drive companies in general and Seagate included

12   continue to put the drives through ongoing

13   testing; is that correct?

14       A    Yes.

15       Q    Okay.  And is it your understanding

16   that Seagate called that ongoing activity ongoing

17   reliability testing or ORT?

18            MS. SCARLETT:  Objection, form.

19            THE WITNESS:  I have seen the term ORT

20   and there may be some other testing that they've

21   done as well.

22            Once the drive does go into

23   manufacturing, it would typically use the same

24   components that were qualified on the drive at the

25   time it was being designed and before it was being

106

1    handed off from the pilot exit and the quality

2    exit.

11       Q    (By Ms. Rodewald) Have you ever been

12   involved in the production of a hard drive that

13   was produced in volume of millions?

14       A    Yes.

15       Q    And when was that?

16       A    That was at Quantum.

17       Q    Okay.

18       A    In the 1980s -- sorry, 1990s as well.

19       Q    And those being hard drive --

20   particular models of the hard drives were being

21   produced in millions of numbers a year?

22       A    Yes.

23       Q    And were those being produced at a

24   number of factories in a number of different

25   countries as well?

107

1      A      No.  I believe we had one major

2  manufacturing facility.

3      Q      Was it Quantum's practice at the time

4  to qualify multiple sources for components?

5      A      Yes.  Quantum would qualify multiple

6  sources before the mass production of the drive

7  began.

8      Q      Before they started ramping production

9  they would qualify multiple sources?

10      A      Yes.

11      Q      And is it possible that a company

12  would qualify multiple sources during the ramp

13  phase?

14          MS. SCARLETT:  Objection, form.

15          THE WITNESS:  It not something that

16  I've ever seen.

17      Q      (By Ms. Rodewald) How many drives have

18  you been involved with taking from design through

19  approval for sale through a ramp?

20      A      Dozens.

21      Q      And was that all at Quantum?

22      A      That was primarily at Quantum, and

23  then I had also done consulting work where I

24  assisted other disk drive companies.

25      Q      When was that?

108

1        A      In the back of my resume, I think it

2    was '83 to '86.  Let's see.  It may have been

3    earlier or later.

4              So when I was at I/O Xel, '86 to 1990,

5    and so I worked with companies like Quantum,

6    Prium, Maxtor and Iomega and assisted them in

7    taking their product through this process.

8        Q      And you were involved in qualifying

9    component suppliers?

10       A      I actually at the time developed

11   something called the SCSI benchmark tester and

12   that was the first patent that I received, and

13   these companies used the tester to evaluate some

14   of the suppliers of some of their components.

15       Q      So you're saying that it's not -- it's

16   not standard practice to continue qualifying new

17   suppliers of parts during the ramp phase of

18   production?

19              MS. SCARLETT:  Objection, form.

20              THE WITNESS:  I'm not familiar with

21   that, and I would think it's somewhat dangerous.

22       Q      (By Ms. Rodewald) Why?

23       A      Because you're about to start building

24   millions of things with parts that you don't

25   really know very much about.

109

1          Q      That's the purpose of the

2    qualification process, isn't it?

3                  MS. SCARLETT:  Objection, form.

4                  THE WITNESS:  That's why I believe the

5    qualification process should occur before the mass

6    production.

7          Q      (By Ms. Rodewald) During ongoing

8    reliability testing or whatever you want to call

9    it -- let me see.

10                 Have you ever been involved in that

11   process, the process of either doing or

12   supervising, directly supervising, ongoing

13   reliability testing?

14         A      Yes.

15                 MS. SCARLETT:  Objection to form.

16                 THE WITNESS:  Sorry.  Yes.

17         Q      (By Ms. Rodewald) When was that?

18         A      That was again at Quantum.

19         Q      And can you please explain what your

20   role was with regard to ongoing reliability

21   testing?

22         A      So at Quantum we were very interested

23   in what the failure rates were, and my group in

24   systems engineering was responsible, as I said,

25   for drives that were targeted for streaming

125

1          Q      Okay.  So you're saying that

2     head-related failures -- you are grouping them all

3     together as being common; is that correct?

4          A      No, that is not what I'm saying.

5          Q      Okay.  So why would it matter whether

6     or not something is called a head-related failure?

7                 It sounds to me like you're saying

8     just because something is called a head-related

9     failure you cannot make a conclusion one way or

10    another whether it has anything in common with a

11    different head-related failure; is that correct?

12                MS. SCARLETT:  Objection, form.

13                THE WITNESS:  Okay.  So I didn't

14    understand your first question and I definitely

15    don't understand your second question.

16         Q      (By Ms. Rodewald) Okay.

17         A      So if you could rephrase them for

18    me --

19

20

21

22

23

24

25

126





128



129

1

2

3

4

5

6          Q      What you reviewed -- you reviewed the

7      documents Seagate produced; is that correct?

8                  MS. SCARLETT:  Objection, form.

9                  THE WITNESS:  I reviewed a lot of

10     Seagate documents.  Which are you talking about?

11         Q      (By Ms. Rodewald) Why are you saying

12     you don't have the data?

13                 MS. SCARLETT:  Objection to form.

14                 THE WITNESS:  Because I did not review

15     any data based on customer failures in the file.

16     Seagate did not produce that in this case.

17         Q      (By Ms. Rodewald) So Paragraph 34, you

18     go on to state, "The data used to calculate AFR

19     and MTBF is usually obtained by conducting

20     accelerated life testing equivalents of running a

21     large population of drives 24 hours per day and

22     seven days per week for at least 30 days in

23     special test chambers which subject the drives to

24     extreme conditions, such as temperature and

25     voltage levels above and below the values listed

1    manufacturer and has their brand on it is that if

2    they are manufacturing disk drives and their disk

3    drives are either 2400 power-on hours or 8760

4    power-on hours, that the disk drive that's inside

5    the enclosure that I buy from them will either be

6    2400 power-on hours per year or 8760 power-on

7    hours per year.

8              I have never seen any piece of

9    information that suggests that customers should

10   only use their Seagate branded storage solutions

11   for less than 2400 hours a year, never seen it.

12   This is the first time today.

13       Q    (By Ms. Rodewald) And you have no idea

14   how long the average consumer uses an external USB

15   drive, correct?

16       A    I don't think that matters.

17            MS. SCARLETT:  Objection to form.

18            THE WITNESS:  I don't think that

19   matters.

20            MS. RODEWALD:  I think we're up to

21   Exhibit 10.

22            (Exhibit 10 marked.)

23   

24   

25

192



224

1          Q    (By Ms. Rodewald) Didn't he say that

2     there is a correlation between the amount of

3     workload stress and the product's propensity to

4     show constant failure rate or wear-out?

5               MS. SCARLETT:  Objection, form.

6               THE WITNESS:  He did say that.

7          Q    (By Ms. Rodewald) Okay.  So that would

8     mean that the higher workload products are the

9     ones that have -- are correlated with this

10    propensity to show Beta equals greater than 1,

11    correct?

12              MS. SCARLETT:  Objection, form.

13              THE WITNESS:  I don't think that's

14    what he said.

15

16

17

18

19

20

21

22

23

24

25

225

1

2

3

4

5      Q     So are all of the bases for your

6   opinions that Seagate did not use the right Beta

7   value stated in your report?

8                MS. SCARLETT:  Objection, form.

9                THE WITNESS:  I think there are lots

10   of opinions that are floating around in my head,

11   some of which are scattered, some of which may or

12   may not make sense.

13                I tried to write a report that was not

14   comprehensive but one that was exemplary and

15   explained the basis for my opinions and provided

16   the evidence that I had for Seagate not reaching

17   their AFR target of 1 percent.

18      Q     (By Ms. Rodewald) Do you know of any

19   evidence, sitting here today, that you did not

20   include in your report?

21                MS. SCARLETT:  Objection, form.

22                THE WITNESS:  In the back of my report

23   here you will see a long list of numbers.

24                I didn't print every single one of

25   these, and I didn't actually cite every single one

231

 1    drives into mass production in Japan.

 2                Quantum designed the drives and then

 3    would send teams of manufacturing engineers to

 4    Japan to implement the production of the drives,

 5    do the preproduction builds, bring the

 6    preproduction drives back for testing in Milpitas,

 7    California, calculate things like AFR, look at

 8    what the yield would be, and when the drive was

 9    deemed sufficiently mature, it would go into mass

10    production.

11                And one of the levels was -- you know,

12    is the drive going to be able to achieve a

13    first-pass yield at the start of mass production.

14        Q    You are not one of the manufacturing

15    engineers, correct?

16        A    I was not a manufacturing engineer,

17    but I had more than enough friends in

18    manufacturing engineering, so I got to hear all

19    the relevant stories, and by the time I was done

20    at Quantum, I was in the management ranks, so I

21    regularly got updates about what was going on and

22    what was on the critical path, what types of

23    problems we're seeing, what we're going to do to

24    get the yield up prior to mass production.

25        Q    But Quantum was not responsible for

232

1    getting the yield up, was it?

2        A     Quantum was.  Quantum acted hand in

3    hand with MKE to identify and correct any issues

4    prior to mass production, so once the drive went

5    into mass production, it was being cranked out by

6    the millions.

7              And this is at a time before the

8    internet, so we didn't have the ability to issue

9    firmware updates twice a year or three times a

10   year like Seagate was doing during the life of the

11   Grenada product.

12             We had to get it right the first time,

13   and we qualified all of our vendors before we went

14   into mass production.

15             We built prototype drives with

16   combinations of each of the vendors' components to

17   make sure that they all worked together.

18             We did our AFR life-cycle testing.  We

19   did all of -- I'm sorry, the accelerated

20   life-cycle testing for AFR.

21             We did all these things prior to

22   getting the drive into production, and it was only

23   when both Quantum and MKE were satisfied with the

24   results that the drive was actually released into

25   mass pro.

233

1          We would never change or try to put a

2    new part on a drive that wasn't already

3    qualified --

4          Q     Okay.

5          A     -- once it went into mass pro.

6          Q     So you never changed -- after the

7    drive went into mass production, you never

8    qualified new suppliers for parts?

9               MS. SCARLETT:  Objection, form.

10              THE WITNESS:  We didn't -- as far as I

11   know, we used the suppliers that were qualified

12   during the design phase and used their parts to

13   make the product, and we made sure that those

14   parts were interchangeable with other parts from

15   other manufacturers.

16              So we avoided swapping out a part in

17   the middle of production with a new part that

18   hadn't been qualified with all the other parts.

19              A disk drive has a tremendous amount

20   of parts inside of it.  It's a complicated device.

21              We did, however, take new suppliers

22   and look at qualifying them into the production to

23   the next production run of a follow-on product.

24              So if we had a bump in aerial density,

25   if we were going to add some new heads, if we were

234

1    going to do something different or target a

2    different market, we would use that as an

3    opportunity to qualify a new vendor, knowing that

4    the original drive, in the case of something like

5    a classic drive, was already solid and stable.

6            We would take a look at what we could

7    do in the next generation to add different

8    components into that, get some more capacity out

9    of it, get a little more performance, maybe some

10   more reliability.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

236



248

1    generating two or more engineering change requests

2    every single day and that's enough to overwhelm an

3    organization.

4        Q    (By Ms. Rodewald) So I have a pretty

5    simple question here.  I hope we can figure it out

6    together.

7            You don't cite any documents in

8    connection with Figures 19 and 20, and so I'm

9    wondering if you can tell me what the actual

10   documents are that you got the data from.

11       A    So the documents are the documents

12   like this FED SEAG0002724, and all of these

13   documents that represent the monthly engineering

14   change request -- they are called the engineering

15   change request logs.

16       Q    Okay.

17       A    And it's either this document with a

18   lot of tabs or it's this document and the

19   subsequent documents.

20       Q    So I'm pretty sure that that document

21   only had one tab, so that would mean that there

22   are a bunch more of those, but you didn't cite the

23   Bates numbers in connection with these two

24   figures.

25       A    We can go back and do that if you need

1   that.

2             I'm sorry.  That would have been an

3   oversight, and you know, I hope that we included

4   those in the disclosure in the back --

5        Q    Okay.

6        A    -- of all the Bates numbers, but if we

7   need to, we can pull those out and get them for

8   you individually.

9        Q    Yeah.  We were just really trying to

10  figure out how you made these pretty pictures.

11  Couldn't figure it out.

12             Now you've mentioned customer code

13  ECRs, and what does that mean?

14        A    So a customer code, my understanding

15  is that would be a change that was implemented at

16  the request of a specific customer.

17        Q    And what might those be?

18        A    It's too loud.  It's -- you know, it's

19  got the wrong color sticker on it, it doesn't

20  accept this vendor unique command that we want.

21        Q    Okay.

22        A    We wanted a blue LED instead of a red

23  LED.  It's that kind of stuff when you're dealing

24  with customers.

25             But primarily the customer codes are

255

1    have any knowledge about the information that was

2    provided to me.



256



315

1              MS. SCARLETT:  Objection to form.

2              THE WITNESS:  I cited this document as

3    an AFR of 0.34.

4              I don't believe I said it was the only

5    document Seagate had ever produced, but, again,

6    I'm presenting exemplary information here, not

7    comprehensive information.

8         Q    (By Ms. Rodewald) Right now do you know

9    of any other evidence that Seagate published an

10   AFR of 0.34 percent in April 2011?

11             MS. SCARLETT:  Objection to form.

12             THE WITNESS:  Off the top of my head,

13   I do not, but I seem to remember advertising

14   different numbers for the AFRs.

15             So the data sheets at some point said

16   0.34 percent, and that was here on Paragraph 53

17   and 54.

18             So I'm sorry, the data sheet remained

19   unchanged, but Seagate continued to advertise the

20   AFR of the ST3000DM001 on its website as 0.34,

21   less than 1 percent, until at least January 2013.

22        Q    (By Ms. Rodewald) Do you think it

23   requires your expertise to review the Seagate

24   website and determine what it said about AFR?

25             MS. SCARLETT:  Objection to form.

316

```
1                THE WITNESS:  I'm sorry.  I don't
2   understand your question.
3        Q    (By Ms. Rodewald) Do you think it
4   requires your expertise to look at Seagate's
5   website and determine what it said about AFR?
6        A    I think --
7                MS. SCARLETT:  Objection to form.
8                THE WITNESS:  I think that any person
9   could look at Seagate's website and see what it
10  says about AFR.
11       Q    (By Ms. Rodewald) Okay.  Do you think
12  that an ordinary consumer could look at Seagate's
13  website and understand what the AFR meant?
14       A    So Seagate changed from MTBF to AFR to
15  make it easier for consumers to understand what it
16  meant, because consumers had a hard time
17  understanding what meantime between failure was on
18  a large population of drives, and they had an
19  easier time of understanding what annual failure
20  rate meant.
21       Q    But you think that an ordinary
22  consumer could look at Seagate's website and
23  understand the information presented there?
24       A    I don't see any reason why they
25  couldn't.
```

317

1      Q      And what about with regard to the

2    product manual and the data sheets that you cite

3    in your report?

4           Is this something that requires your

5    expertise to understand?

6           MS. SCARLETT:  Objection to form.

7           THE WITNESS:  I think that the product

8    manuals and the data sheets are written to be as

9    simplistic as possible.

10     Q     (By Ms. Rodewald) Okay.

11     A     So I would say no, they don't require

12    a Ph.D. in computer engineering to understand

13    them.

14           MS. RODEWALD:  Okay.  I believe that's

15    all I have for now.

16           It seems that you have reserved the

17    right to add to your opinions and we definitely

18    reserve the right to continue the deposition of

19    Mr. Hospodor if he revises or adds to his

20    opinions.

21           I would like to mark this transcript

22    as confidential, please.

23           MS. SCARLETT:  No questions from the

24    Plaintiffs.

25           THE VIDEOGRAPHER:  This marks the end

319

1

2          I, the undersigned, a Certified Shorthand

3     Reporter for the State of California, do hereby

4     certify that the witness in the foregoing

5     deposition was by me first duly sworn to testify

6     to the truth in the cause herein entitled; that

7     said deposition was taken at the time and place

8     herein stated; that the testimony of said witness

9     was reported by me and thereafter transcribed

10    under my direction into typewriting; that the

11    foregoing is a full, complete and true record of

12    said testimony;

13              I further certify that I am not of

14    counsel or attorney for either or any of the

15    parties in the foregoing matter, nor in any way

16    interested in the outcome of the cause herein

17    named.

18              IN WITNESS WHEREOF, I have hereunto

19    set my hand this 17th day of December, 2017.

20

21    _____

22    MARY HOGAN, CSR NO. 05386

23

24

25

# EXHIBIT 12

1

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF CALIFORNIA

3  No. 5:16-cv-00523-RMW

4  _____

5  30(b)(6) DEPOSITION OF SEAGATE TECHNOLOGY, LLC
   AS GIVEN BY:  PATRICK DEWEY
6  September 7, 2017

   _____

7

8  IN RE SEAGATE TECHNOLOGY, LLC

9  LITIGATION
   _____

10

11 APPEARANCES:

12      AXLER GOLDICH, LLC
            By Marc A. Goldich, Esq.
13              Matthew Strout, Esq.
                1520 Locust Street, Suite 301
14              Philadelphia, Pennsylvania 19102
                267.534.7400
15              mgoldich@axgolaw.com
                mstrout@axgolaw.com
16                  Appearing on behalf of Plaintiffs

17      SHEPPARD MULLIN
            By Anna S. McLean, Esq.
18              Four Embarcadero Center, 17th Floor
                San Francisco, California 94111-4109
19              415.434.9100
                amclean@sheppardmullin.com
20                  and
                Mukund Sharma, Esq.
21              379 Lytton Avenue
                Palo Alto, California 94301-1479
22              msharma@sheppardmullin.com
                    Appearing on behalf of Seagate
23                  Technology, LLC

24

25

87

1



88



1

f those tests are related



136



167

1



168



252

1    STATE OF COLORADO)

2                     )   ss.   REPORTER'S CERTIFICATE

3    COUNTY OF DENVER )

4              I, Pamela J. Hansen, do hereby certify that

5    I am a Registered Professional Reporter and Notary

6    Public within the State of Colorado; that previous to

7    the commencement of the examination, the deponent was

8    duly sworn to testify to the truth.

9              I further certify that this deposition was

10   taken in shorthand by me at the time and place herein

11   set forth, that it was thereafter reduced to

12   typewritten form, and that the foregoing constitutes

13   a true and correct transcript.

14             I further certify that I am not related to,

15   employed by, nor of counsel for any of the parties or

16   attorneys herein, nor otherwise interested in the

17   result of the within action.

18             In witness whereof, I have affixed my

19   signature this 18th day of September, 2017.

20             My commission expires September 3, 2018.

21

22             _____
               Pamela J. Hansen, CRR, RPR, RMR
23             216 - 16th Street, Suite 600
               Denver, Colorado  80202

24

25

# EXHIBIT 13

1

 1       UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF
         CALIFORNIA SAN JOSE DIVISION
 2       CASE NO. 5:16-cv-00523-RMW

         _____
 3       30(b)(6) DEPOSITION OF SEAGATE          July 26, 2017
         TECHNOLOGY, LLC BY GLEN ALMGREN
 4       _____
         IN RE SEAGATE TECHNOLOGY, LLC LITIGATION
 5       _____
         APPEARANCES:
 6            AXLER GOLDICH, LLC
                   By Marc A. Goldich, Esq.
 7                          and
                   Matthew Strout, Esq.
 8                   1520 Locust Street, Suite 301
                   Philadelphia, Pennsylvania 19102
 9                    Appearing on behalf of Plaintiffs.
         SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
10                 By Anna S. McLean, Esq.
                            and
11                 Mukund Sharma, Esq.
                   Four Embarcadero Center, 17th Floor
12                 San Francisco, California 94111-4109
                      Appearing on behalf Defendants.
13            ELITE LITIGATION SOLUTIONS, LLC
                1518 Walnut Street, Suite 300
14            Philadelphia, Pennsylvania 19102
              www.elitelsllc.com ~ 215.563.3703
15                                                    2



89



90



143



144



145



162



182



183



185

1



186

1



194



266

1    STATE OF COLORADO).

2                    ss).              REPORTER'S CERTIFICATE

3    COUNTY OF DENVER ).

4            I, Brittany D. Leis, do hereby certify that

5    I am a Court Reporter and Notary Public within the

6    State of Colorado; that previous to the commencement

7    of the examination, the deponent was duly sworn to

8    testify to the truth.

9            I further certify that this deposition was

10   taken in shorthand by me at the time and place herein

11   set forth, that it was thereafter reduced to

12   typewritten form, and that the foregoing constitutes

13   a true and correct transcript.

14           I further certify that I am not related to,

15   employed by, nor of counsel for any of the parties or

16   attorneys herein, nor otherwise interested in the

17   result of the within action.

18           In witness whereof, I have affixed my

19   signature this 4th day of August, 2017.

20           My commission expires December 13, 2017.

21

22

23           _____
             Brittany D. Leis
             216 - 16th Street, Suite 600
24           Denver, Colorado 80202

# EXHIBIT 14

# SEAGATE TECHNOLOGY HOLDING, INC. - Seagate Technology LLC adv. Tim Pozar/Scott Nalick

## *Khurshudov, Andrei - 09-08-2017*

*9/8/2017*

**Full-size Transcript**

**Issue Filter: Print**

**Prepared by:**

Peter Stone
Sheppard Mullin

Friday, January 5, 2018

1

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF CALIFORNIA

3   No. 5:16-cv-00523-RMW

4   _____

5   IN RE SEAGATE TECHNOLOGY, LLC

6   LITIGATION
    _____

7
    SUPERIOR COURT OF THE STATE OF CALIFORNIA
8
    FOR THE CITY AND COUNTY OF SAN FRANCISCO
9
    Case No. CGC-15-547787
10  _____

11  TIM POZAR and SCOTT NALICK,
    Individually and on Behalf of All Others
12  Similarly situated,

13  Plaintiffs,

14  vs.

15  SEAGATE TECHNOLOGY LLC and DOES
    1-50,
16
    Defendants.
17  _____

18  VIDEOTAPED DEPOSITION OF ANDREI KHURSHUDOV
    September 8, 2017
19  _____

20

21

22

23

24

25

13

1          A     I was responsible for developing -- for

2     running projects related to big data analytics,

3     machine learning, and different types of exploratory

4     studies.

5          Q     What is machine learning?

6          A     Machine learning term refers to the field

7     of statistics, mathematics or computer science that

8     relates to algorithms or software that improve

9     performance with experience or with time or data.

10     Essentially, they learn over time.

11          Q     Okay.  And you also said you did

12     exploratory studies.

13          A     Uh-huh.

14          Q     What does that mean?

15          A     Ad hoc studies, whatever I was finding to

16     be important for the company at the time.

17          Q     So you had the freedom to choose the

18     own -- your -- the areas that you wanted to study?

19          A     That's correct.

20          Q     Did you work at any other position at

21     Seagate in the past other than as chief technologist?

22          A     Yes.

23          Q     And what was that?

24          A     I started as a director of advanced

25     reliability in 2006.  Then I moved to -- my subjects

14

1    changed, but the next milestone I will say was a

2    general manager of Seagate Recovery Services.   Then I

3    worked as a senior director in different other

4    functions, including managing cloud research in the

5    analytics organization.

6         Q    All right.  Well, let's take it

7    chronologically from your earliest position.  Take a

8    look at your LinkedIn profile on Page 2, please.

9    What was your first position at Seagate?

10        A    Yes, it says senior director, worldwide

11   advanced quality and reliability.

12        Q    What did you do in that position?

13

15



12          MR. SHARMA:  I think -- did you say

13   fraction or function?

14          THE DEPONENT:  Fraction.

15          MR. SHARMA:  Fraction.

16          THE DEPONENT:  Fraction.  It's a smaller.

17   Q     (BY MR. STROUT)  Okay.  And we'll --

18   A     I'm sorry.

19   Q     We'll return to AFR in a little bit, but

20   for now I want to ask you about ARR.  What is that

21   exactly?

22   A     Annualized return rate is a fraction of

23   shipped product that comes back for whatever reason,

24   for any reason, during one year of operations.

25          THE REPORTER:  During one year of --

24

```
 1    failure rate increases at the end of its life.

 2         Q    (BY MR. STROUT)  Let's turn back to your

 3    LinkedIn profile.  What was your position after

 4    senior director of quality data analytics?

 5         A    Yes.  General manager, Seagate Recovery

 6    Services.

 7         Q    And you were there from June 2010 to

 8    August 2011, correct?

 9         A    Uh-huh.

10         Q    What were your responsibilities in that

11    position?

12         A    Seagate acquired a recovery service

13    business from outside, and I was asked to manage it

14    and integrate it into Seagate company business wise,

15    technology wise, people wise.

16         Q    What was your position after that?

17         A    Yes, senior director, cloud research and

18    analytics.

19         Q    And you were there from August 2011 until

20    May 2015; is that right?

21         A    Correct.

22         Q    What did you do in that position?

23         A    Well, as the title says, Seagate became

24    interested in cloud technology and cloud products,

25    and new organizations were formed focusing on this
```

25

1    field.  And I was building and managing an

2    organization that was responsible for doing research

3    work, in a way ad hoc research activities, and doing

4    analytics and developing analytics solutions for

5    Seagate.

6        Q    In this position, did you deal at all with

7    annualized failure rate?

8        A    Yes.

9        Q    So then you also dealt with mean time

10   between failure?

