UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SEAGATE TECHNOLOGY LLC LITIGATION | Case No. 16-cv-00523-JCS |
| CONSOLIDATED ACTION | **ORDER DENYING RENEWED MOTION FOR CLASS CERTIFICATION**<br>Re: Dkt. No. 189-3 |

## I. INTRODUCTION

After the Court denied a previous motion for class certification without prejudice, Plaintiffs, eight individuals who purchased hard drive products sold by Defendant Seagate Technology LLC ("Seagate"), now move for certification of eight classes of consumers who purchased certain Seagate hard drives manufactured on or before January 1, 2015 in California, Florida, Massachusetts, New York, South Carolina, South Dakota, Tennessee, and Texas. The Court held a hearing on January 18, 2019. For the reasons discussed below, Plaintiffs' renewed motion is DENIED.[1] A case management conference will be held on March 1, 2019 at 2:00 PM, and the parties shall file a joint case management statement no later than February 22, 2019.

## II. BACKGROUND

### A. Overview of Terminology

This case concerns certain three-terabyte hard drives produced by Seagate and designated as model number ST3000DM001. Seagate sold these drives for both internal use (i.e., to be installed within a computer or other device), and external use (i.e., to be attached to a computer or other device with a cable). Names for products that consisted of or included these drives include

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

"Barracuda," "Grenada," "Grenada BP," "Grenada BP PL," "Grenada BP2," and the "Desktop HDD Internal Kit," as well as a large number of external drive products. *See* Scarlett Decl. (dkt. 189-5) Ex. 9 at 4. The currently proposed class excludes external drives and Grenada BP2 drives.

For public marketing purposes, Seagate initially used the term "Barracuda" to refer to internal ST3000DM001 hard drives, and later used the term "Desktop HDD." *See generally id.* Ex. 8. Seagate's distribution channels include "OEM" (sales to original equipment manufacturers who included the drives in computers sold to their own customers), "disty" (bare drives sold through resellers for consumers to install on their own in computers), and "SBS" ("Seagate Branded Storage," drives sold in Seagate packaging, generally ready for standalone external use). *See In re Seagate Tech. LLC*, 326 F.R.D. 223, 226 (N.D. Cal. 2018). The parties agree that the internal drives at issue in the currently proposed class were sold at least primarily through the "disty" distribution channel. *See id.* at 230 n.10 (noting a dispute regarding whether one internal drive product was part of the SBS or disty distribution channel).

### B. Previous Order on Motion for Class Certification

On July 5, 2018, the Court denied without prejudice Plaintiffs' first motion for class certification. *See generally In re Seagate*, 326 F.R.D. 223. The Court held that Plaintiffs could not take their preferred approach of certifying a nationwide class for claims under California consumer protection laws, but that subclasses based on the laws of eight states would likely be manageable and any distinctions among those laws would not likely predominate if Plaintiffs could show common factual questions. *Id.* at 239–41. The Court also held that Plaintiffs had not presented evidence by which a jury could determine on a classwide basis that the drives' suitability (or lack thereof) for RAID configurations was material to consumers. *Id.* at 241–42.

The primary issue in both the previous order and Plaintiffs' renewed motion is whether common issues predominate as to the annualized failure rate, or "AFR," of the drives in question. In their first motion, Plaintiffs relied heavily on the declaration of their technical expert witness Andrew Hospodor, who reviewed internal Seagate documents and determined that some of them revealed AFRs in excess of 1% or 0.34%, the thresholds that Seagate advertised during at least portions of the proposed class period. *See id.* at 225–29 (summarizing Hospodor's report). In

2

addition to documents stating AFR metrics,[2] Hospodor relied on other forms of evidence that he believed indicated unreliability, including shipping holds, product design changes, unusually thorough testing, and a recall of products incorporating the drives by one of Seagate's large commercial customers. *See id.* Hospodor also questioned the methods Seagate used to assess AFR internally. *See id.* at 228. In his deposition, "Hospodor testified that he did not understand his role to be identifying a particular defect that was present across the class period, that he did not believe the drives had the same failure rate throughout the class period, . . . that he had drawn no conclusions about the failure rate of ST300DM001 drives beyond the beginning of 2013," and that "his report and the data he cited therein were 'meant to be exemplary, not comprehensive.'" *Id.* at 230.