11       A    Correct.

12       Q    And defective parts per million?

13       A    Correct.

14       Q    Did you deal at all with factory yield in

15   this position?

16       A    Unlikely.

17       Q    And then after that your position was, as

18   we discussed, chief technologist, big data analytics

19   and insights; is that correct?

20       A    Correct.

21       Q    Okay.  You can put the LinkedIn profile to

22   the side.

23           Before you started working at Seagate --

24   and actually, you can refer back to the LinkedIn

25   profile if necessary -- but where did you work prior

36

1        A       It's a very general question.  Everyone at

2    Seagate worked on everything related to everything

3    Seagate makes.  Specifically, I did not work on

4    products.

5        Q       (BY MR. STROUT)  What do you mean by you

6    didn't work on products?

7        A       There's a product reliability

8    organization, and I was always in advanced/research

9    function.  So we could have performed analysis of

10   this or that, or look into some issues, but actual

11   product quality and reliability was not my

12   responsibility or my organization's responsibility.

13       Q       Did you perform any research at all that

14   may have been on or related to the ST3000 drive?

15       A       I'm sure I did.

16       Q       Did you perform any research on any of the

17   external drives that used the ST3000 in them?

18       A       I -- to my recollection, I cannot answer

19   this question as yes or no.  I do not know, do not

20   remember.

21       Q       All right.  That's okay.

22               I'd like to now go back to talk a little

23   bit more about annualized failure rate.

24       A       Uh-huh.

25       Q       I know you spoke of it earlier, but could

37

1    you please define AFR for me?

2        A       If you look at all the drives of a

3    particular model, say, produced during one year, and

4    then you trace their future, the fraction of drives

5    that will come back will represent the annualized

6    return rate.

7            Of the returns that come back, there will

8    be a fraction measurable, sometimes greater,

9    sometimes smaller, fraction of drives that we will --

10   Seagate will call no trouble found, for example, no

11   trouble found, which means when drives are tested

12   internally, nothing wrong could be found with them,

13   and it remains a question why they were returned.

14           There will be another fraction that will

15   be tested and linked to issues outside of expected

16   range of stress.  As I mentioned before, drives that

17   are clearly mishandled, for example, or drives that

18   are electrocuted by poor electric connection,

19   something that could be easily discovered.

20           In the world of the retail, what's called

21   Disty, distribution drives, there will be some other

22   group of drives.  Sometimes they are returned without

23   even being removed from the packaging, essentially.

24   Internally this will be called buyer's remorse cases,

25   something like that.  Essentially somebody buys and

1    then change his mind and returns a drive even without

2    trying.

3            So depending on the application or market,

4    the fraction of not true failures varies, and it

5    could be as great as 80 percent in some cases.  For

6    every 100 returned drives, only 20 will be confirmed

7    as having real problem.  This is not a typical

8    number, but it could be as bad as this.

9        Q    So does AFR -- that does not include no

10   trouble found drives, right?

11       A    Uh-huh.

12       Q    Or drives that were returned due to

13   buyer's remorse?

14       A    Uh-huh.

15       Q    Or drives that were mishandled?

16       A    Uh-huh.

17            THE REPORTER:  Can I just get you to say

18   yes or no?

19            THE DEPONENT:  Oh, yes.  Yes.

20       Q    (BY MR. STROUT)  Okay.  So -- yeah, I

21   should -- I'll just run through those one more time

22   just because you said uh-huh instead of yes.

23            So AFR does not include drives --

24       A    Sorry.

25            MR. SHARMA:  Take your time.

39

1          THE VIDEOGRAPHER:  Need some help?

2          THE DEPONENT:  I didn't do --

3          (Discussion off the record.)

4          THE DEPONENT:  Okay.

5      Q     (BY MR. STROUT)  All right.  So AFR does

6  not include drives where there is no trouble found?

7      A     Correct.

8      Q     And it does not include drives that were

9  returned due to what you characterized as buyer's

10  remorse?

11      A     Correct.

12      Q     And AFR also does not include drives that

13  were misused?

14      A     I believe so.

15      Q     Does Seagate calculate AFR, you know,

16  prior to releasing a drive?

17          MR. SHARMA:  Objection, lack of

18  foundation.

19      Q     (BY MR. STROUT)  You can answer.

20          THE DEPONENT:  How is that --

21          MR. SHARMA:  If you know the answer --

22  yeah, if you know the answer to the question --

23      Q     (BY MR. STROUT)  You can answer.

24          MR. GOLDICH:  We normally just ignore

25  them.

67

1    Is it 5?

2              THE REPORTER:  6.

3              MR. STROUT:  6, all right.

4              I'm now marking as Exhibit 6 the document

5    Bates labeled FED_SEAG 0019045.

6              (Exhibit 6 marked.)

7       Q    (BY MR. STROUT)  All right.  Have you seen

8    this document before?

9       A    I have not seen this document before.  It

10   looks like a product manual, again typical product

11   manual for a Seagate product.

12      Q    All right.  I represent to you that this

13   document was produced by Seagate during discovery in

14   this case.  Right there on the first page it says

15   Product Manual, Barracuda; is that right?

16      A    Yes, correct.

17              MS. MCLEAN:  I'd also like to note, as I

18   did yesterday, that this document appears to be a

19   draft.  It's not clear that it -- it was released to

20   the public because it has redlines in it.

21      Q    (BY MR. STROUT)  Underneath where it says

22   Barracuda it says ST3000DM001; is that right?

23      A    Yes, that's correct.

24      Q    And this document is dated April 2011,

25   right?

68

```
1           A      Correct.

2           Q      And the data sheet that we were just

3   talking about, the copyright date was 2011, right?

4                  MR. SHARMA:  Take a look at it if you need

5   to.

6           A      That's correct.

7           Q      (BY MR. STROUT)  Please turn to Page

8   19056.

9           A      Uh-huh.  Yes.

10          Q      Do you see on this table where it says

11  annualized failure rate?

12          A      Yes, I can see.

13          Q      Okay.  And there's a column on here for

14  the ST3000 drive; is that right?

15          A      Yes, that's correct.

16          Q      And the annualized failure rate for the

17  ST3000 is listed as .34 percent; is that right?

18          A      I can see.

19          Q      Do you know why it says .34 percent here,

20  whereas in the data sheet we just looked at it said

21  less than 1 percent?

22                 MR. SHARMA:  Objection, lacks foundation,

23  calls for speculation.

24          A      I don't know.

25          Q      (BY MR. STROUT)  Okay.
```

81

1



82

1



84



85



86



88



89



90



95



96



97





100



101



126



127



128



129



204

1    STATE OF COLORADO)

2                      )  ss.   REPORTER'S CERTIFICATE

3    COUNTY OF DENVER )

4            I, Pamela J. Hansen, do hereby certify that

5    I am a Registered Professional Reporter and Notary

6    Public within the State of Colorado; that previous to

7    the commencement of the examination, the deponent was

8    duly sworn to testify to the truth.

9            I further certify that this deposition was

10   taken in shorthand by me at the time and place herein

11   set forth, that it was thereafter reduced to

12   typewritten form, and that the foregoing constitutes

13   a true and correct transcript.

14           I further certify that I am not related to,

15   employed by, nor of counsel for any of the parties or

16   attorneys herein, nor otherwise interested in the

17   result of the within action.

18           In witness whereof, I have affixed my

19   signature and seal this 21st day of September, 2017.

20           My commission expires September 3, 2018.

21

22           _____
             Pamela J. Hansen, CRR, RPR, RMR
23           216 - 16th Street, Suite 600
             Denver, Colorado  80202
24

25

# EXHIBIT 15
## [FILED UNDER SEAL]

# EXHIBIT 16
[FILED UNDER SEAL]

# EXHIBIT 17

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2      Including Professional Corporations
   NEIL A.F. POPOVIĆ, Cal. Bar No. 132403
3  ANNA S. McLEAN, Cal. Bar No. 142233
   TENAYA RODEWALD, Cal. Bar No. 307610
4  LIÊN H. PAYNE, Cal. Bar No. 291569
   Four Embarcadero Center, 17th Floor
5  San Francisco, California 94111-4109
   Telephone:    415.434.9100
6  Facsimile:    415.434.3947
   Email:        npopovic@sheppardmullin.com
7                amclean@sheppardmullin.com
                 trodewald@sheppardmullin.com
8                lpayne@sheppardmullin.com

9
   Attorneys for Defendant SEAGATE TECHNOLOGY LLC
10

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**06/30/2017**
**Clerk of the Court**
BY:VANESSA WU
Deputy Clerk

11             SUPERIOR COURT OF THE STATE OF CALIFORNIA

12               FOR THE CITY AND COUNTY OF SAN FRANCISCO

13

14
   TIM POZAR and SCOTT NALICK,          Case No. CGC-15-547787
15 Individually and on Behalf of All Others
   Similarly Situated,                  **DECLARATION OF DAVE ROLLINGS**
16                                       **IN SUPPORT OF DEFENDANT**
                Plaintiffs,             **SEAGATE'S OPPOSITION TO**
17                                       **PLAINTIFFS' MOTION FOR CLASS**
        v.                              **CERTIFICATION**
18
   SEAGATE TECHNOLOGY LLC and DOES      Judge: Hon. Curtis E.A. Karnow
19 1-50,                                Date:  August 9, 2017
                                        Time: 2:00 p.m.
20              Defendants.             Dept.: 304

21

22

23

24

25

26

27

28

SMRH:483305653.2      DECLARATION OF DAVE ROLLINGS ISO SEAGATE'S OPPOSITION TO PLAINTIFFS'
                                                MOTION FOR CLASS CERTIFICATION

1    I, Dave Rollings, declare as follows:

2        1.      I have personal knowledge of the facts set forth in this declaration, and, if called as

3    a witness, could and would competently testify to their truth.

4        2.      I have worked at Seagate Technology LLC ("Seagate") since 1988. I have worked

5    as a customer-facing Field Applications Engineer since 1998. In this role, I work with Seagate

6    customers to understand what applications they are using and to advise them on using the proper

7    hard drives ("HDDs") for the application. If customers experience issues with Seagate's HDDs, I

8    troubleshoot those issues by working directly with them. This can involve doing onsite visits with

9    customers, pulling the appropriate logs and information from the customer's HDDs and systems,

10   and delivering these logs and information to Seagate's Design Center for failure analysis. If the

11   customer is interested in the results of failure analysis testing, I am responsible for reporting these

12   results to the customer.

13       3.      It is my understanding that Seagate HDDs with model number ST3000DM001 (the

14   "Drives") are at issue in this action. The Drives were marketed under numerous names, including

15   the Barracuda and the Backup Plus. The Drives are consumer, desktop HDDs that are not

16   designed for use in enterprise applications.

17       4.      I was the Field Applications Engineer responsible for assisting and advising

18   Backblaze Inc. ("Backblaze"). As part of my relationship with Backblaze, I visited Backblaze's

19   corporate headquarters in San Mateo. While I was there, they showed me the Backblaze Pod 2.0

20   design and I talked to Backblaze about the design. HDDs in the Pod 2.0 design were mounted

21   between guides, with the upper part of the HDDs held in place with rubber bands to prevent the

22   HDDs from banging against the guides in the pod. I advised Backblaze that holding the upper part

23   of the HDDs in place with rubber bands could contribute to HDD failure by coming loose and

24   allowing excessive vibration between the HDDs. I also expressed concern to Backblaze that the

25   Pod 2.0 design would contribute to mishandling of the HDDs.

26       5.      Some of the HDDs installed in the Backblaze Pod 2.0 were the Drives. I advised

27   Backblaze that the Drives were not appropriate for Backblaze's data system, which is an enterprise

28   cloud storage application that runs 24/7. Backblaze employees informed me that Backblaze

-2-

1    employs a cost-driven business model and that Backblaze did not want to incur higher costs by

2    purchasing more expensive enterprise class HDDs.

3        6.     At some point in 2014, Backblaze reported experiencing unusually high failure

4    rates with the Drives. Prior to Backblaze's report, I was not aware of any customer complaints

5    regarding the performance of the Drives or high failure rates associated with the Drives.

6        7.     I obtained logs from the Drives that Backblaze pulled from its system due to

7    alleged failure. The logs showed a high number of "No Trouble Found" ("NTF") results, which

8    indicates an HDD is operating properly. I also obtained physical drives that were pulled from

9    Backblaze's pods due to alleged failure. I performed verification tests on these Drives. I also

10    worked with Seagate's Design Center in performing failure analyses on these Drives. To the

11    extent that Seagate's testing confirmed certain Drives had failed, no one root cause or consistent

12    pattern of failure was identified. Seagate's testing did not reveal any inherent defect in the Drives

13    themselves.

14        8.     I think it is likely that the problems Backblaze reported were primarily due to

15    Backblaze inappropriately using these consumer, desktop Drives in its 24/7, enterprise

16    environment for which the Drives were not designed. Backblaze's Pod 2.0 design, which was

17    subject to excessive drive vibration and drive mishandling, probably also contributed to the failure

18    rate Backblaze reported.

19        9.     Plaintiffs have asserted that Seagate concluded Backblaze's storage pods worked

20    properly and that testing results pointed to issues with the Drives rather than Backblaze's storage

21    pod design. Seagate only tested Backblaze's Pod 3.0 and 4.0 designs. The reports Seagate

22    produced about the Pod 3.0 and 4.0 design are not applicable or transferrable to the Pod 2.0 design

23    because: (1) Backblaze upgraded its pod design and replaced the rubber bands used in the Pod 2.0

24    design with lids that clamped down on the installed HDDs and were intended to reduce vibration,

25    as Backblaze reported (https://www.backblaze.com/blog/180tb-of-good-vibrations-storage-pod-3-

26    0/), and (2) The ST3000DM001 Drives were installed into Backblaze's Pod 2.0 design, not the

27    Pod 3.0 or 4.0 design.

28

SMRH:483305653.2

1    10.    I declare under penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct.

3    Executed on this ___30___ day of June, 2017, at Cupertino, California.

4    _____
     Dave Rollings

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

# EXHIBIT 18

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
   NEIL A.F. POPOVIC, Cal. Bar No. 132403
3  ANNA S. McLEAN, Cal. Bar No. 142233
   TENAYA RODEWALD, Cal. Bar No. 307610
4  LIÊN H. PAYNE, Cal. Bar No. 291569
   Four Embarcadero Center, 17th Floor
5  San Francisco, California 94111-4109
   Telephone:    415.434.9100
6  Facsimile:    415.434.3947
   Email:        npopovic@sheppardmullin.com
7                amclean@sheppardmullin.com
                 trodewald@sheppardmullin.com
8                lpayne@sheppardmullin.com

9
   Attorneys for Defendant SEAGATE TECHNOLOGY LLC
10

11            SUPERIOR COURT OF THE STATE OF CALIFORNIA

12            FOR THE CITY AND COUNTY OF SAN FRANCISCO

13

14
   TIM POZAR and SCOTT NALICK,           Case No. CGC-15-547787
15 Individually and on Behalf of All Others
   Similarly Situated,                   **DECLARATION OF SEK NAM "ALLEN"**
16                                        **NG IN SUPPORT OF DEFENDANT**
                                          **SEAGATE'S OPPOSITION TO**
17            Plaintiffs,                 **PLAINTIFFS' MOTION FOR CLASS**
                                          **CERTIFICATION**
       v.
18                                        Judge: Hon. Curtis E.A. Karnow
   SEAGATE TECHNOLOGY LLC and DOES        Date:  August 9, 2017
19 1-50,                                  Time: 2:00 p.m.
                                          Dept.: 304
20            Defendants.

21

22

23

24

25

26

27

28

                                    -1-

1    I, Sek Nam "Allen" Ng, declare as follows:

2    1.    I am the Director of Customer Technical Support for the Americas Channel and

3    Original Equipment Manufacturers ("OEMs") at Seagate Technology LLC ("Seagate"). I

4    graduated from the University of Kansas with a Bachelor of Science in Electrical Engineering in

5    1999. I have held engineering positions at various computer and hard drive companies

6    continuously since obtaining my degree.

7    2.    I have personal knowledge of the facts set forth in this declaration, and, if called as

8    a witness, could and would competently testify to their truth.

9    3.    It is my understanding that Seagate hard drives ("HDDs", "drives," or "hard

10    drives") with model number ST3000DM001 are at issue in this action. Seagate sold these HDDs

11    in various products, including the Barracuda and Backup Plus.

12    **HDDs Are Complex Electromechanical Devices That Can Fail For Various Reasons**

13    4.    HDDs with the ST3000DM001 model number were used in many different

14    applications and environments both by Seagate and by consumers and end users. For example,

15    Seagate sold drives with the ST3000DM001 model number as "bare" drives that could be installed

16    by consumers into desktop computers or into external storage systems such as "network attached

17    storage" or "NAS" devices. Consumers could install "bare" drives into desktop computers that

18    they built themselves or into desktop computers or home servers built by computer manufacturers

19    such as Dell, HP, Lenovo, or others. These computers could be configured in a variety of ways

20    and may have differences in other components (e.g. video cards, motherboards, cooling systems)

21    as well. Similarly, consumers could install "bare" drives into NAS systems they assembled

22    themselves or into NAS boxes built by numerous different manufacturers. Typically, NAS boxes

23    might be connected to one or more computers or hand-held devices in a home and used as

24    centralized storage or backup for all of the connected computers or devices.

25    5.    In computers or NAS systems that use more than one HDD, the drives might be

26    used slightly differently than they are used in computers or NAS boxes with only one drive. For

27    example, in systems where several drives are used together, they might be configured as a

28    Redundant Array of Independent Disks ("RAID"). RAID is a storage technology that combines

-2-

　
1  multiple HDDs into one logical unit to improve performance and/or provide data redundancy for

2  reliability.  There are several ways, called Levels, to organize data across the HDDs to achieve a

3  prescribed balance of improved performance and reliability.

4        6.     Seagate also sold drives with model number ST3000DM001 as part of external

5  storage systems manufactured by Seagate.  For example, Seagate sold ST3000DM001 drives as

6  part of Seagate's Backup Plus external backup drives.  These were single drives housed in their

7  own casing that communicated with a computer by USB cable, which is the most common means

8  of connecting backup hard drive products to computer systems.  Seagate also sold drives with

9  model number ST3000DM001 as part of the FreeAgent GoFlex product.

10        7.     The amount and pattern of use the ST3000DM001 drives received could vary

11  widely in all of the above products and environments.

12        8.     HDDs can be affected by the following more general sources of mechanical

13  problems:

14          i.     <u>Contamination</u> – Contamination is a non-specific term that can refer to any

15  particles that may be introduced into the Hard Disk Assembly ("HDA") by assembled

16  components, during the assembly process, from the tools used in assembling the HDA, or as it

17  ages.  The latter can result from Outgassing and Wear over the life of the HDD.  Contamination

18  can also refer to lubricant that is normally present on the surface of the disks (on the media)

19  accumulating in the wrong place within a hard drive.  For example, if the drive is in a high

20  vibration environment, or if the drive is bumped or experiences a mechanical shock, this may

21  cause the read-write head to dip closer to the media and pick up lubrication or "contamination."

22          ii.     <u>Outgassing</u> – Outgassing is the release of volatile materials from the

23  components, adhesives, and lubricants in the HDA as a gas.  These can condense on other

24  components in the HDA if not first trapped in its (activated carbon) recirculation filter.  This can

25  lead to failures if they condense on the Heads or Disks for multiple reasons of which a few are: a)

26  increase Head to Disk separation (flying height), b) Head corrosion , c) unstable Head to Disk air-

27  bearing, d) Head crash, or e) Disk corrosion  leading to grown defects.  Temperature is a key

28

-3-

1  driver of outgassing, and drives that users run in high temperature environments may exhibit

2  higher problems with outgassing.

3         iii.    <u>Wear</u> – Wear is the result of friction between components in contact. This

4  can create contamination as well as just consuming the useful life of the HDD. An important

5  source of wear in the HDA is between the load/unload ramp and the load beam for the Heads

6  when the heads are parked off the Disk. Other sources of wear are the Fluid Dynamic Bearing

7  ("FDB") in the spindle and the pivot bearing on the Actuator Arm. The wear products can lead to

8  failures if they accumulate on the Heads or Disks for multiple reasons of which a few are: a) Head

9  to Disk interference that creates grown defects (and more wear products), b) Head crash, c)

10  increase Head to Disk separation (flying height), or d) Head position tracking errors.

11         iv.    <u>"Random" component failures</u> – Because no components or mechanical

12  systems are ever perfect, a small proportion of each of the components used within hard drives

13  will fail, either because of defects in the components or because of wear over time—leading to

14  some fraction of HDDs failing. Put another way, in any given population of HDDs, some

15  proportion will eventually fail, but the failing drives might have failed for many **different** reasons

16  and causes.

17         9.    Furthermore, the ST3000DM001 drives could have been exposed to any of the

18  following intervening, **external** factors that could cause them to fail:

19         i.    <u>Vibration</u> – As explained above, HDDs are complex assemblies of many

20  parts that need to move very precisely at very high speeds. The HDDs generate rich emitted

21  vibration frequency patterns because of their high spindle speed, spindle imbalances, rapid

22  actuator access times, and HDD system resonant modes. Accordingly they should be adequately

23  secured in the computer case, NAS box, or other environment in which they are used so that these

24  vibrations are suppressed. This is even more important when many HDDs are used together

25  because, if not properly done, the emitted vibrations will be transmitted to neighboring

26  HDDs. These vibrations can combine constructively and be amplified by chassis resonances.

27  This can lead to failures for multiple reasons of which a few are: a) grown defects due to

28  undetected positioning errors while writing, b) Head to Disk interference that creates grown

-4-

1  defects from contamination of undetected excitation of air-bearing resonances, c) high-fly write
2  events that created grown defects, d) Head crashes, e) unstable Head loading (LUL cycles) that
3  create debris leading to a, b, c or d above, f) system time-out error events or slow performance
4  since the HDD cannot position its Heads accurately (HDD does not respond).

5     ii.    <u>Controller Card</u> – In certain systems, HDDs are often used in conjunction
6  with a controller card that allows HDDs to communicate with each other and with the host
7  computer.  Changes to the firmware on the controller card can cause HDDs in the system to
8  malfunction.

9     iii.    <u>Cables</u> – HDDs must be connected to a power source and the controller card
10  or computer motherboard by cables.  If the cable used to connect an HDD to a computer is
11  defective, this may cause connection issues, read or write failures, or otherwise cause the HDD to
12  malfunction.

13     iv.    <u>System Upgrades/Updates</u> – Apple and Microsoft constantly provide
14  customers with computer software updates or upgrades.  Apple iOS and Windows updates can
15  cause external HDDs, such as the Backup Plus, to fail as a result of incompatibilities between the
16  updated operating system and the device firmware interacting with the operating system.

17     v.    <u>Consumer or Shipper Mishandling</u> – Any mishandling of an HDD by end
18  users or by mail carrier services can cause HDDs to fail.  Such mishandling includes dropping
19  items on the HDD, dropping the HDD on hard surfaces, spilling liquids on the HDD, and exposing
20  the HDD to higher or lower temperatures than the temperatures it is designed to withstand.

21     10.    Based on my extensive professional experience with HDDs, it is my understanding
22  that many types of mechanical failure cannot be diagnosed without physically testing and
23  analyzing the drives.

24  **Apple Recall of ST3000DM001 Drives**

25     11.    In June 2015, Apple issued a recall of ST3000DM001.  I am aware of the Apple
26  recall because the Customer Technical Support department is the division within Seagate
27  responsible for managing Apple's account with Seagate.  Apple reported to Seagate that it was
28  seeing a cumulative return rate of around 5% or 6% on drives manufactured approximately two

-5-

1 and one-half years earlier. If true, this would indicate an annual return rate of less than 3%. Even

2 though other Original Equipment Manufacturers ("OEMs") also sold the ST3000DM001 drives in

3 their computers, I am not aware of any other OEMs that were dissatisfied with the 3TB Drives or

4 that issued a recall.

5      I declare under penalty of perjury under the laws of California that the foregoing is true

6 and correct.

7      Executed on this 30th day of June, 2017, at Cupertino, California.

8

9                                        _____

10                               Sek Nam "Allen" Ng

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:483249463.6

DECLARATION OF SEK NAM "ALLEN" NG ISO SEAGATE'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# EXHIBIT 19
## [FILED UNDER SEAL]

# EXHIBIT 20
[FILED UNDER SEAL]

# EXHIBIT 21
[FILED UNDER SEAL]

# EXHIBIT 22

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5    IN RE SEAGATE TECHNOLOGY LLC
     LITIGATION,
6    _____

7
                           CASE NO. 5:16-CV-00523-JCS
8    _____
     CONSOLIDATED ACTION,

9
     _____
10

11

12       VIDEOTAPED DEPOSITION OF NIKOLAS MANAK

13            San Francisco, California

14           Tuesday, June 20, 2017

15

16

17

18

19

20

21

22

23   Reported by:  Ashley Soevyn, CSR No. 12019

24   Job No. 2248

25   Pages 1 - 144

24

1      A    Yes.

2      Q    What is this document?

3      A    It's the receipt for my order for the

4  hard drives from Newegg, which I provided to the

5  attorneys.

6      Q    And when you reference the hard drives,

7  what hard drives are you referring to?

8      A    The two hard drives in the complaint.

9      Q    There's an amount listed that says total

10  amount 219.98.  Is that the purchase price for the

11  hard drives?