The Court held that "Hospodor's declarations ha[d] significant flaws," including summarizing documents that a layperson could understand, reaching no conclusion as to a portion of the proposed class period, and apparently misunderstanding some of the evidence at issue. *Id.* at 243–44. Even assuming that Hospodor's opinions were admissible, the Court held Plaintiffs' evidence would "require a level of individualized inquiry for which Plaintiffs have proposed no manageable plan to resolve," because Plaintiffs relied on a wide variety of evidence to show varying AFRs for a number of constantly changing products over a roughly five-year class period. *Id.* at 244–46. The Court noted that the issue was "*not* whether Plaintiffs have produced, in aggregate, evidence on which a finder of fact could conclude that Seagate actionably failed to disclose material facts as to the AFR of all of the products at issue throughout the entire class period," but rather that even if a factfinder could reach such a conclusion it would not be based on common evidence, and Plaintiffs failed to present "any plan to manage potentially different determinations of whether the AFRs of various drives were higher than Seagate represented or consumers expected across different permutations of timing, product modifications, drive generations, and products intended for different purposes, or whether the named plaintiffs are

---

[2] The parties disputed whether some of this evidence reflected true predicted failure rates, rates before Seagate had taken corrective action, or aspirational goals if anticipated corrective action were successful.

3

typical or adequate to represent the various subclasses that might emerge from attempting to address those variations." *Id.* at 245–46. The Court therefore "denied the motion without prejudice to Plaintiffs moving to certify a narrower class or better-defined subclasses." *Id.* at 246.

### C. Current Arguments and Evidence

#### 1. Plaintiffs' Renewed Motion and Evidence Cited Therein

In an effort to cure the defects identified in the Court's previous order, Plaintiffs have narrowed the scope of proposed certification to eight state-based subclasses of consumers who purchased internal ST3000DM001 hard drives manufactured on or before January 1, 2015, excluding external drives and all drives designated "Grenada BP2" (the last iteration of the product family at issue). *See* Mot. (dkt. 189-3) at i–ii. Plaintiffs no longer cite Hospodor's declarations, instead relying primarily on internal Seagate documents, many of which formed the basis for Hospodor's opinions.

Although Plaintiffs' claims are based on omissions, Plaintiffs rely in part on the theory that Seagate's misleading representations gave rise to a duty to disclose the drives' true AFR. Plaintiffs therefore begin by detailing Seagate's representations regarding the drives' AFR, citing pages from Seagate's website as captured by the Internet Archive at different points in time, as well as other Seagate documentation. *Id.* at 2–4. A data sheet dated November 2011 and a specification page from Seagate's website as captured on November 29, 2011 list the AFR of the ST3000DM001 drive as less than one percent. Scarlett Decl. Exs. 2, 4. Citing what appears to be an identical copy of the November 2011 data sheet, Plaintiffs assert that Seagate continued such representations into 2012. Mot. at 3 (citing Scarlett Decl. Ex. 15). A page of Seagate's website captured on April 28, 2012 describes the "Barracuda" or "Desktop HDD" product as having an AFR of "0.34%, <1%," and a page captured on January 24, 2014 states that the "Desktop HDD" product had an AFR of 0.34%. Scarlett Decl. Exs. 5, 6. Versions of Seagate's "Storage Solutions Guide" dated July 2012, October 2012, and October 2013 listed an AFR of less than one percent for the "Barracuda" or "Desktop HDD" drive family. *Id.* Ex. 16 at 17; *id.* Ex. 17 at 17; *id.* Ex. 18 at 31; *see also id.* Ex. 21 (substantially identical to Exhibit 18). An internal email to product marketing managers dated February 19, 2014 stated that the Storage Solutions Guide was

4

"frequently downloaded and referenced." *Id.* Ex. 19.