12      A    Yes.  It's the combined price for two of

13  them.

14      Q    If you move a little but further up it

15  says:  Minus 50.  Discount for promotion code minus

16  50.

17      A    Yes.

18      Q    Did you receive a discount for your

19  purchase of the hard drives?

20      A    Yes.

21      Q    Do you see the serial number for the hard

22  drives you purchased anywhere in this document?

23      A    No, I don't.

24      Q    And there is a date listed at the top of

25  the document.  May 16, 2013.  Is this the date that

25

1    you purchased the hard drives?

2          A    Yes, I believe it is.

3              MS. PAYNE:  Now I'm introducing Exhibit

4    8, which is, again, an e-mail.

5          (Exhibit 8 marked for identification.)

6              THE WITNESS:  Okay.

7    BY MS. PAYNE:

8          Q    Have you seen this document before?

9          A    Yes.

10         Q    What is this document?

11         A    This is the receipt from Pay-pal for

12   paying for the hard drives in the previous order.

13         Q    Did you use Pay-pal to pay for hard

14   drives ordered from Newegg?

15         A    Yes.

16             MS. PAYNE:  This is Exhibit 9, which is

17   another e-mail.

18         (Exhibit 9 marked for identification.)

19             THE WITNESS:  Okay.

20   BY MS. PAYNE:

21         Q    Have you seen this document before?

22         A    Yes.

23         Q    What is this document?

24         A    This is my shipping confirmation for --

25   wait, no.  It's my sales order confirmation for my

135

1    type of hard drive that you had returned to Seagate?

2         A    Yes.  It was the same model number.

3         Q    Was it a 3 terabyte Barracuda?

4         A    Yes.

5         Q    You testified earlier that when the hard

6    drive failed you lost movies.  What other types of

7    information did you lose?

8         A    Digitally archived copies of my music

9    collection and a few photos.  I can't remember

10   exactly of what, but some of my photo collection was

11   on there, and I hadn't recently synchronized it with

12   what was on my personal computer.

13        Q    Did you read any statements by Seagate

14   about AFR prior to purchasing the Seagate internal 3

15   terabyte hard drive?

16        A    Yes, it was on their data sheet.

17        Q    Did you read any statements by Seagate

18   about the use of 3 terabyte Barracuda hard drives in

19   RAID before purchasing the hard drives?

20        A    Yes.

21        Q    Where did you read those statements?

22        A    On the data sheet.

23        Q    Did you read any statements by Seagate

24   about the use of 3 terabyte Barracuda hard drives in

25   NAS before purchasing the hard drives?

136

1       A    Yes, I did.

2       Q    Did you rely on any of those statements?

3       A    Yes.  Both RAID and NAS were my intended

4    usage so I relied on both of those statements.

5       Q    Did you rely on statements about AFR?

6       A    Yes, I did.  I knew I would be using RAID

7    zero, so there was always the possibility of data

8    loss.  So I relied on their very, very low AFR,

9    which would mean it was very unlikely I would suffer

10    any data loss.

11       Q    Are you aware that the second

12    consolidated amended complaint states that you read

13    the data sheet but it does not specifically state

14    that you relied on statements about AFR, RAID or

15    NAS?

16       A    No, I'm not aware of that.

17       Q    We're finished with documents.

18            What relief are you seeking in this

19    lawsuit?

20       A    I am going to defer to the lawyers on

21    what would be appropriate relief.

22       Q    Is there a different amount that you

23    would have paid for the Seagate 3 terabyte internal

24    Barracudas knowing how long the drive lasted?

25            MR. SIEGEL:  Objection as to form.  Calls

144

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were duly sworn; that a record

8     of the proceedings was made by me using machine

9     shorthand, which was thereafter transcribed under my

10    direction; further, that the foregoing is a true

11    record of the testimony given.

12          I further certify I am neither financially

13    interested in the action nor a relative or employee

14    of any attorney or party to this action.

15          IN WITNESS WHEREOF, I have this date

16    subscribed my name.

17

18    Dated: _____

19

20

21

     _____
22    ASHLEY SOEVYN
     CSR No. 12019
23

24

25

# EXHIBIT 23

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5    IN RE SEAGATE TECHNOLOGY, LLC
     LITIGATION,

6    _____ No. 3:16-cv-00523 JCS

7    CONSOLIDATED ACTION

8    _____

9

10

11

12       Videotape Deposition of Stefan Boedeker,

13    taken at Four Embarcadero Center, 17th Floor,

14    San Francisco, California, on Tuesday, December

15    12, 2017 at 9:29 a.m.

16

17

18

19

20

21

22    REPORTED BY:

23    Mary Hogan CSR No 05386

24

25

284

1    next summer campaign, do the consumers like mango

2    peach better than cherry vanilla, it can be more

3    like a product model case.  I can use product

4    analysis for that.

5              In this case I use conjoint analysis

6    to measure the change if an attribute changes, and

7    if that attribute belongs to something that's very

8    important, the results will be one way, if it

9    belongs to something that is not very important,

10   it has a different impact.

11             My study actually showed that a RAID

12   NAS feature, that was also part of the statement,

13   the RAID, actually was not very important and

14   numbers showed it.

15             Ultimately it was very, very small

16   increase that -- that consumers -- that the price

17   would have changed.  It was pennies.

18             So that showed me that something that

19   was not very important doesn't change demand very

20   much, whereas something that is important in this

21   case changed the demand a lot more.

22        Q    (By Ms. McLean) How did you decide to

23   select the features that you ultimately chose for

24   the conjoint?

25             Capacity, connectivity, and I believe

326

1    I, the undersigned, a Certified Shorthand

2    Reporter for the State of California, do hereby

3    certify that the witness in the foregoing

4    deposition was by me first duly sworn to testify

5    to the truth in the cause herein entitled; that

6    said deposition was taken at the time and places

7    herein stated; that the testimony of said witnes

8    was reported by me and thereafter transcribed

9    under my direction into typewriting; that the

10    foregoing is a full, complete and true record of

11    said testimony;

12         I further certify that I am not of

13    counsel or attorney for either or any of the

14    parties in the foregoing matter, nor in any way

15    interested in the outcome of the cause herein named.

16         IN WITNESS WHEREOF, I have hereunto

17    set my hand this 14th day of December, 2017.

18

19    _____

20    MARY HOGAN, CSR NO. 5386

21

22

23

24

25

# EXHIBIT 24

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5    IN RE SEAGATE TECHNOLOGY LLC
     LITIGATION,
6    _____

7
                              CASE NO. 5:16-CV-00523-JCS
8    _____
     CONSOLIDATED ACTION,
9
     _____
10

11

12       VIDEOTAPED DEPOSITION OF DENNIS CRAWFORD

13            San Francisco, California

14            Thursday, June 15, 2017

15

16

17

18

19

20

21

22

23   Reported by:  Ashley Soevyn, CSR No. 12019

24   Job No. 2244

25   Pages 1 - 149

39

```
 1    Exhibit 5 begin at paragraph 92 and go through

 2    paragraph 99; is that correct?

 3         A    In Exhibit 5?

 4         Q    Yes.

 5         A    92 to 99.

 6         Q    Is that right?

 7         A    It looks right to me.

 8         Q    In Enders Exhibit 2 the allegations that

 9    relate to you begin at paragraph 171 and go through

10    paragraph 187; is that correct?

11         A    That's correct.

12         Q    So it appears that there were more

13    allegations added to -- about you added to Enders

14    Exhibit 2 after the complaint was amended?

15         A    Yes.

16         Q    Were you involved in supplying additional

17    information to plaintiffs' counsel for purposes of

18    amending the complaint?

19         A    I believe, from my recollection, that

20    there were additional questions asked, and to

21    provide additional details around, you know, the set

22    of circumstances to better understand what happened.

23         Q    In Exhibit 5 you refer to having

24    purchased three internal Barracudas in April 2012

25    from TigerDirect.  And in Exhibit 2 from Enders you
```

149

1              I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4              That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a record

8    of the proceedings was made by me using machine

9    shorthand, which was thereafter transcribed under my

10   direction; further, that the foregoing is a true

11   record of the testimony given.

12             I further certify I am neither financially

13   interested in the action nor a relative or employee

14   of any attorney or party to this action.

15             IN WITNESS WHEREOF, I have this date

16   subscribed my name.

17

18   Dated: _____

19

20

21

     _____

22   ASHLEY SOEVYN
     CSR No. 12019

23

24

25

# EXHIBIT 25

## Consumer Protection Statutes

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Alabama (Ala. Code 1975 §8-19-1, et seq.)** | No. Ala. Code §8-19-10(f). | Yes. Ala. Code §8-19-10(a); *Billions v. White and Stafford Furniture Co., Inc.*, 528 So.2d 878 (Ct. Civ. App. 1988). | No. Only some of the listed deceptive acts have an intent element. *See* Ala. Code §8-19-5. | Undecided. | 1 year from when person should have discovered the violation and no longer than 4 years after the transaction. Ala. Code §8-19-14. | Yes. Ala. Code §8-19-10€. | Yes. Ala. Code §8-19-10(a)(1). | Yes. Ala. Code §8-19-10(a)(2). | No. Ala. Code §8-19-10(a)(2); *Register v. Rus of Auburn*, 193 F.Supp.2d 1273 (M.D. Ala. 2002). | Yes. Ala. Code §8-19-10(a)(3). | Yes. Ala. Code §8-19-10(a)(3). | Yes, if action was frivolous, bad faith, or brought for harassment. Ala. Code §8-19-10(a)(3). |
| **Alaska (Alaska Stat. §§ 45.50.471-.561)** | Yes. *See, e.g., Turner v. Alaska Comms. Sys. Long Distances, Inc.*, 78 P.3d 264, 266-70 (Alaska 2003). | Yes - actual loss of money or property. AS §45.50.531(a); *Garrison v. Dixon*, 19 P.3d 1229, 1235 n.22 (Alaska 2001). | No. *Kenai Chrysler Ctr., Inc. v. Denison*, 167 P.3d 1240, 1255 (Alaska 2007). | No. *See* AS §45.50.531 (a); *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 534 (Alaska 1980). | 2 years from date violation was or reasonably should have been discovered. AS 45.50.531(f). | Yes, but only before an action for injunctive relief. AS §45.50.535. | Yes. AS §45.50.531(a). | Yes, is mandatory. AS §45.50.531(a) | Yes - recoverable in addition to treble damages. AS §45.50.531; *Kenai Chrysler*, 167 P.3d at 1260. | Yes. AS §§ 45.50.531 (a), 45.50.535. | Yes. AS §45.50.537. | Yes - mandatory if the action was frivolous or done to gain business advantage. AS §45.50.537 (b)-(c). |
| **Arizona (Ariz. Rev. Stat. §§ 44-1521 through 44-1534)** | Yes. *See, e.g., Ventures Edge Legal PLLC v. GoDaddy.com LLC*, 2016 Wl 3570465 (D. Ariz. July 1, 2016). | Yes - distinct and palpable injury. *Fernandez v. Takata Seat Belts, Inc.*, 108 P.3d 917, 919 (Ariz. 2005). | Yes, but only intent for the conduct, not intent to deceive. Ariz. Rev. Stat. § 44-1522(A); *Powers v. Guaranty RV, Inc.*, 229 Ariz. 555 (Ariz. Ct. App. 2012). | Yes, even if unreasonable. Ariz. Rev. Stat. § 44-1522(A); *Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004); *Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz. 1992). | 1 year from when cause of action accrues. Ariz. Rev. Stat. § 12-541(5); *Ventures Edge Legal PLLC v. GoDaddy.com LLC*, 2016 Wl 3570465 (D. Ariz. July 1, 2016). | No. | Yes. *Holeman*, 803 F. Supp. at 242; *Nataros v. Fine Arts Gallery of Scottsdale, Inc.*, 612 P.2d 500, 504 (Ariz. Ct. App. 1980). | No. *See generally* Ariz. Rev. Stat. §§ 44-1528, 44-1531. | Yes, but only when the conduct is wanton or reckless or involves spite or ill will. *Holeman*, 803 F. Supp. at 242-43; *Howell v. Midway Holdings, Inc.*, 362 F. Supp. 2d 1158, 1165 (D. Ariz. 2005). | Unclear if private right to equitable relief exists. Statute only allows for State Atty General to initiate. Ariz. Rev. Stat. §§ 44-1528, 44-1531. | No, only allowed for defendant if plaintiff had rejected settlement offer higher than final judgment. Ariz. Rev. Stat. § 12-341.01(A); *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573 (1974). | |
| **Arkansas (A.C.A. §4-88-101, et seq.)** | No. A.C.A. §4-88-113(f)(1)(B). | Yes, requires proof of financial loss. A.C.A. §4-88-113(f)(1)(A), (f)(2); *Skalla v. Canepari*, 2013 Ark. 415 (2013). | No, but some of the listed unlawful acts have an intent element. A.C.A. §4-88-107. | Yes. A.C.A. §4-88-113(f)(1)(A). | 5 years from the violation. A.C.A. §4-88-115. | No. | Yes. A.C.A. §4-88-113(f)(1)(A). | No. *See generally* A.C.A. §4-88-113(f)(1)(A). | No. *See generally* A.C.A. §4-88-113(f)(1)(A). | No, only can be initiated by state Attorney General. A.C.A. §4-88-113(a); *Baptist Health v. Murphy*, 2010 Ark. 358 (2010). | Yes. A.C.A. §4-88-113(f)(3). | Yes. A.C.A. §4-88-113(f)(3). |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **California UCL (Cal. Bus. & Prof. Code §17200, et seq.)** | Yes. Cal.Bus. & Prof. Code § 17203. | Yes. Cal.Bus. & Prof. Code §§17203, 17204 | No. *Cortez v. Purolator Air Filtration Products Co.*, 999 P.2d 706 (Cal. 2000). | Yes, by named plaintiffs. *In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009). | 4 years from when cause of action accrues. Cal.Bus. & Prof. Code §17208. | No. | Equitable relief is the only available remedy under the UCL. Cal. Bus. & Prof. Code §17203; *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (Cal. 2003). | | | | No, unless plaintiffs establish entitlement to fees as a private attorney general under Cal. C.C.P. § 1021.5. *Yanting Zhang v. Super. Ct.*, 57 Cal.4th 163, 167 n.4 (2013). | |
| **California FAL (Cal. Bus.& Prof. Code §17500, et seq.)** | Yes. Cal.Bus. & Prof. Code § 17535. | Yes. Cal.Bus. & Prof. Code §17535. | No. Cal.Bus. & Prof. Code §17500. | Yes. *In re Ferrero Litigation*, 794 F.Supp.2d 1107 (S.D. Cal. 2011). | 3 years. Cal. C.C.P. §338; *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012). | No. | Equitable relief is the only available remedy under the FAL. Cal. Bus. & Prof. Code § 17535; *Benson v. Southern California Auto Sales, Inc.*, 239 Cal.App.4th 1198 (2015). | | | | No, unless plaintiffs establish entitlement to fees as a private attorney general under Cal. C.C.P. § 1021.5. *Benson v. S. Cal. Auto Sales, Inc.*, 239 Cal.Appp.4th 1198, 1208 (2015). | |
| **California - CLRA (Cal. Civ. Code § 1750, et seq.)** | Yes. Cal. Civ. Code §§ 1752, 1781(a). | Yes. Cal. Civ. Code § 1781(a). | No. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012). | Yes. *Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201 (2012). | 3 years from date of wrongful act. Cal. Civ. Code § 1783. | Yes, at least 30 days' notice. Cal. Civ. Code § 1782. | Yes. Cal. Civ. Code § 1780(a)(1). | No. | Yes. Cal. Civ. Code § 1780(a)(4). | Yes. Cal. Civ. Code § 1780(a)(2)-(3). | Yes. Cal. Civ. Code § 1780(e). | Yes, if plaintiff's action not in good faith. Cal. Civ. Code § 1780(e). |
| **Colorado (Colo. Rev. Stat. §§ 6-1-101, et seq.)** | No, private class actions for damages are prohibited. C.R.S.A. § 6-1-113(2); *Friedman v. Dollar Thrifty Automotive Group, Inc.*, 2015 WL 4036319 (D. Colo. July 1, 2015). | Yes, and must also show injury to public interest. C.R.S.A. § 6-1-113(1)(a); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142 (Colo. 2003). | No, but many of the listed unlawful acts have an intent element. C.R.S.A. §6-1-105 | Causation required. *Crowe v. Tull*, 126 P.3d 196 (Colo. 2006). | 3 years from date violation was or reasonably could have been discovered. C.R.S.A. § 6-1-115. | No. | Yes, but not for class actions. C.R.S.A. § 6-1-113(2)(a). | Yes, but not for class actions. C.R.S.A. § 6-1-113(2)(a). | No. *See generally* C.R.S.A. § 6-1-113(2). | No. *See generally* C.R.S.A. § 6-1- 113(2). | Yes, but not for class actions. C.R.S.A. § 6-1-113(2)(b). | Yes – if claims are "groundless," in bad faith, or meant to harass. C.R.S.A. § 6-1-113(3). |
| **Connecticut (Conn. Gen. Stat. § 42-110a, et seq.)** | Yes. Conn. Gen. Stat. § 42-110g(b). | Yes, and must show that damages are capable of being discovered, observed, or established. Conn. Gen. Stat. § 42-110g(a); *Lentini v. Fidelity Nat. Title Ins. Co. of New York*, 479 F. Supp. 2d 292 (D. Conn. 2007). | No. *H&L Chevrolet, Inc. v. Berkley Ins. Co.*, 110 Conn.App. 428 (Conn. App. Ct. 2008). | No. *Hinchcliffe v. American Motors Corp.*, 440 A.2d 810 (Conn. 1981). | 3 years after date of violation. *See* Conn. Gen. Stat. § 42-110g(f). | No. | Yes. Conn. Gen. Stat. § 42-110g(a). | No. *See generally* Conn. Gen. Stat. § 42- 110g. | Yes where reckless indifference to the rights of others is established. Conn. Gen. Stat. § 42-110g(a); *Fabri v. United Tech. Int'l, Inc.*, 387 F.3d 109 (2d Cir. 2004). | Yes. Conn. Gen. Stat. §§ 42-110g(a), (d). | Yes. Conn. Gen. Stat. § 42- 110g(d). | No. *See generally* Conn. Gen. Stat. § 42-110g(d). |

Consumer Protection Statutes

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Delaware (6 Del. Code § 2511, et seq.)** | Yes. | Yes. Del.C. §2525(a). | No, only intent for omission/concealment. Del. C. § 2513(a); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069 (Del. 1983); *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646 (Del. Sup. 1985). | No. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069 (Del. 1983); *see also Brady v. Publishers Clearing House*, 787 A.2d 111, (Del. Ch. 2001). | 3 years from date violation was or reasonably should have been discovered. 10 Del. C. § 1806; *Pack & Process*, 503 A.2d at 650. | No. | Yes. *Stephenson*, 462 A.2d at 1076. | No. | Yes, for gross, oppressive, or aggravated fraud. *Stephenson*, 462 A.2d at 1076-77. | Yes, but only when necessary. Del. C. § 2523. | No. *DiSimplico v. Equitable Variable Life Ins. Co.*, 1988 WL 15394 (De. Sup. Jan. 29, 1988). | No. *DiSimplico v. Equitable Variable Life Ins. Co.*, 1988 WL 15394 (De. Sup. Jan. 29, 1988). |
| **District of Columbia (D.C. Code § 28-3901 to 28-3913)** | Yes. DC ST §28-3905(k)(1)(B); *see, e.g., Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714 (D.C. 2003). | No. DC ST §§ 28-3904, 28-3905(k); *Wells*, 210 F.R.D. at 8. | No. *Beck v. Test Masters Educ. Servs.*, 994 F. Supp. 2d 90, 93-94 (D.D.C. 2013) (citing *Cannon v. Wells Fargo Bank, N.A.*, 926 F.Supp. 2d 152, 173-74 (D.D.C. 2013)). | No. D.C. Code §§ 28-3904, 28-3905(k); *Wells*, 210 F.R.D. at 8. | 3 years from date violation was or reasonably should have been discovered. D.C. Code § 12-301(8); *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308 (D.C. 2008). | No. | No, treble damages are automatic. D.C. Code § 28-3905(k)(1); *Williams v. First Gov't Mortgage & Investors Corp.*, 225 F.3d 738, 745 (D.C. Cir. 2000). | Yes. DC ST § 28-3905(k)(2). | Yes. D.C. Code § 28-3905(k)(2). | Yes. DC ST § 28-3905(k)(2). | Yes. DC ST § 28-3905(k)(2). | No. *See generally* D.C. Code § 28-3905(k)(1). |
| **Florida (Fla. Stat. §§ 501.201, et seq.)** | Yes. *Egwuatu v. South Lubes, Inc.*, 976 So.2d 50 (Fla. Dist. Ct. App. 2008). | Yes, but injury must not have been reasonably avoidable. F.S.A. §501.211; *Porsche Cars N. Amer., Inc. v. Diamond*, 140 So.3d 1090 (Fla. Dist. Ct. App. 2014); *McGuire v. Ryland Group, Inc.*, 497 F. Supp. 2d 1347, 1355 (M.D. Fla. 2007). | No. *See generally Porsche Cars N. Amer., Inc. v. Diamond*, 140 So.3d 1090 (Fla. Dist. Ct. App. 2014); | Courts are split. Compare *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000) with *Mac-Gray Serv., Inc. v. DeGeorge*, 913 So. 2d 630, 634 (Fla. Dist. Ct. App. 2005). | 4 years after violation. F.S.A. §95.11; *Yusuf Mohamad Excavation, Inc. v. Ringhaver Equip., Co.*, 793 So. 2d 1127 (Fla. Dist. Ct. App. 2001). | No. | Yes. F.S.A. §501.211(2). | No. *See generally* F.S.A.. § 501.211. | No. *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984). | Yes. F.S.A. § 501.211(1). | Yes. F.S.A. §§ 501.2105(1), 501.211(2). | |
| **Georgia - GFBPA (O.C.G.A. § 10-1-390, et seq.)** | No. Ga. Code Ann. § 10-1-399(a) ; *Honig v. Comcast of Georgia*, 537 F. Supp. 2d 1277 (N.D. Ga. 2008). | Yes. Ga. Code Ann. § 10-1-399(a); *Regency Nissan, Inc. v. Taylor*, 391 S.E.2d 467, 470 (Ga. Ct. App. 1990). | No. *Regency Nissan*, 391 S.E.2d at 470; *Henderson v. Gandy*, 270 Ga. App. 827 (2004). | Yes. *Crown Ford, Inc. v. Crawford*, 221 Ga. App. 881 (1996); *Zeeman v. Black*, 156 Ga. App. 82 (1980). | 2 years from date violation reasonably should have been discovered. Ga. Code Ann. § 10-1-401(a)(1). | Yes, 30 days before commencing suit. Ga. Code Ann. §10-1-399(b). | Yes. Ga. Code Ann. § 10-1-399(a); *Conseco Fin. Serv. Corp. v. Hill*, 556 S.E.2d 468, 473 (Ga. Ct. App. 2001). | Yes, only for intentional violations. Ga. Code Ann. § 10-1-399(c); *Conseco Fin. Serv. Corp.*, 556 S.E.2d at 473. | Yes, for intentional violations. Ga. Code Ann. § 10-1-399(a); *Conseco Fin. Serv. Corp.*, 556 S.E.2d at 473. | Yes. Ga. Code Ann. §10-1-399(a). | Yes, but may be limited by rejection of reasonable settlement offer post-notice. Ga. Code Ann. § 10-1-399(d). | Yes, for bad faith or harassment. Ga. Code Ann. § 10-1-399(d). |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Georgia - UDTPA (O.C.G.A. § 10-1-370, et seq.)** | Yes. | No, only a likelihood of future injury. Ga. Code Ann. § 10-1-373(a). | No. Ga. Code Ann. §10-1-373(a). | No. Ga. Code Ann. § 10-1-372(b). | 4 years. Ga. Code Ann. § 9-3-31; *Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199 (11th Cir. 1997). | No. | Only injunctive relief is available. Ga. Code Ann. § 10-1-373(a)-(c); *Catrett v. Landmark Dodge, Inc.*, 560 S.E.2d 101 (Ga. Ct. App. 2002); *Moore- Davis Motors, Inc. v. Joyner*, 556 S.E.2d 137 (Ga. Ct. App. 2001). | | | | Yes, if willful and knowingly deceptive. Ga. Code Ann. §10-1-373(b). | Yes, if groundless action. Ga. Code Ann. §10-1-373(b). |
| **Hawaii (Haw. Rev. Stat. § 480-2)** | Yes. HRS § 480-13(c); *see, e.g., Nakamura v. Countrywide Home Loans, Inc.*, 122 Hawai'I 238 (Ct. App. 2010). | Yes, but not if one is only seeking injunctive relief.. Haw. Re. Stat. §§ 480-13, 481A-4. | No. *See* Haw. Rev. Stat. §§ 480-2, 481A-4; *Davis v. Wholesale Motors*, 949 P.2d 1026 (Haw. Ct. App. 1997). | Causation required *See* Haw. Rev. Stat. § 480-13; *Sambor v. Omnia Credit Services, Inc.*, 183 F. Supp. 2d 1234 (D. Haw. 2002). | 4 years from date cause of action accrues. HRS § 480-24. | No. | Yes. HRS § 480-13(b)(1). | Yes. HRS § 480-13(b)(1). | No, limited to just treble damages. *Zanakis- Pico v. Cutter Dodge, Inc.*, 47 P.3d 1222 (Haw. 2002). | Yes. HRS § 480-13(b)(2). | Yes. Haw. Rev. Stat. §§ 480-13(b)(1)-(2). | No. *See generally* Haw. Rev. Stat. § 480-13. |
| **Idaho (I.C. §48-601, et seq.)** | Yes. I.C. §48-608(1). | Yes. I.C. §48-608(1). | No. *State ex rel. Kidwell v. Master Distributors, Inc.*, 101 Idaho 447 (1980). | No. *In re Edwards*, 233 B.R. 461 (Bankr. D. Idaho 1999). | 2 years from date cause of action accrues. I.C. §48-619. | No. | Yes, but for class actions, capped at $1,000. I.C. § 48-608(1). | No. *See generally* I.C. §48-608(1). | Yes, for repeated or flagrant violations. I.C. §48-608(1). | Yes. I.C. §48-608(1). | Yes. I.C. §48-608(5). | Yes, if action is spurious or brought for harassment. I.C. §48-608(5). |
| **Illinois - CFA (815 ILCS 505/1-505/12)** | Yes. *See, e.g., Miner v. Gillette Co.*, 87 Ill. 2d 7 (1981); *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801 (Ill. 2005). | Yes. 815 ILCS 505/10a; *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 155 (2002). | Yes, intent that consumer rely on the deception. *Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F.Supp.2d 898 (N.D. Ill. 2012). | No. *Empire Home Services, Inc. v. CarpetAmerica, Inc.*, 653 N.E.2d 852 (Ill. Ct. App. 1995). | 3 years after cause of action accrues. 815 ILCS 505/10a(e). | No. | Yes. 815 ILCS 505/10a(a). | No. *Mulligan v. QVC, Inc.*, 382 Ill. App.3d 620, (2008). | Yes. *Dubey v. Public Storage, Inc.*, 918 N.E.2d 265 (Ill. App. Ct. 2009). | Yes. 815 ILCS 505/10a(c). | Yes. 815 ILCS 505/10a(c). | |
| **Illinois - UDTPA (815 ILCS 510/1-510/7)** | Yes. | No, only a likelihood of future injury. 815 ILCS 510/3. | No. 815 ILCS 510/3. | No. 815 ILCS 510/3. | 5 years. *Second Chance Body Armor, Inc. v. American Body Armor, Inc.*, 1996 WL 568794 (N.D. Ill. Sept. 30, 1996). | | Injunctive relief is the only available remedy under the UDTPA. 815 ILCS 510/3. | | | | Yes, for willful deception. 815 ILCS 510/3. | No. *See generally* 815 ILCS 510/3. |