With respect to actual failure rates, Plaintiffs cite a variety of internal Seagate documents. *See* Mot. at 4–9. Plaintiffs cite, for example, three slides of a May 3, 2013 presentation, which show, respectively, AFR fluctuating within the range from 0.73% to 2.66% (apparently for drives in Seagate's "disty" distribution channel), Scarlett Decl. Ex. 22 at 33, AFR fluctuating within the range from roughly 0.6% to 1.3% (apparently for Seagate's "SBS" distribution channel), *id.* at 34, and AFR fluctuating with a range from 1.04% to 1.41% (apparently for the GranadaBP version of the drive), *id.* at 35. *See* Mot. at 4–5 (citing Scarlett Decl. Ex. 22 at 33–35). The time period captured by those charts is not apparent from the face of the document. Plaintiffs also cite a February 7, 2012 presentation that on one slide shows AFR increasing from 1.02% to 2.21%, again over a period that is not clearly defined by the chart, which has horizontal access labeled from "1220" to "1231." Mot. at 5; Scarlett Decl. Ex. 23 at FED_SEAG00009681. Plaintiffs next cite a March 2012 presentation reporting a rolling average AFR of 2.25% for the Grenada dries, *id.* at 6 (citing Scarlett Decl. Ex. 26 at 4), and a June 2012 presentation reporting 3.436% "AFR (1st year Weibull)," 2.35% "Demo'd" "Reduced AFR," and 1.79% "Potential" "Reduced AFR" for the Grenada Classic product, *id.* (citing Scarlett Decl. Ex. 34 at 36[3]). Plaintiffs cite a chart in a November 2012 presentation showing that AFRs for Grenada drives bound for OEM customers (as opposed to the individual consumer purchasers at issue here) ranged from just over 2% to just over 0.5% for the Grenada Classic product and from slightly under 1% to slightly over 1.5% for the Grenada BP product. Mot. at 6–7 (citing Scarlett Decl. Ex. 30 at 2). Another November 2012 presentation cited by Plaintiffs includes a chart showing AFRs for the "disty" distribution channel ranging between 1.72% and 2.52% over a twelve-week period. Mot. at 7–8 (citing Scarlett Decl. Ex. 33 at 3). Despite excluding the Grenada BP2 from the proposed class definition, Plaintiffs cite a January 15, 2014 presentation indicating that the AFR for that product was 1.039%, and could be reduced to 0.9%. *Id.* at 8 (citing Scarlett Decl. Ex. 35).

In summary, Plaintiffs present a chart created by counsel comparing actual AFR for the

---

[3] This presentation does not consistently display page numbers on each slide, but the pages containing the data cited by Plaintiffs are Bates numbered FED_SEAG0026785–86.

5

Grenada Classic and Grenada BP models to Seagate's advertised AFR for twelve specific months of the twenty-five month period from November 2011 through November 2013, including ten months of data for the Grenada Classic and five months of data for the Granada BP. Mot. at 9. The chart indicates that Seagate's actual AFR derived from testing was lower than its advertised AFR for the Grenada Classic in February of 2013, exceeded its advertised AFR by roughly half of a percentage point or less for two months for the Grenada Classic and three months for the Grenada BP, and otherwise exceeded the advertised AFR by larger amounts. *Id.*; *see also* Scarlett Decl. Ex. 63 (a table prepared by counsel providing more information regarding the data in the chart). Plaintiffs also cite a 2012 presentation prepared by Seagate analyst Andrei Khurshudov questioning Seagate's methodology calculating AFR, although the analyst stated that more time was needed to reach a conclusion regarding the Grenada product line. Mot. at 11 (citing Scarlett Decl. Ex. 52); *see* Scarlett Decl. Ex. 52 at FED_SEAG0001857.[4]

Plaintiffs also rely on other evidence that does not directly report AFRs. For example, Plaintiffs cite a February 2012 email exchange discussing a shipping hold, which they characterize as showing that Seagate held shipments of drives for four days and had "shipped hundreds of thousands, and possibly millions, of drives with high failure rates to retailers" (including "[a]t least 320,025 from the Korat factory") before implementing the hold, although those specifics are not clear from the face of the evidence. Mot. at 5–6 (citing Scarlett Decl. Ex. 24). Plaintiffs similarly cite a March 2012 email exchange discussing a shipping hold and calling for redirection of failed drives from OEM customers to the "disty" and "SBS" distribution channels based on different quality standards. *Id.* at 7 (citing Scarlett Decl. Ex. 31 at 4). Plaintiffs cite a May 2012 presentation for its conclusion that 21.13% of drive failures were caused by "Head Related Issues," *id.* at 6 (citing Scarlett Decl. Ex. 25 at 7), and a June 2012 presentation that notes "Head Instability" as one of several issues observed with Grenada BP drives, albeit with no clear indication that such issues occurred at an unacceptable rate. *Id.* at 8 (citing Scarlett Decl. Ex. 34 at 7). Plaintiffs cite internal Seagate emails noting concerns about quality and failures caused by