## Consumer Protection Statutes

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Indiana (Ind. Code §§ 24-5-0.5-3(a)(1)-(18))** | Yes. Ind. Code § 24-5-0.5-4(b). | Yes. Ind. Code § 24-5-0.5-4(a). | Yes. *McKinney v. State*, 693 N.E.2d 65 (Ind. 1998). | Yes. Ind. Code § 24-5-0.5-4(a). | 2 years from occurrence of deceptive act. Ind. Code § 24-5-0.5-5(b). | Yes. Ind. Code § 24-5-0.5. | Yes. Ind. Code § 24-5-0.5-4(a). | Yes. Ind. Code § 24-5-0.5-4(a). | No. *See generally* Ind. Code § 24-5-0.5-- 4(a). | No, only the Attorney General can bring an action for equitable relief. *S e e* Ind. Code § 24-5- 0.5-4(c). | Yes. Ind. Code § 24-5-0.5-4(a). | |
| **Iowa (I.C.A. §714.16)** | I.C.A. §714.16 does not provide a private cause of action to enforce its consumer fraud law. | | | | | | | | | | | |
| **Kansas (Kan. Stat. § 50-623, *et seq*.)** | Yes. K.S.A. § 50-634. | Yes. K.S.A. § 50-634(c)-(d); *Finstad v. Washburn Univ. of Topeka*, 845 P.2d 685 (Kan. 1993). | No. *William v. Ewen*, 634 P.2d 1061 (Kan. 1981). | Yes. *Finstad*, 845 P.2d at 689-91. | 3 years after date of violation. K.S.A. § 60-512(c); *Alexander v. Certified Master Builders Corp.*, 1 P.3d 899, 908 (Kan. 2000). | No. | Yes, but only for acts listed in K.S.A. §§50-26, 27, 40. K.S.A. §§ 50-634(d)(1). | No. *See Equitable Life Leasing Corp. v. Abbick*, 757 P.2d 304 (Kan. 1988). | No, must come from a separate cause of action. *See Equitable Life Leasing Corp. v. Abbick*, 757 P.2d 304 (Kan. 1988). | Yes. K.S.A. §§ 50-634(a)(1)-(2), (c). | Yes. K.S.A. § 50-634(e). | Yes, if plaintiff brought or maintained an action they knew to be groundless. K.S.A. § 50-634(e). |
| **Kentucky (KRS §367.110, *et seq*.)** | Yes. | Yes. KRS §367.220(1). | Yes, must show at least gross negligence. *Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343 (2000). | No. *Corder v. Ford Motor Co.*, 869 F.Supp.2d 835 (W.D. Ky. 2012). | Within 2 years of violation. KRS §367.220(5). | No. | Yes. KRS §367.220(1). | No. *See generally* KRS §367.220(1). | Yes. KRS §367.220(1). | Yes. KRS §367.220(1). | Yes. KRS §367.220(3). | |
| **Louisiana (La. Rev. Stat. § 51:1405, *et seq*.)** | No. La. Rev. Stat. §§ 51:1409(A); *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159 (5th Cir. 2004). | Yes. La. Rev. Stat. § 51:1409(A). | Yes - more than mere negligence. *Marshall v. Citicorp Mortg., Inc.*, 601 So. 2d 669 (La. Ct. App. 1992). | No, but must prove causation. La. Rev. Stat. § 51:1409(A). | 1 year from date of transaction giving rise to action. La. Rev. Stat. § 51:1409(A). | No. | Yes. La. Rev. Stat. § 51:1409(A). | Yes – for "knowing" violations after defendant is put on notice by the Attorney General. La. Rev. Stat. § 51:1409(A). | No. La. Rev. Stat. § 51:1409(A). | No. La. Rev. Stat. § 51:1409; *Michaelson v. Motwani*, 372 So.2d 726 (La. Ct. App. 1979). | Yes. La. Rev. Stat. § 51:1409(A) | Yes, if groundless and in bad faith. La. Rev. Stat. § 51:1409(A). |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Maine (5 M.R.S.A. §205, et seq.)** | Yes. *See, e.g., LaRocque ex rel. Spang v. TRS Recovery Services, Inc.*, 285 F.R.D. 139 (D. Me. 2012). | Yes. 5 M.R.S.A. §213(1). | No. *State v. Weinschenk*, 868 A.2d 200 (Me. 2005). | Yes. *GXG Management, LLC v. Young Bros. and Co., Inc.*, 457 F.Supp.2d 47 (D. Me. 2006). | 6 years. 14 M.R.S.A. §752; *State v. Bob Chambers Ford, Inc.*, 522 A.2d 362 (Me. 1987). | Yes. 5 M.R.S.A. §213(1-A). | Yes, but only if the purchase was for personal purposes. 5 M.R.S.A. §213(1). | No. *See generally* 5 M.R.S.A. §213. | Unclear. | Yes. 5 M.R.S.A. §213(1). | Yes. 5 M.R.S.A. §213(2). | No. *See generally* M.R.S.A. §213. |
| **Maryland (MD Code, Commercial Law §13-101, et seq.)** | Yes. *See, e.g., Green v. H&R Block, Inc.*, 735 A.2d 1039 (Md. Ct. App. 1999). | Yes. MD Code , Commercial Law, §13-408(a). | No. *Allen v. Bank of America, N.A.*, 933 F.Supp.2d 716 (D. Md. 2013). | Yes, if for misrepresentation. *Bank of America, N.A. v. Jill P. Mitchell Living Trust*, 822 F.Supp.2d 505 (D. Md. 2011). | 3 years. MD Code , Courts and Judicial proceeding, §5-101; *Greene Tree Home Owners Assn. v. Greene Tree Associates*, 749 A.2d 806 (Md. Ct. App. 2000). | No. | Yes. MD Code , Commercial Law, §13-408(a). | No. *See generally* MD Code , Commercial Law, §13-408. | No. *Frazier v. Castle Ford, Ltd.*, 59 A.3d 1016 (Md. Ct. App. 2013). | Only restitution. MD Code , Commercial Law, §13-408(a); *Hallowell v. Citaramanis*, 88 Md. App. 160 (Md. Ct. Spect. App. 1991). | Yes. MD Code , Commercial Law, §13-408(b). | Yes, if bad faith or frivolous suit. MD Code , Commercial Law, §13-408(c). |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Massachusetts (M.G.L.A. 93A §1, et seq.)** | Yes. M.G.L.A. 93A §9(2). | Yes, can be non-economic. *Bellerman v. Fitchburg Gas and Elec. Light Co.*, 54 N.E.3d 1106 (Mass. 2016). | No. *Aspinall v. Philip Morris Companies, Inc.*, 813 N.E.2d 476 (Mass. 2004). | No, but causation required. *Heller Financial v. Insurance co. of North America*, 573 N.E.2d 8 (Mass. 1991). | 4 years. M.G.L.A. 260 §5A. | Yes. M.G.L.A. 93A §9(3). | Yes. M.G.L.A. 93A §9(1), (3). | Yes, if willful and knowing violation. M.G.L.A. 93A §9(3). | Limited to treble damages. M.G.L.A. 93A §9(3). | Yes. M.G.L.A. 93A §9(1). | Yes, unless plaintiff had rejected earlier reasonable settlement offer. M.G.L.A. 93A §9 (3), (4). | No. *See generally* M.G.L.A. 93A §(4). |
| **Michigan (M.C.L.A. 445.901, et seq.)** | Yes, but limited to unfair acts listed in Section 3. M.C.L.A. 445.911(3). | Yes, for damages. M.C.L.A. 445.911(2), (3). | Yes. *In re OnStar Contract Litigation*, 278 F.R.D. 352 (E.D. Mich. 2011). | No, only required for some of the listed unfair acts. *Evans v. Ameriquest Mortg. Co.*, 2003 WL 734169 (Mich. Ct. App. Mar. 4, 2003). | 6 years after the act or 1 year after the last payment made in the transaction, whichever is later. M.C.L.A. 445.911 (7). | No. *See generally* M.C.L.A. 445.911. | Yes. M.C.L.A. 445.911(2), (3). | No. *See generally* M.C.L.A. 445.911. | Not for class actions. M.C.L.A. 445.911(3); *Peters v. Cars to Go, Inc.*, 184 F.R.D. 270 (W.D. Mich. 1998). | Yes. M.C.L.A. 445.911(1). | Not for class actions. *See* M.C.L.A. 445.911(2), (3); *Gavriles v. Verizon Wireless*, 194 F.Supp.2d 674 (E.D. Mich. 2002). | No. *See generally* M.C.L.A. 445.911. |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minnesota – UDTPA (Minn. Stat. §§ 325D.43-325D.48)** | Yes. *See, e.g., Schlink v. Edina Realty Title*, No. CT 02-018380, 2003 WL 23786984 (Minn. Dist. Ct. Sept. 9, 2003). | Likelihood of future injury; past injuries not actionable. *I-Systems, Inc. v. Softwares, Inc.*, No. Civ. 02-1951 JRTFLN, 2004 WL 742082 (D. Minn. Mar. 29, 2004). | No. M.S.A. § 325D.45(1). | No. *Thompson v. Am. Tobacco Co., Inc.*, 189 F.R.D. 544 (D. Minn. 1999). | 6 years from date of sale. Minn. Stat. § 541.05; *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 926 (8th Cir. 2004). | No. | No - the UDTPA provides injunctive relief only. M.S.A. § 325D.45; *Dennis Simmons, D.D.S, P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336 (Minn. Ct. App. 1999). | | | Yes. M.S.A. § 325D.45(1). | Yes, only if defendant willfully engaged in the trade practice knowing it to be deceptive. M.S.A. § 325D.45(2). | Yes, if plaintiff knew suit was groundless. M.S.A. § 325D.45(2). |
| **Minnesota - CFA (Minn. Stat. §§ 325F.68-325F.70), FSAA (Minn. Stat. Minn. Stat. § 325F.67)** | Yes. *See, e.g., Curtis v. Philip Morris Cos., Inc.*, No. PI01-018042, 2004 WL 2776228 (D. Minn. Nov. 29, 2004). | Yes. *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178 (8th Cir. 2011). | Yes. Minn. Stat. § 325F.69. | Yes. *Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 14 (Minn. 2001); *Higgins v. Harold-Chevrolet-Geo, Inc.*, No. A04-596, 2004 WL 2660923, at *3-4 (Minn. Ct. App. Nov. 23, 2004). | 6 years from date of sale. Minn. Stat. § 541.05; *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 926 (2004). | No. | Yes. Minn. Stat. § 8.31(3a). | No. *See generally* Minn. Stat. § 8.31(3a). | Yes. *Wexler v. Brothers Entertainment Group, Inc.*, 457 N.W.2d 218 (Minn. Ct. App. 1990). | Yes, but not for past injury. *Ponzo v. Affordable Homes of Rochester, LLC*, No. A04-2234, 2005 WL 1804644, at *4 (Minn. Ct. App. Aug. 2, 2005). | Only for prevailing plaintiff. Minn. Stat. § 8.31(3a). | |

## Consumer Protection Statutes

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mississippi (Miss. Code Ann. §75-24-1, et seq.)** | No. Miss. Code Ann. §75-24-15(4). | Yes. Miss. Code Ann. §75-24-15(1). | No. Miss. Code Ann. §75-24-3; *In re Mississippi Medicaid Pharmaceutical Average Wholesale Price Litigation*, 190 So.3d 829 (Miss. 2015). | Unclear, but practice must be "likely to cause" injury. *In re Mississippi Medicaid Pharmaceutical Average Wholesale Price Litigation*, 190 So.3d 829 (Miss. 2015). | None specifically listed for the statute. Would need to use most analogous cause of action. | Yes, must go through informal dispute settlement program first. Miss. Code Ann. §75-24-15(2). | Yes. Miss. Code Ann. §75-24-15(1). | No. *See generally* Miss. Code Ann. §75-24-15(1). | Unclear. | No, can only be brought by state Attorney General. Miss. Code Ann. §75-24-9. | Yes, but only prevailing defendant is entitled to it. Plaintiff's fees awarded based on court's discretion. Miss. Code Ann. §75-24-15; *Wilson v. William Hall Chevrolet, Inc.*, 871 F.Supp.279 (S.D. Miss. 1994). | |
| **Missouri (V.A.M.S. 407.010, et seq.)** | Yes. V.A.M.S. §407.025(2); *see, e.g., Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707 (Mo. Ct. App. 2009). | Yes. V.A.M.S. § 407.025(1); *Schriener v. Quicken Loans*, 774 F.3d 442 (8th Cir. 2014). | No. *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308 (Mo. Ct. App. 2016); *State ex rel. Webster v. AreaCo Inv. Co.*, 756 S.W.2d 633 (Mo. Ct. App. 1988). | No. *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308 (Mo. Ct. App. 2016). | 5 years from time plaintiff sustained damage from the unfair practice. V.A.M.S. § 516.120(2); *Boulds v. Chase Auto Fin. Corp.*, 266 S.W.3d 847 (Mo. Ct. App. 2008). | No. | Yes. V.A.M.S. § 407.025(1). | No. *See generally* V.A.M.S. § 407.025(1). | Yes. *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410 (Mo. 2014). | Yes. V.A.M.S. §407.025(2). | Yes. V.A.M.S. §407.025(2); *Arcese v. Daniel Schmitt & Company*, 504 S.W.3d 772 (Mo. Ct. App. 2016). | |