---

[4] Khurshudov's presentation (as addressed by the parties' experts) is summarized in more detail in the Court's previous order. *See In re Seagate*, 326 F.R.D. at 228, 232

6

contamination, *id.* (citing Scarlett Decl. Exs. 27, 28), including a July 2012 email expressing concern that Seagate was shipping unreliable drives, *id.* at 7 (citing Scarlett Decl. Ex. 27), as well as an October 2012 summary report email listing a number of shipping holds for Grenada drives, *id.* at 6 (citing Scarlett Decl. Ex. 29). Along the same lines, Plaintiffs cite evidence that Seagate's large and sophisticated customers expressed concern regarding the reliability of Grenada drives, including instances where large customers experienced high failure rates, returned drives, placed shipment holds, or conducted a product recall, and a report prepared by the cloud storage company Backblaze detailing problems with the Grenada drives when used in a commercial setting. Mot. at 9–11 (citing Scarlett Decl. Exs. 36–44, 45–47, 49–52, 64).

Plaintiffs rely on the declaration of their expert witness Stefan Boedeker to show materiality. Mot. at 11–12. Based on conjoint analysis of surveys, Boedeker concluded that reliability is the most important consideration for consumers purchasing hard drives. Boedeker Decl. (dkt. 189-24) ¶ 145. Boedeker also assessed the economic loss to consumers purchasing hypothetical drives with different true AFRs but advertised as less than one percent AFR, with specific assessments ranging from a 15% AFR drive (for which the economic loss would exceed the purchase price) to a 3% AFR drive (for which consumers would experience approximately $15 of economic loss). *See id.* ¶¶ 149, 157 & figs. 23, 25; *see also id.* ¶ 151 & fig. 24 (assessing economic loss for AFRs ranging from 10% to 50%). Boedeker states that "[t]he fact that the minimum economic loss in all simulated scenarios is greater than zero is empirical proof that class-wide damages do exist and can be measured by this approach," and includes a footnote stating that his model "allows for the specification of economic losses for all incremental AFRs between 1% and 50%," but does not specifically address any AFR below 3%. *See id.* ¶¶ 149–50 & n.41.

Turning the legal requirements for class certification, Plaintiffs argue that the class is sufficiently numerous and that "a number of common questions exist," such as whether drives failed at a higher rate than advertised and a reasonable consumer was likely to be misled. Mot. at 13–14. Plaintiffs contend that the named plaintiffs are typical and adequate representatives because they purchased the drives at issue, relied on Seagate's advertised AFR, and have actively

7

participated in litigation thus far. *Id.* at 15–16. Plaintiffs argue that common questions predominate because, in Plaintiffs' view, the laws of the eight states for which they seek to certify subclasses do not materially differ in their requirements for omissions claims. *Id.* at 17–24; *see also id.* at 25–26 (arguing that the need to establish tolling for states with shorter statutes of limitations does not undermine predominance, and that state bars to class actions are procedural and do not apply in federal court). In their argument regarding predominance, Plaintiffs do not address the variation in AFR over time. *See id.* Plaintiffs cite Ninth Circuit law holding that damages alone cannot defeat class certification, and also argue that Boedeker's conjoint analysis model can establish damages on a classwide basis. *Id.* at 27 (citing *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013). Plaintiffs conclude by arguing that the low damages per class member render classwide adjudication preferable, that the class is ascertainable based on retailer records that likely exist but have not yet been assembled, and that Plaintiffs' counsel is qualified to represent the proposed class. *Id.* at 27–28.

### 2. Seagate's Opposition and Evidence Cited Therein

In its opposition brief, Seagate contends that Plaintiffs cannot rely on Seagate's public representations regarding AFR because such representations varied over time and across different pages of Seagate's website, and because there were some periods where Seagate made no representations of its drives' AFR. Opp'n (dkt. 193) at 4–7. Seagate also contends that Plaintiffs have not presented true classwide evidence of high AFR. *Id.* at 7–9. First, Seagate argues that nearly all of the evidence Plaintiffs cite relates to drives produced in 2012 or early 2013. *Id.* at 7 (citing Scarlett Decl. Exs. 23–34, 36–52, 64; Rodewald Decl. (dkt. 193-1) ¶¶ 19–28 & Ex. 25). Seagate also faults Plaintiffs for relying on evidence related to external drives and Grenada BP2 drives not at issue in the proposed class, as well as drives used in commercial rather than consumer settings. *Id.* at 7–8. Seagate notes that Plaintiffs submit no evidence of AFRs for drives within the proposed class definition produced after mid-2013, and offers charts indicating that AFRs were below 1% for much of that time and below 0.34% for portions of it. *Id.* at 8 (citing Rodewald Decl. Exs. 28–30). Even with respect to the earlier portion of the class period covered by Plaintiffs' evidence of higher AFRs, Seagate argues that its employee Harrie Netel's testimony