## Consumer Protection Statutes

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Montana (Mont. Code § 30-14-101, *et seq.*)** | No. Mont. Code § 30-14-133(1). | Yes. Mont. Code § 30-14-133(1). | No. *WLW Realty Partners, LLC v. Continental Partners VIII, LLC*, 381 Mont. 333, 360 P.3d 1112 (2015). | Yes. *Anderson v. ReconTrust Company, N.A.*, 2017 WL 6498065 (Dec. 19, 2017). | 2 years from date violation should have been reasonably discovered. Mont. Code § 27-2-211; *Osterman v. Sears, Roebuck & Co.*, 318 Mont. 342, 80 P.3d 435 (2003). | No. | Yes. Mont. Code § 30-14-133(1). | Yes. Mont. Code § 30-14-133(1). | Yes, but the statutory treble damages are not punitive. If wants to add additional punitive damages on top of treble damages, must show fraud or malice and cannot exceed $10 million. *Plath v. Schonrock*, 314 Mont. 101, 64 P.3d 984 (2003); Mont. Code § 27-1-220; Mont. Code § 27-1-221. | Yes. Mont. Code § 30-14-133(1). | Yes, but for prevailing defendants, need to show plaintiffs' action was frivolous, unreasonable, or without foundation. Mont. Code § 30-14-133(3); *Tripp v. Jeld-Wen, Inc.*, 327 Mont. 146, 112 P.3d 1018 (2005). |
| **Nebraska (Neb. Rev. Stat. § 59-1601, *et seq.*) (Consumer Protection Act)** | Yes. Neb. Rev. Stat. § 25-319. | Yes, and must also show that the act affects the public interest. *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 605 N.W.2d 136 (2000). | No. Neb. Rev. Stat. § 59-1609. | Unclear. | 4 years from accrual of cause of action. Neb. Rev. Stat. § 59-1612. | No. | Yes. Neb. Rev. Stat. § 59-1609. | No, but the court can increase the award up to $1000 more to match actual damages. Neb. Rev. Stat. § 59-1609. | Unclear. | Yes. Neb. Rev. Stat. § 59-1608. | Yes. Neb. Rev. Stat. § 59-1609. | |
| **Nebraska Neb. Rev. Stat. § 87-301, *et seq.* (Uniform Deceptive Trade Practices Act)** | Yes. Neb. Rev. Stat. § 25-319. | No. Neb. Rev. Stat. § 87-303. | No. Neb. Rev. Stat. § 87-303. | No. Neb. Rev. Stat. § 87-303. | Four years from the date of purchase. Neb. Rev. Stat. § 87-303.10. | No. | No. Neb. Rev. Stat. § 87-303. | No. Neb. Rev. Stat. § 87-303. | No. Neb. Rev. Stat. § 87-303. | Yes. Neb. Rev. Stat. § 87-303. | Yes. Neb. Rev. Stat. § 87-303. | |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Nevada (Nev. Rev. Stat. § 41.600)** | Yes. *See Sobel v. Hertz Corp.*, 674 Fed.Appx. 663 (9th Cir. 2017). | Yes. *Sattari v. Wash. Mut.*, 475 Fed. Appx. 648, 648 (9th Cir. 2011). | Most of the prohibited acts' definitions include an intent requirement. *See* Nev. Rev. Stat. §§ 598.0915-598.0925; 41.600(2). | Causation required *Sattari*, 475 Fed. Appx. at 648. | 4 years from date violation was or could have been reasonably discovered. Nev. Rev. Stat. § 11.190(2)(d). | No. | Yes. Nev. Rev. Stat. § 41.600(3)(a)-(b). | No. *See generally* Nev. Rev. Stat. § 41.600(3)(a)-(b). | No. *See generally* Nev. Rev. Stat. § 41.600(3)(a)-(b). | Yes. Nev. Rev. Stat. § 41.600(2). | Yes. Nev. Rev. Stat. § 41.600(3)(a)-(b). | |
| **New Hampshire (RSA 358-A:1, et seq.)** | Yes. RSA § 358-A:10-a; *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 931 A.2d 571 (2007). | Yes. RSA § 358-A:10. | No. RSA § 358-A:10; *Barrows v. Boles*, 687 A.2d 979, 986-87 (N.H. 1996). | Causation required, but not reliance. *Mulligan v. Choice Mortgage Corp. USA*, 1998 WL 544431 (D.N.H. Aug. 11, 1998). | 3 years from date violation was or reasonably could have been discovered. RSA § 358-A:3(IV-a). | No. | Yes. RSA § 358-A:10. | Yes, if willful and knowing violation. RSA § 358-A:10. | No. RSA § 358-A:10. | Yes. RSA § 358-A:10. | Yes. RSA § 358-A:10. | No. *See generally* RSA § 358-A:10. |
| **New Jersey (N.J. Stat. § 56:8-1, et seq.)** | Yes. *See Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 45 (App. Div. 2000). | Yes. *Thiedemann v. Mercedes-Benz U.S.A., LLC*, 183 N.J. 234 (2005). | No. Intent is an element for concealment, suppression, and omission, but is not an element for other unconscionable practices. N.J. Stat. § 56:8-2; *Fenwick v. Kay Am. Jeep, Inc.*, 72 N.J. 372, 377 (1977). | No, but plaintiff must show a causal nexus to loss. *Int'l Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 929 A.2d 1076 (2007). | 6 years from time plaintiff knew or should have known of the claim's existence. N.J.S.A. 2A:14-1; *Mirra v. Holland America Line*, 331 N.J. Super. 86, 91 (App. Div. 2000). | No. | Yes. N.J. Stat. § 56:8-19. | Yes, is mandatory. N.J. Stat. § 56:8-19. | Yes. *Wildstein v. Tru Motors, Inc.*, 227 N.J. Super. 331 (Law. Div. 1988). | Yes. N.J. Stat. § 56:8-19. | Yes. N.J. Stat. § 56:8-19. | No. *See generally* N.J. Stat. § 56:8-19. |
| **New Mexico (N.M. Stat. § 57-12-1, et seq.)** | Yes. N.M. Stat. § 57-12-10 (E); *Fiser v. Dell Computer Corp.*, 144 N.M. 464, 468-69 (2008). | No, but injury is required to recover damages. *Page & Wirtz Constr. Co. v. Solomon*, 794 P.2d 349, 354 (N.M. 1990); N.M. Stat. §§ 57-12-10(A), (B). | Yes, "knowingly." N.M. Stat. §§ 57-12-2(A), (B); *Atherton v. Gopin*, 340 P.3d 630 (N.M. Ct. App. 2014). | No, but causation required for damages. N.M. Stat. § 57-12-10(B); *Lohman v. Daimler-Chrysler Corp.*, 142 N.M. 437, 166 P.3d 1091 (Ct. App. 2007). | 4 years from date of violation. N.M. Stat. Ann. § 37-1-4; *Nance v. L.J. Dolloff Assocs., Inc.*, 138 N.M. 851, 856 (2005). | No. | Yes. N.M. Stat. § 57-12-10(B). | Yes, but only for the named plaintiffs. N.M. Stat. § 57-12-10(B), (E). | Yes, but only up to treble damages. Additional punitive damages can be obtained for separate causes of action. *McLelland v. United Wis. Life Ins. Co.*, 127 N.M. 303 (1999). | Yes. N.M. Stat. § 57-12-10(A). | Yes. N.M. Stat. § 57-12-10(C). | Yes, if the plaintiff's claims were "groundless." N.M. Stat. § 57-12-10(C). |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **New York -N.Y. Gen. Bus. § 349**<br><br>**New York -N.Y. Gen. Bus. § 350** | Yes, but the deceptive act had to have occurred in New York. *See Drizin v. Sprint Corp.*, 12 A.D.3d 245, 785 N.Y.S.2d 428 (App. Div. 2004). | Yes – actual harm. N.Y. Gen. Bus. §§349, 350; *Baron v. Pfizer, Inc.*, 840 N.Y.S.2d 445, 448 (N.Y. App. Div. 2007). | Courts are split. *Compare People v. Wilco Energy Corp.*, 284 A.D.2d 469 (N.Y. App. Div. 2001) with *Samiento v. World Yacht Inc.*, 10 N.Y.3d 70 (N.Y.Ct. App. 2008). | No, but must prove causation. *Baron*, 840 N.Y.S.2d at 448; *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43 (1999).<br><br>Yes. *Bello v. Cablevision Systems Corp.*, 185 A.D.2d 262 (N.Y. App. Div. 1992). | 3 years after plaintiff suffered injury. N.Y. C.L.S. C.P.L.R. § 214(2); *State v. Daicel Chem. Indus., Ltd.*, 840 N.Y.S.2d 8 (2007). | No. | Yes. N.Y. Gen. Bus. §§ 349(h), 350-e(3). | Yes, up to $1000 if defendant "willfully and knowingly" violated § 349.<br><br>Up to $10,000 if defendant "willfully or knowingly" violated §350. | Not allowed for class actions. *See Burns v. Volkswagen of America, Inc.*, 460 N.Y.S.2d 410 (1982). | No. *See generally* N.Y. Gen. Bus. § 349.<br><br>Yes. N.Y. Gen. Bus. § 350-e(3). | Yes. N.Y. Gen. Bus. §§ 349(h), 350-e. | No. *See generally* N.Y. Gen. Bus. §§ 349, 350. |
| **North Carolina (N.C. Gen. Stat. § 75-1.1, *et seq.*)** | Yes. *Crow v. Citicorp Acceptance Co., Inc.*, 319 N.C. 274 (1987). | Yes. N.C. Gen. Stat. § 75-16. | No. *Excel Staffing Serv., Inc. v. HP Reidsville, Inc.*, 616 S.E.2d 349 (N.C. Ct. App. 2005). | Courts are split. Compare *Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 580 (Ct. App. 2003) with *Business Cabling, Inc. v. Yokeley*, 182 N.C. App. 657 (2007). | 4 years from date of violation. N.C. Gen. Stat. § 75-16.2. | No. | Yes. N.C. Gen. Stat. § 75-16. | Yes, is mandatory. N.C. Gen. Stat. § 75-16; *Pearce v. Am. Defender Life Ins. Co.*, 316 N.C. 461, 470 (1986). | No. *Pinehurst, Inc. v. O'Leary Bros. Realty, Inc.*, 79 N.C. App. 51, 62-63 (Ct. App. 1986). | No, unless for lending violations. N.C. Gen. Stat. § 75-19. | Yes, but only if violation was willful. N.C. Gen. Stat. § 75-16.1. | Yes, if plaintiff knew or should have known the action was frivolous and malicious. N.C. Gen. Stat. § 75-16.1. |
| **North Dakota (N.D. Cent. Code §§ 51-15-01 through 51-15-11)** | Yes. *Rose v. United Equitable Ins. Co.*, 651 N.W.2d 683 (N.D. 2002). | Yes. *Ackre v. Chapman & Chapman, PC*, 788 N.W.2d 344 (N.D. 2010). | Yes. N.D. Cent. Code § 51-15-02. | No. N.D. Cent. Code § 51-15-02. | 6 years from time plaintiff knew or should have known of claim's existence. N.D. Cent. Code § 28-01-16. | No. | Yes. N.D. Cent. Code § 51-15-09. | Yes, but only for "knowing" violations. N.D. Cent. Code § 51-15-09. | Yes. *DJ Coleman, Inc. v. Nufarm Americas, Inc.*, 693 F. Supp. 2d 1055 (D. N.D. 2010). | No. Only the Attorney General may seek it. *See* N.D. Cent. Code §§ 51-15-07. | Yes. N.D. Cent. Code § 51-15-09. | Yes, is required that defendants be awarded attorney's fees for frivolous claims. N.D. Cent. Code § 28-26-01. |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ohio (ORC § 1345, et seq.)** | Yes, but only if a prior decision or rule put defendant on notice that the specific conduct at issue was deceptive or unconscionable prior to the subject transaction. ORC §1345.09(B); *Bower v. Int'l Bus. Machines, Inc.*, 495 F. Supp. 2d 837 (S.D. Ohio 2007). | Yes, for each class member. *Felix v. Ganley Chevrolet, Inc.*, 145 Ohio St. 3d 329 (2015). | No. *Rose v. Zaring Homes, Inc.*, 702 N.E.2d 952 (Ohio Ct. App. 1997). | No. *Rose*, 702 N.E.2d at 956. | 2 years after violation or 1 year after termination of proceedings by the Attorney General. O.R.C. § 1345.10(C). | No. | Yes. ORC §§ 1345.09(A), (B). | Not for class actions. ORC § 1345.09(B). | No. *Borror v. MarineMax of Ohio*, 2007 WL 431737 (Ohio Ct. App. Feb. 9, 2007). | Yes. ORC § 1345.09(D). | Yes, but only if defendant knowingly committed a violation. ORC § 1345.09(F). | Yes, if plaintiff brought or maintained an action that was groundless or made in bad faith. ORC § 1345.09(F). |
| **Oklahoma (15 Okla. Stat. § 751, et seq.)** | Yes. *Tibbetts v. Sight 'n Sound Appliance Centers, Inc.*, 2003 OK 72, 77 P.3d 1042; *Walls v. Am. Tobacco Co.*, 2000 OK 66, 11 P.3d 626. | Yes. 15 Okla. Stat. §761.1(A); *Walls*, 2000 OK at ¶ 11, 11 P.3d at 629. | Most of the prohibited practices have an intent element. 1 5 Okla. Stat. § 753. | Causation required *Patterson v. Beall*, 2000 OK 92, 19 P.3d 839, 846-47. | 3 years after date of plaintiff's injury. *Brashears v. Sight "N Sound Appliance Centers, Inc.*, 981 P.2d 1270 (Ok. Ct. Civ. App. 1999). | No. | Yes. 1 5 Okla. St. § 761.1(A). | No. *See* 15 Okla. St. § 761.1(A), (B). | Yes, but not for class actions and only for unconscionable violations. 1 5 Okla. Stat. § 761.1(B). | No. *See generally* 15 Okla. Stat. §761.1. | Yes, up to $10,000. 1 5 Okla. Stat. § 761.1(A). | |
| **Oregon (ORS §646.605, et seq.)** | Yes. ORS §646.638(8). | Yes. *Feitler v. Animation Celection, Inc.*, 170 Or.App. 702 (2000). | Yes. Class members can only recover damages if defendant was "reckless" or "knowing." ORS §646.638(8). | Causation required. *Pearson v. Philip Morris, Inc.*, 358 Or. 88 (2015). | 1 year from discovery of violation. ORS §646.638(6); *Pearson v. Philip Morris, Inc.*, 358 Or. 88 (2015). | No. | Yes. ORS §646.638(1). | No. *See generally* ORS §646.638. | Yes. ORS §646.638(8). | Yes. ORS §646.638(8). | Yes. ORS §646.638(3). | Yes, if plaintiff had no objectively reasonable basis to bring the action. ORS §646.638(3). |
| **Pennsylvania (73 Pa. Stat. § 201-1, et seq.)** | Yes. *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 201-03 (Pa. 2007); *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 444 (Pa. 2001). | Yes. 73 P.S. § 201-9.2(a); *Weinberg*, 777 A.2d at 446. | No. *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145 (Pa. Super. 2012). | Yes. *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 201-03 (Pa. 2007). | 6 years from date plaintiff had sufficient facts to be on notice of the wrong. *Lesoon v. Metropolitan Life Ins. Co.*, 898 A.2d 620, 627 (Pa. Super. 2006). | No. | Yes. 73 P.S. § 201-9.2. | Yes. 73 P.S. § 201-9.2. | No. *McCauslin v. Reliance Fin. Co.*, 751 A.2d 683, 685 (Pa. Super. 2000); *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 401 (3d Cir. 2004). | Yes. 73 P.S. § 201-9.2. | Yes. 73 P.S. § 201-9.2. | No. *See generally* 73 P.S. § 201-9.2. |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Rhode Island (R.I. Gen. Laws §6-13.1-1, et seq.)** | Yes, but limited to plaintiffs who purchased the product for personal or household purposes. Gen. Laws §6-13.1-5.2(a)-(b). | Yes. Gen. Laws §6-13.1-5.2(a). | No. *Long v. Dell, Inc.*, 93 A.3d 988 (R.I. 2014). | Causation required. Gen. Laws §6-13.1-5.2(a). | Adopts the statute of limitations for the most analogous cause of action to the unfair/deceptive act. *Kennedy v. Acura*, 2002 Wl 31331373 (R.I. Sup. Aug. 28, 2002). | No. | Yes. Gen. Laws §6-13.1-5.2(a)-(b). | No, but punitive damages are allowed. *See generally* Gen. Laws §6-13.1-5.2. | Yes. Gen. Laws §6-13.1-5.2(b). | Yes. Gen. Laws §6-13.1-5.2(b). | Yes. Gen. Laws §6-13.1-5.2(d). | Yes. Gen. Laws §6-13.1-5.2(d). |
| **South Carolina (S.C. Code Code §§ 39-5-10 to 39-5-560)** | No. S.C. Code §§ 39-5-140(a); *Dema v. Tenet Phys. Services-Hilton Head, Inc.*, 383 S.C. 115 (2009). | Yes, and must also show injury to the public interest. S.C. Code § 39-5-140(a); *Omni Outdoor Adver., Inc. v. Columbia Outdoor Adver., Inc.*, 974 F.2d 502, 507 (4th Cir. 1992). | No. *Inman v. Ken Hyatt Chrysler Plymouth, Inc.*, 363 S.E.2d 691, 692 (S.C. 1988). | No. S.C. Code § 39-5-140(a); *Inman*, 363 S.E.2d at 692. | 3 years from date violation was or reasonably could have been discovered. S.C. Code § 39-5-150. | No. | Yes. S.C. Code § 39-5-140(a). | Yes, if was "willful or knowing" violation. S.C. Code § 39-5-140(a) | No. *Tousley v. N. Am. Van Lines, Inc.*, 752 F.2d 96 (4th Cir. 1985). | No. *See generally* S.C. Code §§ 39-5-10 to 39-5-560. | Yes. S.C. Code § 39-5-140(a). | No. *See* S.C. Code §§ 39-5-140(a). |
| **South Dakota (S.D. Codified Laws §37-24-21, et seq.)** | Unclear. | Yes, if the plaintiff wants to pursue damages. S.D. Codified Laws § 37-24-31. | No. Only some of the deceptive practices listed have an intent element. S.D. Codified Laws § 37-24-6. | Yes. *Nygaard v. Sioux Valley Hospitals & Health System*, 731 N.W.2d 184 (S.D. 2007). | 4 years after discovery of conduct. S.D. Codified Laws § 37-24-33. | No. | Yes. S.D. Codified Laws § 37-24-31. | No. *See generally* S.D. Codified Laws § 37-24-31. | No. *See generally* S.D. Codified Laws § 37-24-31. | Equitable relief can only be sought by the state Attorney General. *See* S.D. Codified Laws § 37-24-23 | No. *See generally* S.D. Codified Laws § 37-24-31. | No. *See generally* S.D. Codified Laws § 37-24-31. |
| **Tennessee (Tenn. Code Ann. §47-18-101, et seq.)** | No. Tenn. Code Ann. § 47-18-109; *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301 (Tenn. 2008). | Yes. Tenn. Code Ann. § 47-18-109(a)(1). | No. *Fayne v. Vincent*, 301 S.W.3d 162 (Tenn. 2009). | Unclear, but reliance required for fraud and misrepresentation claims. *Hardcastle v. Harris*, 170 S.W.3d 67 (Tenn. Ct. App. 2004). | 5 years after date of transaction. Tenn. Code Ann. § 47-18-110. | No. | Yes. Tenn. Code Ann. § 47-18-109(a)(1). | Yes, if "willful or knowing" violation. Tenn. Code Ann. § 47-18-109(a)(3). | Yes. Tenn. Code Ann. § 47-18-109(a)(3). | Yes. Tenn. Code Ann. § 47-18-109(b). | Yes. Tenn. Code Ann. § 47-18-109€(1) | Yes, if action was frivolous, without merit, or meant to harass. Tenn. Code Ann. § 47-18-109(3)(2). |
| **Texas (Tex. Bus. & Com. Code Ann. §17.41, et seq.)** | Yes. Tex. Bus. & Comm. Code Ann. §17.501. | Yes, includes mental anguish. Tex. Bus. & Comm. Code §17.50(a). | No. Only some of the deceptive practices listed have an intent element. Tex. Bus. & Comm. Code §17.46. | Yes. Tex. Bus. & Comm. Code §17.50(a)(1)(B). | 2 years from discovery of the violation. Tex. Bus. & Comm. Code §17.565. | Yes. Tex. Bus. & Comm. Code §17.505 | Yes. Tex. Bus. & Comm. Code §17.50(b)(1). | Yes, if knowing or intentional violation. Tenn. Bus. & Comm. Code §17.50(b)(1). | No, cannot exceed treble damages. Tex. Bus. & Comm. Code §17.50(h). | Yes. Tex. Bus. & Comm. Code §17.50(b)(2)-(3). | Yes. Tex. Bus. & Comm. Code §17.50(d). | Yes, if groundless, bad faith, or meant to harass. Tex. Bus. & Comm. Code §17.50(c). |

**Consumer Protection Statutes**

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Utah (Utah Code § 13-11-1 to 13-11-23)** | Limited. Class damages only permissible if violation occurred after authority adopted a rule prohibiting the act, the act was declared to violate a final judgment, or act was prohibited by a finalized consent judgment. Utah Code § 13-11-19(4)(a). Otherwise, class is limited to just equitable relief. Utah Code § 13-11-19(3). | Yes. Utah Code § 13-11-19(2), (4). | Yes. *Kee v. R-G Crown Bank*, 656 F. Supp. 2d 1348, 1356 (D. Utah 2009). | Causation required. Utah Code § 13-11-19(2), (4). | 2 years after violation or 1 year after termination of proceedings by the enforcing authority. Utah Code § 13-11-19(8). | No. | Yes. Utah Code § 13-11-19(2), (4). | No. *See generally* Utah Code § 13-11-19. | No. *See* Utah Code § 13-11-19(4)(a). | Yes. Utah Code § 13-11-19(1), (3). | Yes, but only if defendant's act violated the UCSPA. Utah Code § 13-11-19(5). | Yes, if plaintiff brought or maintained an action s/he knew to be groundless. Utah Code § 13-11-19(5). |
| **Vermont (9 V.S.A. §§ 2451 to 2480n)** | Yes. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 331 (2002); *Salatino v. Chase*, 182 Vt. 267 (2007). | No injury required *if* reliance is shown. *Peabody v. P.J.'s Auto Village, Inc.*, 153 Vt. 55 (1989); 9 V.S.A. § 2461(b). | No. *Inkel v. Pride Chevrolet-Pontiac*, 945 A.2d 855, 859 (Vt. 2008); *Winton v. Johnson & Dix Fuel Corp.*, 147 Vt. 236, 243 (Vt. 1986). | No reliance required *if* injury is shown. 9 V.S.A. § 2461(b); *Jordan v. Nissan N. Am.*, 853 A.2d 40, 44 (Vt. 2004). | 6 years. 12 V.S.A. § 511. | No. | Yes. 9 V.S.A. § 2461(b). | Yes. 9 V.S.A. § 2461(b). | Yes, only if defendant acted with malice. *Bruntaeger v. Zeller*, 147 Vt. 247, 253-54 (1986). | Yes. 9 V.S.A. § 2461(b). | Yes. 9 V.S.A. § 2461(b). | Yes. 9 V.S.A. § 2461(b). |
| **Virginia (Va. Code § 59.1.196, *et seq.*)** | No, Virginia law has no provision for class actions in its state law. Va. Code §59.1-204. | Yes. Va. Code §59.1-204(A); *Polk v. Crown Auto, Inc.*, 228 F.3d 541 (5th Cir. 2000); *Alston v. Crown Auto, Inc.*, 224 F.3d 332 (4th Cir. 2000). | Yes. *Weiss v. Cassidy Dev. Corp.*, 63 Va. Cir. 76 (2003). | Yes. *Weiss v. Cassidy Dev. Corp.*, 63 Va. Cir. 76 (2003). | 2 years from date of plaintiff's injury. Va. Code §59.1-204.1; *Schmidt v. Household Fin. Corp.*, 276 Va. 108 (2008). | No. | Yes. Va. Code § 59.1-204(A). | Yes. Va. Code § 59.1-204(A). | No. *See generally* § 59.1-204. | No. Va. Code § 59.1-201; *Physicians Comm. For Responsible Med. v. General Mills, Inc.*, 283 Fed. Appx. 139 (4th Cir. 2008). | Yes, unless defendant made a written offer to cure that was rejected. Va. Code §§ 59.1-198, 59.1-204(B), (C). | No. *See generally* Va. Code § 59.1-204. |

## Consumer Protection Statutes

| | Class actions permitted? | Injury required? | Scienter require? | Reliance required? | Statute of limitations | Pre-suit notice required? | Remedies: Actual damages? | Remedies: Treble damages? | Remedies: Punitive damages? | Remedies: Equitable relief? | Attorney's fees for prevailing P? | Attorney's fees for prevailing D? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Washington (RCW § 19.86.010, et seq.)** | Yes. *See, e.g., Trimble v. Holmes Harbor Sewer Dist.*, 2003 WL 23100273 (Super. Ct. Oct. 6, 2003). | Yes, but plaintiff must also show injury to public interest. RCW § 19.86.090; *Stephens v. Omni Ins. Co.*, 138 Wash.App. 151 (2007). | No. *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986). | Causation required *Hangman Ridge*, 719 P.2d at 539. | 4 years from accrual of cause of action. RCW § 19.86.120. | No. | Yes. RCW § 19.86.090. | Yes. RCW § 19.86.090. | No. *See generally* RCW § 19.86.090. | Yes. RCW § 19.86.090. | Yes. RCW §19.86.090; *Mason v. Mortgage America, Inc.*, 792 P.2d 842 (Wash. 1990). | No. *See generally* RCW § 19.86.090. |
| **West Virginia (W. Va. Code § 46A-1-101, et seq.)** | Yes. *See, e.g., In re West Virginia Rezulin Litigation*, 214 W.Va. 52 (2003). | Yes. W. Va. Code § 46A-6-106(a). | No, but most of the listed deceptive acts have an intent element W. Va. Code § 46A-6-102(7)(M). | Yes. *White v. Wyeth*, No. 35296, 2010 WL 5140048 (W. Va. Dec. 17, 2010). | 4 years from date of violation. W. Va. Code § 46A-5-101(1); *Silvious v. Coca Cola Co.*, 2012 Wl 1565288 (N.D. W. Va. May 2, 2012). | Yes. Consumer must inform seller in writing via certified mail of alleged violation and allow seller 20 days from receipt of notice to make cure offer. W. Va. Code § 46A-6-106(b). | Yes. W. Va. Code § 46A-6-106(a). | No. *See generally* W. Va. Code § 46A-6-106. | No. *Virden v. Altria Group, Inc.*, 304 F.Supp.2d 832 (N.D. W. Va. 2004). | Yes. W. Va. Code § 46A-6-106(a). | No. *See generally* W.Va. Code § 46A-6-106. | Yes, if the defendant had already accepted and performed on the cure offer prior to the action. W. Va. Code § 46A-6-106(h). |
| **Wisconsin - DTPA (Wis. Stat. § 100.18, et seq.)** | Yes. *See, e.g., Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233 (Wis. 2004). | Yes. Wis. Stat. § 100.18(11)(b)(2). | Yes, must have intended to make the representation. *Tietsworth*, 677 N.W.2d at 239. | No, but causation is required.. *K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 732 N.W.2d 792, 798 (Wis. 2007). | 3 years after violation. Wis. Stat. § 100.18 (11)(b)(3). | No. | Yes. Wis. Stat. § 100.18(11)(b)(2). | No. *See generally* Wis. Stat. § 100.18. | Double damages available for violation of prior injunction. Wis. Stat. § 100.18(11)(b)(2). | No. Only the Dept. of Agriculture, Trade and Consumer Protection can seek injunctive relief. Wis. Stat. § 100.18(11). | Yes. Wis. Stat. §100.18 (11)(b)(2). | No. *See generally* Wis. Stat. § 100.18. |
| **Wyoming (W.S. §§ 40-12-101 through 114)** | Yes. W.S. § 40-12-108(b). | Yes. W.S. § 40-12-108(a). | Yes, requires "knowing" violation. W.S. § 40-12-105(a). | Yes. W.S. § 40-12-108(a). | Within earlier of 1 year from discovery of violation or 2 years from consumer transaction AND within 1 year of providing notice to violator. W.S. § 40-12-109. | Yes. Consumer must give written notice within 1 year of initial discovery of the unlawful practice, or within 2 years after the transaction. W.S. § 40-12-109. | Yes. W.S. § 40-12-108(b). | No. *See* W.S. §§ 40-12-108, 114. | No. *See* W.S. §§ 40-12-108, 114. | No. *See* W.S. §§ 40-12-108, 114. | Only for prevailing plaintiffs. W.S. § 40-12-108(b). | No. *See generally* Wis. Stat. § 100.18. |

# EXHIBIT 26



Data Sheet

# Barracuda®

## The Power of One

### Key Advantages

- Double your capacity and drive down costs with the industry's first 1TB-per-disk hard drive technology.

- Up to 3TB capacity with 7200-RPM performance. Why compromise?

- SATA 6Gb/s interface optimizes burst performance

- Seagate AcuTrac™ servo technology delivers dependable performance, even with hard drive track widths of only 75 nanometers.

- Seagate OptiCache™ technology boosts overall performance by as much as 45% over the previous generation.

- Seagate SmartAlign™ technology provides a simple, transparent migration to Advanced Format 4K sectors.

- Free Seagate DiscWizard™ software allows you to install a 3TB hard drive in Windows, including XP, without UEFI BIOS.

### Best-Fit Applications

- Desktop or all-in-one PCs
- Home servers
- PC-based gaming systems
- Desktop RAID
- Direct-attached external storage devices (DAS)
- Network-attached storage devices (NAS)



# Barracuda®
## The Power of One



| Specifications | 3TB[1] | 2TB[1] | 1.5TB[1] | 1TB[1] | 750GB[1] | 500GB[1] | 320GB[1] | 250GB[1] |
|---|---|---|---|---|---|---|---|---|
| Model Number | ST3000DM001 | ST2000DM001 | ST1500DM003 | ST1000DM003 | ST750DM003 | ST500DM002[2] | ST320DM000[2] | ST250DM000[2] |
| Interface Options | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ |
| **Performance** | | | | | | | | |
| Spindle Speed (RPM) | 7200 | 7200 | 7200 | 7200 | 7200 | 7200 | 7200 | 7200 |
| Cache, Multisegmented (MB) | 64 | 64 | 64 | 64 | 64 | 16 | 16 | 16 |
| SATA Transfer Rates Supported (Gb/s) | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 |
| Seek Average, Read (ms) | <8.5 | <8.5 | <8.5 | <8.5 | <8.5 | <11 | <11 | <11 |
| Seek Average, Write (ms) | <9.5 | <9.5 | <9.5 | <9.5 | <9.5 | <12 | <12 | <12 |
| Average Data Rate, Read/Write (MB/s) | 156 | 156 | 156 | 156 | 156 | 125 | 125 | 125 |
| Max Sustained Data Rate, OD Read (MB/s) | 210 | 210 | 210 | 210 | 210 | 144 | 144 | 144 |
| **Configuration/Organization** | | | | | | | | |
| Heads/Disks | 6/3 | 6/3 | 4/2 | 2/1 | 2/1 | 2/1 | 2/1 | 1/1 |
| Bytes per Sector | 4096 | 4096 | 4096 | 4096 | 4096 | 4096 or 512[2] | 4096 or 512[2] | 4096 or 512[2] |
| **Voltage** | | | | | | | | |
| Voltage Tolerance, Including Noise (5V) | +10%/–5.0% | +10%/–5.0% | +10%/–5.0% | +10%/–5.0% | +10%/-5.0% | +10%/–5.0% | +10%/–5.0% | +10%/–5.0% |
| Voltage Tolerance, Including Noise (12V) | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% |
| **Reliability/Data Integrity** | | | | | | | | |
| Contact Start/Stop Cycles | — | — | — | — | — | 50,000 | 50,000 | 50,000 |
| Load/Unload Cycles | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | — | — | — |
| Nonrecoverable Read Errors per Bits Read, Max | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 |
| Annualized Failure Rate (AFR) | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Power-On Hours | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 |
| **Power Management** | | | | | | | | |
| Startup Power (A) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Operating Mode, Typical (W) | 8.0 | 8.0 | 6.70 | 5.90 | 5.90 | 6.19 | 6.19 | 6.19 |
| Idle2 Average (W) | 5.40 | 5.40 | 4.50 | 3.36 | 3.36 | — | — | — |
| Idle Average (W) | — | — | — | — | — | 4.60 | 4.60 | 4.60 |
| Standby Mode (W) | 0.75 | 0.75 | 0.75 | 0.63 | 0.63 | 0.79 | 0.79 | 0.79 |
| Sleep Mode (W) | 0.75 | 0.75 | 0.75 | 0.63 | 0.63 | 0.79 | 0.79 | 0.79 |
| **Environmental** | | | | | | | | |
| Temperature | | | | | | | | |
| Operating (ambient min °C) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating (drive case max °C) | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Nonoperating (ambient °C) | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 |
| **Physical** | | | | | | | | |
| Height (mm/in) | 26.11/1.028 | 26.11/1.028 | 26.11/1.028 | 20.17/0.7825 | 20.17/0.7825 | 19.98/0.787 | 19.98/0.787 | 19.98/0.787 |
| Width (mm/in) | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 |
| Depth (mm/in) | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 |
| Weight (g/lb) | 626/1.38 | 626/1.38 | 535/1.18 | 400/0.88 | 400/0.88 | 415/0.92 | 415/0.92 | 415/0.92 |
| Carton Unit Quantity | 20 | 20 | 20 | 25 | 25 | 25 | 25 | 25 |
| Cartons per Layer | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Cartons per Pallet | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| **Special Features** | | | | | | | | |
| Seagate OptiCache™ Technology | Yes | Yes | Yes | Yes | Yes | No | No | No |
| Seagate AcuTrac™ Technology | Yes | Yes | Yes | Yes | Yes | No | No | No |
| Seagate SmartAlign™ Technology | Yes | Yes | Yes | Yes | Yes | Yes[2] | Yes[2] | Yes[2] |

1 One gigabyte, or GB, equals one billion bytes and one terabyte, or TB, equals one trillion bytes when referring to drive capacity.

2 Seagate ships this drive in both 4K- and 512-byte sectors. SmartAlign technology is included on 4K sector drives. Both drives are functionally and physically equivalent.