8

demonstrates that AFR tested at the factory is not indicative of drives shipped to customers because many of those drives were subject to shipping holds and not ultimately sold. *Id.* at 8–9 (citing Netel Decl. (dkt. 150-10) ¶¶ 19, 28–33, 38–39).

As for materiality, Seagate argues that Boedeker's declaration says nothing about drives with AFR below 3%, that his methods were unreliable as asserted by Seagate's own expert Itamar Simonson, and that Boedeker's theory fails to account for whether consumers actually saw any advertisement of AFR. *Id.* at 9–10, 15–16. Seagate also contends that Plaintiffs have not presented classwide evidence establishing a duty to disclose AFR to the class under California law because AFR is not a specific physical defect, it does not cause safety risks, Plaintiffs have not shown Seagate's knowledge of AFRs above 1% for the full class period, and Plaintiffs have not shown that all class members viewed or relied on any representations of low AFR. *Id.* at 11–15.

Seagate argues that the individual plaintiffs are not qualified to serve as class representatives because two of them, Plaintiffs Nelson and Schechner, purchased external drives no longer included in the proposed class definition, and contends that substitution of class representatives would be inappropriate at this stage. *Id.* at 16. Seagate contends that Plaintiff Manak purchased his drive outside of the Texas statute of limitations, and that all of the named plaintiffs' stated reliance on advertised AFR is atypical of consumers generally, citing Seagate's expert Simonson's conclusion that consumers do not consider representations of AFR as "less than 8%" to materially affect their purchasing decisions as compared to "less than 1%." *Id.* at 17–18.

Seagate concludes that individual issues predominate both as to the facts regarding drives' true AFR and Seagate's representations, and as to the laws of the eight states at issue, which Seagate contends differ on issues including when a duty to disclose arises, what degree of intent is necessary, and whether materiality is based on a subjective or objective standard. *Id.* at 18–22. Seagate also argues that the class action bans under South Carolina and Tennessee law apply here. *Id.* at 22–24. Finally, Seagate contends that Plaintiffs have not shown how this case could manageably be tried as a class action. *Id.* at 24–25.

### 3. Plaintiffs' Reply and Evidence Cited Therein

Plaintiffs argue in their reply brief that whether Seagate knowingly understated the AFR of

9

its drives is an issue common to the class because "undisputed evidence proves that Seagate did in fact misrepresent the AFR of its drives from at least to 2011 to 2013." Reply (dkt. 194-2) at 3–4. Plaintiffs also argue that "the true failure rate may have been as high as 30 percent"—apparently based on failures reported by certain commercial customers—because "Seagate questioned its own AFR testing model for the drives" as evidenced by Andrei Khurshudov's 2012 report, and that whether commercial customers' experience is indicative of the drives' AFR in consumer use is a question of fact for the jury, as is the question of whether drives originally produced for OEM customers were instead downgraded and sold to consumers. *Id.* at 4–6. Contrary to Seagate's argument that it made no AFR representations during certain portions of the class period, Plaintiffs argue that Seagate's original data sheet for the Barracuda product was available from Seagate's website throughout the class period, citing a declaration by Plaintiffs' attorney Breanna Van Engelen describing results she obtained from multiple public search engines and "a simple web forensics tool." *Id.* at 6–7; *see generally* Van Engelen Decl. (dkt. 194-4).[5] Plaintiffs therefore argue that Seagate had a duty to disclose its drives' true AFR and/or internal concerns about the drives' performance, or at least that the question of whether Seagate had such a duty is appropriate for classwide adjudication. *See id.* at 7–8.