Think Green™    ADVANCED AF FORMAT

## www.seagate.com

AMERICAS    Seagate Technology LLC   10200 South De Anza Boulevard, Cupertino, California 95014, United States, 408-658-1000
ASIA/PACIFIC    Seagate Singapore International Headquarters Pte. Ltd.   7000 Ang Mo Kio Avenue 5, Singapore 569877, 65-6485-3888
EUROPE, MIDDLE EAST AND AFRICA    Seagate Technology SAS   16–18, rue du Dôme, 92100 Boulogne-Billancourt, France, 33 1-4186 10 00

© 2011 Seagate Technology LLC. All rights reserved. Printed in USA. Seagate, Seagate Technology and the Wave logo are registered trademarks of Seagate Technology LLC in the United States and/or other countries. AcuTrac, Barracuda, DiscWizard, OptiCache and SmartAlign are either trademarks or registered trademarks of Seagate Technology LLC or one of its affiliated companies in the United States and/or other countries. All other trademarks or registered trademarks are the property of their respective owners. When referring to drive capacity, one gigabyte, or GB, equals one billion bytes and one terabyte, or TB, equals one trillion bytes. Your computer's operating system may use a different standard of measurement and report a lower capacity. In addition, some of the listed capacity is used for formatting and other functions, and thus will not be available for data storage. Actual data rates may vary depending on operating environment and other factors. Seagate reserves the right to change, without notice, product offerings or specifications. DS1737.1-1111US, November 2011

# EXHIBIT 27



Data Sheet

# Barracuda®

## The Power of One

### Key Advantages

- Double your capacity and drive down costs with the industry's first 1TB-per-disk hard drive technology.

- Up to 3TB capacity with 7200-RPM performance. Why compromise?

- SATA 6Gb/s interface optimizes burst performance

- Seagate AcuTrac™ servo technology delivers dependable performance, even with hard drive track widths of only 75 nanometers.

- Seagate OptiCache™ technology boosts overall performance by as much as 45% over the previous generation.

- Seagate SmartAlign™ technology provides a simple, transparent migration to Advanced Format 4K sectors.

- Free Seagate DiscWizard™ software allows you to install a 3TB hard drive in Windows, including XP, without UEFI BIOS.

### Best-Fit Applications

- Desktop or all-in-one PCs
- Home servers
- PC-based gaming systems
- Desktop RAID
- Direct-attached external storage devices (DAS)
- Network-attached storage devices (NAS)



# Barracuda®
## The Power of One



| Specifications | 3TB[1] | 2TB[1] | 1.5TB[1] | 1TB[1] | 750GB[1] | 500GB[1] | 320GB[1] | 250GB[1] |
|---|---|---|---|---|---|---|---|---|
| Model Number | ST3000DM001 | ST2000DM001 | ST1500DM003 | ST1000DM003 | ST750DM003 | ST500DM002[2] | ST320DM000[2] | ST250DM000[2] |
| Interface Options | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ | SATA 6Gb/s NCQ |
| **Performance** | | | | | | | | |
| Spindle Speed (RPM) | 7200 | 7200 | 7200 | 7200 | 7200 | 7200 | 7200 | 7200 |
| Cache, Multisegmented (MB) | 64 | 64 | 64 | 64 | 64 | 16 | 16 | 16 |
| SATA Transfer Rates Supported (Gb/s) | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 | 6.0/3.0/1.5 |
| Seek Average, Read (ms) | <8.5 | <8.5 | <8.5 | <8.5 | <8.5 | <11 | <11 | <11 |
| Seek Average, Write (ms) | <9.5 | <9.5 | <9.5 | <9.5 | <9.5 | <12 | <12 | <12 |
| Average Data Rate, Read/Write (MB/s) | 156 | 156 | 156 | 156 | 156 | 125 | 125 | 125 |
| Max Sustained Data Rate, OD Read (MB/s) | 210 | 210 | 210 | 210 | 210 | 144 | 144 | 144 |
| **Configuration/Organization** | | | | | | | | |
| Heads/Disks | 6/3 | 6/3 | 4/2 | 2/1 | 2/1 | 2/1 | 2/1 | 1/1 |
| Bytes per Sector | 4096 | 4096 | 4096 | 4096 | 4096 | 4096 or 512[2] | 4096 or 512[2] | 4096 or 512[2] |
| **Voltage** | | | | | | | | |
| Voltage Tolerance, Including Noise (5V) | +10%/–5.0% | +10%/–5.0% | +10%/–5.0% | +10%/–5.0% | +10%/-5.0% | +10%/–5.0% | +10%/–5.0% | +10%/–5.0% |
| Voltage Tolerance, Including Noise (12V) | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% | +10%/–7.5% |
| **Reliability/Data Integrity** | | | | | | | | |
| Contact Start/Stop Cycles | — | — | — | — | — | 50,000 | 50,000 | 50,000 |
| Load/Unload Cycles | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | — | — | — |
| Nonrecoverable Read Errors per Bits Read, Max | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 | 1 per 10E14 |
| Annualized Failure Rate (AFR) | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Power-On Hours | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 | 2400 |
| **Power Management** | | | | | | | | |
| Startup Power (A) | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Operating Mode, Typical (W) | 8.0 | 8.00 | 6.70 | 5.90 | 5.90 | 6.19 | 6.19 | 6.19 |
| Idle2 Average (W) | 5.40 | 5.40 | 4.50 | 3.36 | 3.36 | — | — | — |
| Idle Average (W) | — | — | — | — | — | 4.60 | 4.60 | 4.60 |
| Standby Mode (W) | 0.75 | 0.75 | 0.75 | 0.63 | 0.63 | 0.79 | 0.79 | 0.79 |
| Sleep Mode (W) | 0.75 | 0.75 | 0.75 | 0.63 | 0.63 | 0.79 | 0.79 | 0.79 |
| **Environmental** | | | | | | | | |
| Temperature | | | | | | | | |
| Operating (ambient min °C) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating (drive case max °C) | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Nonoperating (ambient °C) | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 | –40 to 70 |
| **Physical** | | | | | | | | |
| Height (mm/in) | 26.11/1.028 | 26.11/1.028 | 26.11/1.028 | 20.17/0.7825 | 20.17/0.7825 | 19.98/0.787 | 19.98/0.787 | 19.98/0.787 |
| Width (mm/in) | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 | 101.6/4.0 |
| Depth (mm/in) | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 | 146.99/5.787 |
| Weight (g/lb) | 626/1.38 | 626/1.38 | 535/1.18 | 400/0.88 | 400/0.88 | 415/0.92 | 415/0.92 | 415/0.92 |
| Carton Unit Quantity | 20 | 20 | 20 | 25 | 25 | 25 | 25 | 25 |
| Cartons per Layer | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Cartons per Pallet | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| **Special Features** | | | | | | | | |
| Seagate OptiCache™ Technology | Yes | Yes | Yes | Yes | Yes | No | No | No |
| Seagate AcuTrac™ Technology | Yes | Yes | Yes | Yes | Yes | No | No | No |
| Seagate SmartAlign™ Technology | Yes | Yes | Yes | Yes | Yes | Yes[2] | Yes[2] | Yes[2] |

1 One gigabyte, or GB, equals one billion bytes and one terabyte, or TB, equals one trillion bytes when referring to drive capacity.

2 Seagate ships this drive in both 4K- and 512-byte sectors. SmartAlign technology is included on 4K sector drives. Both drives are functionally and physically equivalent.

## www.seagate.com


Think Green™



AMERICAS        Seagate Technology LLC    10200 South De Anza Boulevard, Cupertino, California 95014, United States, 408-658-1000
ASIA/PACIFIC        Seagate Singapore International Headquarters Pte. Ltd.    7000 Ang Mo Kio Avenue 5, Singapore 569877, 65-6485-3888
EUROPE, MIDDLE EAST AND AFRICA        Seagate Technology SAS    16–18, rue du Dôme, 92100 Boulogne-Billancourt, France, 33 1-4186 10 00

© 2011 Seagate Technology LLC. All rights reserved. Printed in USA. Seagate, Seagate Technology and the Wave logo are registered trademarks of Seagate Technology LLC in the United States and/or other countries. AcuTrac, Barracuda, DiscWizard, OptiCache and SmartAlign are either trademarks or registered trademarks of Seagate Technology LLC or one of its affiliated companies in the United States and/or other countries. All other trademarks or registered trademarks are the property of their respective owners. When referring to drive capacity, one gigabyte, or GB, equals one billion bytes and one terabyte, or TB, equals one trillion bytes. Your computer's operating system may use a different standard of measurement and report a lower capacity. In addition, some of the listed capacity is used for formatting and other functions, and thus will not be available for data storage. Actual data rates may vary depending on operating environment and other factors. Seagate reserves the right to change, without notice, product offerings or specifications.
DS1737.1-1111US, November 2011

# EXHIBIT 28

1

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5    IN RE SEAGATE TECHNOLOGY LLC
     LITIGATION,
6    _____

7
                          CASE NO. 5:16-CV-00523-JCS
8    _____
     CONSOLIDATED ACTION,

9
     _____
10

11

12      VIDEOTAPED DEPOSITION OF DAVID SCHECHNER

13            San Francisco, California

14            Tuesday, June 6, 2017

15

16

17

18

19

20

21

22

23   Reported by:  Ashley Soevyn, CSR No. 12019

24   Job No. 2240

25   Pages 1 - 154

103

1      A    Exhibit 4.

2      Q    RFP numbers three and four are request

3  for production numbers three and four.

4          Are you currently in possession of any of

5  the hard drives referred to in the complaint?

6      A    I am currently in possession of the hard

7  drive that was sent to me in December 2014.  I don't

8  know the serial number of that drive and whether

9  it's referred to in this complaint or not.

10      Q    In response to request number five, have

11  you searched for all documents, including but not

12  limited to advertising, upon which you relied in

13  connection with your purchases of any of the drives

14  referred to in the complaint?

15      A    I have.

16      Q    Was there any advertising that you relied

17  on?

18      A    There was no advertising that I had

19  saved.

20      Q    Do you remember what you relied on in

21  making the decision to purchase the Backup Plus

22  drive?

23      A    Initially?

24      Q    Yes.

25      A    Sure.  I relied on the advertised

104

1    specifications for the drive, the size, the price,

2    the annualized failure rate; anything that would

3    have been shown on Amazon.  I relied on other

4    customer reviews.

5        Q    Do you remember looking at any other

6    websites other than Amazon?

7        A    I do.  That was listed in here.  I looked

8    at Tiger Direct and at Newegg, I believe, was the

9    third one that I had listed.

10        Q    Do you remember going to the Seagate

11    website?

12        A    I looked up the data sheet for the

13    Barracuda drives, yes.

14        Q    What do you recall reading on the data

15    sheet?

16        A    The annualized failure rate was listed

17    less than 1 percent power on hours of 2,400.

18        Q    Did you save anything you saw on the

19    Seagate websites?

20        A    Not at the time, no.  I didn't.  I have a

21    copy of the data sheet now but I had not saved it at

22    the time.

23        Q    Is there any other document that you

24    relied on, or website that you relied on, in making

25    the decision to purchase the Backup Plus hard drive?

106

1    sit there and be accessed when the backup program

2    ran.

3         Q    At the time that you purchased the

4    external hard drive, the Backup Plus, did you know

5    the model number of the internal drive?

6         A    Not at the time.

7         Q    Where did you find the data about AFR and

8    power-on hours?

9         A    On Seagate's website.

10        Q    Seagate's website for the Backup Plus?

11        A    Seagate's website for Barracuda drives,

12    yeah.

13        Q    Did you know it was a Barracuda drive

14    that was inside the Backup Plus?

15        A    I did.

16        Q    And where did you get that information?

17        A    I couldn't even tell you.  Somewhere

18    online.  It might have been Tom's Hardware.  I don't

19    recall.

20        Q    I think we partially covered this before.

21    Have you searched for all of your communications

22    with Seagate?

23        A    Yeah.  Yes.

24        Q    Is it possible that you did not search

25    your sent mail folder on your Gmail account?

154

```
 1              I, the undersigned, a Certified Shorthand

 2    Reporter of the State of California, do hereby

 3    certify:

 4              That the foregoing proceedings were taken

 5    before me at the time and place herein set forth;

 6    that any witnesses in the foregoing proceedings,

 7    prior to testifying, were duly sworn; that a record

 8    of the proceedings was made by me using machine

 9    shorthand, which was thereafter transcribed under my

10    direction; further, that the foregoing is a true

11    record of the testimony given.

12              I further certify I am neither financially

13    interested in the action nor a relative or employee

14    of any attorney or party to this action.

15              IN WITNESS WHEREOF, I have this date

16    subscribed my name.

17

18    Dated: _____

19

20

21
      _____
22    ASHLEY SOEVYN
      CSR No. 12019
23

24

25
```

# EXHIBIT 29

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5    IN RE SEAGATE TECHNOLOGY LLC
     LITIGATION,
6    _____

7
                              CASE NO. 5:16-CV-00523-RMW
8    _____
     CONSOLIDATED ACTION,
9
     _____
10

11

12      VIDEOTAPED DEPOSITION OF CHRISTOPHER NELSON

13            San Francisco, California

14             Friday, June 2, 2017

15

16

17

18

19

20

21

22

23    Reported by:  Ashley Soevyn, CSR No. 12019

24    Job No. 2257

25    Pages 1 - 171

112

1    close quote.  Did you read that statement prior to

2    making your purchase?

3         A    Yes.

4         Q    Did you rely on that statement?

5         A    I did.

6         Q    Were there any other statements from

7    Seagate that you relied on in making your decision

8    to purchase the Backup Plus Three-terabyte hard

9    drive?

10              MR. SIEGEL:  Objection as to form.

11              THE WITNESS:  Can you be more specific.

12   BY MR. POPOVIC:

13        Q    Is there anything else you saw on

14   Seagate's website that influenced your decision to

15   purchase the Three-terabyte Backup Plus hard drive?

16              MR. SIEGEL:  Same objection.  Sorry.

17   Same objection.

18              THE WITNESS:  I believe I had reviewed

19   some technical documents.

20   BY MR. POPOVIC:

21        Q    What technical documents?

22        A    I believe it's referenced in 73.

23        Q    Paragraph 73 of the Second Consolidated

24   Amended Complaint says, "This information appeared

25   in the Barracuda data sheet and the Storage

113

```
1   Solutions Guide, among other places.  See Exhibit
2   B."  Is that what you're referring to?
3        A    Yes.
4        Q    The Barracuda is a different product from
5   the product you purchased; is that correct?
6        A    The Barracuda is a different
7   nomenclature, but it's the same drive.
8        Q    So did you look at materials about the
9   Barracuda product in connection with your purchase
10  of a Backup Plus?
11       A    I believe what I referred to was the
12  three-terabyte -- the three-terabyte hard drive
13  information, because it's the same drive externally
14  as it is internally, I believe.  Or at least that's
15  what I was led to believe.
16       Q    Is there any other specific information
17  from Seagate that you can recall, as you're sitting
18  here right now, that you relied on in making your
19  decision to purchase a Backup Plus Three-terabyte
20  hard drive?
21            MR. SIEGEL:  Same objection.
22            THE WITNESS:  I can't specifically recall
23  at this time.
24  BY MR. POPOVIC:
25       Q    At the time you purchased your Seagate
```

Nelson, Christopher - 06-02-2017

114

1    Three-terabyte Backup Plus hard drive, did you

2    believe that it was, quote, "one of the most stable

3    and reliable 3TB external hard drives on the

4    market," close quote?

5         A    Based on what I read, yes.

6         Q    Based on which things that you had read?

7         A    The information that I had read on the

8    Seagate website.

9         Q    Is that the items that were quoted in

10   Paragraph 67?

11        A    Yes.

12        Q    And anything else?

13        A    I can't recall.  I think so.

14        Q    What else do you think you relied on?  Or

15   let me rephrase that.

16             What else do you think caused you to

17   believe that the drive was one of the most stable

18   and reliable 3TB external hard drives on the market?

19        A    In addition to the documents on Seagate's

20   website and the information, the marketing

21   information, and the information outside of the --

22   on the outside of the box, you mean, or?

23        Q    Well, is that the universe?  Is there

24   anything in addition to those things?

25        A    Not that I can think of.

171

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a record

8    of the proceedings was made by me using machine

9    shorthand, which was thereafter transcribed under my

10   direction; further, that the foregoing is a true

11   record of the testimony given.

12          I further certify I am neither financially

13   interested in the action nor a relative or employee

14   of any attorney or party to this action.

15          IN WITNESS WHEREOF, I have this date

16   subscribed my name.

17

18   Dated: _____

19

20

21

     _____
22   ASHLEY SOEVYN
     CSR No. 12019
23

24

25

# EXHIBIT 30

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5    IN RE SEAGATE TECHNOLOGY LLC
     LITIGATION,
6    _____

7
                      CASE NO. 5:16-CV-00523-JCS
8    _____
     CONSOLIDATED ACTION,
9
     _____
10

11

12       VIDEOTAPED DEPOSITION OF JAMES HAGEY

13            San Francisco, California

14            Monday, July 24, 2017

15

16

17

18

19

20

21

22

23   Reported by:  Ashley Soevyn, CSR No. 12019

24   Job No. 2259

25   Pages 1 - 94

75

1    drives failed?

2         A    I did not.

3         Q    So we talked a little bit about

4    representations regarding AFR and what your

5    interpretation of what AFR was.  I want to do the

6    same for RAID now.

7         A    Okay.

8         Q    So can you tell me what a RAID is?

9         A    It's a redundant array.  It's multiple

10   disks run together so that if one fails you don't

11   lose your data; you just replace one disk that has

12   failed.

13        Q    And given your hobbies with videography

14   and things of that nature, do you use RAID, a RAID

15   configuration, for things like faster speeds?

16        A    I have, but -- I have, but at this time

17   I'm not.

18        Q    So it's mostly for data redundancy that

19   you're using your RAID?

20        A    Correct.

21        Q    So I know that you mentioned that you

22   have a RAID at home now, but you didn't purchase any

23   three-terabyte Barracuda drives for use in a RAID;

24   is that correct?

25        A    Correct.

1      Q    And did you read any of the statements

2  made by Seagate regarding RAID capabilities, or the

3  internal Barracuda's RAID capabilities, prior to

4  purchasing --

5      A    Yes.

6      Q    Sorry -- prior to purchasing the drive?

7      A    Yes.

8      Q    Did you rely on any of those statements

9  considering you weren't going to use the drive on a

10  RAID configuration?

11      A    Yes.

12      Q    Why did you rely on them?

13      A    Because RAID is typically a more critical

14  application of a computer setup where you just

15  cannot afford to lose your data.  And my assumption

16  was that a drive suitable for RAID would be just as

17  suitable for single-drive storage.

18      Q    Gotcha.

19           And just kind of turning to the -- to

20  another term that's used throughout the complaint.

21  Have you heard of a NAS before?

22      A    Yes.

23      Q    Do you know what it?

24      A    Yes.

25      Q    Can you tell me?

94

1            I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4            That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a record

8    of the proceedings was made by me using machine

9    shorthand, which was thereafter transcribed under my

10   direction; further, that the foregoing is a true

11   record of the testimony given.

12           I further certify I am neither financially

13   interested in the action nor a relative or employee

14   of any attorney or party to this action.

15           IN WITNESS WHEREOF, I have this date

16   subscribed my name.

17

18   Dated: _____

19

20

21

     _____
22   ASHLEY SOEVYN
     CSR No. 12019
23

24

25

# EXHIBIT 31

F I L E

San Francisco County Superior

E-SERVICE
61309541
Nov 01 2017
04:44PM
File & ServeXpress

NOV 1 – 2017

CLERK OF THE COURT

BY: _____

Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| TIM POZAR ET AL.,<br><br>              Plaintiffs,<br><br>vs.<br><br>SEAGATE TECHNOLOGY LLC ET AL.,<br><br>              Defendants. | Case No. CGC – 15-547787<br><br><br>**ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

Plaintiffs Tim Pozar and Scott Nalick seek certification of a class action against Seagate Technology LLC.  They claim: Seagate violated (1) the Song-Beverly Consumer Warranty Act because it breached the implied warranty of merchantability in connection with its ST3000DM001 hard disk drives (the Drives); (2) the "fraudulent" prong of the Unfair Competition Law (UCL) through its representations of the Drives' reliability and its omissions regarding the Drives' failure rates; (3) the Consumer Legal Remedies Act (CLRA), primarily by concealing the Drive's failure rates; (4) the "unfair" prong of the UCL; and (5) the "unlawful" prong of the UCL based on its Song-Beverly Act and CLRA violations.

Plaintiffs propose the following class definition:  "All citizens of California who purchased a Seagate hard disk drive with model number ST3000DM001, or who purchased an external drive that contained an ST3000DM001 drive, on or after September 4, 2011." *Id.* 9. Plaintiffs also seek certification of a "Consumer Subclass:"  "All Class Members who purchased a Seagate ST3000DM001 hard disk drive for personal, family, or household purposes." *Id.* at 10.

- 1 -

I heard the certification motion August 9, 2017.  I continued the matter for the submission of supplemental filings, and heard final argument October 31, 2017. In the Conclusion I set a case management conference.

**Evidentiary Issues**

**(1) Amended Schubert Declaration**

(a)  Portions of ¶¶ 7-8

Objections are immaterial because numerosity is uncontested.  Seagate Supp. Brief, 96.

(b)    Exhibit 1 – objection overruled

Seagate has now admitted that Exhibit 1 is "genuine."  Schubert Supp. Decl., Ex. 9 at 4:6. In its supplemental brief, Seagate argues that the document is inadmissible because its statements are not based on personal knowledge and are hearsay.  The emails were sent by Seagate employees from their Seagate email accounts.  They are not hearsay when offered against Seagate.  *See* Evid. Code § 1220.  Second, the email in question on its face seems to recount a statement of the employee's personal knowledge. While that employee has distanced herself from that testimony and implicate another Seagate employee, this does not render the testimony inadmissible, although as indicated below it does severely weaken the value of the evidence.

(c)    Exhibit 2

This exhibit was withdrawn.  Although Plaintiffs respond to the objections to the exhibit in their supplemental filing, the exhibit should not be considered.[1]

(d)    Exhibit 3- objection overruled

Seagate has now admitted that Exhibit 3 is "genuine."  Schubert Supp. Decl., Ex. 9 at 4:17-19.  Seagate argues that the document remains inadmissible because the Seagate employee

---

[1] In some instances, Plaintiffs correctly recognize the exhibits that they have withdrawn.  In others, they do not.

who wrote the email has subsequently stated at deposition that she was recounting what she was told, such that the information is beyond her personal knowledge.  Seagate Supp. Brief, 46.  The statement in the email, that "this drive is truly an issue," may be based on the writer's knowledge based on other emails to which she was a party discussing how to handle the situation related to the Drive.  Her explanation at deposition goes to the weight to be afforded to her email.

(e)    Exhibit 8- objection overruled

Seagate has now admitted that Exhibit 8 is "genuine."  Schubert Supp. Decl., Ex. 9 at 5:2-4.  Seagate argues that the document is irrelevant and constitutes hearsay.  The hearsay objection is meritless because the document was sent by a Seagate employee using a Seagate email account.  Plaintiffs argue that a sentence in the email constitutes an admission that the drives analyzed by Backblaze failed due to issues with the drives.  While this reading of the document is tenuous, it is not such a deviation from the document itself that the document requires additional foundation to establish its relevance.  Schubert Supp. Decl. ¶ 18 (summarizing discovery responses tying "Grenada" name to Drives at issue).  However, again, the content of the exhibit is vague and of practically little value.

(f)    Exhibits 9-10

These exhibits were withdrawn.  Although Plaintiffs respond to the objections to the exhibits in their supplemental filing, the exhibits should not be considered.[2]

(g)    Exhibits 11-12 -- Sustain.

Seagate has now admitted that Exhibits 11-12 are "genuine."  Schubert Supp. Decl., Ex. 9 at 5:15-17, 5:25.  Plaintiff asserts, and Seagate does not dispute, that Exhibit 12 is an email demonstrating the date and authorship of the PowerPoint slide in Exhibit 11, which was attached to the email.  Seagate Supp. Brief, 58.  But the PowerPoint has no present relevance – it refers to

---

[2] See note 1.

failure rates of Seagate's products in general terms.  Amended Schubert Decl., Ex. 11.  The

limited excerpts from the author's deposition do not shed greater light on the import of this

report.  Schubert Supp. Decl., Ex. 6 at 190:6-20.  Importantly, Plaintiffs have not presented any

evidence tying the failure rates discussed in the PowerPoint to the Drives at issue in this

litigation.

(h)    Exhibit 13 -- objection overruled

Seagate has now admitted that Exhibit 13 is "genuine."  Schubert Supp. Decl., Ex. 9 at

6:9-11.  The statement that "Grenada is the highest volume by far" is relevant to indicate that

"Grenada" was the largest source of failures in the "daily report on the 90 day inventory of

failures."  Amended Schubert Decl., Ex. 13.  The "Grenada" products are at issue in this action.

Schubert Supp. Decl., Ex. 10.  Seagate's arguments as to the meaning of the document only go to

the weight to be given to the evidence.  Seagate Supp. Brief, 59 (arguing that it is not clear

whether the reference to "Grenada" drives is limited to the drives in this litigation and that the

use of the phrase "not stable" in the email had nothing to do with defects in the drive, but

statistical sample sizes).