As for materiality, Plaintiffs argue that AFR is inherently material because it is "central to the functioning of [the] product," *id.* at 8–9 (citing *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164 (2015)), and that Plaintiffs need not establish that the class as a whole was exposed to Seagate's representations because they appeared on Seagate's own website rather than in advertisements, *id.* at 9–10 (distinguishing *Mazza v. Am. Honda Motor Cor.*, 666 F.3d 581 (9th Cir. 2012), and citing *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334 (N.D. Cal. 2018)). Plaintiffs argue that Boedeker's analysis establishes materiality because "the Ninth Circuit [has] held that the full refund calculation is a permissible method for measuring classwide damages," *id.* at 10–11 (citing *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017), but do not explain how Boedeker's report supports a conclusion that "the product at issue

---

[5] Seagate objects to Van Engelen's declaration as expert testimony without a sufficient showing of expertise, and as improperly introducing new evidence with Plaintiffs' reply. *See* Dkt. 195.

10

was valueless and therefore amenable to full refund treatment," *cf. Lambert*, 870 F.3d at 1183.

Plaintiffs contend that any variations in state law are minor and not relevant to the adjudication of their claims. Reply at 11–13. They argue that most of the named Plaintiffs are adequate representatives, noting that Nelson purchased an internal drive as well as an external drive, and arguing that the limitations period for Manak's claim was tolled until the Backblaze report gave him reason to believe that his drive failure was caused by higher-than-advertised failure rates. *Id.* at 13–15. Plaintiffs implicitly concede that Schechner is not an appropriate representative of the proposed Florida subclass because he only purchased an external drive, but argue that they should be permitted to substitute a new representative, Eric Ingram. *Id.* at 14; Ingram Decl. (dkt. 194-6).[6]

Plaintiffs conclude by arguing that classwide adjudication is "superior to thousands of individual claims" even if Seagate's representations regarding AFR varied over time, and that Seagate could have met its obligations throughout the class period "by disclosing an accurate AFR range (*e.g.*, 'up to ten percent')" or "that particulate issues and head instability were making an accurate AFR difficult to calculate." Reply at 15.

## III. ANALYSIS

### A. Legal Standard

In the federal courts, class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. A party seeking class certification must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Further, although not explicitly discussed in the Rule, "an implied prerequisite to class certification is that the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and ascertainable class exists." *Xavier v. Philip*

---

[6] In a filing captioned as an objection to Plaintiffs' reply evidence, Seagate argues that it is too late to substitute a new named plaintiff, in part because discovery has closed and Seagate has not had an opportunity to depose Ingram or otherwise investigate the circumstances of his claim. *See* dkt. 195.

11

*Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011). In short, a party must show numerosity, commonality, typicality, adequacy, and ascertainability.

A proposed class must also satisfy at least one of the subsections of Rule 23(b). Plaintiffs in this action invoke Rule 23(b)(3), which provides that a class that meets the requirements of Rule 23(a) may be certified where "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks and citation omitted). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id*. "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 350. "Rule 23 does not set forth a mere pleading standard." *Id.*

"Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (citation omitted). Such analysis, however, is not a "license to engage in free-ranging merits inquiries [regarding the ultimate outcome of the case] at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Rather, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*.

**B.     Actual AFR is Not a Common Issue, and Common Issues Do Not Predominate**

As discussed above, the Court's previous order found a number of issues with Plaintiffs' first motion for class certification. Plaintiffs have sought to address some of those defects by excluding external drives that may have been held to different standards and reducing the range of

12

drive models to exclude the Grenada BP2. Nevertheless, the following key flaws identified in the previous order remain unresolved: (1) "Plaintiffs have not submitted documentary evidence showing the drives' AFR across the entire proposed class period," *In re Seagate Tech.*, 326 F.R.D. at 243; (2) documents submitted by Plaintiffs "highlight differences in performance between different generations of the drives," *id.* at 245; (3) "Plaintiffs do not explain how consumers who purchased drives affected by [a given issue identified by Seagate during the class period] are similarly situated to consumers who received drives produced after the issue was resolved," *id.*; (4) internal correspondence and complaints from commercial customers offered to "prove Seagate's knowledge that its drives were unreliable, . . . is not classwide [evidence], because correspondence that Seagate received or produced internally later in the class period does not show knowledge relevant to class members who purchased drives before the date of such correspondence," *id.*; and in sum (5) "Plaintiffs have not addressed any plan to manage potentially different determinations of whether the AFRs of various drives were higher than Seagate represented or consumers expected across different permutations of timing, product modifications, [and] drive generations, . . . or whether the named plaintiffs are typical or adequate to represent the various subclasses that might emerge from attempting to address those variations," *id.* at 245–46.