(i)    Exhibits 14, 17 (smaller excerpt from same email)-- Overruled.

Seagate has now admitted that Exhibits 14 and 17 are "genuine."  Schubert Supp. Decl.,

Ex. 9 at 6:22-24, 8:1-3.  Plaintiffs have now submitted evidence that certain "Grenada" products

are at issue in this action.  Schubert Supp. Decl., Ex. 10.  While Seagate argues that only a subset

of 3 TB drives are within the scope of this action, issues with 3 TB drives are clearly discussed in

the email.  Amended Schubert Decl., Ex. 14 at SEAG0010383.  Seagate's arguments undermine

the persuasive power of the email as an admission of latent defects in the Drives at issue in this

action, but they do not entirely destroy the relevance of the document.  The only portion of the

email that clearly relates a statement by someone outside of Seagate is the reference to a "claim" of a failure rate over 30%. (Nevertheless, this email would not be read as an admission that "Grenada Classic" had a failure rate of over 30%.)

(j)    Exhibits 15-16, 18-21

These exhibits were withdrawn. Although Plaintiffs respond to the objections to the exhibits in their supplemental filing, the exhibits are not considered.[3]

(k)    Exhibit 22--Sustain.

Seagate objected to Plaintiffs' request to admit the authenticity of this document. Schubert Supp. Decl., Ex. 9 at 9:12-18. Plaintiffs' evidence does not authenticate the document (Schubert Supp. Decl., Ex. 5 at 57:10-18) and Plaintiffs' Counsel does not have the personal knowledge to do so.

(l)    Exhibit 23--Sustain.

Plaintiffs obtained evidence from Backblaze that is sufficient to address the objection to the foundation for the Backblaze email chain contained in Exhibit 23. Seagate Supp. Brief, 74-75. But the email is inadmissible hearsay. First, Plaintiffs argue that the evidence is not offered for the truth of the matter asserted. *Id.* at 73. The material portions of the email are the representations that Seagate 3TB drives "are failing" and that "Drive Savers has confirmed this is bigger than just us." Amended Schubert Decl., Ex. 23. These points would be material now to the extent that they establish that this email is admissible evidence of widespread failures among the Drives. To serve that purpose, it must be admissible for the truth of the matters asserted. Second, Plaintiffs argue that the email is a business record. Even if considered, the inadmissible Budman Declaration at ¶ 15 does not suffice – if accepted any work email on any subject would

---

[3] See note 1.

be an admissible business record. For instance, there is no testimony regarding how the email was prepared. Evid. Code § 1271(c).

(m)    Exhibit 25--Sustain.

Plaintiffs obtained evidence from Backblaze sufficient to address the objection to the foundation for the Backblaze email chain contained in Exhibit 23. *See* Seagate Supp. Brief, 76. Nevertheless, the email is inadmissible hearsay. First, Plaintiffs argue that the evidence is not offered for the truth of the matter asserted. *Id.* at 75. The material portion of the email is that DriveSavers told a Backblaze employee that DriveSavers rated the unspecified drive model addressed in the email 15% lower recoverability than is standard for Seagate drives. Amended Schubert Decl., Ex. 25. These points would be material now to the extent they establish that this email may be admissible evidence of widespread failures among the Drives. To serve that purpose, it must be admissible for the truth of the matters asserted. Second, plaintiffs argue that the email is admissible as a business record. Assuming that were the case, the email recounts an out of court by DriveSavers, for which plaintiffs have not offered any hearsay exception. (In any event, the email is too general to be useful in this motion.)

(n)    Exhibit 26

This exhibit was withdrawn. Although plaintiffs respond to the objections to the exhibit in their supplemental filing, the exhibit is not considered.[4]

(o)    Exhibit 27-- Sustain.

Seagate has now admitted that Exhibit 27 is "genuine." Schubert Supp. Decl., Ex. 9 at 10:8-10. Nevertheless, the contents of the document are inadmissible hearsay. First, plaintiffs argue that the statements are not hearsay because they are not introduced to prove the truth of the matter asserted. Seagate Supp. Brief, 80. On its face, this Seagate document recounts what

---

[4] See note 1.

"Shutterfly reported" and what "Shutterfly estimated" regarding failure rates of Grenada BP 3TB drives and the cause of those failures – mechanical drive issues. *See* Amended Schubert Decl., Ex. 27. These points would be material now only to extent they establish this email is admissible evidence of widespread failures among the Drives or the cause of Drive failures. To serve that purpose, it must be admissible for the truth of the matters asserted. Second, Plaintiffs argue that the statements are admissible as adoptive admissions. Evid. Code § 1221. The highly redacted document presented contains only two sentences reciting Shutterfly's findings in a section entitled "Study Introduction." Nothing indicates the unidentified author intended to adopt as true the factual representations made by Shutterfly. *People v. Hayes*, 21 Cal.4th 1211, 1258 (1999) (mere recital or description of another's statement does not necessarily constitute adoption of it).

(p)     Exhibits 28-31

These exhibits were withdrawn.

(q)     Exhibit 32--Sustain.

Plaintiffs argue that Seagate has admitted the authenticity of this email, but cite to a different Bates-numbered page. *Compare* Seagate's Supp. Brief, 87 (referring to SEAG0002617); *with* Amended Schubert Decl., Ex. 32 (SEAG0007963). Seagate did admit that the email was genuine. Schubert Supp. Decl., Ex. 9 at 12:4-6. But Seagate stands by its foundation/relevance objection on the basis that it is not clear that the email relates to the Drives at issue in this case. Seagate Supp. Brief, 88-89. This is correct: the email does not provide a basis for concluding that the Drives that are the subject of this litigation are discussed in the email. In their briefing, Plaintiffs rely, without citation, on a quote that is nowhere in the document. Seagate Supp. Brief, 88:14-15.

(r)     Exhibit 33

This exhibit was withdrawn.

(s)    Exhibit 34--Overruled.

Seagate has now admitted that Exhibit 34 is "genuine." Schubert Supp. Decl., Ex. 9 at 12:22-24. Seagate argues that Plaintiffs have not submitted sufficient evidence to establish a foundation for the relevance of the email. Seagate Supp. Brief, 92-93. But Plaintiffs have. Seagate's discovery responses reflect that the "Grenada" and "Grenada BP" are at issue in this litigation. Schubert Supp. Decl., Ex. 10 at 2. Seagate also argues that the statements are inadmissible hearsay. But this is an internal Seagate email stating what "We know" regarding return rates for Grenada drives relative to other drives based on "Standard OEM field data." On its face, this is a party admission that adopts the Standard OEM field data as true. Evid. Code §§ 1220-1221.

(t)    Exhibit 35 --Overruled, admitted only for a limited purpose and not for the truth of the matter asserted.

Seagate has now admitted that Exhibit 35 is "genuine." Schubert Supp. Decl., Ex. 9 at 13:6-8. But the email is, on its face, an email from an Amazon.com employee to several Seagate employees. Plaintiffs argue that it is not submitted for the truth, but to show that customers complained about the drives and that Seagate was aware of such complaints. To the extent Seagate's knowledge of customer complaints may be relevant, the email may be considered. But to the extent this is proposed evidence of the existence of customer complaints, it is inadmissible hearsay. There is no evidence that Seagate adopted the specific statements made in this email and the statement that "We have multiple customer complaints…" is offered for the truth of the matter asserted.

(u)    Exhibit 41

Seagate withdraws its objection because it does not contest numerosity.  Seagate Supp.

Brief, 96.

**(2)  Coughlin Declaration**

(a) Exhibits B-C -- Sustain in part

These are blog posts from Backblaze are inadmissible hearsay if offered for the truth of

the matter asserted, otherwise largely irrelevant.  At best, the blog posts are relevant to provide

context for internal Seagate emails that discuss the Backblaze blog posts.  They are admitted for

that purpose alone.  Coughlin laid a general foundation identifying the documents as such.[5]  The

blog posts discuss the expected failure rate of hard drives and the specific failure rate of

Seagate's hard drives at issue in the present case.  To serve as common evidence that

Backblaze's drives had unexpectedly high failure rates or at least suggest that common evidence

of such fact can be obtained because the fact is true they would have to admitted for their truth.

Seagate's Supp. Brief, 30, 34 (Plaintiffs sole argument for the relevance of the blog posts is their

tendency to prove the failure rate of the Drives).[6]

Plaintiffs have not established the existence of a hearsay exception that would make the

blog posts admissible.  Plaintiffs rely on the business records exception.  Evid. Code § 1271;

Seagate's Supp. Brief, 29, 33-34; Budman Decl. ¶¶ 5-13.  Plaintiffs' argument fails because it

---

[5] Although Plaintiffs state that the Court previously took judicial notice of the blog posts, Plaintiffs fail to observe that the Court did not take judicial notice of the truth of any statements in the blog posts. *See* Order Overruling Demurrers of Seagate Technology, 2-3.  That order has no bearing on the present dispute.

[6] Plaintiffs argue that the "submit factual evidence of Drive failure rates, latent defects, and complaints only to show the types of common evidence that would predominate at a class trial" and not for the truth of the matter asserted. *See* Plaintiff's Supp. Brief, 4.  This does not evade the objection.  While Plaintiffs are correct that they do not need to prove the merits of their case at class certification, Plaintiffs are required to submit substantial evidence showing that they will be able to prove their claims by common evidence at trial.  A court's ruling unsupported by substantial evidence cannot stand. *Am. Honda Motor Co. v. Superior Court*, 199 Cal.App.4th 1367, 1372 (2011) (*Honda*).  The blog posts can only serve, at least in isolation, as proof that common evidence exists if they are admissible for the truth of the matter asserted.  If they are inadmissible, they are not common evidence on which Plaintiffs may rely at trial.

depends on the Budman Declaration, which is inadmissible for want of a proper attestation. *See* C.C.P. § 2015.5.

Even if considered, the evidence submitted does not demonstrate that the blog posts fall within the business records exception. The first blog post states Backblaze's findings the stated topic "How long do disk drives last?" over the course of five years of observations. Coughlin Decl., Ex. B. The second discusses the rate at which Seagate Drives used by Backblaze failed over the course of more than three years. *Id.* at Ex. C. Neither is a contemporaneous record of an act, condition, or event – both are recitations of extemporaneous analyses of events, Drive failures, that occurred over the preceding years. *Reisman v. Los Angeles School Dist.*, 123 Cal.App.2d 493, 503 (1954) (report made two years and two months after accident was not made "at or near the time of the act, condition or event"); *People v. Reyes*, 12 Cal.3d 486, 503 (1974) (opinion's stated in business records are not acts, conditions, or events within the scope of the hearsay exception).

However, the blog posts do have some relevance to provide context for certain Seagate internal emails that are admissible. *See, e.g.,* Amended Schubert Decl., Ex. 1. The blog posts are admitted for that limited purpose.

(b) ¶ 17—Sustain. In any event, this paragraph has little to no weight.

The thrust of the testimony is that, based on the documents Coughlin reviewed, his opinion is that there is "significant evidence" of a quality problem with the Drives that resulted in higher failure rates than advertised. Coughlin Decl. ¶ 17. Accordingly, the purpose of this paragraph is to relate as true case-specific facts derived from the records Coughlin reviewed. Coughlin may only do so if the facts are independently proven by competent evidence or are covered by a hearsay exception. *See Dep't of Fish & Game v. Superior Court*, 197 Cal.App.4th

1    1323, 1351 (2011) (at certification, expert opinion must be examined to determine whether it is

2    supported by the record); *People v. Sanchez*, 63 Cal.4th 665, 686 (2016). Coughlin identifies a

3    handful of documents on which he relies: The Backblaze blog posts and a handful of documents

4    produced in discovery. Coughlin Decl. ¶¶ 14, 18-19, 21; *see also* Seagate Supp. Brief, 7

5    (confirming that Coughlin cited the materials on which his opinion was based and did not rely on

6    uncited materials). Some, but not all, of the documents Coughlin relied on are admissible.

7    Amended Schubert Decl., Exs. 1, 8, 14, 17. As a result that the opinion set forth in this

8    paragraph is based in part on inadmissible hearsay. Importantly, the documents that are

9    admissible for the truth of the matter asserted constitute nothing more than emails. Coughlin's

10   opinion is not useful to aid the trier of fact in interpreting the admissible emails. Amended

11   Schubert Decl., Exs. 1, 8, 14, 17. However, this objection was not made. Seagate Supp. Brief, 5

12   (objecting that this is an improper expert opinion because it is predicated on hearsay).

13   (c)  ¶ 18--Sustain.

14        The paragraph at issue recounts failure rates experienced by Backblaze and Shutterfly,

15   Backblaze's findings, and Seagate's internal findings. Only one of the documents Coughlin

16   cited to support his assertions is admissible. *See* Coughlin Decl. ¶ 18; Amended Schubert Decl.,

17   Ex. 8. It does not support the conclusions set forth in the paragraph.[7] Accordingly, the hearsay

18   objections are sustained.

19   (d)  ¶ 19-- Sustain.

20        The opinions here relate to OEM return rates. While some portions of the cited

21   documents are in the record as Exhibits 1 and 22 to the Amended Schubert Declaration, Exhibit

---

[7] Plaintiffs argue that Exhibit 34 to the Amended Schubert Declaration is identical to one of the documents referenced by Coughlin. Seagate Supp. Brief, 11. On its face, that document references Standard OEM field data regarding return rates. It does not support Coughlin's conclusions in ¶ 18.

22 is inadmissible and in any event neither exhibit supports Coughlin's assertions. Notably, the return rate set forth in Exhibit 22 has been redacted prior to filing.

(e) ¶ 20—Sustained.

Coughlin recounts general facts (the occurrence of "catastrophic floods in Thailand" and a resulting reduction in the worldwide capacity for hard drive production) that putatively tend to provide a reason to expect increasing failure rates in Seagate's Drives. There is no demonstrated logic, but only implied speculation, linking the premise of the floods and defects in the Drives. Compare *Taylor v. Trimble*, 13 Cal. App. 5th 934, 945 n.15 (2017) (expert opinion that does not contain a reasoned explanation illuminating why the facts have convinced the expert need not be relied on). Finally, the reference to Seagate's quality control problems in ¶ 20 are not admissible (see ruling on ¶ 17), making this entire paragraph useless.

(f) ¶ 21  -- Sustain in part (as to opinion regarding defective disk components in Seagate drives) and overrule in part (as to opinion regarding documents suggesting head contamination issues).

Coughlin opines that, based on his review of the documents provided to him, the Drives may have had some specified, and potentially other unspecified, quality issues. The thrust of Seagate's objection is that there is no record to support Coughlin's conclusions. There is one document in the record to loosely support Coughlin's conclusion that the documents reflect some unknown number of Seagate's drives contained head contamination issues. Amended Schubert Decl., Ex. 17. There are no documents in the record to support Coughlin's conclusions regarding defective disk components. The balance of the cited paragraphs contain only general information about possible sources of defects in hard drives. The objection is sustained only to the case-specific opinion regarding defective disk components in Seagate Drives. The opinion

regarding head contamination should be given the weight to which it is entitled based on the underlying documentation, which is only that some contamination may exists on some drives.

(g)  ¶ 22—Sustain. In any event, the assertion of "higher" failure rates in Seagate's Drives has no weight.

In this paragraph, Coughlin tenders his central opinion – based on the "higher" failure rates of Seagate's Drives, the Drives were not of the same quality as those HDDs generally acceptable in the industry and were not suitable for the ordinary consumer use of data storage and backup of a user's files.  As with the conclusions in ¶ 17, the assertion regarding "higher" failure rates in the Drives has insufficient support in the admissible evidence.  The opinion is also not useful, and so inadmissible, because it is unclear what "higher," a relative term, means, that is, as in ¶ 20 (last sentence) one cannot tell what the rate is compared to, and it appears to be based, in significant part, on evidence which is not admissible, such as the BackBlaze and Shutterfly work, and an Apple return rate (see e.g., ¶¶ 18, 19).  The statement regarding ordinary consumers is a legal conclusion, or, if not, it is an unsupported factual assertion.  The Declaration does not indicate where it was signed, and thus may not comply with C.C.P. § 2015.5. However, I do not disregard it for that reason, because its Ex. A strongly suggests the declarant is located in the state of California and so signed the declaration here.

**(3)    Bergmark Declaration**-- Sustain as to ¶ 16, otherwise overrule.

Bergmark is a partner at an economic and accounting services firm who has experience performing damages analyses. *See* Bergmark Decl. ¶¶ 2-3.  He outlines various ways that class-wide damages could be computed. *Id.* at ¶¶ 11-18.  He has not obtained sufficient data to compute damages or attempted any computations.  His declaration is generally admissible.

However with respect to ¶ 16 Bergmark opines that a survey can be completed to assess the true value of the Drives. Bergmark does not have expertise to offer this opinion on the facts of this case – he simply refers to discussions with survey experts in other matters where surveys have been completed. Paragraph 16 is not admissible.

-

### Underlying Law

1.      **Certification under the CLRA**

The CLRA has its own version of class action requirements: (1) the impracticability of bringing all members of the class before the court; (2) questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members; (3) the claims of the class representative are typical of the class; and (4) the class representatives will fairly and adequately protect the interests of the class. *Thompson v. Automobile Club of S. Cal.*, 217 Cal.App.4th 719, 727-28 (2013).

The CLRA requirements are similar to those of C.C.P. § 382. In both cases, the potential class must be sufficiently numerous as to make individual adjudication impractical, although the CLRA does not explicitly require an ascertainable class. *Id.* at 728. Both CLRA and non-CLRA class actions require ascertainability. *In re Vioxx Class Cases*, 180 Cal.App.4th at 128 n.12. The CLRA includes three requirements that are essentially the same as the community of interest requirement under § 382. *Thompson*, 217 Cal.App.4th at 728. The CLRA differs from § 382 in that there is no "superiority" requirement. *Id.* And unlike § 382, a court must certify if all of the requirements of the CLRA are met. *Id.* at 728 n.2. However, courts retain considerable latitude in determining whether the four requirements are met. *Id.*

## 2.    The Song-Beverly Act

With some exceptions, "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." C.C. § 1792. An "implied warranty of merchantability" means, *inter alia*, that the goods (1) "[p]ass without objection in the trade under the contract description," (2) "[a]re fit for the ordinary purposes for which such goods are used," and (3) "[c]onform to the promises or affirmations of fact made on the container or label." C.C. § 1791.1(a); *Mexia v. Rinker Boat Co.*, 174 Cal.App.4th 1297, 1303 (2009). The core test for merchantability is fitness for the ordinary purpose for which such goods are used. *Mexia*, 174 Cal.App.4th at 1303. That fitness is shown if the product is in safe condition and substantially free of defects. *Id.*

The implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale. *Mexia*, 174 Cal.App.4th at 1304. In such cases the implied warranty is breached, by the existence of the unseen defect, not by its subsequent discovery. *Id.* at 1305.

To be subject to the Song-Beverly Act, the sale must occur in California. *See* C.C. § 1792. A sale occurs in California where title to the product passes in California within the meaning of California Uniform Commercial Code § 2401. *Cal. State Elecs. Ass'n v. Zeos Int'l Ltd.*, 41 Cal.App.4th 1270, 1275-77 (1996) (*Zeos*). "Thus, when the parties agree to or contemplate shipment by the seller, title passes to the buyer upon that shipment, unless the agreement specifically requires the seller to make delivery at the destination." *Id.* at 1276-77.[8]

---

[8] Plaintiffs contend that the reasoning in *Zeos* does not apply here because that case involved an express warranty under Civil Code § 1793.2, whereas this action involves an implied warranty under Civil Code § 1792. *See* Reply, 6-8. The statutes use different language. *Compare* C.C. § 1792 ("...every sale of consumer goods that are sold at retail in this state"); *with* C.C. § 1793.2(a) ("Every manufacturer of consumer goods sold in this state..."). Both share the term "sold." "Sale" is subject to a common definition throughout the Song-Beverly Act: Sale "means either of the following: [¶] (1) The passing of title from the seller to the buyer for a price. [¶] (2) A consignment for sale." C.C. § 1791(n). The *Zeos* Court reasoned that the Song-Beverly Act was only implicated on the facts before

Shipment contracts are the presumptive form in California. *Wilson v. Brawn of Cal., Inc.*, 132 Cal.App.4th 549, 556 (2005).

### 3. UCL

The UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Bus. & Prof. Code § 17200. The UCL's "sweeping" coverage embraces "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999) (internal quotations omitted).

By proscribing "unlawful" conduct, the UCL borrows rules set out in other laws and makes violations of those rules independently actionably. *Zhang v. Superior Court*, 57 Cal.4th 364, 370 (2013).

Fraudulent conduct subject to the UCL is not limited to common law fraud, but only requires a showing that members of the public are likely to be deceived. *Day v. AT & T Corp.*, 63 Cal.App.4th 325, 332 (1998). To establish fraudulent conduct within the meaning of the UCL, a plaintiff need not establish that the fraudulent deception was actually false, was known by the perpetrator to be false, or was reasonably relied on by a victim who incurred damages. *In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009); *see also Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal.App.4th 544, 565 (2011) (to be actionable, misrepresentation must be material – i.e., a reasonable person would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question). To determine whether a

---

it if title passed within the state of California based on: (1) the definition of "sale;" (2) the fact that the defendant did not make consignments for sale within California; and, possibly, (3) the fact that Civil Code § 1793.2 imposed local warranty service facility requirements whereby such facilities had to be reasonable close to where the "goods are sold." *Zeos*, 41 Cal.App.4th at 1275. As Plaintiffs argue, the third rationale is inapposite here. *See* Reply, 7. Nevertheless, the common definition and usage of the term "sale" controls the analysis – the statute does not apply to the transactions at issue here unless title passed in California. *See Gusse v. Damon Corp.*, 470 F.Supp.2d 1110, 1112-13 (C.D. Cal. 2007).

statement is likely to mislead for the purposes of the UCL, courts apply a reasonable consumer standard. *Hill v. Roll Intern. Corp.*, 195 Cal.App.4th 1295, 1304 (2011).

Whether conduct runs afoul of the "unfair" prong may be assessed by one of several tests. *See Zhang*, 57 Cal.4th at 380 n.9 (collecting cases applying unfairness tests).

A UCL plaintiff must have standing. For private plaintiffs, this entails an economic injury caused by the unfair business practice or false advertising at issue. *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 322 (2011). Thus named plaintiffs in fraudulent conduct claims must show that the misrepresentations were an immediate cause of the injury-causing conduct, although the plaintiff need not show that the misrepresentations were the sole or even the decisive cause of the injury inducing conduct. *In re Tobacco II Cases*, 46 Cal.4th at 328. The plaintiff must prove "actual reliance to satisfy the standing requirement...but...is not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where...those misrepresentations and false statements were part of an extensive and long-term advertising campaign." *Id.*

This standing requirement does not extend to putative class members. *Id.* at 326; *Mass. Mutual Life Ins. Co. v. Superior Court*, 97 Cal.App.4th 1282, 1288 (2002); *In re Vioxx Class Cases*, 180 Cal.App.4th 116, 134 n.19 (2009).

But relief cannot be secured for absent class members that were never *exposed* to the alleged unfair business practice, such as advertising that is alleged to violate the "fraudulent" prong. *Compare Tucker v. Pac. Bell Mobile Servs.*, 208 Cal.App.4th 201, 227 (2012) (UCL does not authorize an award of injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice); *Pfizer Inc. v. Superior Court*, 182 Cal.App.4th 622, 631 (2010) (one who was not exposed to alleged misrepresentations

and therefore could not have lost money or property as a result of the unfair competition is not entitled to restitution); *with Mass. Mutual*, 97 Cal.App.4th at 1286, 1291 (in a case predicated on uniform non-disclosures, plaintiffs presented evidence that the defendant withheld from its customers and agents its view of the amount of the discretionary dividend it was paying; a trier of fact could find defendant's recognition that its dividend rate was excessive would have been important to prospective purchasers and that defendant's failure to disclose its own conclusions was misleading, which would in turn support a restitution order under the UCL); *Fairbanks*, 197 Cal.App.4th at 563 (factually distinguishing *Mass Mutual* where uniformity of the defendant's business practice was in issue).

4.    **CLRA**

The CLRA proscribes specified "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." C.C. § 1770(a). "Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against the person to recover or obtain" actual damages, injunctive relief, restitution, and/or punitive damages, as specified. C.C. § 1780(a).

CLRA plaintiffs must show that a defendant's conduct was deceptive and that the deception caused them harm. *Tucker*, 208 Cal.App.4th at 222, *citing Mass. Mutual*, 97 Cal.App.4th at 1292.  Under *Tucker*, an inference of class wide reliance may be shown by proof of material misrepresentations made to the entire class (because a representation is material when it induces the consumer to alter his position to his detriment). *Tucker*, 208 Cal.App.4th at 222.

But if the issue of materiality or reliance may vary from consumer to consumer, the action should not be certified. *Id.*

Materiality is determined using an objective standard. *Fairbanks*, 197 Cal.App.4th at 565. The test is whether a reasonable person would attach importance to the existence or nonexistence of the misrepresentation in connection with the transaction. *Id.* But individual issues may arise where two options differ in a variety of ways such that materiality depends on individual consumer needs or preferences. See *id.* at 565; *In re Vioxx Cases*, 180 Cal.App.4th at 126.