Plaintiffs' reply essentially concedes that the evidence varies across the class period, asserting that "undisputed evidence proves that Seagate did in fact misrepresent the AFR of its drives *from at least 2011 to 2013*." Reply at 3 (emphasis added). And while Plaintiffs no longer rely on Hospodor's expert opinions, they do not explain how a jury should be able to reach a conclusion regarding the AFR of the drives after 2013 when their own expert witness was unable to do so, *In re Seagate*, 326 F.R.D. at 243—or more importantly for class certification purposes, how AFR is a common question for a class extending from 2011 to 2015.

Plaintiffs conclude their reply brief by arguing that class certification is warranted because "Seagate could have made truthful representations by disclosing an accurate AFR range (*e.g.*, 'up to ten percent') during the whole class period." Reply at 15. As a starting point, there is no clear evidence that drives sold to consumers ever had an AFR even close to ten percent. More

13

importantly, the question is not what Seagate *could* have disclosed; it is what Seagate was *obligated* to disclose. If a jury determined—as it could on this record—that Barracuda drives had an AFR of, say, 1.5% during certain periods, Seagate was under no obligation at that time to disclose an AFR of "up to ten percent," even if such a disclosure might have been *permissible* because the actual failure rate was lower than ten percent. Seagate would at most have been required to disclose the true AFR, and a jury would need to determine whether that AFR, which is only half a percentage point higher than the upper bounds of Seagate's actual disclosures, would have been material to consumers. Seagate also presents evidence indicating that the true AFR was well below one percent during certain periods, Rodewald Decl. Exs. 28–30, and Plaintiffs themselves report an AFR below the advertised rate for Grenada Classic drives in February of 2013, Mot. at 9. If a jury agreed, it might determine that no omission occurred for at least some of the class period, because Seagate correctly represented the AFR to be less than one percent.

Plaintiffs rely, much as Hospodor did, on a wide range of documentary evidence related to drive reliability, some of which has at best an attenuated connection to the purported omission at the heart of this case: the AFR of consumer hard drives. Plaintiffs cite, for example, an April 2015 presentation regarding a commercial customer's study predicting a roughly twenty percent failure rate for that customer's Seagate drives, Scarlett Decl. Ex. 40, but present no evidence connecting that failure in a commercial use setting to any particular failure rate in a consumer setting. While Plaintiffs argue that "the weight a factfinder will give" this commercial use study is a disputed merits issue that should nor bar class certification and that the study "cannot be held . . . irrelevant as a matter of law," Reply at 5, the disputed relevance of the study is but one example of a contested issue affecting, at most, a subset of the proposed class. Plaintiffs have not shown how this study, from months after the end of the proposed class period, is relevant to the claim of a customer who purchased a drive early in the class period, or how the Court would manage a trial in which a jury found credible evidence that Seagate concealed materially high failure rates in some portions of the class period but did not find credible evidence as to other portions of the class period.

As was the case with respect to Plaintiffs' first motion for class certification, the evidence

14

continues to indicate that Seagate at times took corrective action to improve the reliability of its drives, some of which was at least partially successful. *See, e.g.*, Scarlett Decl. Ex. 46 at 21 ("Majority of failures being reported . . . are pre-corrective action drives . . . ."); Netel Decl. ¶ 31 (stating that "Seagate could not release products from a ship hold unless it had validated a method to fix the problem or sort out the drives that had the potential issue"). The jury would also be asked to consider disputed questions of whether (or how many) drives subject to shipping holds due to excessive AFRs were ultimately sold to consumers. *See* Mot. at 5–6 (arguing that Seagate correspondence indicated hundreds of thousands of drives affected by issues that led to a shipping hold were nevertheless sold to customers); Netel Decl. ¶¶ 19, 30–33 (stating that shipping holds prevented defective drives from reaching consumers). Because there is no question that Seagate's drives' AFR changed significantly over time, as well as evidence that Seagate had at least some success in resolving major issues it identified, this case is not like *Arris*, where the court accepted that "none of [the defendant's] firmware versions fixed the latency problems" giving rise to the class claims. *Cf. In re Arris*, 327 F.R.D. at 349. Plaintiffs have once again failed to "explain how consumers who purchased drives affected by [those particular issues] are similarly situated to consumers who received drives produced after [those issues were] resolved." *See In re Seagate*, 326 F.R.D. at 245.