## Certification

1.    **Numerosity and Ascertainability**

A.    **Song-Beverly Act**

Seagate has not disputed that the class definitions use objective characteristics that will identify numerous individuals.  Seagate does contend that the class definitions are overbroad for the purposes of the Song-Beverly Act because they include all "citizens" of California, as opposed to purchasers wherein title transferred in California.  Seagate asserts that this overbreadth precludes certification, because the appropriate class to whom Seagate could be liable includes only an unidentifiable group of individuals to whom title for the Drive passed in California.

The reach of the Song-Beverly Act is limited, at least outside of a consignment for sale, to transactions where title passes in California.  To the extent the class definition sweeps in individuals who purchased the Drives from retailers pursuant to shipment contracts where the place of shipment was outside of California, and to the extent that California citizens purchased the Drives from retailers pursuant to delivery contracts where the specified place of delivery was

outside of California, it is overbroad. *Zeos*, 41 Cal.App.4th at 1277. Furthermore, the class definition is overbroad because it may include California citizens that purchased Drives from brick-and-mortar stores outside of California.

Plaintiffs propose a Song-Beverly Act subclass in their Reply: "All Class members who purchased at retail in California." Reply, 8 n.7. Plaintiffs contend that this proposed sub-class is ascertainable because it is defined by objective criteria that can be used to determine class membership. *Id.* Plaintiffs' Counsel declares that his firm is working with federal plaintiffs to obtain customer records to identify individuals who purchased Drives from third parties. Schubert Reply Decl. ¶ 3. Seagate counters that ascertainability is impossible because there will need to be an individualized inquiry into (i) the identity of the retailer; (ii) the location of the retailer; and (iii) the terms of the transaction.

For ascertainability purposes, the narrowed definition proposed by plaintiffs might suffice. The definition relies on objective criteria within the possession of individual consumers, whether or not plaintiffs will be successful in obtaining the identities of purchasers through third-party retailers. The material criteria identified by Seagate – the identity of the retailer and the terms of the transaction – are objective and within the knowledge of putative class members.

Seagate's challenge touches on issues of predominance and manageability – whether there is an effective means of culling individuals who are not, by definition, members of the class because they purchased from out-of-state online retailers for whom title did not pass in California under the terms of the contract. That is taken up separately.

## B.    UCL and CLRA

There is no dispute that the individuals who meet the objective characteristics of the class definition, and the Consumer Subclass definition, are identifiable. Amended Schubert Decl. ¶¶

5-6, Ex. 40 (Seagate possesses names and external model numbers specified products that contain the drives).  In addition, the class definition uses objective transactional criteria sufficient for individuals who fit the definition to identify themselves.  Moreover, there is no dispute that these individuals are numerous.  Amended Schubert Decl. ¶ 7-8, Ex. 41.  Setting aside Seagate's predominance arguments, addressed separately, Seagate does not argue that the class definition is overbroad with respect to the UCL[9] and/or CLRA claims.

Nevertheless the class definition is overbroad.  It applies to all purchases made by California citizens even if those purchases were made wholly out-of-state.  The class definition is also under-inclusive to the extent individuals who purchased products in California are not citizens of California.  *See, e.g., Sullivan v. Oracle Corp.*, 51 Cal.4th 1191, 1206-09 (2011) (out-of-state plaintiffs suing California-based employer for Fair Labor Standards Act violations occurring outside of California cannot bring UCL claim predicated on those FLSA violations).

To the extent there are defects in the class definition, they may be addressed by revising the definition, such as to include only purchases made in California.

2.      **Commonality/Predominance/Superiority**

As noted above, the superiority element does not apply to the CLRA claim.  For the purposes of C.C.P. § 382, class actions are meant to be superior to alternate means for a fair and efficient adjudication of the litigation in that they must provide substantial benefits to both the courts and the litigants. *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 332 (2004), citing *Washington Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906, 914 (2001).

A.      **Song-Beverly Act**

---

[9] At least to the extent the UCL claim is not predicated on a violation of the Song-Beverly Act.  *See* Opposition, 25 n.19 (UCL claim predicated on violation of Song-Beverly Act cannot be certified for the same reasons as direct Song-Beverly Act claim).

The issues identified by the Parties are:[10]

(1) Whether title to the Drives passed in California such that the Song-Beverly Act can be invoked;

(2) Whether the Drives contain a latent defect;

(3) Whether any defects in the Drives were caused by unreasonable use; and

(4) The appropriate remedy and the computation of damages, if any.

### i.    Location Where Title Passes

In their moving papers, Plaintiffs implicitly assume that that all California citizens may press claims under the Song-Beverly Act. As noted above, this is incorrect – the Song-Beverly Act applies only if title passes in California. This creates individualized issues.

For purchases occurring in brick-and-mortar stores in California, the location where title passes is likely a common issue that is not subject to dispute. For purchases from online retailers or other retailers that ship from within California, the location where title passes is also likely a common issue not subject to dispute. For purchases from online or other retailers that ship from outside California, a review of the transactional terms is probably necessary to evaluate whether title passes in California. The record lacks: (1) information concerning the number of purchases at brick-and-mortar retailers; (2) information concerning the number of purchases at online retailers inside and/or outside California; (3) information concerning the total number of retailers at issue; and, relatedly, (4) information concerning the terms of any online purchases from out-of-state retailers.[11] Thus the record does not support a conclusion that the location where title

---

[10] *See* Motion, 14-15; Opposition, 15-19, 25-27.
[11] The Parties appear to agree that there are some third party retailers that may ship from out-of-state. *See* Opposition, 15 (without citation to evidence); Reply, 6-8 (arguing that such purchases are within the scope of Plaintiffs' claim); Schubert Reply Decl. ¶ 3 (referring to discovery efforts related to "some online merchants such as Amazon.com").

passes is common.  Assessing whether online purchasers are entitled to recover as members of the class will require individualized inquiries.[12]

### ii.    Whether the Drives Contain a Latent Defect

Plaintiffs assert that a jury can conclude that the Drives were unfit for their ordinary use as consumer data storage based solely on their high failure rates.  Motion, 14; *see also* Coughlin Decl. ¶ 22 ("Due to the higher failure rates of Defendant's Drives, I believe many of these Drives were not of the same quality as those HDD's generally acceptable in the industry and were not suitable for ordinary consumer data storage and backup of a user's files").  This opinion (even were it admissible) with its use of the word "many," highlights the critical problems with certification of this claim.

"[T]he party moving for class certification must provide substantial evidence of a defect that is substantially certain to result in malfunction during the useful life of the product.  This is an issue that must be considered not only to determine the merits of a plaintiff's claim, but also in a class certification motion."  *Honda*, 199 Cal.App.4th at 1375.

In *Honda*, the plaintiff "presented no evidence that it [was] substantially certain [that the transmissions in the vehicles belonging to the 18,755 class members who had not experienced third gear problems] would exhibit third gear problems as required by *Hicks*[ *v. Kaufman and Broad Home Corp.*, 89 Cal.App.4th 908 (2001)]."  *Id.* at 1377.

*Hicks* held that the plaintiffs could recover for an inherent defect that is substantially certain to result in a malfunction during the life of the product, whether or not the product is presently functioning as warranted.  89 Cal.App.4th at 918.

---

[12] Such inquiries may be common for each purchaser from a common retailer.  However, this is speculation in the absence of evidence.

Here, according to plaintiffs' evidence, "hard disk drives are generally designed for a five to ten year life under specified use conditions.  HDDs can last less than or greater than that period of time, but the design margin for a HDD should result in minimal drive failures during the design life."  Coughlin Decl. ¶ 15.  Plaintiffs' produce expert testimony to the effect that "there was a quality problem with Defendant's Drives, which resulted in high failure rates." *Id.* at ¶ 18 (ruled above not to be admissible).  With circular reasoning, Plaintiffs' expert states, "Due to the high failure rates of Defendant's Drives, I believe many of these Drives were not of the same quality as those HDDs generally acceptable in the industry and were not suitable for the ordinary consumer use of data storage and backup of a user's files." *Id.* at ¶ 22 (ruled above not to be admissible).  The expert declaration regarding high failure rates is only as good as the underlying evidence. *See Sanchez*, 63 Cal.App.4th at 686.

The evidence on which plaintiffs rely to establish the high failure rates is either inadmissible or inadmissible for the truth of the matter asserted, and the expert opinion here in fact adds almost nothing to the underlying evidence.

I examine the admissible evidence.  It is Amended Schubert Decl., Exs. 1 (Seagate employee's email referring to "contamination issues that caused them to fail much faster and more" in discussing Backblaze blog post), Ex 3 (Seagate employee's email that drive is "truly an issue" following Backblaze blog post), Ex 14 (references to cracked boxes during floods and outgassing/contamination in a Seagate employee's email following the Backblaze blog post); Reply Schubert Decl., Ex. 1 at 71:4-16.  Plaintiffs also submit evidence to support the conclusion that Seagate was made aware of problems (whatever they were) with the Drives as early as 2012.  Amended Schubert Decl., Ex. 35. Plaintiffs rely on the BackBlaze study (Reply at 2), but that is

not admissible—and it certainly is not the sort of study which our Supreme Court had in mind at this certification stage. Compare, *Duran v. U.S. Bank Nat. Assn.*, 59 Cal. 4th 1, 41–42 (2014).

I am not persuaded that this evidence could support a finding that there was a latent defect in all the Drives—or "substantially all"—the Drives at issue.[13] The fact that the Drives are 'an issue' or that some of them fail 'much faster and more' suggests at best that a higher percentage of these drives fail than the author thinks is proper—for all we know, that means a fail rate of 1% if the author thinks a reasonable rate is e.g. 0.5%. But plaintiffs' evidence does not provide us a way to compare any such numbers (none of which are actually presented in the evidence, I must note) with a failure rate which some expert contends is reasonable. The evidence refers to various causes (contamination and outgassing, for example), but none of these is adopted by the plaintiffs as the latent defect. Indeed, there is no theory of latent defect: that is, after all the discovery we have had in this case, plaintiffs do not even have a theory as to what the latent defect is and why the Drives failed. Nor is there any study done, or any study offered or described, which would provide a statistical analysis of the failure rate. Compare *Duran v. U.S. Bank Nat. Assn.*, 59 Cal. 4th 1, 41–42 (2014).[14] There is no trial plan. In sum, there are only a few instances of anecdotal evidence, and these do not show that there is common proof that the Drives as a group were defective or had a latent defect,[15] and plaintiffs suggest no other admissible evidence to be presented at trial to prove this common issue.

---

[13] The evidence is very weak because, while I have admitted the cited material because it could be read as statements by people who know the truth, the statements on balance actually seem (to me as fact finder) to report the conclusions of others.

[14] See generally William B. Rubenstein, 3 NEWBERG ON CLASS ACTIONS, Use of expert testimony at the class certification stage § 7:24 (5th ed. 2017).

[15] Seagate presents evidence that there are a variety of reasons why a hard drive can fail. *See* Almgren Decl. ¶¶ 4-6 (describing how hard drives function); Ng Decl. ¶¶ 3-10 (reasons hard drives fail). Further, Seagate presents evidence that there is no common cause for the Drives' failures. *See* Rollings Decl. ¶ 7; *see also* Clark Decl. ¶¶ 10-11 (stating that prior to April 2015 Seagate had not received an abnormal number of customer complaints directed at the Drives that would lead Seagate to believe there was a problem). In addition, Seagate offers evidence calling into question the inferences Plaintiffs' seek to draw from the Backblaze analysis and from Seagate's internal

### iii. Manageability of Individual Issues and Superiority

There are individual issues with respect to (1) determination of whether online purchasers are covered by the Song-Beverly Act; and (2) damages.

As to the first issue, there has been no showing as to the scope of the issue – i.e., the number of different online sellers, their physical location, and any differences in their terms of sale. Nor have plaintiffs demonstrated how these individual issues can be managed. Accordingly, the motion should be denied in part for want of manageability, although this problem alone does not justify denial of certification as to purchasers who bought Drives from brick-and-mortar stores in California.

As to the second issue, individual issues as to damages do not generally justify denial of class certification. *Sav-On*, 34 Cal.4th at 333

### B. UCL – Fraudulent Prong

The issues identified by the Parties are:[16]

(1) Whether members of the public were likely to be deceived by Seagate's representations about the Drives' reliability;

(2) Whether members of the public were likely to be deceived by Seagate's failure to disclose the Drives' failure rates; and

(3) The appropriate measure of restitutionary relief, if any.

### i. Affirmative Misrepresentations

Plaintiffs have not presented evidence of: (1) any Seagate advertising; or (2) the identity of the Seagate retail products within the scope of this action.[17] Accordingly, the record is

---

communications. *See* Rollings Decl. ¶¶ 4-9 (discussing Seagate's assessment and investigation of Backblaze report); Ng Decl. ¶ 11 (discussing Apple recall and noting absence of any other recalls); Clark Decl. ¶¶ 12-14 (discussing interpretation of her own internal emails regarding failure rates).
[16] *See* Motion, 16; Opposition, 19-27.

1    without evidence to support a finding that common questions predominate as to any affirmative

2    misrepresentations. *See, e.g., Fairbanks*, 197 Cal.App.4th at 563-64 (class certification properly

3    denied where alleged misrepresentations were not commonly made to members of the class);

4    Section III(D), *supra*. No class can be certified as to affirmative misrepresentations.

5              ii.      **Omissions**

6

7         Plaintiffs' theory of liability is as follows: "[P]roof of liability turns on whether the

8    average consumer purchasing the Drive would be likely to be deceived by Seagate's

9    representations about the Drives' reliability and its omission of the Drives' failure rates.

10   Because Seagate uniformly concealed the true failure rates of the Drive – while prominently

11   featuring the Drive's reliability on its website, in its marketing, and on its boxes – the Class was

12   exposed to the same deceptive course of conduct. In order to prove that Seagate deceived the

13   public, Plaintiffs will present evidence that Seagate knowingly concealed the Drive's high failure

14   rates – all of which would be common to the Class as a whole." Motion, 16.

15

16        Seagate contends that no UCL claim predicated on omissions can be certified because:

17   (1) the alleged omissions were not contrary to Seagate's common representations; (2) as a result,

18   Seagate was not under a common duty to disclose; and (3) Seagate's knowledge changed over

19   time, such that Seagate's knowledge base is not common as to all putative class members.

20   Opposition, 22-25.

21

22   ---

[17] Setting aside representations in the briefs, the only evidence of affirmative representations presented by Plaintiffs
23   in the moving papers are their vague descriptions of advertising and/or information they obtained from undisclosed
     internet sources and an offhand and unspecific reference from their expert. *See* Amended Schubert Decl., Ex. 36 at
24   86:2-87:13, Ex. 37 at 50:4-24; Coughlin Decl. ¶ 16; Schubert Reply Decl., Ex. 2 at 51:2-51:17, 54:14-54:23, Ex. 3 at
     46:21-25. In reply, Plaintiffs submit excerpted deposition testimony in which a Seagate official stated that the
25   "marketing message" she wanted to portray to the public about the "BarraCuda" product at an unspecified time
     period was that it had "the best combination of performance, capacity and reliability." Schubert Reply Decl., Ex. 1
26   at 17:2-17. This testimony lacks sufficient context to be of any use to the class certification analysis. For example,
     it says nothing about the timing, mode, or specific substance of any marketing. *Compare In re Tobacco II Cases*, 46
27   Cal.4th at 328 (in the context of alleged exposure to a long-term advertising campaign, plaintiff need not plead with
     an unrealistic degree of specificity that she relied on particular advertisements or statement). It also does not appear
     to address all products at issue in this motion.

Several courts have held that "a failure to disclose a fact one has no affirmative duty to disclose is [not] 'likely to deceive' anyone within the meaning of the UCL." *See Berryman v. Merit Property Mgmt., Inc.*, 152 Cal.App.4th 1544, 1556-57 (2007) (quoting *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 838 (2006)); *Buller v. Sutter Health*, 160 Cal.App.4th 981, 988 (2008); *see also Bardin v. Daimlerchrysler Corp.*, 136 Cal.App.4th 1255, 1275 (2006). That is, there must be some common basis to impose upon Seagate the obligation to disclose any [high] failure rate. However, for that duty to arise, Plaintiffs are not necessarily required to prove that Seagate made contrary representations. *See Collins v. eMachines, Inc.*, 202 Cal.App.4th 249, 255-58 (2011) (plaintiff stated a claim under the UCL "fraud" prong based on the defendant's alleged knowing active concealment and non-disclosure of a material fact).

To the extent plaintiffs' press a theory of liability predicated on a duty to disclose arising out of the knowing concealment of some failure rates *arising from latent defects*, they presumably would have present proof of a latent defect, but as noted above, they have not demonstrated that they can do so. However, plaintiffs may be able to demonstrate that whatever the failure rate was—and by definition, there was *some* failure rate, there always is—it was sufficiently high that consumers should have been alerted to it. That presents common issues.[18] And to the extent *Daugherty v. Am. Honda Motor Co.* blocks the claims, the issue is common.

Seagate's knowledge of the failure rate involves common evidence. Any inquiry into Seagate's knowledge will focus on one entity – Seagate. This will turn primarily on the testimony of Seagate's officials, internal communications, and other documents available to Seagate. Seagate argues, correctly, that the time when Seagate learned certain facts may be

---

[18] While implying that the failure rates of Seagate's drives evidenced in their papers are unreasonably high, Plaintiffs have not clarified the failure rate that a "reasonable consumer" would expect. *See Collins*, 202 al.App.4th at 256, 258 (for deceit to occur, members of the public must have an expectation about the matter in question). Nevertheless, the very nature of the inquiry – the expectations of a reasonable consumer regarding the useful life and failure rate of a consumer hard drive – render the question susceptible to common proof.

1    relevant and may divide the class.  Opposition, 24-25.  For example, knowledge obtained in 2014

2    may support a claim by a 2015 purchaser, whereas it is irrelevant to a 2013 purchaser.  Even so,

3    this individual issue can be managed by reference to purchase records should it be determined

4    that Seagate's knowledge did, in fact, vary over time.[19]  Possibly subclass will be required.

5         The "reasonable consumer" test presents a common issue. *McKell v. Washington Mutual,*

6    *Inc.*, 142 Cal.App.4th 1457, 1471 (2006); *see also Collins*, 202 Cal.App.4th at 256, 258

7    (applying "reasonable consumer" standard to CLRA claim, and adopting CLRA analysis for

8    UCL claim).  Plaintiffs contend that the global failure rate for the Drives must be accurately

9    disclosed, else a reasonable consumer will be deceived.  Seagate may, for example, put on

10   evidence that publication of such a rate is itself misleading due to variances in the Drives' failure

11   rates according to their use or that any failure rate identified by Plaintiffs is improperly inflated

12   by Drives that were used unreasonably.  Nevertheless, this element raises predominant common

13   questions.

14        On balance the common issues predominate.

15             **iii.    Manageability and Superiority**

16        In light of the predominant common questions and the relatively minor individual

17   inquiries, permitting the UCL claim predicated on omissions to proceed on a class-wide basis is

18   superior to the alternative of individual litigation.  Importantly, the "individual" issues affecting

19   liability turn primarily on the time at which Seagate was obtained material information and

20   allegedly began suppressing that information. This is a general issue cutting across many

21   individual cases,  and it is not likely there will be substantial individual evidence.  To the extent

22   that Seagate may put in evidence that failure rates varied by product, such evidence will not

---

[19] Some of the exhibits date to 2012.  *See* Amended Schubert Decl., Exs. 13, 35.

render trial unmanageable. Finally, the individual issues that are likely to arise with respect to

damages should not defeat certification. *Sav-On*, 34 Cal.4th at 333.

### C.    CLRA

The issues identified by the Parties are:[20]

(1) Whether members of the public were likely to be deceived by Seagate's failure to disclose the Drives' failure rates;

(2) Whether the putative class members relied on their erroneous expectations regarding the Drives' failure rates;

(2) Whether Plaintiffs' omission claims are barred under *Daugherty*; and

(3) The appropriate measure of restitutionary relief, if any.

The issues relating to the CLRA claim are substantially the same as the issues relating to the UCL claim under the fraudulent prong. *See, e.g., Collins*, 202 Cal.App.4th at 255-59; see Motion, 20 (incorporating UCL discussion into CLRA section); Opposition, 19-27 (generally discussing UCL and CLRA together).

As plaintiffs recognize, the CLRA claim does pose the additional issue of class-wide reliance. Motion, 20; Reply, 15. Plaintiffs state that they will demonstrate class-wide reliance by demonstrating that the reliable function of a hard-drive throughout its useful life is material to a reasonable consumer. Motion, 20. While Plaintiffs have not identified the evidence on which they will rely (Motion, 20), Seagate has not argued that this inquiry presents individual issues. Plaintiffs may be able to rely on the basic function of a hard drive – storage of information for future use – to establish that a reasonable consumer would consider the rate at which the hard drive fails to store information throughout its useful life as material. *See, e.g.,* Amended Schubert Decl., Ex. 37 at 43:22-25, 50:4-22 (describing in general terms that hard drive was

---

[20] *See* Motion, 20; Opposition, 19-22, 24-27.

marketed for storage of documents and his "outrage[]" when the Drive he purchased lasted only one year). Accordingly, this additional issue does not change the analysis.

The CLRA claim should also be certified.

**D.    UCL – Unfair Prong**

In brief, the parties argue the propriety of certifying the unfair prong as they do the UCL claims generally. Opposition, 25 n.19; Motion, 15 n.11. The limited argument in the briefs suggests that the unfair prong will add only common legal questions – whether the course of conduct addressed under the fraudulent and unlawful prongs also satisfies one of the pertinent tests for unfairness. Thus it should be certified as well.

**E.    UCL – Unlawful Prong**

The UCL claim predicated on unlawful conduct is, pursuant to the moving papers, predicated on the "implied warranty of merchantability" – i.e., the claim under the Song-Beverly Act. Motion, 15 n.11. for reasons stated above in connection with the Song-Beverly Act, this cannot be certified.

**3.    Typicality/Adequacy**

The typicality element requires that a representative plaintiff have claims that are similar, although not necessarily identical, to the remainder of the class. *Classen v. Weller*, 145 Cal.App.3d 27, 46 (1983). See *McGhee v. Bank of America*, 60 Cal.App.3d 442, 450 (1976); *Richmond v. Dart Indus., Inc.*, 29 Cal.3d 462, 470 (1981).

Seagate contends that Plaintiffs are inadequate because they did not rely on any affirmative representations or omissions at issue in this action, such that they do not have standing to pursue a UCL claim. With respect to omissions, Nalick testified in general terms that he relied on Seagate's representations on its packaging that the Drives were reliable. *See*

1   Schubert Reply Decl., Ex. 2 at 51:2-51:19, 54:1-23.  It may be inferred that Nalick would not

2   have purchased the drive had he known it failed at a high rate.  *See also* Siu Decl., Ex. C at 83:7-

3   13 (discussing his expectation that the Drive would last 5-10 years).  Similarly, Pozar testified

4   that his expectation for the duration of the Drives based on his past experience was substantially

5   longer than the Drives lasted.  *See* Siu Decl., Ex. A at 221:15-222:3.  This testimony, too, is

6   consistent with plaintiffs' theory of relief on the omission claim.  Plaintiffs are typical of the

7   class if they purchased the Drives with the understanding, based on Seagate's omission, that the

8   Drives would last materially longer than they actually did.

9        Plaintiffs are typical of the CLRA claim and adequate to represent the class to the same

10  extent that they are typical of the UCL claim and adequate to represent the class with respect to

11  that claim.

12       Pozar did not purchase a Drive at retail.  Rather, his friend purchased a Drive at retail for

13  use in a shared system and Pozar reimbursed his friend for half of the purchase price.  Siu Decl.,

14  Ex. A at 117:24-121:13.  Thus Pozar does not fit within the class definition – which includes

15  only specified individuals who "purchased a Seagate hard disk drive with model number

16  ST3000DM001" or "purchased an external drive that contained an ST30000DM001 drive."  He

17  is atypical for this reason, and cannot be a class representative.

18       There are any adequacy objections to Nalick, aside from the challenges rejected above.

19       Based on their conduct of this litigation and their evidentiary submission, Plaintiffs'

20  Counsel appear adequate to represent the class.  Amended Schubert Decl. ¶ 2, Ex. 43.

**Conclusion**

The motion to certify is granted in part, limited to CLRA and UCL (but not the illegal prong) claims based on omissions.  The motion is otherwise denied.

To the extent there are defects in the class definition, they may be addressed by revising the definition, such as to include only purchases made in California. It is also possible that now (or in the future) the nature of the subclasses should be refined.  The parties should confer on these issues before the next case management conference (CMC), as well as whether notice should issue and the appropriate next steps in this case, in advance of the next CMC, and present the results in their joint CMC statement. The parties should now ensure all documents lodged subject to a potential sealing motion are filed in the public file, as no sealing motion was filed.

A CMC is set for November 30, 2017 at 3:30 p.m.

Dated: November 1, 2017

_____
Curtis E.A. Karnow
Judge of The Superior Court

**CERTIFICATE OF ELECTRONIC SERVICE**
(CCP 1010.6(6) & CRC 2.260(g))

  I, DANIAL LEMIRE, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

  On    NOV 1 – 2017    , I electronically served THE ATTACHED DOCUMENT via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated:    NOV 1 – 2017

       T. Michael Yuen, Clerk

       By: _____
          DANIAL LEMIRE, Deputy Clerk