The challenges posed by the variation among the forms of evidence Plaintiffs use to show failure rate are compounded by the lack of any clear threshold for materiality. Plaintiffs rely on the declaration of their expert witness Stefan Boedeker, but Boedeker does not opine that any particular threshold of AFR would be material to a typical consumer, instead presenting values for economic loss for selected AFRs, the lowest of which (three percent) is higher than Seagate's testing found for most if not all of the class period. *See* Mot. at 9 (Plaintiffs' summary chart of test results, showing only AFR values below three percent). Other than a conclusory assertion in a footnote that his model can show economic loss for any value between one percent and fifty percent, Boedeker does not address whether a consumer would consider the difference between "<1%" AFR and, say, 1.02% AFR, to be material. *See* Scarlett Decl. Ex. 23 at FED_SEAG0009681 (Seagate chart showing tested AFR of 1.02% for one of the weeks at issue).

15

Seagate's expert, Itamar Simonson, presents a conclusion that consumers do not find advertised AFR of "less than eight percent" to be materially different from "less than one percent." Simonson Decl. (dkt. 156-5) ¶ 37. Weighing competing testimony from these two experts, a jury might well conclude that the threshold for material omission falls somewhere within the range of actual AFRs occurring over the course of the class period, thus increasing the potential for differing determinations as to whether consumers who purchased drives at different times were subject to material omissions by Seagate. Plaintiffs have not addressed how a classwide resolution of their claims is possible under such circumstances.

Despite the Court's previous order clarifying that "the only remaining omission addressed in Plaintiffs' motion [capable of supporting an omissions claim] is AFR," *In re Seagate*, 326 F.R.D. at 243, portions of Plaintiffs' briefs suggest that Plaintiffs also seek liability based on other issues with Seagate's drives. *See, e.g.*, Reply at 12 (asserting that "Seagate was the only entity that had knowledge of the particulate issues, head instability, and high AFR affecting consumers' drives"); *id.* at 15 (suggesting that Seagate "could have disclosed that particulate issues and head instability were making an accurate AFR difficult to calculate"). To the extent that Plaintiffs belatedly seek to expand their claims to encompass failure to disclose specific defects such as "particulate issues" and "head instability," such claims exceed the scope of Plaintiffs' complaint and the claims permitted to proceed by the Court's previous orders. Moreover, Plaintiffs have presented no evidence from which a finder of fact could conclude that such issues affected the class as a whole, throughout the entire class period.

At the hearing, Plaintiffs' counsel suggested that the Court could certify a class over a shorter period, ending in 2013, to correspond to the period for which Plaintiffs offer direct evidence of factory AFR measurements. Such an approach would not resolve the issues addressed above because there was substantial variation in AFR within that period, both over time and between the two versions of the drive (Grenada and Grenada BP). Plaintiffs themselves assert, for example, that Seagate's testing indicated an AFR for the Grenada drive that was virtually identical to Seagate's public representations in November of 2011, and an AFR below its representations for the Grenada BP drive in February of 2013. *See* Mot. at 9 (summary chart). Moreover, even if

16

Plaintiffs limited the class definition to a period where Seagate internal testing showed AFR greater than what Seagate represented, the lack of any clear threshold for materiality means variations in AFR, even above Seagate's representations, complicate classwide resolution of Plaintiffs' claims. The shorter class period proposed at the hearing also encompasses multiple shipping holds, the effectiveness of which the parties dispute, necessitating litigation of factual questions relevant only to certain members of the class. Plaintiffs have not identified any period of hard drive production during which consumers were sufficiently similarly situated that classwide common issues would predominate in litigation of their claims.

In sum, the wide variety of evidence on which Plaintiffs rely for the key issue in this case—AFR—and the undisputed variance of that metric across the class period predominate over any common theoretical question of whether, at any given time and for any given class member, Seagate failed to disclose true AFR materially higher than its advertisements or reasonable consumer expectations, and Plaintiffs have once again failed to present any workable plan for resolving their claims on a classwide basis. The motion is therefore DENIED.

## IV. CONCLUSION

For the reasons discussed above, Plaintiffs' renewed motion for class certification is DENIED. The parties are instructed to meet and confer regarding a plan to resolve or try Plaintiffs' individual claims. A case management conference will be held on March 1, 2019 at 2:00 PM, with a joint case management statement to be filed no later than February 22, 2019.

**IT IS SO ORDERED.**

Dated: January 22, 2019

JOSEPH C. SPERO
Chief Magistrate Judge